UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 12 CR 0973 (PGG)

MATHEW MARTOMA,

Defendant.

------------------------------x

January 10, 2014
9:00 a.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
BY: ARLO DEVLIN-BROWN
EUGENE INGOGLIA
Assistant United States Attorneys

GOODWIN PROCTER, LLP
Attorneys for Defendant
BY: RICHARD M. STRASSBERG
ROBERTO M. BRACERAS
LARKIN M. MORTON
MEGHAN K. SPILLANE

- also present -

Matthew Callahan, FBI Special Agent
Ruby B. Hernandez, Government Paralegal Specialist
Spencer Hattendorf, Government Paralegal
Stephen Paterson, Defense Consultant
Ray McLeod, Defense Consultant

(In open court; jury not present)

THE COURT: I understand there are some issues we need to take up?

MR. INGOGLIA: There are, Judge.

Last night at 7:30 the defense showed us some of the demonstratives that they said they intend to show today during their opening. We consulted with them last night, and we were able to resolve some issues but three remain; two of which we discussed last night, one of which we discussed this morning but we haven't resolved.

The first is that we haven't seen certain of the slides, and the defense had told us that last night they were deliberately withholding a couple and that we'd see them at some point in advance of their opening. I asked again about it this morning, and they said, well, in their view these are not controversial slides, and so apparently -- I'm not clear whether we're ever going to see them before the jury sees them. So that is the first issue. I certainly can't commit to not objecting to something I haven't seen. I don't think that's consistent with what was represented to us yesterday; that we never see them, so we'd like to see them.

THE COURT: Let's address that.

MR. STRASSBERG: Your Honor, sure. While we were still in the court, I told Mr. Ingoglia and Mr. Devlin-Brown that we had two slides that were, in essence, an outline of the

presentation. They were not graphs, not charts; they're just text.

THE COURT: They're just what?

MR. STRASSBERG: They're just text, sort of like a helpful aid for the jury, we think of "here are the points we're going to talk about."

THE COURT: It's an outline of your argument.

MR. STRASSBERG: An outline of the argument.

We told them that we would provide them to them before we would argue, so if they had objections they could raise them before, not during; and we also told them the reason why was because it was an outline of our argument.

I said to them myself -- to both of them -- that, in fact, if they would promise me that they would not alter their opening based on seeing these slides, I would give them to them yesterday. But Mr. Devlin-Brown said he didn't feel comfortable making that promise, which I understood, but I said, well, given that, I don't want to give you what my opening is going to be in an outline format and then have you adjust in response.

So, I said we could do it again before when my opening would be, and depending on the timing, you know, we could do that whenever your Honor thinks it's appropriate to do it depending on how our schedule works.

We gave them all the other slides. They did have a

number of issues about -- I would say two other issues about two other groups of slides. But that's the issue, your Honor, with respect to these two kind of bullet point slides.

Again, we think they're not controversial. We think they are very neutrally laying out the points we think the evidence will show and that we are going to share with the jury.

I'm sure they will object because they have taken a very aggressive stance with respect to the other demonstratives that we'll talk about in a second, but my thought is that we would certainly address that with your Honor and clear any objections. We told them we were prepared to live with whatever rulings your Honor made about whether these slides were appropriate. Obviously, if you said they were not, we would not use the slide, and we would adjust accordingly.

MR. INGOGLIA: Look, as long as we will see it in advance and not during because that would moot the issue, right, if we objected and you granted our objection and the jury had already seen it. As long as we see it in advance, that's fine.

THE COURT: So there will have to be a break between the government opening and defense opening so that you can look at these slides, figure out whether you have an objection, and if you do, I'll deal with it.

MR. INGOGLIA: That seems perfectly reasonable.

MR. STRASSBERG: That would be perfect, your Honor.

There are two other issues. Broadly I understand from Mr. Ingoglia that there are a number of charts that we have that we intend to both introduce through a witness but also refer to in the opening, and they've raised a question about whether those charts would be admissible, not with respect to the witness testimony, but the idea that are they relevant to the case; and, even if relevant, do they open the door to charges against SAC.

Let me explain to you what these charts are and why we think they are both clearly relevant and also why they have nothing to do with charges against SAC Capital. So they are charts, very simple charts of a number of different stocks also in 2008 where SAC Capital had large positions which were reversed in a very short period of time.

As your Honor knows, one of the pieces of the circumstantial evidence that the government has highlighted in its indictment and in its press release and in many of the filings, and that we expect they will highlight throughout their opening and at trial, is the timing of the trades; that, in fact, there was a large position, and that position was reversed completely in a very short period of time.

These slides, and this evidence, is relevant directly to that point. It shows that that is something that happens. It is not unusual. It is not an instance that only happened

with Elan and Wyeth, and that's really the only point we're making with them; but it's a very relevant point directly going to the piece of evidence that the government has highlighted throughout the pretrial phases of this case.

With respect to the door opening, you know, obviously Mr. Ingoglia will raise that issue from his perspective. It's hard for me to see how they're arguing that opens the door other than, of course, they like to argue that and hold that against the defense and limit us on our ability to try to put on a defense as much as they can --

THE COURT: Well, let me say "opening the door," I'm not sure what we're opening the door to, so ...

MR. STRASSBERG: Well, what they said their position would be and what they would argue to you -- and I'll let them argue it -- was that they would say that we put in trades that SAC Capital did, and this is all trades in 2008 right around the same time frame, which show big positions had changed. If we did that, then they believed that they were entitled to introduce evidence that SAC Capital had been charged; that there had been a plea; that they had been under investigation for insider trading. And they haven't outlined all the areas for me, but that is certainly what they said to me last night; that they believed this would open the door.

When I asked them why these trades were not alleged to be improper trades in any charging documents in anything that's

ever been filed in public, the timing of the trades are -- again, are the kind of issue in play and they're not implicated by any charge; and their view was that, well, if you are going to pick trades that aren't implicated, we're entitled to pick trades that are implicated and talk about those.

Our sense would be that isn't a fair view of what is a consequence of simply making this very limited point, which is that this isn't the only time in the history of SAC Capital in 2008 that there was a large position that got reversed.

MR. INGOGLIA: Let me try to suggest what our argument actually is.

First of all, these are not trades that Mr. Martoma did. There is no suggestion that he's involved, and that is the kind of thing you often see in insider trading cases. Here is the defendant's pattern of trading and this fits the defendant's pattern of trading. That's not what this is. These are different portfolio managers at SAC, four selected examples.

THE COURT: Four?

MR. INGOGLIA: Four different stocks -- not stocks that are at issue in the case -- that were traded at SAC by some other portfolio managers. One of those stocks has been the subject of the government's -- of insider trading charges, although not the specific transaction that the defense points to. So that at a later date there's an insider trading

publicly disclosed etc. in that stock later.

THE COURT: Not to interrupt your argument, but let me make an observation. It's obvious that this is a complicated issue; that it needs to be the subject of briefing. I am not going to be able to make a ruling based on what you tell me in a nutshell this morning about whether anyone is opening the door to anything. That's going to require a lot more thought, and, frankly, it's going to require a briefing from you.

So, I think what we are really talking about is whether the government is going to suffer unfair prejudice from Mr. Strassberg's merely showing these charts in his opening. That seems to me to be what the real issue is. Because I'm not going to be able to resolve this morning whether his showing these charts or making these arguments is going to open the door to the government proving other things that SAC did, I'm not going to be in a position where I am going to be able to rule on that because it's going to require a lot more in-depth written briefing, and I haven't received any on this subject.

Mr. Ingoglia, if you could focus -- if you believe that Mr. Strassberg merely showing these charts to the jury is going to cause unfair prejudice to the government, I'm happy to hear you on that. Let me say that I will give a specific instruction to the jury that both sides are going to show what are referred to as demonstratives, charts. I gather these are PowerPoint slides that they're going to be seeing?

MR. STRASSBERG: Exactly, your Honor.

THE COURT: And that neither side's demonstratives, PowerPoint slides, are evidence in the case, and they shouldn't be regarded as evidence. They're just a lawyer's arguments.

Obviously, I have very standard language about what is evidence and what is not. I am about to tell that to the jury as part of my preliminary instructions. So I want you to know that. I want you to know I am going to tell the jury that nothing they hear in the openings and nothing they see in the form of demonstratives is evidence in the case. It's just a lawyer's arguments.

But if you believe that, as I say, the mere showing of these charts is going to cause the government to suffer unfair prejudice, I'm happy to hear you on that.

MR. INGOGLIA: I'll focus on that. I take your point, and I appreciate what you just said. I appreciate that and I think that cautionary language will help. But, you know, the slides are -- it's not just one slide. It's the first three pages of the defendant's opening, as I understand it.

So it seems like there will be a featured argument and the gist of the argument is the defendant's use of improperly trading "here are examples that look like what my client did with his stock that SAC did properly that's an example of the proper trading practices that SAC does in its routine business all the time."

And our argument is you've now established an unfair mark. You can't on the one hand say here's the fair normal practice of SAC that you should compare my guy's trading to when in fact that's a much more complicated picture that we won't be able to address in our opening. I understand why we shouldn't, but that's where we think the danger of unfair prejudice is.

THE COURT: Mr. Strassberg, do you agree that Mr. Martoma didn't have anything to do with these trades that are set forth in your charts?

MR. STRASSBERG: Yes, your Honor. The point is that, of course, they are not focusing on the trades here that Mr. Martoma was even directly involved with. They're looking at all of SAC Capital trades in Elan and Wyeth. They have charts, I believe not for their opening, but certainly we've seen them, that talk about the change in the position, in the Elan and Wyeth position.

Our point here is not an extensive one. The only point -- we're not talking about how proper everything is. We're talking about the idea that one of the things that happens at SAC Capital is that they have large positions and that they quickly in short time periods reverse those large positions. That's the point. That's the only point we're going to be talking about in the opening with these slides and positions, so --

THE COURT: I guess I want to understand why if Mr. Martoma had nothing to do with those trades, why they are relevant?

MR. STRASSBERG: Your Honor, because the numbers that the government will recite throughout this case are not numbers that come from the one account at this time that Mr. Martoma was responsible for. They're numbers firm-wide, SAC Capital firm-wide. So they're looking at the aggregate position across many accounts. Most of those accounts were controlled by people other than Mr. Martoma. He had no ability to decide what happened in those accounts.

THE COURT: You're saying with respect to the Elan and Wyeth trades, they're factoring all of SAC's trading, not just the part he was responsible for?

MR. STRASSBERG: A hundred percent. Of course, they say he's influencing those by making recommendations and the like, but the point is that it's not as if we're saying, well, here's a trade of a limited value, but the relevance is that they argue to the jury, you can find circumstantial evidence to support our story because it was so large and it came back down to zero -- they'll even say it went to negative -- in a very short period of time.

That's why we're entitled to say, listen, that happens. We're not going to be commenting, frankly, about the propriety of what SAC Capital does or doesn't do. All we're

saying is that that is something -- having large positions and then reversing them in short order is something that happens, and here are examples where it happened.

If the concern is we're going to be saying and SAC Capital vetted it fully and that it was properly done, we're not going to be suggesting any of those things. We're not going to say any of that. The goal is to be able to say what I just said, which is a very small point which actually, I think, be very minor which there are a couple of graphs that show it that say, listen -- let me phrase it this way -- that SAC Capital having a large position and reversing it was something that was part of the business that they did. It was not an unusual event.

MR. INGOGLIA: A couple things. On the aggregation point. The evidence will show that Mr. Martoma was credited financially credited, by SAC for his recommendations about the Elan and Wyeth trades. That's not happening in these other examples. There's no suggestion that Mr. Martoma recommended these trades but there was trading in some other account or something like that. He's got nothing to do with those trades.

Mr. Strassberg says, well, we make some sort of argument that he recommended them or something like that. Yes, we think that his recommendation is central to that. That's not a small point. That's a major point. The point is that those four stocks that have nothing at all to do with

Mr. Martoma; they do have to do with SAC Capital, and obviously I don't know what he's going to say about it, but the implication is these four are proper and this is a practice of SAC Capital. And if we're going to make arguments about what's a practice, something that happens sometimes at SAC Capital, if that's relevant, then there's a whole subject of things that also happened with some frequency at SAC Capital that might also be relevant for the jury's analysis in weighing that argument that he's making.

THE COURT: Let me say this: I am not going to bar Mr. Strassberg from showing these charts. However, it is possible I may not allow the evidence in. It is also possible that if I allow the evidence in, I may allow the government leeway in introducing other evidence as a result.

So, Mr. Strassberg, you know what the risks are in showing the slides. I'm telling you I may or may not permit the evidence to come in, but I am not going to bar him from showing the charts.

MR. INGOGLIA: Understood. Last line -- go ahead.

MR. STRASSBERG: Sure. The one other issue, your Honor -- just to make sure I understand your Honor. So I would take the risk then -- I would show the slides and the proof wouldn't be in and the jury would see that I said something and then --

THE COURT: That's exactly right.

MR. STRASSBERG: The other issue I hope is an easier one, but the government may disagree. There is a document called -- it's an investment thesis.

THE COURT: It's a what?

MR. STRASSBERG: An investment thesis, but it's a form that SAC Capital had. When you wanted to propose an idea to Steve Cohen in the Intrinsic model back in 2006, you were supposed to fill out this form that set forth your reasons for belief that you thought this investment was a good idea for him to make.

So, there is a form like this in August of 2006. It comes in the form of an email, although it is a form that gets filled out, different categories get filled out that Mr. Martoma sends to his boss Mat Grossman at the time and also to Steve Cohen who is Mat Grossman's boss proposing that there be an investment in Elan.

THE COURT: This is 2006?

MR. STRASSBERG: 2006. This is August. This is before, at least our understanding from the 302 material, even the cooperator says there was any beginning of any conspiracy. Our view is that this is clearly a business record of SAC Capital. Also, that it's clearly relevant to show how SAC Capital began to acquire Elan stock.

They raise the question as to whether it is hearsay because it is from Mr. Martoma, but our position would be that,

of course, being introduced ultimately at trial, as we imagine it will be introduced because it is a crucial piece of the actual whole story as to how SAC Capital had an investment in Elan in the first place, they started to buy Elan a little before this investment thesis. They increased their position substantially after it all before allegations of conspiracy.

So, I would submit to your Honor that this isn't a hearsay issue because this is explaining how events happened. So, frankly, I would view it as a pretty crucial piece of the full story. It was a little surprising that they took issue with that. They didn't do that last night, but they did do it right before we began in court this morning, and, of course, the concern they articulated to us was a hearsay one

MR. INGOGLIA: So, that's more or less right. We did raise it this morning.

THE COURT: I don't care when it was raised. I guess the question is why isn't it a business record. It either is or isn't. It either was kept and made in the regular course of business or it wasn't.

MR. INGOGLIA: I think that's right. The questions about relevance don't answer the hearsay objection, right. It could be here is something that's relevant but also be hearsay.

THE COURT: Absolutely.

MR. INGOGLIA: So I take the points on relevance, but if it's being offered for the truth of the statements, then

even within a business record you could have hearsay.

THE COURT: Absolutely.

MR. INGOGLIA: And we might very well object to it, you know, either the admissibility generally or we would want it to be admitted subject to some instruction, and we wanted to raise that in advance of the opening so he didn't feel like at trial we had sandbagged him by objecting to something we hadn't raised prior to his opening. That's why I raised it.

THE COURT: So, they're telling you they might raise an objection to it. You know whether you have the elements of the business record as exception or you don't. So if you do, then it would likely be admitted. If you don't, it may not, and you'll take that risk.

MR. STRASSBERG: So, that one was easier, your Honor, as I hoped it would be.

THE COURT: Anything else before I bring the jury in?

MR. INGOGLIA: Not from the government.

MR. BRACERAS: Yes, your Honor, just one issue. This goes back to the press and media exposure issue. Your Honor, as we anticipated, there were a number of stories both on television and in the newspaper. We have some of them here we could share with you. There was a blurb on the front page of the New York Times, I thought, that was a little bit difficult because it didn't even mention SAC. The language I looked at here is "Kicked Out of Harvard." That was on the front page of

The Times. Then inside the front page of the business section there's a large article about this matter and that issue. Our concern, especially that that line "Kicked out of Harvard" is it doesn't say SAC, so it would be very easy for a juror to look at that and read it because it doesn't say SAC on it, it's not something that they would move away from.

There are many other news stories on, whether it's the local news, CNN, CNBC. We even have a chart here based on the voir dire what all the jurors said who read The New York Times, who read the New York Post, who read The Daily News and the corresponding stories with them.

It's a long way of saying, your Honor, that we would request that the Court do a quick and easy voir dire or polling of the jurors just to see if any of them has read this, whether they have been affected by this, whether even if they tried to avoid it if they listened to the Court's instruction whether they could not help but to see this.

There is a Second Circuit case *United States v. Lord*. It is, I believe, one of the leading cases on it. 565 F.2d 831. In that case, the Second Circuit basically held that a simple admonition to the jury instructing them to stay away from the press wasn't enough where there was a serious risk of influence by the media.

THE COURT: What year was that case?

MR. BRACERAS: It's a 1977 case, your Honor. The

Court there basically held that the lower court should do a polling of the jurors to see if there was any unfair taint of the jurors.

THE COURT: Let me make a comment. There is going to be media coverage of this case, I suspect, on a daily basis. I am not going to question the jury every day whether they violated my instruction.

The system we have is one that's based on trust. While I will instruct them frequently as I already have repeatedly -- not to read, listen to or expose themself in any fashion to any information about the case, I am not going to cross-examine them on a daily basis as to whether they violated that. I am not going to do that because it suggests to them a lack of trust in a context in which we have to rely on the jury and trust the jury in innumerable ways.

In light of the special concerns the defense has raised with respect to this particular issue, I will ask them today whether they have followed my instruction with respect to reading, listening to, exposing themself to information about the case, and of course I will reiterate that instruction both today and I'm sure many other times during the trial; but I want you to know that I am not going to quiz them every day on whether they have looked at the paper because I don't believe that that is the message I want to send to them about whether I believe they will follow the Court's instructions. But I will

ask them today.

MR. BRACERAS: Thank you, your Honor.

(Pause)

THE COURT: We are still waiting on three jurors. We do have one juror that has a back problem, and we are going to allow him to sit in the back row with a special chair. I have also told him that if he wants to stand from time to time to relieve the pressure on his back, he is welcome to do that. So he will be sitting out of order. So I wanted you to understand why he is going to be sitting in a different place and also I wanted you to understand that from time to time he may stand up and that is why.

Other issues that any one wants to raise? OK.

(Pause)

(Jury present)

THE COURT: Please be seated.

Mr. Ruocco, would you please swear in the jury.

(A jury panel of 12 and 4 alternates was impaneled and sworn)

THE COURT: Good morning, ladies and gentlemen. You are now a jury. There is no higher function in our legal system. From now on, whenever you enter or leave the courtroom as a jury, my deputy will instruct the parties and the audience to rise, the same as he does for me because you are every bit as powerful and important as any judge.

Mr. Ruocco will take you into the jury room at our next break. There he will give you his telephone number where you can reach him if there is an emergency, and I will ask you to give him a phone number where you can be reached in the evening. Mr. Ruocco is the person to speak with if you have any questions or difficulties during the trial.

You may have also noticed Ms. Kwapisz who is seated next to Mr. Ruocco. Ms. Kwapisz is my law clerk, and her job is to help research any legal issues that may come up during the trial.

I will give you some preliminary instructions and then we will go right into opening statements and the presentation of evidence.

Before we begin with opening statements, however, I need to review with you once again the rules of conduct that apply here, and then in preliminary instructions I will give you some instructions as to legal matters.

As I have already repeated to you before, in order to ensure that the case is decided based only on the evidence and that you not be influenced in any way by anything that might occur outside the courtroom, you must follow these rules:

Don't discuss the case among yourselves or with any other person including any members of your family or your friends. As I told you, you may tell your family that you are a juror in a case, but don't tell them anything else until

after you have been discharged by me at the end of trial.

You may discuss the case among yourselves only after all of the evidence has come in and the case is given to you to discuss and decide in the jury room.

As I told you, this rule is important because experience has shown that when someone expresses an opinion about a witness or about an issue in the case, they begin to identify with that opinion.

And since another important rule that you will hear me say to you many times is to keep an open mind until you've heard all the evidence, you should not discuss the case with anyone, including even your fellow jurors, or communicate about the case in any fashion until the case is given to you at the end of the trial for you to reach a verdict.

As I told you, you must not read anything in the newspapers, over the internet or anywhere else about the case. You must not listen to or watch any reporting about the case if it should be broadcast on TV or over the radio or a story about it appears on the internet in some form.

Don't let anyone speak to you about the case. Again, if you are approached by anyone to speak about it, tell me that that has happened and tell the person that's approached you if that should happen that the judge has directed you not to discuss the case.

Don't do any research or investigation about the case

on your own.

As you know, and I'm sure you can appreciate, it is critically important that these rules be followed to the letter. As I told you yesterday, the parties are entitled to have you render a verdict in this case solely on the basis of your independent evaluation of the evidence that will be presented here in this courtroom. Speaking to anyone else about the case or exposing yourself to information outside the courtroom would compromise your service and the duty of fairness that you owe to the parties and violate your oath as a juror.

I want to confirm this morning with you that no one has read, seen or heard anything about the case before they arrived here in court this morning other than to the extent you have revealed that in the questionnaires and so forth that were previously submitted to the Court?

Tell me if you become aware that anyone that you know has come to court. This is a public trial, so obviously that could happen. It's important, however, that you do not hear from anyone you know about what may have happened in court when the jury is not present. Accordingly, if you should see a friend or relative or someone else you know come to court, please send me a note through Mr. Ruocco telling me that at your first opportunity.

You should also know that the attorneys, the parties

and the witnesses are not supposed to talk to any of the jurors outside the courtroom even to say a friendly hello. So if you happen to see any of them outside the courtroom, they will not and should not speak to you. I ask you not to take any offense at this. They will only be acting properly by doing so.

Let me turn to my preliminary instructions on legal matters. In the American system of justice, as I have told you, the Judge and the jury have very separate roles. My job is to instruct you as to the law that governs or controls this particular case. I will give you some of those instructions now. There may be other instructions during the trial, and there will be detailed instructions at the end of the trial on the law that you will need to apply in deciding this case.

Your job as jurors is to determine the facts based on the evidence that will be presented in this courtroom. You are the only triers of the facts and your decisions on these factual matters will determine the outcome of this case.

You must not take anything I may say or do during the trial as indicating what your verdict should be. Don't be influenced by my taking notes. What I write down may have nothing to do with the trial or with the matters that you have to be concerned with at trial.

You must pay close attention to all the evidence presented. Evidence consists only of the testimony of witnesses, documents and other things admitted as evidence or

stipulations as to facts that are agreed to by the lawyers. There are many things that are not evidence, and you must not consider them as evidence. For example, statements and arguments by lawyers are not evidence. They are simply arguments in which the lawyers will tell you what they think the evidence proves and how they think you should analyze the evidence. You should give these arguments only as much weight as is consistent with your own common sense, and you should under no circumstances consider them as evidence.

The lawyers are going to show you in their opening statements certain materials that lawyers refer to as demonstratives. They are charts, PowerPoint presentations, things of that sort. None of that is evidence. Whether these charts, PowerPoint presentations, arguments are persuasive to you depends on whether the evidence does or does not bear out these arguments. If there is no evidence supporting these arguments, you should, and must, disregard them in reaching a verdict. However, you may find these demonstratives, charts, PowerPoint presentations useful to you in understanding the evidence.

Any statement I may make to you is not evidence. Questions by lawyers are not evidence. Only the answers given by the witness are evidence. The question that the attorney asks is only important insofar as it places the witness' answer in context.

For example, if a witness is asked in an examination whether it was raining on June 2 and the witness answers no, then based on that exchange there is no evidence in the case that it was raining on June 2.

Objections to questions are also not evidence. Lawyers have an obligation to make an objection when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the mere making of an objection. If I sustain the objection, you should ignore the question and any answer that may have followed. If I overrule the objection, you should treat the answer just like any other.

Any testimony that I may exclude or strike or tell you to disregard is not evidence, and you must not consider it. If I instruct you that some evidence is only to be considered for a particular purpose, you must follow that instruction.

As I've told you many times, and as I will repeat throughout the trial, anything you may have seen or heard about the case outside the courtroom is not evidence and must be entirely disregarded. You must decide the case based solely on the evidence presented here in the courtroom.

In deciding the facts of the case, you will have to make decisions concerning the credibility of the witnesses; that is, how truthful and believable they are. How do you decide what to believe and what not to believe? You're going

to listen to the witnesses, watch them and observe them, and then decide as you would decide such questions in your ordinary lives, did they know what they were talking about? Were they candid, honest, open, and truthful? Or did they appear to be falsifying, exaggerating or distorting what happened? Is there any reason to think they might be lying or just plain mistaken about what they're telling you?

Sometimes it's not so much what a witness says but how he or she says it that may give you a clue as to whether or not to accept that witness' version of an incident or event as credible or believable. In short, the way a witness testifies may play an important role in your reaching a judgment as to whether or not you can accept a witness' testimony as reliable. You need to use your common sense and life experience in evaluating every witness' testimony.

As the trial proceeds, you may develop impressions of a witness or views on a particular issue. You must not allow these impressions to become fixed or hardened. In other words, you shouldn't make up your mind right away. If you do, in a sense you prevent from yourself from considering the testimony of other witnesses or other evidence that may be presented after the witness or witnesses you have already heard. This would be unfair to one side or the other. A case could only be presented step by step, witness by witness.

We know from experience that frequently one person's

initial description of an event might sound impressive and even compelling, but when we hear another person's version of the same event or even the same witness cross-examined about that event, what seemed to be very compelling and impressive may fall apart or become less convincing.

Please remember that there may be another side to any witness' story. You will use your common sense and your good judgment to evaluate each witness' testimony based on all the circumstances. You must keep an open mind until the trial is over. You should not reach any conclusions until you have all the evidence before you.

There are three basic rules in a criminal case that you must keep in mind:

First, the defendant is presumed innocent until proven guilty. The indictment brought by the government against the defendant is only an accusation and is nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified.

Third, the government must prove the defendant's guilt

beyond a reasonable doubt. I will give you further instructions on this point later, but bear in mind, as I have told you that in this respect, a criminal case is different from a civil case.

Finally, let me say a few words about trial procedure. A trial has three parts:

First, the lawyers have the opportunity to make opening statements to you. As I have told you, their arguments to you and the materials they may show you are not evidence. The purpose of opening statements is for the lawyers to give you a preview or a roadmap of what they think the evidence will show. Actual evidence, however, only comes from the witnesses and the exhibits that are received in evidence.

After the opening statements, you will hear testimony from witnesses. Because the government has the burden of proof, the government will call witnesses first. Each witness will first give direct testimony and then he or she may be cross-examined by the other side. Sometimes there's redirect testimony and recross examination. Exhibits and stipulations or agreements as to facts may be received in evidence.

After the government's case, the defendant may, but is not required to, present witnesses and other evidence. If the defense calls witnesses, those witnesses will be examined and cross-examined just as the government's witnesses were. If the defendant presents evidence, it is possible the government may

present some rebuttal to that evidence. Of course, the defendant never has to testify or present any evidence at all. The burden of proof is always on the government.

After all the evidence has been received, each side will have an opportunity to make closing arguments to you. The lawyers will review the evidence with you and make arguments as to what conclusions they think you should or should not draw from the evidence. These arguments also are not themselves evidence, but they may be helpful to you in reviewing the evidence during your deliberations.

After these closing arguments or summations, as they are called, I will give you some detailed instructions as to the law that applies and controls in this case, and you must follow my instructions. Then you will go into the jury room to deliberate and discuss the evidence in order to decide the facts and render a verdict.

From time to time during the trial, it may be necessary for me to talk with the lawyers out of the hearing of the jury either by having a conference up here at the bench when the jury is present in the courtroom or by calling a recess. The lawyers and I will do this as little as possible. Please understand that while you are waiting, we are working. The purpose of any conference outside your hearing is not to keep relevant information from you, but, rather, for me to decide procedural issues or how proposed evidence should be

treated under the rules of evidence.

Our trial days will begin at 9:30 a.m. Our days will end at 5:00. We will sit five days a week. We will take a break for lunch approximately 12:45 or so and a short recess in the morning and in the afternoon. If anyone needs a recess at any other time, just raise your hand. I would ask you to be on time after breaks and in the morning because if you are late, you will be keeping everyone waiting.

We will now begin with the government's opening statement.

MR. DEVLIN-BROWN: May I proceed, your Honor?

THE COURT: You may.

MR. DEVLIN-BROWN: It was July of 2008, Mathew Martoma, the defendant, the gentleman sitting over there, was one of about a thousand people packed into a crowded Chicago convention hall waiting for an expert on Alzheimer's disease to take the stage. That expert's name was Dr. Sidney Gilman, and he was there that day to announce the results of a three-year study of an experimental medicine that two pharmaceutical companies had developed and that they hoped, and many other people hoped, would be the first effective treatment for Alzheimer's disease.

Alzheimer's disease is a really horrific disease. It steadily and irreversibly destroys the mind. It affects millions of people and it has no cure. So if these two

pharmaceutical companies had come up with the first effective treatment for the disease, it would mean a medical breakthrough, and it would also mean a medical breakthrough that could make a fortune for these companies, because they created the medicine, and they would be the ones selling it. It could also make a fortune for people who own stock in those companies.

If, on the other hand, the news was bad, if it didn't look like this drug was ever going to be brought to market or work, that would be bad news for the companies and bad news for people who owned stock in those companies.

So, the audience that night in the convention hall in Chicago, it wasn't just science types or doctors who were interested in the medicine part of it; it was investors like Mathew Martoma who were interested in the money part of it. And the results of this medical study that Dr. Gilman was about to present, they had been kept secret, this three-year study. So everyone in that convention hall was waiting there to listen and find out what Dr. Gilman would say, almost everyone anyway.

You see, Mathew Martoma, he already knew what Dr. Gilman was going to say. He knew what Dr. Gilman was going to say because he had corrupted Dr. Gilman. He'd corrupted him through real money and through phony promises of friendship. Through that corruption, Dr. Gilman had shared the secret results. The very presentation he was about to give to that

crowd, he'd shared that with Mathew Martoma approximately two weeks before.

So Dr. Gilman took the stage and he presented the results. The results were not good. Certainly not if the stock market saw it. The stock of one of the two pharmaceutical companies that developed this drug, a company called Elan, it fell over 40 percent in the next 24 hours after the announcement. And Elan's partner making this drug, a company called Wyeth, that stock fell too. A lot of investors in Elan and Wyeth had been blindsided by Dr. Gilman's news, and so a lot of those investors lost a lot of money, but, again, not Matthew Martoma.

Because when Dr. Gilman had shared that presentation with Martoma approximately two weeks before, Mathew Martoma knew that those results were not going to be good for the stock prices of Elan and Wyeth, and the hedge fund, the company where Mathew Martoma worked, owned approximately $700 million worth of Elan and Wyeth two weeks before Dr. Gilman would take the stage, and they owned this stock largely because Mathew Martoma had been recommending it, recommending it largely on the basis that he believed the drug trial results were going to be positive.

So now that Dr. Gilman had presented the results to Mathew Martoma two weeks earlier, Mathew Martoma knew what he had to do, and he sold, he caused his hedge fund to sell the

whole 700 million worth of Elan and Wyeth stock before the rest of the world could find out and before the stock prices could take a nose dive. What Mathew Martoma did, ladies and gentlemen, it's called insider trading. He got important confidential information from someone who had a duty to keep it secret, and he used that information to buy and sell stock or securities.

Insider trading is illegal. It's a kind of securities fraud. It's a crime. And in this case it was a crime that paid. The hedge fund where Mathew Martoma worked made profits and avoided losses of $270 million through these trades, and Mathew Martoma himself, he received a bonus of $9.3 million.

So, ladies and gentlemen, good morning. This is the government's opening statement, as Judge Gardephe said. What an opening statement is, is an opportunity for us to give you an overview of what we expect the evidence is going to show during this trial. So what I am going to do during this opening statement is two things:

First, I am going to give you sort of a largely chronological highlight of what the evidence will show in this case.

And, second, what I'd like to do is tell you a little bit about the types of evidence we are going to put before you to prove the case.

So, we should start at the beginning with what Mathew

Martoma did for a living. You will learn that Mathew Martoma worked at a hedge fund called SAC Capital where he was trading stocks. Now, a hedge fund, for those of you who don't know, it's basically just an entity that takes money from various investors and puts that money into the stock market or into other investments. Mathew Martoma was what's called a portfolio manager for this hedge fund. That means he was given a large amount of money, approximately $400 million or so by the hedge fund, and he was given authority to buy and sell stocks with that money. You will learn that Mathew Martoma's specialty is the focus of his portfolio, that's what they call it, the money that he's given to buy and sell; but the focus of his portfolio was healthcare stocks. You will learn that if Mathew Martoma's portfolio of healthcare stocks made profits, then Mathew Martoma was entitled to keep a large share of those profits for himself.

That was the basic business model of the hedge fund and of the portfolio Mathew Martoma was running. So Mathew Martoma started at SAC Capital. He was in a division of it called CR Intrinsic, if that name comes up, but I'll refer to it as SAC Capital. He started there in July of 2006 and right away when he started, he took an interest in drug companies that were working on experimental medicine for Alzheimer's disease.

Two of these companies were Elan Pharmaceuticals and

Wyeth. They were working together. They were competing companies, but they had partnered together because drug trials are very -- it's expensive to develop a drug. The drug they were working on was this experimental medicine for Alzheimer's disease, and I'm not sure who decides what the names of these drugs are, ladies and gentlemen, but the name was bapineuzumab. That's the name of the Alzheimer's disease drug. Some people refer to it for short as bapi or bap. But you're going to hear the name bapineuzumab a lot during this trial.

What was the idea behind bapineuzumab? What was it supposed to do? You will learn that people with Alzheimer's disease have this substance in their brains, it's sometimes referred to as a plaque. The idea behind this drug bapineuzumab was, it was supposed to get rid of the plaque. It was going to be injected into the body and get rid of the plaque in the brain. The theory of this, and what Elan and Wyeth hoped, was if you could get rid of the plaque that was in people's brains, maybe you could stop, or at least slow down, the steady worsening progression of Alzheimer's disease.

So that was the theory. But theory, of course, is one thing and proving it is something else. You will learn that in order to sell a drug in the United States, you can't just create it and then just have it at Duane Reade. You need approval from a government agency. It's called the FDA, the Food and Drug Administration.

To get that approval, you basically need to be able to demonstrate two things: Number one, that the drug that you've created is safe; and, number two, that it's effective; that it does help cure whatever it is you're trying to cure.

So, there is an established way for drug companies to try to make that case to the FDA that their product is going to be safe and effective. They run what's called a clinical trial, which is basically a scientific experiment with rigorous scientific rules to make sure you have a fair test as to whether the drug is safe and whether the drug works.

So you will hear that's what Elan and Wyeth did with this drug bapineuzumab; they ran a clinical trial. Starting in 2005, after they had done an initial small safety test, Elan and Wyeth began recruiting approximately 250 people who had Alzheimer's disease and they joined up in this clinical trial, and it injected these people with the drug bapineuzumab, and it monitored them, and it ran all kinds of tests on them. They got multiple injections over 18 months.

The idea was at the end, after everyone had been tested, you could compare and see how these people did and make a judgment as to whether this drug was safe and effective. The results of this were all to be kept secret while it was ongoing and to be published to the public at large to and investors altogether at once in the summer of 2008 when the trial was over. When I say the trial, I'm referring to the drug trial or

the clinical trial.

So, almost the moment Mathew Martoma started at SAC Capital, he started learning all he could learn about Elan and Wyeth and the drug they were developing bapineuzumab. I want to be very clear, ladies and gentlemen. A lot of what Mathew Martoma did was perfectly legal and perfectly legitimate to learn about the drug. Things like reading what analyst reports say about the drug, things like learning some of the science and medicine about the drug, things like going to investor presentations that the company is making to learn about the drug.

But the evidence is going to show that Mathew Martoma also sought out an illegal edge. And the illegal edge that Mathew Martoma sought out was he wanted to talk to doctors who had inside information, who had confidential information about this drug because they were working on the drug trial and he wanted to pay these doctors working on the drug trial to consult with them about the drug trial they were working on. These doctors had signed confidentiality agreements promising not to share the secret information they were learning, and it was these doctors Mathew Martoma wanted to consult.

So, in August 2006, you will see an email about this. This is about a month -- not right now -- I shouldn't have gestured. During the trial you will see an email about this. It will show that about a month after he started at

SAC Capital, Mathew Martoma sent an email to a company called GLG. What he sent that company was a list of 22 doctors. And he asked in that email if GLG would please arrange consultations with all of these 22 doctors on the subject of this experimental drug, bapineuzumab.

What was GLG? GLG was what's called an expert network. One way to think about it is as a middleman of sorts. It would work like this: A hedge fund, like SAC Capital, would use GLG as a way to pay doctors or other people who had particular expertise in a field to talk to portfolio managers like Mathew Martoma about whatever it is the doctor had or expert had some expertise in. It was sort of a broker or middleman. There were a lot of experts that had affiliations through GLG, and you could simply call them if you worked at a hedge fund, as Mathew Martoma did, and arrange a paid consultation. There is nothing wrong, there is nothing wrong with someone arranging a paid consultation with experts, as long as you're not trying to get illegal inside information from those experts.

But what you will see, ladies and gentlemen, in this email, this email with the 22 doctors, what all of these doctors had in common, each of them was that they were all working on the drug trial. They had all promised not to share confidential information about that drug trial. They were what was known as the principal investigators, the people actually

administering this drug to the patients. These were the people that Mathew Martoma in August 2006 was reaching out to to try to talk with as many as he could.

Now, ladies and gentlemen, most of these principal investigators working on the drug trial, most of them would not talk to Mathew Martoma, not about the drug trial. But you will learn about one man that Mathew Martoma was able to find who would talk to him about the drug trial. That was a man by the name of Joel Ross, Dr. Joel Ross. Now, Dr. Ross, like most of the principal investigators or like all of the principal investigators, was responsible for administration bapineuzumab to the patients. He was responsible for seeing that they got the injections, running the tests, monitoring the patients and reporting back what he was learning to the people at Elan and Wyeth who were running the study.

Like every other principal investigator, Dr. Ross had signed a strict legal agreement with Elan, and it required to him to keep virtually everything he was learning during that drug trial secret. But it didn't take long, you'll learn, for Dr. Ross to break that promise he made in these confidentiality agreements, to break that legal commitment he had made, it didn't take long in consultations with Mathew Martoma that paid Dr. Ross approximately $1,500 for an hour-long consultation.

That fee seems high, but you'll actually learn Dr. Ross wasn't just doing it for the hourly fee. Dr. Ross was

about to start a new business. He was trying to do a little clinical trial business himself, and he thought Mathew Martoma was a particularly well-connected person who might be able to steer some business his way if he shared with Martoma his confidential information. So you will learn that that is what Dr. Ross did. Dr. Ross started telling Mathew Martoma virtually everything he knew about the drug trial. He told him, for example, that his impressions of the patients that he was treating was that as a group overall they seemed to be doing better. He didn't know exactly which patient was getting which amount of drug. He didn't know which people are on a placebo, which is like a fake drug, but his overall impression was everyone as a group seemed to be doing a little bit better.

He also told Mathew Martoma that there had been what looked like a very serious side effect with the drug that he was initially concerned about, but that after it was managed, after they had found a way to address that side effect, he wasn't as concerned about it any more, and that he thought the drug seemed safe overall.

So the evidence is going to show, ladies and gentlemen, that Dr. Ross's information was confidential; that it was useful to Mathew Martoma, but it certainly wasn't the end-all and be-all. That's because Dr. Ross knew some things but only about his own patients, a couple dozen people. He didn't know what was going on with the other group of patients,

and it was a 250 patient or so drug trial.

The evidence is going to show that Mathew Martoma was very persistent. He was also able to find a doctor who had far more secret information about this drug trial and who, just like Dr. Ross, was willing to break his confidentiality agreements and share that information with Mathew Martoma. And who is this second doctor? It's Dr. Sidney Gilman. That was the doctor that I mentioned at the start of the opening, the doctor who eventually, two weeks before the full results of this drug trial were going to be announced, shared his confidential presentation with Mathew Martoma.

Now, you will learn that Dr. Gilman played an important role on the drug trial. He was the chairperson of what was known as the Safety Monitoring Committee or SMC. So, what is a safety monitoring committee? Well, experimental medicine like this -- and this was very cutting edge stuff -- these are untested, but by definition they're being tested right there, and they can be dangerous. In fact, an earlier version of this drug bapineuzumab, they had to stop the clinical trial in the middle because it was causing serious brain damage to people taking it. So it was the job of this safety monitoring committee to make sure that patients were not being harmed by a medicine that was designed to help them. And to do their job, you will learn, the safety monitoring committee would get updates regularly as to whether anyone was

experiencing serious side effects with the drugs. They would get detailed safety information relating to these 250 patients. This was detailed safety information that very few other people had, not principal investigators like Dr. Ross, and not even most people at Elan and Wyeth.

Well, just like Dr. Ross, Dr. Gilman had a legal agreement with Elan and with Wyeth to keep the confidential information he was learning through the safety monitoring committee secret. And just like Dr. Ross, Dr. Gilman broke that promise of confidentiality in paid consultations with Mathew Martoma; but just like with Dr. Ross, it wasn't about the hourly fee for Dr. Gilman either. You will hear that Dr. Gilman consulted with all kinds of people in the hedge fund industry, and you will also hear that, frankly, he sometimes crossed the line and shared little bits that he shouldn't have with some of those other people.

But you will hear that his relationship with Mathew Martoma was different. He began to view Mathew Martoma as a friend. He got to take a real liking to him. And this may seem like an odd coupling at first. You'll learn that Dr. Gilman was a professor -- he was then in his mid seventies -- at the University of Michigan, and Mathew Martoma, of course, was a much younger hedge fund trader out in Connecticut. But what you will learn is that Mathew Martoma was very flattering to Dr. Gilman. Mathew Martoma came across

as a very smart, curious person who asked really intelligent questions of Dr. Gilman about the drug trial. Perhaps it was vanity, but Dr. Gilman, flattered by that, began sharing with Mathew Martoma and teaching this eager pupil everything that Dr. Gilman knew about what Mathew Martoma was asking. What Mathew Martoma was asking about was this confidential drug trial that Dr. Gilman chaired the safety monitoring committee for.

So, in a matter of time at Mathew Martoma's urging and encouragement, Dr. Gilman began telling Mathew Martoma virtually everything he was learning from the safety monitoring committee. You will learn that Mathew Martoma used this expert network, this matchmaker or middle man GLG that I mentioned before, you will hear that he used that company GLG to arrange over 40 paid consultations with Dr. Gilman between 2006 and 2008; and that paid Dr. Gilman, by the way, around $70,000.

Indeed, you will hear evidence that to cover up what they were doing, at times Mathew Martoma would tell GLG that the consultation with Dr. Gilman was about a different Alzheimer's disease drug, not the bapineuzumab, or tell them that it was even about a different disease.

You will also see important evidence about the timing of the SMC meetings, the safety monitoring committee meetings, and Mathew Martoma's consultations with Dr. Gilman. You will see, and we will put it on the screen, that the safety

monitoring committee met five times between when Mathew Martoma started at SAC -- that's July 2006 -- and when the drug trial results were announced. You will see evidence that Mathew Martoma scheduled a consultation with Dr. Gilman to occur right after each and every one of these meetings.

So there was a November 21, 2006 meeting of the safety monitoring committee where Dr. Gilman received confidential safety data from Elan and Wyeth, and the very next day, November 22, Mathew Martoma had a paid consultation with Dr. Gilman.

February 8, 2007 another safety monitoring committee meeting. The very next day, February 9, a consultation with Mathew Martoma.

October 9, 2007, a 10:00 a.m. safety monitoring committee meeting, and Mathew Martoma consults with Dr. Gilman the same day at 4:00 p.m.

And I won't even read the last two because you can see them yourself and you can see the pattern.

Now, the evidence, ladies and gentlemen, is going to show that these consultations, these pattern of them matching after safety monitoring committee meetings, that was not a coincidence. You will see clear evidence that Mathew Martoma and Dr. Gilman planned to make sure that their consultations would take place after Dr. Gilman had gotten fresh confidential information from a safety monitoring committee meeting.

So, we have one example of that which I will put on the screen. You see an email on the screen, September 5, 2007 from Enchi Liu. You see her email address at Elan.com. I expect you will hear testimony, by the way, from Enchi Liu in this trial. She writes to the safety monitoring committee, and that includes Dr. Gilman, he is on this email, and we will show it to you in a second. He writes, "We will not hold a teleconference in the month of September. We will proceed with a meeting on October 9 in Washington D.C." And the meeting she is referring to there is a safety monitoring committee meeting. It's been a meeting actually that had gotten rescheduled several times even up to this point, and that Dr. Gilman and Mathew Martoma had talked about.

This email went to Dr. Gilman from Ms. Liu at 5:25 on September 5, 2007, and you will see -- if we can see what happens next -- Dr. Gilman at 6:16, not even an hour later, forwards this email to Mathew Martoma. He writes in this email, he calls it "the latest." He writes, "It might be best for us to speak sometime after October 9 unless I have materials for the meeting in advance." That's the October 9 meeting that Enchi Liu was just telling him about below of the safety monitoring committee meeting.

You will see evidence, ladies and gentlemen that Mathew Martoma took Dr. Gilman up on this advice. He changed his times for a planned consultation with Dr. Gilman so it

would take place on -- actually, that was one we just showed you. It was on the same day as the October 9 safety monitoring committee meeting.

So, I want to look at one other thing on this slide for a moment while it is up. You see the last sentence of the first email on top, Dr. Gilman writes, "Unless I have materials for the meeting in advance." So, what materials is Dr. Gilman referring to there? What does he mean? Well, you will hear evidence that before each of the SMC meetings, Dr. Gilman would receive from Elan a confidential PowerPoint presentation, slides, similar to this, and he would receive these slides that had detailed safety data, and that what Dr. Gilman would do after he would get these slides from the safety monitoring committee meeting is in one of these phone calls or teleconferences with Mathew Martoma that they scheduled through GLG, he would simply read the relevant information off the slides to Mathew Martoma. In fact, he would even pause sometimes to make sure Mathew Martoma could write numbers down.

So what did Mathew Martoma learn from these consultations with Dr. Gilman about the safety? Well, you'll learn -- you'll learn a lot more detail during the trial, but, by and large, what you will learn is that the safety data was positive. The drug seemed relatively safe to Dr. Gilman. Of course, there were some side effects that were noted that initially worried Dr. Gilman, but as time went on, Dr. Gilman

became more and more comfortable that this was going to be a safe drug.

In fact, you will learn that Dr. Gilman said that one of these side effects that he saw, it even suggested to him that perhaps this drug really was getting rid of the plaque that was in the brain and really might be promising not just as a safe drug but might be promising as a drug that would work.

All right. As I said before, the trial, drug trial of bapineuzumab, it took three years to do the whole trial. It had already started when Mathew Martoma began working at SAC Capital in July of 2006. It didn't end until the summer of 2008. It ended in the spring of 2008 and was announced in the summer of 2008.

So, you will learn that almost immediately after Martoma started at SAC in July 2006, almost immediately he started buying Elan stock in his portfolio with that pot of money that he controlled. Soon the amount of stock he owned in Elan, which is Elan's position -- if I say position, I mean how much of the stock he has. So soon that position he had in Elan was bigger than any other stock that he had in his portfolio. It became his single biggest stock.

You will learn that later Mathew Martoma began buying stock in Elan's partner, Wyeth. And that too became one of the biggest stocks he owned in his portfolio, one of the largest positions.

You will also learn that Mathew Martoma started recommending to the owner of this hedge fund, whose name is Steven Cohen, he started recommending to Mr. Cohen that Mr. Cohen start buying Elan and Wyeth stock in accounts and portfolios that Mr. Cohen controlled because the arrangement at SAC Capital, you will hear, is that if a portfolio manager like Mr. Martoma recommends profitable trades to Steven Cohen, then the portfolio manager gets some of the profits that Steven Cohen makes.

You will learn that SAC Capital, both Mathew Martoma's portfolio and the accounts that are controlled by Steven Cohen, the position that SAC Capital had in Elan and Wyeth, the amount of stock they had, it increased over time. When Mathew Martoma started, there was basically virtually no Elan and Wyeth stock that the hedge fund owned. By the end of 2006, they about $60 million worth of Elan stock. By the fall of 2007, they had about getting near $500 million worth of Elan and Wyeth stock.

You will see it wasn't sort of just up, up, up in a straight line. Sometimes they'd have a little more. Sometimes they'd have a little less. Sometimes it would be more in one portfolio, sometimes more in another portfolio; but the direction was clear, it was up, and the strategy was also clear and will be clear from the evidence. The strategy was to buy a large position and hold this large position up until the drug trial results were announced when Mathew Martoma told Mr. Cohen

he expected the stock to go even further up.

Now, in building up this large position, I want to be clear about something else. Mathew Martoma didn't buy this large position because all he ever got was this safety information from Dr. Gilman and Dr. Ross. No, of course not. You will hear evidence, ladies and gentlemen, as I said before, that he was a hard worker, and he looked at other signs that this could be a promising investment. But the positive safety data, you will learn, that he was getting from Dr. Gilman and Dr. Ross, but especially Dr. Gilman, was very important to the investment decision because, after all, this drug trial was about testing the drug for two things: Remember, does it work, and is it safe? And safety is obviously a big part of that.

You will also learn that there was some other benefit to Mathew Martoma in having this relationship with Dr. Gilman while the safety results were slowly accumulating over time. The relationship is this, and the effect of it is this: Because will hear that Mathew Martoma had established this bond with Dr. Gilman where he would talk to Dr. Gilman after one of these SMC meetings and learn whatever Dr. Gilman had just learned, because he had this bond, Mathew Martoma had an opportunity that other investors did not. What his opportunity was, ladies and gentlemen, is that if on one of those meetings Dr. Gilman learned something bad about the drug trial, if he learned that there was bad safety information, Mathew Martoma

would learn it himself right away and would have an opportunity to sell the stock or take whatever steps he needed to do before other people found out about the problem.

So, that is how it came to be, ladies and gentlemen, that by the time the drug trial was all done, and they were getting ready to announce the results, SAC Capital had about $700 million worth of Elan and Wyeth stock. That's in the spring of 2008. They have this amount of stock and now there is just one thing to wait for, and that is for Elan and Wyeth to announce the final results of the drug trial.

So, let's go to the results. The big day for Elan and Wyeth was July 29, 2008. Elan and Wyeth's plan was to announce the results after the stock market closed on July 29, and they would announce this on July 29 at this conference in Chicago that is widely attended by people who are interested in Alzheimer's disease both because they might be scientists interested in the medicine but also investors who specialize in healthcare interested in drug development and which drugs might be promising or profitable. That was the plan for Dr. Ross and Dr. Gilman.

Mathew Martoma already knew one aspect of the results largely; he knew that the safety results were largely good, and he had a lot of detail about that. But, as I said, probably said too many times now, but there's the safety part they have to prove, and they also have to prove that the drug works.

You'll hear the term efficacy which is essentially, is it effective? Does it work? What you will learn, ladies and gentlemen, is this question of whether the drug worked, finding that out was extremely hard to do, harder to do than finding safety information, and that's because you will learn until the drug trial was actually over, no one, no person at all, knew the full data, knew the full results. That is just the way clinical trials are designed work.

(Continued on next page)

MR. DEVLIN-BROWN: The full data is compiled at the end, and then people have the opportunity to see the results.

So when the drug trial -- actually, one other point. Even when the drug trial came to an end and people start looking at the results, you'll learn that it is a very small group of people that get to look at the results of this bapineuzumab trial. You will learn that these people are unblinded, which means they get to see the results. They worked in a separate building in Elan with the results. They have a separate computer network. And they were very sensitive, you will learn, about these secret results getting out, getting released to the public before the July 29th announcement.

So there was a little bit of a teaser before the July 29th announcement, you will learn. Elan and Wyeth put out a short press release. And the press release said that people who have a certain gene -- that is about half the people in the population -- people who had a certain gene, they did better taking bapineuzumab than people who were not. So, but how much better? Better, you know, good enough to make a real difference in their lives? Good enough to make this drug a very profitable drug that would likely get approved and could be sold? That wasn't in the press release, you will see. For that sort of information, for the actual results that investors wanted to know, they had to wait until the

July 29th announcement.

So the evidence is going to show that Mathew Martoma wanted to get these secret result early, just as he had wanted to get the safety results early while the drug trial was ongoing. So in early July 2008, Elan and Wyeth decided to have a dinner presentation for the principal investigators, the people who were running the study, like Dr. Joel Ross. They were going to have a dinner presentation for these principal investigators one night before the results were announced to the rest of the world. So they had this dinner presentation for the principal investigators on July 28, and these investigators would learn at this dinner the secret results of the drug trial a full day before they would be announced to the publics after the stock market closed on July 29th.

And so you learn that Mathew Martoma, once he found out about this dinner from Dr. Ross, what did Mathew Martoma do? He made an appointment to meet Dr. Ross right after he got out of that July 28th dinner presentation. Right after he learned the secret results, Mathew Martoma and Dr. Ross were scheduled to meet so that they could talk about those results. That would have given Mathew Martoma the next day during stock market hours to buy and sell Elan stock depending on what he learned.

But you are going to learn, ladies and gentlemen, that Mathew Martoma found a way to get the results even earlier than

when Dr. Ross would get them. Because in early July 2008 Elan and Wyeth selected the person that they wanted to have present this drug trial information to the public on July 29th. And this person that they were going to select, of course, they had to see the drug trial results in advance, the full drug trial results, and this person also had to, of course, see the presentation that the person was supposed to make to the public at the conference.

And the person that Elan and Wyeth happened to select was none other than Dr. Sidney Gilman, who you've already heard, the evidence will show, Mathew Martoma had corrupted and gotten secret safety information from.

So for the next series of events we'll put up a timeline.

This is what happened in the weeks leading up to the drug trial as Dr. Gilman learned the secret results.

So July 15th of 2008 Dr. Gilman gets on a private jet that Elan had arranged for him in Detroit and flies him out to Elan's offices in San Francisco. They bring him to this room where the people have the secret information about the drug trial, and they do what's called unblinding Dr. Gilman; they share with him the secret results.

And so you'll hear that Dr. Gilman, on July 15th and the next day July 16th, looked at the results and started working with Elan and Wyeth on the PowerPoint presentation he

was going to give on July 29th. At the end of July 16th he flew back home to Detroit and went home to Ann Arbor, Michigan, where he lived.

So the next day, which is July 17th, around 1 in the afternoon, Elan e-mailed Dr. Gilman a draft of that highly confidential PowerPoint presentation that Dr. Gilman was going to present about two weeks later after the public announcement.

What happens next? At around 4:15 that afternoon, Mathew Martoma, who has gone home at this point in the day, calls Dr. Gilman from home and speaks to him for one hour and 45 minutes. The evidence will show, ladies and gentlemen, that during that call Dr. Gilman did the same thing he had done when he had gotten the confidential safety slides from Elan and Wyeth. What he did is he read them to Martoma. He read him the secret drug trial results that were contained in that slide presentation and that Dr. Gilman was scheduled to present on behalf of Elan and Wyeth on July 29th.

Now, ladies and gentlemen, this PowerPoint presentation with the results, you will hear, was a much more important document than anything Mathew Martoma had received previously from Dr. Gilman. This was the very thing that would be -- it is in draft form, but it is the gist of the very thing that is going to be presented to investors everywhere in two weeks. And it had all kinds of charts and graphs. It is the kind of charts and graphs that, you will see, are easier to

understand if you can look at them. And you are going to see evidence, ladies and gentlemen, that Mathew Martoma made plans to do just that, made plans to look at them. Because that same day, July 17th, Mathew Martoma booked round-trip travel between JFK Airport in New York and Detroit to leave and come back the same day, Saturday, July 19th.

Later that same day, at about 8:45, Mathew Martoma and Dr. Gilman spoke by phone again. And during that call Mathew Martoma told Dr. Gilman that, as circumstances happen to have it, Mathew Martoma would be in Ann Arbor on Saturday, July 19th, and would it be all right if he happened to stop by Dr. Gilman's office. And you will see that Dr. Gilman then made an appointment on his calendar that Mathew Martoma would be coming to his office.

So what happened then on Saturday, July 19th? Well, the evidence will show that Mathew Martoma flew to Detroit. He arrived in the late morning. Upon arrival, he took a taxi to the University of Michigan, which is where Dr. Gilman worked. It is about 45 minutes away. When he got there, he met with Dr. Gilman for approximately an hour and reviewed the confidential PowerPoint slides in person. And then he got back in a cab, went back to the airport, waited around for his flight for a little while, and eventually landed at JFK Airport that evening.

So, ladies and gentlemen, the evidence will show that

when Mathew Martoma heard about the PowerPoint presentation on the phone from Dr. Gilman and then got a chance to see it in person, the evidence will show that he knew these results would not be good. And you'll hear a lot of evidence about reasons why it would not be good during this trial. I'll give you an overview or preview of just one of them now.

You'll learn that one thing that people look for when they're trying to evaluate whether a drug trial is successful or not, whether a drug is likely to work or not, is called a dose effect, or dose response. All that means is if you see that there's some relationship between how much of the stuff you take and what it does for you, that tends to show that what you're taking is doing something.

I'll give you a simple example. If you take a half of a -- if you have a headache and you take half a Tylenol, it may do nothing for you. If you take one Tylenol, it does a little bit more for you. You take two, it does even better. At some point, you know, maybe you are taking three or four, it doesn't make you any better than two, and at some point you take too many and it can cause actually serious damage. So that's a dose effect, a dose response.

You will see that the evidence for bapineuzumab, it didn't show anything like that. It showed essentially random information as to people, how much of this bapineuzumab they took and how much better, if at all, they got with Alzheimer's

disease. And you'll hear evidence that that was a red flag that perhaps even the positive stuff that Elan and Wyeth had found, maybe that was just random because people didn't exhibit this dose response. You will hear a lot more about that later but that was just a preview.

So I want to be clear about one other thing, ladies and gentlemen. When I say that Mathew Martoma knew the results would not be good, I don't mean to say that the results would not be good from the perspective of a scientist. Scientists, I think you'll hear, because some of them will testify, tend to be optimistic people, and they will tell you that the drug had some promising things that made people think that perhaps people were on the right track and maybe it wouldn't be Elan and Wyeth, but some day some company was going to figure this out and be able to bring the drug to market. So that is maybe a scientific perspective on optimism, that maybe someday you are on the right track and you will get there.

I don't mean to say the results are bad that way, but from an investors perspective, ladies and gentlemen, that some company someday will come up with something, that is not the investor perspective. The investors want to know, you'll learn, whether this drug is likely to be sold by the companies that they own stock in and make money for those companies, and from that perspective Mathew Martoma knew that these results were bad for the stock prices of Elan and Wyeth, that the

results were nowhere near what investors were expecting them to be.

So as Mathew Martoma flew home from Michigan, SAC, as I mentioned, owned approximately $700 million worth of Elan and Wyeth stock. Mathew Martoma owned $100 million, about, in his own portfolio, the pot of money he got to manage. And the rest of it was owned by SAC Capital's -- was controlled by SAC Capital's owner, Steve Cohen, who had bought Elan and Wyeth largely based on Mathew Martoma's positive recommendation and Mathew Martoma's positive statements about the drug trial results in the past. So if the stock price of Elan and Wyeth fell once investors heard the same news that Dr. Gilman had provided Mathew Martoma before the public announcement, well, Mathew Martoma could lose millions and his boss could lose millions. Millions on a stock that Mathew Martoma had been recommending for years that his boss buy.

So, ladies and gentlemen, Mathew Martoma had a phone call to make, and you'll learn that he made that call. On Sunday, July 20th, the next day, before 8 a.m., Mathew Martoma sent an e-mail to Steve Cohen, which you'll see. It said just what's on the screen there. Is there a good time to catch up with you this morning? It's important.

Less than an hour later, the phone records show, the two men spoke for about 20 minute; Mathew Martoma and Steve Cohen spoke for about 20 minutes. And a little later Mathew

Martoma emailed Steve Cohen a list of Elan and Wyeth stock that was in two portfolios Mathew Martoma often traded in.

Well, the next day was Monday, the stock market was open, and Mathew Martoma went to work. And Mathew Martoma and SAC Capital started selling Elan and Wyeth. In the seven trading days before the results would be announced to the world, Mathew Martoma sold all of the $100 million of Elan and Wyeth that was in his portfolio. And Mr. Cohen sold all of the Elan and Wyeth stock that Mathew Martoma had been recommending that he buy.

SAC Capital also shorted Elan and Wyeth stock, which is basically a stock trade that will profit if the price of the stock falls. And they bought what are called some options that essentially are other things you can buy and trade in to bet that a stock price will go up or go down, and they bought options predicting the prices to go down.

You will also learn that while SAC Capital, of course, is a large hedge fund and they buy and sell positions all the time, you'll learn that this position was sold in a very peculiar way. It was sold in a way to keep it secret not just from other hedge funds but even within the hedge fund so only a few people knew about it. They used special accounts to mask what they were doing, and you'll hear more detail about that.

And so that takes us back to where I started the opening, that packed convention hall where Dr. Gilman was about

to take the stage and tell the rest of the world what Mathew Martoma had already known from talking to Dr. Gilman earlier.

So after he did that, after Dr. Gilman made that public announcement, the prices of Elan and Wyeth shares started falling immediately. And by the end of the next day Elan shares had fallen some 42 percent. Wyeth's shares had also fallen 11 percent. And you'll learn that Wyeth was a much bigger, much more diverse company that had many other drugs so it wasn't impacted as much by one drug trial, but it fell 11 percent nonetheless. SAC Capital's combined profit and losses from this was $275 million, and Mathew Martoma got his $9.3 million bonus at the end of the year for trading in Elan and Wyeth.

So that's a summary of what the government expects to prove at trial. And I just want to spend not too much longer now but a little bit of time telling you how it is the government expects to prove it, what evidence we expect to present to you.

So there is basically two types of evidence. You will hear witnesses and you will see documents and other sort of physical evidence. And let's talk first about the witnesses.

You will hear from a number of witnesses. Some of these witnesses are people from Elan and Wyeth who will tell you about the confidentiality agreements and the confidentiality restrictions in which they prevent or they are

supposed to prevent doctors who are working on the drug trial from sharing any information in advance.

You'll also hear from current and former SAC Capital employees who will tell you about how Martoma recommended buying Elan and Wyeth shares and bought Elan and Wyeth shares in his own portfolio based on what Martoma was saying back before he got the secret results from Dr. Gilman based on what were Mathew Martoma's positive views about the drug trial.

You are also going to hear from both of the doctors I mentioned, Dr. Ross and Dr. Gilman.

Now, there is no question, ladies and gentlemen, that these doctors, they broke the law and they disgraced themselves in their profession. They took data that was entrusted to them in the noble work of actually trying to cure a disease and they turned it over to Mathew Martoma so that he could make enormous financial profits.

But it is precisely because they had this corrupt relationship with Mathew Martoma, ladies and gentlemen, that that's what makes them valuable witnesses, and it is important and valuable, potentially -- you will decide that, but it is important potentially for you to hear from them.

Now, you'll hear the government has agreed not to prosecute these doctors if they testify truthfully. And you will want to, of course, examine carefully what these doctors are telling you. And you're going to learn that the memory of

these doctors on details is far from perfect, particularly with Dr. Gilman, who is now 81 years old. But you'll also hear from them that whatever confusion they may have on the details, they both will tell you, without any hesitancy, that they shared confidential information with Mathew Martoma about this drug trial. And you will be able to test what they say because you will be able to compare it against other evidence to see if the other evidence supports or corroborates what they are telling you.

So that's the witnesses. The second category of evidence will be documents.

Now, you're going to learn that neither the University of Michigan, where Dr. Gilman taught, nor SAC Capital have now anything like a full record of all their e-mails from 2006 to 2008. There are some but nothing like a full record. And what does still exist and what the SAC Capital and the University of Michigan have, you will find some vivid examples of Dr. Gilman and Mathew Martoma speaking about the confidential safety monitoring committee proceedings.

You will also see trading records that show SAC Capital's trades, how it sold $700 million of Elan and Wyeth stock after Martoma got the drug trial results from Dr. Gilman on the 17th. And you will see phone records showing how Dr. Gilman and Mathew Martoma would speak after these Safety Monitoring Committee meetings regularly, and you'll see a

record of that 1-hour-45-minute call on July 17th.

And, finally, you'll see evidence of a series of things that Mathew Martoma did to try to avoid detection, things that he did to try to hide his interactions with Dr. Gilman after Dr. Gilman was unblinded and got the full data on July 15th so that it would appear that the only time Mathew Martoma talked to him about the drug trial was after Dr. Gilman made the announcement, rather than before.

So, ladies and gentlemen, I won't speak -- or my colleague won't speak again to you until all the evidence is in and the case is ready to be presented to you. So before I sit down, I would like to leave you with three thoughts.

First, please listen carefully to the evidence that's presented to you. As you may know already, trials are not the glamorous affairs as depicted on television. Each witness only knows a piece of the story, and each witness can only testify about that. Things won't always happen in chronological order. But it is important that you pay attention for the same reason that Judge Gardephe identified. Because nothing that I say or any lawyer says is evidence. I'm saying what I expect the evidence to show, and it will be for you to listen to the witnesses and see the documents and decide for yourself what the evidence shows.

The second thing, ladies and gentlemen, is to please listen carefully to Judge Gardephe's instructions on the law.

It is Judge Gardephe's instructions on all issues, including what is and what is not illegal insider trading, that are the only legal instructions that matter, as opposed to anything that counsel would tell you.

And the third thing I want to leave you with is this. And that is use your common sense, the common sense that all of you use in your lives to make judgments about things.

Now, there is no question, this case will have some science, but it is not a science test. And, obviously, this case takes place in a setting where there is sophisticated hedge funds making trading decisions, but you don't have to work on Wall Street. Because ultimately, ladies and gentlemen, the case is not about scientific testing and it is not about trading. Those are the backdrops. Those are the background. The case is about cheating. And you can use your common sense to guide you in evaluating the evidence under the law that Judge Gardephe will give you.

If you do those things, ladies and gentlemen, if you pay attention to the evidence, you follow the law, and always keep your common sense, I submit to you that at the end of this case, when you go back to retire and deliberate, you will reach the only verdict that is supported by the evidence, and that is that the defendant is guilty as he has been charged.

THE COURT: Ladies and gentlemen, we will take a ten-minute recess and then we will hear the defense opening.

THE CLERK: All rise.

(Jury not present)

THE COURT: Please be seated.

So we will take about ten minutes. If there is anything we need to discuss about the defense slides, you will let me know.

(Recess)

THE CLERK: All rise.

THE COURT: Please be seated.

(Jury present)

THE CLERK: All rise.

THE COURT: Please be seated.

Ladies and gentlemen, we will now hear the opening on behalf of the defendant.

Mr. Strassberg.

MR. STRASSBERG: May it please the Court, counsel, and members of the jury:

A little more than ten years ago there was a big hit on Broadway. It was a play called "The Exonerator." But it was the true stories of six different people, people who had been accused of horrible crimes, crimes like murder and rape. And in each of those cases the prosecutor stood before a jury and said it was a straightforward case and they were convinced that the evidence would show those people were guilty.

But here is the thing. In each of those cases the

prosecutor was wrong. In their haste to make a case, they had put innocent men and women behind bars -- not just behind bars, on death row -- until hard evidence, DNA evidence in those cases, proved that they had been falsely accused.

Now, I stand before you not in some play but in a very real courtroom, with very real consequences and a very real life on the line -- my client's life -- Mathew Martoma.

Because the prosecution has it wrong here. They have rushed to judgment, and in that rush to judgment they have falsely accused Mathew Martoma. There were many, many independent reasons to sell Elan and Wyeth stock in July of 2008. Inside information was not one of them.

Now, the opening is our chance to give you a sense of what the evidence will show. Because what the evidence will show is that there is no hard evidence to back up the prosecutor's claims. There are no taped conversations. There was no wiretap. There is no e-mail saying sell Elan stock now, sell Wyeth stock now. There is no hard evidence of any kind. And when you see the evidence, you will see that this case really comes down to simply the testimony of Dr. Gilman.

The prosecutor at the end of the opening suggested some concerns you're going to see with Dr. Gilman. But let me tell you what else the evidence is going to show. The evidence is going to show that Dr. Gilman felt pressured to tell a story that the prosecution wanted to hear. And that his story, his

story has been a moving target. It has changed time and time again, and to this very day it raises more questions than it answers.

And so on the very issue at the heart of the case, did he intentionally give inside information to Mathew Martoma, you will hear that he told the prosecutors that he did not, that he did not.

But you'll also hear when that couldn't get him out of harm's way with the prosecutors, when there was a threat that he would be charged with his own misconduct, then he changed that story. He changed that story to say now that he emailed that PowerPoint presentation to Mathew before the conference, that ICAD conference that the prosecutor mentioned at the end of July. But you are going to hear something else, ladies and gentlemen. When the FBI searched his computers and couldn't find that email, you will hear he felt pressured to change his story. And change his story he did.

So that after telling the prosecutors for months time and time again that he had no memory, no memory at all of ever meeting with Mathew in his office in Michigan, simply had no memory of that occurring, once his computer did not confirm that the email that he said he sent was on it, he suddenly recalled such a meeting.

But you'll hear that even that story changes. Because at first he said he just had a very vague meeting that he met

Mathew outside his office on the street. But then you'll hear, well, now, really what you'll hear, according to the government, and in the government's opening, is he is going to come in and tell you all sorts of details about what happened in that meeting five-and-a-half years ago, when just one year ago he was swearing up and down that he had no memory of it at all.

The evidence is going to show you something else. It's going to show you why he keeps changing his story. Because, literally, the prosecutors made him an offer he couldn't refuse. They offered him a nonprosecution agreement. That means a free pass for all of his misconduct, a free pass, as long as he agreed to say that he had tipped Mathew Martoma. It means that he never faces -- he never has to admit that he did something wrong and plead guilty to an offense, as many other cooperating witnesses have to do. He never has to face a judge for sentencing, or the Sentencing Guidelines in cases like this can call for years and years, over decades in prison, never has to face any of that as long as he says that he tipped Mathew Martoma.

So you will see that Dr. Gilman was faced with a choice. Take the deal, save the time and the money in fighting the full weight of the federal government, and end your life in peace; or fight the federal government, perhaps use up the remaining resources that you have in doing so, and face the

real risk that you might face a day like this in a courtroom and be convicted by the government and literally for Dr. Gilman spend the rest of your life in jail.

So deal? Or no deal?

And you will see that Dr. Gilman took that deal. And now he will be up on the stand to try to sell that deal to you. But you will see that his deal makes him biased and his story changes make him not credible.

So, ladies and gentlemen, right from the start you are going to see that the prosecutors' story that they just told you on opening will be riddled with inconsistencies and will be filled with reasonable doubt.

Now, the prosecution would have you believe that it is a simple case. Dr. Gilman told Mathew the results of that clinical trial for bapineuzumab, the Alzheimer's drug, told him the results were bad. Mathew said, OK, I'd better sell that stock.

But you're going to see that story is not true, and it is certainly not that simple.

Now, Dr. Gilman was one of the leading Alzheimer's specialists. He was an expert in the disease. He had literally written a book about it. And you're going to hear from the evidence that when Dr. Gilman saw the results of that test, of that test results, the details of the bapineuzumab test, he thought that the results were terrific. He thought

that the data was, in his own words, dynamite to show that bapineuzumab would be a drug that would be effective at treating Alzheimer's disease. Anyone getting a tip from Dr. Gilman would think I have to buy this stock, not that I would sell.

Now, just think about this. How in the world is a young portfolio manager supposed to think that he knows the science, the complicated science, about Alzheimer's disease better than one of the foremost experts in the disease? That claim makes no sense.

And if the expert is saying to you that I think this data shows this drug is going to work, is going to become the first drug in the whole world to treat one of the most horrible diseases, Alzheimer's disease, that affects millions and millions and millions of people worldwide, well, you don't have to have a fancy business degree to know that that's going to be good news for the companies that make that drug. And you're going to want to buy more stock if you are listening to Dr. Gilman at this time, or at least hold your position. But one thing you're not going to want to do is sell. So right from the getgo, you are going to see that the prosecution's story is contradicted, is undermined by their very own star witness.

Now, what the evidence will show you is that the prosecution rushed to judgment. They rushed to judgment when

they saw those large trades that happened before the ICAD conference. I am going to talk about them as we go through the opening.

But in that rush to judgment, ladies and gentlemen, they have charged an innocent man, just like in those cases in "The Exonerated." Mathew Martoma did not commit these charges. And so he stands before you, through me, and asks you not to rush to judgment. The evidence that we will see together during this trial will show you that he has been falsely accused.

Now, let me take a moment to reintroduce myself.

So my name is Rich Strassberg, and together with my partner, Roberto Braceras, and my colleagues, Meghan Spillane and Larkin Morton and Roberto Braceras. We have the privilege and honor to represent Mathew Martoma in this trial.

Now, what I'd like to do in the rest of my opening is give you an overview of what we anticipate the evidence will show. We are going to give you a little bit of a roadmap so you can follow along with us as we go through what the evidence will show you.

First we'll discuss Mathew's background and how he came to work at SAC Capital. Then we'll talk about this investment in Elan Pharmaceuticals. In fact, we'll talk about how the evidence is going to show you that Mathew and SAC Capital invested in Elan before any allegation of any improper

information occurred.

Third, we are going to talk about the many, many reasons that SAC Capital had to sell Elan and Wyeth stock in July of 2008, literally a perfect storm of reasons coming together to make it the sensible, prudent decision to sell the stock at the time they did.

Now, fourth, we're going to talk about the prosecutors' case, and we're going to talk about the witnesses -- at least some of them -- that the prosecutor referenced, those two doctors. And we're going to talk about how the evidence will not add up, and we'll show that this story cannot be believed.

And, finally, we're going to talk about how the evidence will show there has been a rush to judgment in this case, and in that rush to judgment the prosecutors have charged an innocent man.

So let's begin with the background.

What will you learn about Mathew Martoma? Well, the evidence will show you in many ways Mathew was the quintessential American success story. He was born to immigrants in Florida, and he grew up in a middle class family in the shadow of the Kennedy Space Center.

Now, his family had endured hardships in India, being part of a minority Christian community there, and they had come to the U.S. to find freedom. And you'll find that, from the

evidence, that as they were here in the U.S., they were minorities as well. But Mathew was never taught that being a minority was a disadvantage. And you'll hear that he graduated from public high school and that he went on to Duke University and he graduated from there. And you'll hear that as he was getting his MBA, he met Rose. Now, Rose -- and this was back in 2002 -- now, Rose was a medical student, studying for her medical boards. And by 2003 Mathew and Rose were married and she became a pediatrician.

And you'll hear that same year Mathew got a job offer, an offer to join a hedge fund, an investment fund, in Boston called Sirios, S-i-r-i-o-s. It was a small but prestigious hedge fund in Boston, and Mathew and Rose moved to Boston and Mathew began his first job with Sirios. And you'll hear that in Boston Mathew and Rose began their family and that they have three young children -- Joshua, Ava and David -- all under the age of 9.

Now, at Sirios, Mathew's boss had him focus on the healthcare industry. And you will hear that Mathew gravitated toward companies that were looking for drugs that could treat Alzheimer's disease, because it was a horrible disease and there was no drug that could treat it.

You'll also hear that because of his hard work, his -- Mathew actually had a number of successes at Sirios, Sirios. And his success in the industry was noticed. And so in 2006

Mathew was approached by someone from SAC Capital, a man by the name of Sol Kumin, K-u-m-i-n. Mr. Kumin wanted Mathew to come join SAC Capital.

Now, you'll learn that Mathew was happy in Boston and at Sirios, but SAC Capital was a much bigger, much more well known and prestigious firm at that time. And so Mathew decided to take the job offer and move down to Connecticut and begin working at SAC Capital. And that was July of 2006.

So let's now turn to the second point in our overview, the investment in Elan.

What you are going to learn is that at SAC Capital Mathew reported to Mat Grossman, who was the head of this division called CR Intrinsic. CR Intrinsic was one company or division inside the broader umbrella of SAC Capital.

Now, we have two Mats in this case. So we have Mathew Martoma. We have Mat Grossman. Mathew Martoma, he also went by the name Mat. So we don't get too confused and I don't get confused, I'm going to calling Mathew "Mathew" throughout this opening to distinguish him from Mat Grossman.

But you are going to learn that when Mathew comes to SAC, he's reporting to Mat Grossman, and Mat Grossman reports to Steve Cohen. And for the great bulk of time involved in this case, Mathew's role really is to make recommendations, to Mat Grossman and sometimes to Steve Cohen, about the investment decisions that they will ultimately make for the portfolios

that they run.

Now, in July 2006, almost immediately upon Mathew joining the firm, the firm begins to invest in Elan. And Mathew begins to look and study Elan and bapineuzumab, that drug that Elan was trying to develop with Wyeth. You will learn at this point Mathew was really just learning the ropes; he has only been there for a few weeks. But Mat Grossman and Steve Cohen soon begin to share the enthusiasm for the Elan investment.

And you will hear that, in fact, SAC builds a position of 4.7 million shares -- 4.7 million shares -- before any allegation of impropriety in this case, in fact, before Mathew has ever met Dr. Gilman in person.

And you'll see that Mathew's decision to recommend to Mat Grossman and to Steve Cohen that SAC should invest in Elan had nothing to do with inside information. In fact, you'll get to see the investment thesis that Mathew put together, really just in the beginning of his time at SAC, recommending that SAC -- and here his boss Mat Grossman and Mat Grossman's boss Steve Cohen -- take the position in Elan stock that they ultimately do take.

Now, you're going to learn that Mat Grossman remained Mathew's supervisor until the end of 2007, and then Grossman left to start his own hedge fund, his own firm. And at that time Mathew became responsible for managing his own portfolio

as a portfolio manager.

But you're also going to learn that any trading decision that impacted the firm as a whole, such as the decision to sell all of the Elan and Wyeth stock that happened in the summer of 2008, that still had to be run by Steven Cohen, the head of SAC Capital. And you'll learn that Steven Cohen was a tremendously experienced investor with his own definite and definitive views about when to buy and especially when to sell different stocks.

And you're also going to learn that Mr. Cohen surrounded himself with smart analysts and portfolio managers who gave him advice about what investments to make and what investments to get out of. And you're going to hear that decisions impacting the firm as a whole, SAC Capital as a whole, were Steven Cohen's decision to make.

In fact, you're also going to hear that Mr. Cohen had an agreement with a former SAC healthcare specialist -- and there were many SAC healthcare specialists, people who specialized in healthcare investments at the firm. And you're going to hear that Mr. Cohen, he had an agreement with one of them, the one that he thought was the best healthcare investor he had ever met, and this person's name was Wayne Holman, H-o-l-m-a-n.

And you're going to hear that Mr. Holman, who had recently -- who had left SAC Capital and set up his own firm,

had a special agreement with Mr. Cohen to advise him on one healthcare stock in particular -- Wyeth -- one of the two stocks that is at issue in this case, and that Mr. Cohen primarily took direction about the Wyeth investment from Mr. Holman. Something you never heard of in the prosecutors' opening statement.

Now, let me take a moment to talk about what research analysts and portfolio managers do. In some ways the words sort of define themselves. As a research analyst or a portfolio manager, your job is to research the investments that you are thinking about recommending and to analyze is this investment going to be a good one, is this going to be one that we think will make money. But make money not just for us and for our firm, because the firm actually has money from other people that is being invested. And so the job of a portfolio manager and research analyst is to do all the hard work necessary to leave no stone unturned to try and understand whether an investment is going to be a good investment, an investment that's worthwhile to recommend for someone else's money. And no one would want some investment professional to recommend that your money gets put into an investment that they haven't done the full research on, that they haven't fully vetted, that they're guessing about.

So it's very important that research analysts and portfolio managers do incredibly deep research about the

investments that they are considering. And you will hear that that is exactly what Mathew did throughout his time at SAC Capital and his time at Sirios, too. And what you're also going to learn, that speaking to experts, doctors in the field who understand the science behind the drugs, who understand the nuances of what is being tested in the drug trials themselves, that is what is expected of research analysts and portfolio managers. That is what happens throughout the industry. There were companies -- they mentioned this company, GOG. There are companies, many of them, that are set up just to allow that to happen. And it happened all the time. It was standard practice. It was, in fact, demanded of people who were going to be research analysts or portfolio managers in the healthcare space. That was their job. That wasn't a crime.

So when the prosecutor talks to you about edge or illegal edge, what they say there, that is just not something sinister. You're going to hear that the term "edge" was a term that was used all the time at SAC Capital. And the term meant trying to work harder and do your job better than the next guy. Trying to understand the investment as best as you can possibly understand it. What you were supposed to do -- what, frankly, anyone who is responsible for investing someone else's money should be doing -- in order to do their job correctly.

Nothing wrong with it. Nothing sinister about it. Nothing criminal about it.

Here, again, the proof is not going to support the allegations that you've just heard from the prosecutor.

Now, what kind of information do research analysts and portfolio managers seek? Well, as I mentioned, they really want as much data as they can get about whether the potential investment may work. And you are going to hear a lot in this trial about supposed confidential information. But don't be confused. Just because something is labeled as confidential doesn't mean that it is important to investors. It doesn't mean that it matters, and it doesn't mean that it's material.

Now, the Judge, Judge Gardephe, is going to instruct you on the law at the end of the case. For now, what's important to remember is to keep in mind that just because someone says the information is confidential, it doesn't mean that it can support an insider trading charge. In fact, it doesn't even mean that it's not nonpublic. It doesn't even mean that it actually is confidential information. Because information that could have a label "confidential" at one point in time, if it is then disclosed to the public is no longer confidential information and can no longer support a charge of insider trading. We are going to come back to this as we go through the timeline about this case.

You're also going to learn that information can be public when it's made available to the public even if everyone doesn't know about it.

So now let's turn to July of 2008, when the prosecution claims that the actual insider trading occurred in this case. Let's talk about what the evidence will show happened then.

So on July 18th, SAC Capital's total position in Elan was about 10 million shares. That included the one portfolio that Mathew managed and all the other portfolios in the firm.

Now, the prosecutor wants you to think that there's something wrong with the fact that SAC Capital sold its entire position before the ICAD conference at the end of July. But what the evidence is going to show to you is that that is what hedge funds do. They take big positions to sell big positions, often around events.

This is not like you or I or perhaps even a mutual fund that might invest in a stock, might invest in IBM, and then hold it, pass it on to our children, our grandchildren. This is a hedge fund that they make money by taking big positions and by selling big positions.

So when you see that they sold the big position around the July timeframe, that is simply what it is that they do. That's their business model.

And let's just take a look in the same July -- excuse me, the same 2008 timeframe at a number of other instances where they had taken large positions only to reverse course and sell off those positions in a very short period of time. So

you can see, this is about a position in GE stock. GE stock. Over $500 million worth of GE stock sold off in a very brief period of time in the fall of 2008.

Let's take a look at the next example. Similarly, Yahoo! stock. This is in the spring of 2008. Almost $400 million sold off again in a very brief period of time.

Let's look at another example. Anheuser-Busch, over $600 million of stock sold off in a very brief period of time. In fact, the same period of time as what we will see for Elan.

Let's put Elan up on the board, too.

So the point here is only that the fact that they had a large position and they sold a large position is not proof of anything other than the fact that that's what a hedge fund does. It takes large positions and it sells large positions.

And the evidence is going to show you that there were so many reasons to sell Elan and Wyeth stock in the summer -- in July particularly -- of 2008 that it was really only -- the only sensible decision for SAC Capital to make. So let's take a look at some of those decisions -- some of those reasons. Excuse me.

First you'll see that, as we just talked about, SAC's business model was to take and sell large positions, just as we've seen they were doing throughout 2008.

But, second, do you remember back five-and-a-half years ago now? The summer of 2008, the United States was

facing the beginning of that global economic crisis that resulted in the biggest recession we've had really since the Great Depression. And you're going to learn that in the spring and summer of 2008, SAC was deeply concerned about the economy. Bear Stearns, a big well known firm, had just collapsed and failed. Lehman Brothers was to follow in the fall. And the senior management of SAC Capital was very concerned about the risks that the firm had at that time. And they met with Mathew in May and June to discuss those concerns.

And you'll hear that Mathew was also spoken to by people at Risk Management, the people who are really kind of the firm's auditors, and they were also concerned about the risk with these large positions.

The Elan investment had been very profitable. If SAC sold Elan, Mathew would be one of the few portfolio managers who was going to be successful in 2008, at least as it stood in that midyear timeframe. But if they rolled the dice and held onto the investment and Elan crashed like the rest of the market was starting to, they could lose all of that profit.

So let's take a look at the next reason why it made sense to sell. Elan's stock had increased in price. The evidence is going to show you that the market for Elan was in fact overheated. Now, what does it mean to say that the market was overheated? You're going to hear that during this time period, when the market for all stocks was cratering, was

starting to collapse, Elan was the one bright spot. It was rising against the trend. And because it was rising, too many investors were getting involved in it and the price was getting too hot; it was started to overvalue the company.

In fact, you're going to see that the S&P 500 during this period of time declined close to 8 percent, and that's the period of time from May to July. And you're going to learn that in June of 2008, Elan released the preliminary results of this Phase II trial of bapineuzumab.

Now, the prosecutor referenced this issue as a teaser. But you are going to learn, the evidence will show you, that the actual results, the results they claim were this big secret, were released in a press release to the world on June 17th of 2008. And they didn't just talk about one small group of people; they talked about the whole trial. They actually announced the results, that they hadn't found statistical significance with the trial that they had been hoping to find. But because their trial was really about safety, they had done subgroup analysis. I won't get into details too much on the opening. But what they had announced to the public was that they had statistically significant findings that for people, for big groups of people who didn't have a particular gene, bapineuzumab showed positive results on treating Alzheimer's. And those results were all disclosed to the public. And they also disclosed safety results, safety

findings, to the public. All of that happened in June.

You'll hear that they also said, we'll give you more details about these results in July. But it will be a part of the story -- really a central part of the story about the disclosures that they made on June 17th of 2008.

And if we take a look at the entire chronology of the investment in Elan and not just a few days at the end but just look at the whole story, we are going to see why it makes so much sense to sell Elan in July of 2008, before that conference, that ICAD conference, because let's look what happened to the price.

So we start in January of 2007, and you'll see then the price is trading below $15. Earlier it had been trading even lower.

What are you going to see from the evidence happens in July of 2007? You're going to see that Elan announces publicly, to the world, that it believes it will proceed with Phase III. In other words, to move from the Phase II trial, which is really about does the drug hurt people, to a Phase III trial, where you will have thousands of people taking the drug to see will the drug actually work and help cure and treat Alzheimer's disease. And they announce in January, as the safety trial, the Phase II trial is going on, that we will move to the Phase III trial, the big, big trial, only if the Phase II results are spectacular, strong, very meaningful.

So then we'll go ahead and we'll see the price stays around that $15 area until May of 2007, when they announce they are moving to Phase III, publicly announced, known to anyone who is following the news about the company. And then you see the price starts to rise. The price starts to go up. The price starts to go up.

And then you are going to see what happens, which is that they announce those results on June 17th of 2008, the results that Mathew was suggesting made Elan a good investment, hoping that those results would actually be positive. And they announce, while they didn't find statistical significance overall, they found really positive news about a lot of people who could be helped by this drug, and, in response, the price of the stocks soared. So from June 17th to the beginning of July, July 10th, you'll see that Elan's stock price rose more than 36 percent.

It rose more than 36 percent in the face of all of the economic problems the whole country was facing. At the same type the S & P was diving down 8 percent, at the same time investors were starting to flee from investments, elan was shooting up.

SAC's plan was always to sell Elan. It was never to hold Elan forever. It was always to sell it once the price got to a point where it made sense to do so. And the runup in price from January of '07 to July '08 made this time the

perfect time to sell.

You'll also hear that outside analysts were advising that Elan's stock should be sold at this time.

Now, for the reasons I talked about with respect to the price movement and the economic concerns and other reasons, analysts who had a different opinion about all sorts of investments, including Elan and Wyeth, had different opinions that they were expressing throughout this timeframe that we're looking at. But in July of 2008, a number of analysts started to come out with strong recommendations to sell Elan. We'll see some of these. They were worried about uncertainty about the final results, but also about little immediate upside, even if the results were good, and potential downside, given the economic uncertainties.

So you'll see, on July 11th, Brean Murray, an analyst available to the public, initiated coverage about Elan with a new recommendation to sell. You'll see that they talked about the risks outweighing the benefits. And that they thought the stock runup was unwarranted, that stock runup we just looked at.

And also on July 11th, Piper Jaffray, another analyst company, they downgraded this stock. They had been neutral, saying hold. And now they said sell. And you'll see that. They are discouraged by a laundry list of concerns. And they viewed the recent stock appreciation as unwarranted; in other

words, time to sell now.

You'll also see another report -- this is one from Canaccord Adams -- on July 17th of 2008, again reiterating their sell recommendation right in the middle of July 2008.

You will also hear about the next reason that it made sense to sell, which is that SAC's own healthcare specialists were recommending to Mr. Cohen that he sell the stock, that he get out now. They feared that the stock price would begin to come down after that ICAD conference, and they thought the prudent move was to get out of the stock now. And they were making their views known throughout SAC Capital and to Mr. Cohen.

Sixth, you'll hear that scientists were publicly questioning the science behind bapineuzumab. In June and July, you will learn that there had been a substantial discussion in the investor community about whether the science behind bappy, this drug, actually worked, because there had been another drug that was based on similar science that had just failed. And then, on July 17th, this day that seems to keep coming back into this case, you'll learn that a prestigious medical journal called the Lancet -- L-a-n-c-e-t -- published an article that questioned whether the theory -- the scientific theory behind bapineuzumab -- actually would help patients with Alzheimer's at all.

And you're going to learn about another reason why it

made sense to sell in July of 2008, and that's that Elan's only other drug was in jeopardy. Now, Elan was developing bapineuzumab, but it really only had one other drug that it was selling to patients and to the market, and that was a drug called Tysabri, T-y-s-a-b-r-i. And Tysabri was a drug to treat multiple sclerosis, not Alzheimer's. But the thing is Tysabri had a known side effect; it was called PML. And, in essence, it was like a virus that would attack the brain and, it could be very, very serious. It could even be fatal.

And so in 2005 there had been some cases of PML connected to Tysabri, and the Food and Drug Administration, the FDA, had taken Tysabri off the market. And when they did that, Elan's stock plummeted. It fell 75 -- close to 75 percent. And then in 2006 the FDA allowed Tysabri to go back on the market, and there had been no cases of PML from that point forward. But what was happening in June and July of 2008 was that the rumors were starting to circulate that there may be cases of Tysabri PML connected to Elan's only drug that was being sold, and investors were worried that if those rumors proved to be true, Elan's stock would crater, it would fall tremendously, just like it had in 2005.

And so, finally, you'll see that there was simply way more risk than upside to holding the stock and the sale would lock in profits.

So in July 2008, when the rest of the market was

beginning to crash in this worst economic crisis that we've had in our lifetime, the sale of Elan allowed SAC Capital to lock in profits, to make sure that they eliminated risk. In a bad year, it was a tremendous success. And personally, for a young father with three young kids, locking in profits was the opportunity to secure his and his family's future. It was the smart, conservative things to do.

The point here is the evidence is going to show you that there was all of these factors all coming together in a perfect storm against holding Elan through that conference, that it was now time to sell that investment, just as they had always contemplated doing.

Now, let's turn to the prosecutor's case.

Now, the prosecution alleges that Mathew recommended that SAC sell Elan and Wyeth based on inside information that he had gotten from Dr. Gilman and Dr. Ross. But you will not see any hard evidence -- again, there will be no wiretaps, there will be no taped conversation, there will be no emails saying sell the stock -- nothing, no hard evidence at all. And you are going to see that the testimony of Dr. Gilman will give you many, many reasons to doubt the story that he is telling.

The prosecution seeks you -- seeks to have you convict based simply on the testimony, testimony that is based on faulty memory, testimony that is based on inconsistencies, and testimony that won't add up with the evidence that you're going

to see at this trial. Because the fact that Dr. Gilman has a memory that's faulty and has changed his story again and again is going to give you ample reasonable doubt about the story the prosecution wants you to find beyond a reasonable doubt.

Now, you've heard me talk about reasonable doubt a few times. So let me take a moment and talk about what that term means. Judge Gardephe referenced it earlier and will explain it to you in detail, and he is the -- he is the only law on what the law means. But let's take a moment to talk about this because it is a vitally important principle.

The burden of proof "beyond a reasonable doubt," it is the highest burden that exists in the law. As to each and every one of the charges, the prosecution must prove the elements -- every element -- beyond a reasonable doubt. And that highest burden, the highest one we have, it exists to prevent innocent people from being convicted based on speculation, based on conjecture, based on a rush to judgment. With the consequences so great in a criminal case, the law demands that each and every element be proven beyond a reasonable doubt.

Now, as Judge Gardephe explained to you earlier, the defendant has no burden to prove anything to you. We have no burden to makes any objections, to make any arguments, to call any witnesses, to do anything, and that's because in our law we have a presumption of innocence. Mathew is presumed innocent

unless and until the government can prove beyond a reasonable doubt that he committed these crimes. And the burden of proof and the presumption of innocence are really the bedrock principles of our system of government, our system of justice. They protect all of us -- you and me and Mr. Martoma and everyone in this courtroom and, frankly, everyone in this country -- from unjust prosecutions.

Ladies and gentlemen, they are the principles that will determine Mathew Martoma's life, because the stakes here could not be higher. And the evidence will show, when you look at the testimony from these witnesses, that there is reasonable doubt everywhere that you turn. So let's look closely at what the evidence will show you about Dr. Gilman's story.

Now, first, as I mentioned, you're going to see that you can't trust his story broadly because of the deal that he's gotten and the bias that that deal gives him. But you'll also learn that the story is at odds with what he told at the time, and it's at odds with what he said when he was first approached by the prosecutors.

But you'll hear also that this deal ensures that he never has to face any jail, any consequences with the criminal justice system as a result of his own misconduct, as a result of the things that he did that he should not have done.

And you'll learn that he's the one -- he's the one -- who had the obligation to keep information confidential, not

just with respect to Mathew, but with respect to others, the other people that he talked to.

And you're going to hear how this deal provides him with a great motivation to remember things, remember things the way the prosecution wants him to remember them. Because Dr. Gilman's choice was himself or Mathew. And who was Mathew to him? A young portfolio manager who was more than 40 years his junior, who he met only a handful of times during this whole period of time, whose family he had never met, who he had never socialized with. And so you'll get to see that evidence, and you'll see Dr. Gilman's choice to choose himself over Mathew.

And you're going to see, second, that the evidence will show you that Dr. Gilman's story, at its heart, makes no sense. Because, for starters, why would Dr. Gilman risk everything that he had to intentionally provide confidential information over to Mathew? At the time that Gilman now claims that he was providing information to Mathew that he should not have, he had been the head of the department at the University of Michigan and he had talked there as a professor for over 30 years and he had built a substantial reputation as an Alzheimer's expert. He even had a scholarship named after him. And, in addition, he had developed a lucrative consulting practice. He was making more than a million dollars during this period of time from the consulting he was doing with other

individuals and other companies. And he risked that all if he would intentionally pass confidential information along to Mathew.

His story doesn't add up. And you're going to see that the motivations behind the deal that he's gotten are what's influencing him to come to court and tell you the story we are going to hear on that witness stand.

But there is more. As I mentioned, you'll hear that Dr. Gilman claims that when he saw the data, he thought the data was great, was dynamite, that the drug would work. And you won't see that it was about the science being good, but it was about bapineuzumab -- that's what his reaction was -- that bapineuzumab worked, the drug he had personally been involved with.

If Gilman was the tipper in an insider trading case, we should see SAC buying, not selling.

So the story right away doesn't add up.

And the prosecution's case turns on Dr. Gilman's biased recollections of events that happened five to six to seven, sometimes as long ago as almost eight years ago. But you're going to learn that Gilman spoke to hundreds of analysts -- not just Mathew Martoma -- hundreds of analysts, hundreds of investors. Between 2006 and 2008, he had more than 320 consultations with more than 230 analysts. Mathew was just one of them.

You can see the numbers graphically depicted on the slide. And he consulted with 230 separate analysts and more than 320 consultations, and he did more than a dozen consultations with companies on top of that.

And in June and July of 2008, the critical time period in this case, you are going to learn that he was diagnosed with cancer. And while he successfully treated that disease, he underwent aggressive chemotherapy exactly during this time, the time period that's at issue in this case. And he was prescribed a powerful cocktail of drugs, including one called Prednisone, a drug that has a known side effect of confusion.

So the prosecution's entire case will rest on the biased recollections, that keep changing, of an 81-year-old doctor about conversations that happened five-and-a-half to eight years ago with one of more than 230 clients he had when he was in the midst of chemotherapy treatments that caused confusion.

We submit, you are going to find reasonable doubt in all aspects of that story.

Now, the prosecution implied that there was something wrong with Mathew trying to talk to many doctors and experts about Elan and about bapineuzumab. Interestingly, they didn't mention how many consultations Dr. Gilman had had.

But the evidence will be clear about one thing, and that's that talking with experts through expert networks, such

as this GOG company, was, as I mentioned, perfectly legal, perfectly standard, and really demanded of people who were involved in the healthcare industry as investment professionals.

And you're going to learn why. Because public information about drug trials is incredibly complicated. It's complicated and it's confusing. You need to be a doctor or a scientist, really, just to understand the science behind Alzheimer's disease. And because it's so complicated, it is very important for investors to be able to talk to experts. Because it's very hard for experts to know what information -- excuse me. It's very hard for investors to know what information is public and what information is not public, and so they look to the experts to help them make that call.

And it's important to use the experts, again, since they cannot be guessing about what the science means, in making recommendations about where to invest other people's money.

So you are going to see that SAC's agreement with this company, GOG, allowed all of SAC, and Mathew included, to have fairly unlimited access to experts. And Mathew used that access extensively.

To put this in context, the evidence is going to show that during this same time period, July '06 to July '08, Mathew himself spoke to more than 220 experts, different experts, all through the same company, and more than 350 different

consultations. You will see the numbers as we look at the graph. But he was talking to experts all the time. And he had even additional consultations with experts from other firms.

So we agree that the evidence will show that Mathew Martoma was talking with Dr. Gilman. But, again, that was his job. And as you will see, the 40-some-odd consults that he had with Dr. Gilman was just a tiny fraction of the amount of consults that he was having with experts in the healthcare industry about primarily Alzheimer's disease, about that complicated science involving Alzheimer's.

And as I've mentioned, the evidence is going to show you that that is what was required of him to do his job. That was not a crime. That was work.

And the evidence will establish more inconsistencies in the story you are going to hear from Dr. Gilman. Because if he had Dr. Gilman, the Chair of the Safety Monitoring Committee, the SMC, giving him the inside information throughout this entire time, then it would make no sense to spend over 350 consultations with over 220 experts talking about these complicated issues. You don't do that if you have the insider telling you about the inside information.

And you're going to learn from the evidence how it was routine for Mathew and other research analysts and portfolio managers to look to the experts to explain the science of drug -- excuse me, to explain the science of drug trials using

information that was public; that was allowed. Now, Gilman was the expert here, not Mathew. The information was scientific, was incredibly complex. We'll look at some of that information together during this trial, and you can see just how mindbogglingly complex it really is. But it was Gilman who was responsible for knowing what information was public and what information was not public, what information could be disclosed, and what information could not be disclosed.

Now, listen, we agree that no one is allowed to blindly rely on anyone else, even an expert, to make the call. But what you are going to see here in this case is that both Gilman and the company, Elan, were publicly disclosing all sorts of complicated scientific information about bapineuzumab throughout this time period. And because there was so much information that was already publicly disclosed, here you needed to rely, to be able to rely, on the experts. It was the only reasonable course of conduct to take to make sure that what you were being told by the people who had the obligation to make that call were doing it correctly.

Now, the prosecution also pointed you to a number of calls that Mathew had with Dr. Gilman around those SMC meetings, and they suggested that that was some evidence of insider trading. Again, the evidence you are going to see will actually tell you a different story.

Now, as I mentioned, the Elan investment was on the

books before any allegation of improper information is being made in this case, before, in fact, Mathew ever met with Dr. Gilman in person. And you're going to see the SAC positions in Elan throughout this time period. And you're going to see that the positions in Elan fluctuated dramatically. They went up and they went down. And the Elan positions had no relationship to the SMC meetings.

So we're going to put up -- these are the dates of the SMC meetings. The prosecutor said he was getting positive safety information, the kind of information you would think would make you buy more of the stock. But you'll see there is no pattern of buying more of the stock. And you see the prosecutor said, well, Gilman was giving him an early preview so you would think he would accumulate and buy more and more. And he mentioned perhaps a little tweaking here and there. But we are not going to see tweaking here and there when we look at the actual trading runs; you are going to see millions of shares of position.

Let's take a look, if we can, Mr. McLeod in the October '07 time period. You're going to see -- now it is hard to tell by the chart there, but that's the sale of more than 5 million shares of Elan stock in October '07, when it's supposed to be getting positive information to buy more. And then even more of the same happens in the spring of '08. Take a look over here.

And, again, if you kind of look a little bit on our chart, but the drop of millions and millions and millions of shares of stock -- inconsistent with what the prosecutors' story was to you in their opening remarks.

You're going to see that the evidence doesn't fit the story.

Now, you're also going to learn something else about these SMC meetings, these Safety Monitoring Committee meetings, but you're going to learn that it's all really just a big smokescreen. Because the prosecution in this case alleges that the specific insider trades occurred at the end of July of 2008. And by July 2008, the safety issues that were part of the SMCs, even if they had been confidential at one point in time, had been substantively disclosed to the public. They had been made public by the company by the disclosures that happened to the public. And so they couldn't support an insider trading charge in July of 2008 no matter what. It is all just a distraction.

Now, the prosecution also mentioned to you another witness, this Dr. Joel Ross, and you're going to get to examine Dr. Ross and scrutinize him as well. And there is going to be a lot to look at there, because you'll hear that Dr. Ross, like Dr. Gilman, got another one of these sweetheart deals, a nonprosecution agreement, that means he will never have to face any consequences for his own misconduct. But on the key point

in this case, on the key point that you'll have to decide about this trial, you're going to learn that Dr. Ross is largely irrelevant. He's part of the rush to judgment.

Now, you're going to hear that Ross is an Alzheimer's doctor who operates some health clinics or, as he calls them, memory enhancement centers. And he's a doctor who recruits patients to be part of trials and then administers the drug that's part of the trial to them, and he gets paid for doing so. And throughout almost the entire time period of this case Ross could not have told Mathew anything about whether the bapineuzumab drug worked because he didn't know anything that mattered about whether the bapineuzumab drug was working.

The bapineuzumab trial was called a double-blinded trial, and that means that both the patients and the doctors didn't know whether they were actually getting this drug bapineuzumab or just getting a placebo, like a saline solution, injected into them. So Dr. Ross didn't even know as to whether the patients were on the drug or weren't on the drug. He didn't have any access to inside information about whether the drug worked in the first place.

And what he did know about his own patients, whatever he could surmise about them or any side effects that they may have gotten during the course of this trial, was not material to the issue as to whether the drug would work or not. So he didn't have anything that mattered to an investment decision.

Now, the prosecution told you that Ross supports Gilman's story because on July 28, 2008, the night before the ICAD presentation, that conference, Ross claims to have gotten a copy of the presentation, to have reviewed it, and then to have met with Mathew. But you're going to see that Ross' own emails contradict that spin on events.

So on July 29th, the day after this meeting and after the ICAD conference, you'll see that Dr. Ross sends Mathew an email. You see, it is July 29th. And in the email he gives him his take on the ICAD results. And he says that he believes the results were quite phenomenal and that he's hoping the drug, bapineuzumab, would be on the market by 2011 or sooner.

But what is more, Ross' story, as you consider it and as you think about it, will actually contradict and undermine Dr. Gilman's story. Because if Gilman had told Mathew about the results of the bapineuzumab trial and that the results were bad and that he should sell and that he started to do all this in the middle of July and that SAC Capital began selling their stock on July 21st, then Mathew would have no reason to meet with Dr. Ross on the evening of the same conference. After all, that stock had been started to be sold on July 21st. It doesn't make sense. It doesn't add up. It, in fact, contradicts the government's own story.

And when the facts don't fit the story, the story has reasonable doubt.

Now, the prosecution asks you to look closely at the testimony of Drs. Gilman and Ross because of their deal. Well, we agree. We ask you to scrutinize their testimony. You're going to see that they've changed their stories time and again. They have even admitted to lying. To lying. And they have a tremendous bias to point the finger at Mathew because that is what gets them out of harm's way with the prosecutors. That's what enables the prosecutors to bring the case that we are here today about.

And think of it this way. Would you trust your most precious possession, the safety of your loved one, to either of them when you know that they have a motive to benefit themselves by putting your loved one in harm's way? And if you won't, then you will have reasonable doubt in this case. You will see that their stories don't add up, that this case doesn't make sense.

We ask you to assess their credibility, what they say, what they don't say, and how their stories have changed over time. Because when you do that, that will be more than enough to find reasonable doubt and to acquit Mathew of all of these charges.

Now, let me go to my final point.

The evidence is going to give you many reasons to doubt Dr. Gilman's story. And Dr. Ross will not alleviate those doubts, but he is going to make those doubts greater.

And as you see the evidence, you will see that time and again the pieces are not going to fit together. The story doesn't add up, because in the haste to make a case the prosecutor rushed to judgment here.

Now, as the evidence comes in in this case, it will come in in bits and pieces. And it will come in through witnesses who will testify about things and through documents that will refer to things, and those things may not be in order. And those things may not always be readily apparent of their significance to you. So we ask that you keep an eye out for the proof that will come in that will be inconsistent with the stories that the prosecutor told you their witnesses are going to tell here, stories that will establish the reasonable doubt that you will see at the end of this case when you are able to look at all of the evidence.

So, ladies and gentlemen, that is what you are going to see from the evidence.

The sale of Elan and Wyeth stock occurred wholly apart from any claimed inside information. There were many, many independent reasons for SAC to sell Elan and Wyeth stock in the summer of 2008. The evidence will show it was exactly the kind of prudent investment decision that a supersophisticated and experienced investor like Steven Cohen was paid to make. The prosecution's case will not add up. The pieces will not fit. You will see the reasonable doubt in all of their key

witnesses' testimony.

Now, while there may have been a rush to judgment in this case by the prosecutors, in our system of justice, the prosecution -- the prosecutors don't count. What counts is you, the jury, because you are the judges of the facts. You will determine what happened. And so we ask you, don't rush to judgment. Scrutinize these facts. Look at the evidence, the parts of the evidence that won't fit the prosecutors' story. Because when you do that, you will find that Mathew did not commit these charges. He has been falsely accused. And once you've done that, I am sure that you will come back with the only evidence -- excuse me, with the only verdict that will be a verdict based on the evidence, and that is a verdict of not guilty.

Thank you.

THE COURT: Ladies and gentlemen, we are going to take our lunch break now. I am going to ask you to return at 1:45.

Don't discuss the case. Don't read, listen to, or look at anything about the case. Keep an open mind. You haven't heard any evidence yet.

Have a pleasant lunch. We will see you at 1:45.

Thank you very much.

THE CLERK: All rise.

(Jury not present)

THE COURT: Anything we need to take up?

MR. DEVLIN-BROWN: Not right now, your Honor.

MR. STRASSBERG: No, your Honor.

THE COURT: All right. We will resume at 1:45.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

2:00 p.m.

(In open court; jury present)

THE COURT: The government will call its first witness.

MR. DEVLIN-BROWN: The government calls Tim Jandovitz, your Honor.

TIMOTHY JANDOVITZ,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. DEVLIN-BROWN:

Q. Good afternoon, Mr. Jandovitz. Where are you from originally?

A. I'm from Connecticut. I was born in Stamford and raised in New Canaan.

Q. How far did you go in school?

A. I graduated with an economics degree from Boston College.

Q. What line of work are you in?

A. I work in the financial services industry.

THE COURT: Feel free to pull that mike towards you. Go ahead.

Q. What city are you working in now?

A. I live -- I currently live and work in New York City.

Q. Before you were in New York, where was the most recent city you were working?
A. I spent the last couple years living and working in Chicago, Illinois.
Q. Were you in the financial service industry in Chicago?
A. I was not.
Q. What were you doing in Chicago?
A. I started a food concept there.
Q. I don't know if anyone else is having a little trouble hearing. If you could speak into the mike a little bit more?
A. Is this any better?
Q. I think so. So I think you said something about a food concept in Chicago?
A. Yeah. I was working on a food concept a couple years -- for a couple years that I devised, and there was a BEL 50 store and restaurant that I operated.
Q. What was the food concept?
A. It was a low sugar yeast-based waffle bread.
Q. Was this like a restaurant that you had?
A. Yes, it was a restaurant.
Q. Before you had your restaurant, where were you working?
A. The last five years of my employment in the financial services industry I worked at SAC Capital from 2005 to 2010.
Q. Did you work at any particular division of SAC Capital?
A. Yes, I was hired to be the head healthcare trader at CR

Intrinsic.
Q. What does being a trader involve?
A. It involves buying and selling stocks throughout the course of the day.
Q. Did your job involve making investment decisions about which stocks to buy or sell?
A. It did not.
Q. What do you mean then you were trading stocks?
A. I was instructed by an analyst and a portfolio manager what stocks to buy and sell.
Q. So your job was just then implementing those instructions; is that right?
A. Correct.
Q. So SAC Capital is where you say you worked, right, sir?
A. That is correct.
Q. What is SAC Capital?
A. It's Steven A. Cohen's hedge fund.
Q. What's a hedge fund?
A. A hedge fund is a private investment firm that can both buy stocks with anticipation of them going up in price as well as betting -- shorting stocks and selling stocks, betting that they will go down in value; whereas a mutual fund, you buy stocks expecting that they are going to go up in value.
Q. I will ask you about a couple of those concepts. Where do hedge funds get money to be buying and selling stocks?

A. High-net-worth individuals. In the case of SAC, it was pension funds, high-net-worth individuals, Steven Cohen's own personal money.
Q. And you said you may be betting the stocks go up or down. Is that right?
A. That is correct.
Q. How do you make trades based on a prediction that stocks will go up?
A. Analysis.
Q. If you believe a stock is going to go up and you want to profit from this, what would you do as a trader?
A. You would accumulate or buy a stock.
Q. What if you believed the price of a stock is going to go down and you want to profit from that, what can you do?
A. You would get a locate or a borrowed stock from a brokerage firm and sell short the stock anticipating that the stock will go down in price.
Q. That concept you just described is known as selling short. Is that right?
A. That is correct.
Q. It involves borrowing a stock?
A. Correct.
Q. Do you actually like go somewhere and get the stock and then give it back when you're done?
A. The common term is borrowing, but you -- there is something

called a stock loan desk at various brokerage firms and you "secure borrow" from said firms and then you sell short the stock.
Q. Do people just refer to it as shorting a stock?
A. That is correct.
Q. If you do you short a stock I believe you said that's -- that profits -- the stock price goes down?
A. Correct. So if you -- if a stock is trading at $50 and you think it's worth $40, you short the stock betting that the stock will go down in value.
Q. So, I want to ask you a little bit more about SAC Capital. Where was SAC Capital's office?
A. We had offices throughout the world, but our headquarters were in Stamford, Connecticut.
Q. When you say throughout the world, other continents?
A. We had offices in London, Hong Kong. We had a fairly sizable office in New York City, but our main headquarters where Steve worked and most of senior management was located in Stamford, Connecticut.
Q. This Steve you're referring to there?
A. Steven Cohen.
Q. Where did you work most of the time?
A. A hundred percent of the time to start, the first few years I was in Stamford, Connecticut. Over my five plus years at the firm, over the last few years I split my time between New York

City and Stamford, Connecticut.
Q. Let's stick with -- well, let me ask you the 2006 to 2008 time range. Where were you working during that time period?
A. 90 percent of the time I was in Stamford, Connecticut.
Q. Can you describe what the space was like around you where you were working?
A. It was a space probably three or four times the size of this room.
Q. Did you have an individual office within that space?
A. I did not. I sat with approximately 30 other traders on what was called the execution desk.
Q. Was there a name for this whole space that was three times the size of the courtroom?
A. A trading floor.
Q. How many people approximately worked at SAC cap in Stamford?
A. I think when I was there, there were approximately 800 employees and probably half of which, 3- or 400 at least worked in Stamford, Connecticut.
Q. So when you were a trader at SAC Capital, were you trading for everyone at the firm or any particular individual or individuals?
A. I traded for three portfolio managers.
Q. For what, sir?
A. Three portfolio managers.

Q. If you look around the courtroom, do you recognize any of the portfolio managers that you traded for at the time?
A. Yes.
Q. Who do you recognize?
A. Mat Martoma.
Q. Would you just describe what he's wearing and where he's sitting?
A. Mat is wearing a dark-colored suit a white shirt and a tie.
Q. Is that sufficient? You mentioned that you traded stocks for portfolio managers. Is that right?
A. That is correct.
Q. What was a portfolio manager's role at SAC Capital as you understood it?
A. A portfolio manager's role was to do analysis and research on individual stocks in the sector he was assigned to and make calls or predictions based upon this research as to whether or not the stocks would rally in price or decline in price.
Q. You mentioned sectors. What do you mean by sectors?
A. There are various sectors of the economy. Like -- we concentrate on the healthcare sector, so companies like Pfizer, Bristol Myers, Merck, are well-known pharmaceutical companies, and we traded their stocks.
Q. Did Mr. Martoma have a portfolio at any point at SAC Capital?
A. He did.

Q. What sector was that portfolio specialized in?
A. Originally it was European pharma.
Q. Pharma means what?
A. Pharmacy, so drug companies.
Q. Did that change?
A. No.
Q. So the whole time it was European pharma?
A. His role evolved over his time there. Besides European pharma, he invested in a variety of stocks, orthopedic device manufacturers, biotechnology stocks.
Q. And you mentioned that you had a few other portfolio managers that you traded for. Is that right?
A. That is correct.
Q. Were they healthcare focused portfolios as well?
A. That is correct.
Q. So, did you spend most of your time trading healthcare stocks then?
A. Almost a hundred percent of my time.
Q. Like technology stocks, would you trade those ordinarily?
A. I did not trade technology stocks as my primary responsibility at SAC.
Q. So, the term portfolio manager, what is the portfolio?
A. A portfolio of stocks. So when you invest in a mutual fund, said mutual fund manager is going to either be a generalist or concentrates on sectors. He may concentrate on

the bank sector and bank stocks or all economy industry stocks or health stocks. So it's a number of -- it's comprised of a number of companies that represent the portfolio in aggregate. So, the portfolio -- a portfolio consists of ten stocks, 20 stocks, 30 stocks, 50 stocks, a hundred stocks.
Q. Are portfolio managers at SAC given any particular amount of funds to invest?
A. There's a set amount of funds that are designated for them to invest.
Q. In 2008, do you recall how much approximately Mathew Martoma had to invest?
A. It was roughly around $500 million.
Q. 5 what?
A. $500 million.
Q. Within the amount of money that is given to a portfolio manager to invest, what sort of trading -- what sort of authority, as far as you understood it, did portfolio managers have in terms of what investments to make with the money?
A. They had a significant degree of autonomy, but there was a risk management team that could control the bets we could make in individual stocks as well as our overall portfolio.
Q. In your experience at SAC Capital, were portfolio managers generally assisted by other people?
A. They were assisted by analysts who helped them do the analysis as well as traders like me.

Q. What was Steve Cohen's role at SAC Capital?
A. Steve was the head of the firm, and Steve managed -- Steve Cohen managed the largest -- managed and traded the largest portfolio at the firm.
Q. Was there any system in place at SAC Capital through which portfolio managers could recommend trading ideas to Steven Cohen for his portfolio?
A. That is correct, there were weekly write-ups that were composed and sent to Steve on Sundays apprising Steve of portfolio positions as well as the ideas they had both long and short in the portfolio as well as conviction in the ideas.
Q. Could portfolio managers receive bonuses based on profitable trades Steve Cohen would make in response to ideas submitted to him?
A. Yes.
Q. Now, did you trade healthcare stocks for Steve Cohen generally?
A. Initially I would help out SAC's portfolio -- excuse me -- trader. If he had to use the men's room, I would cover for him. I traded for Steve very infrequently to start. That evolved to almost no trading for Steve over the course of my last few years at SAC.
Q. Did Steve Cohen have traders that worked directly for him?
A. Yes, he did.
Q. Did he have a head trader?

A. Yes, he did.
Q. Who was that?
A. His name was Phil Villhauer.
Q. When did Mr. Martoma start at SAC?
A. Mat started at SAC at some point in the summer of 2006.
Q. So you were already there at the time then?
A. I had been there for just under a year.
Q. Did Martoma when you started have any other traders that he used to your knowledge or were you his one and only?
A. He did not. It was just me.
Q. During Mathew Martoma's whole tenure at SAC Capital, did he have any other traders than yourself who executed trades for him?
A. There was a woman I hired to be my assistant trader in 2008 named Annette Koberlein, but Annette essentially reported to me, so Mat would have limited interaction with Annette; but it was for the most part me.
Q. Now, when Mathew Martoma started in 2006, do you know whether he had complete decision-making authority for his portfolio?
A. I believe that the "chain of command" was to produce ideas and then run them by Mat, Matt Grossman who was the head of Intrinsic.
Q. And by Intrinsic, you mean CR Intrinsic?
A. Correct, CR Intrinsic.

Q. Did there come a point when Mr. Grossman left the firm?
A. That is correct, at the end of 2007, Matt decided to leave SAC Capital and start his own venture.
Q. Matt Grossman again, right?
A. Matt Grossman, I'm sorry.
Q. Before Matt Grossman left, were you still trading stocks for Mat Martoma?
A. That is correct.
Q. When Mr. Grossman was still there, would Mat Martoma give you trading orders directly?
A. Initially, the orders came from Matt Grossman. Over time, it evolved to where the orders came directly from Mat Martoma.
Q. Do you know what portfolios -- did they have any acronyms at SAC? Do portfolios have acronyms?
A. There were four-letter acronyms for the portfolio. Mat Martoma's portfolio was GEHC. Matt Grossman's master CR Intrinsic portfolio was the GGEN portfolio.
Q. While Mr. Grossman was still with CR Intrinsic, do you know whether Mathew Martoma's trades were in GEHC, GGEN or both of those?
A. His trades were allocated to both portfolios, GGEN and GEHC.
Q. When Mr. Grossman left the firm, did Mathew Martoma obtain his own direct portfolio?
A. Mat Martoma was given his own portfolio.

Q. What acronym did that have?
A. GEHC, it remained the same.
Q. Once Mat Martoma had his own portfolio, do you know if he had an analyst who worked for him?
A. He did. Her name was Katie Lyndon.
Q. So what were your day-to-day responsibilities -- let's take now the time period around the beginning of 2008 through July 2008. What were your day-to-day responsibilities for being a trader for Mat Martoma?
A. Sure. I'll just walk you through my day very briefly.
I would get into work around 7:00. I would read and review approximately 50 to 60 research emails produced by analysts at Goldman Sachs, Merrill Lynch, the various investment banks as well as boutique research firms.
I would filter that research down to healthcare specific or healthcare in general and then research specifically related to the stocks in our portfolio that we both owned expecting that they go up in value as well as the stocks we would short expecting that they would decline in value.
I would convene with the portfolio manager around 9:00 a.m., 9:15 to review the research that had been issued overnight.
The market would open, the New York Stock Exchange and NASDAQ would open at 9:30, and throughout the course of the day

I would be buying and selling stocks on the New York Stock Exchange and NASDAQ as well as communicating with the three portfolio managers that I worked for.
Q. Did you have authority to buy or sell any of those stocks without direction to do so from one of those three portfolio managers?
A. Did not.
Q. So what information would you have available to you in 2008 with respect to Mat Martoma's portfolio?
A. Would you repeat the question?
Q. It wasn't a good question. What information did you have access to in 2008 about what was in Mat Martoma's portfolio at a given time?
A. I could see the portfolio positions as well as be informed of the weekly writeups that Mat Martoma would send to Steve Cohen via email on the weekends on Sundays.
Q. Let's take both of those in turn. You said you could see what was in his portfolio?
A. Correct.
Q. Was there any particular tool or tools you used to do that?
A. We had a portfolio tracking system that was proprietary to SAC called panorama. It showed the stock, the shares we owned, the average price, a couple other things.
Q. In the course of your day, how often would you be checking panorama?

A. Probably 200 times a day.
Q. Did it enable you to see what Mat Martoma had in his portfolio in realtime?
A. That is correct.
Q. You mentioned also emails; that you would learn something about what was in his portfolio from emails?
A. The analysts/portfolio managers would send weekly writeups to Steve Cohen on the weekend highlighting their top ideas in their portfolio as well as conviction rankings on their ideas.
Q. If Mathew Martoma wanted to trade a particular security, how would he communicate that to you?
A. There were mainly three mediums of communication: Email, instant message or communicated over the phone.
Q. So, I want to walk through different ways you could execute a trade if you were given a trade by Mathew Martoma. Let's say you're given an order to buy 500 shares of IBM. What were your options for trying to do that?
A. Well, I would be interacting with the various brokers and traders at the banks. So I may receive an instant message from a trader at Goldman Sachs saying I have -- you sent 500 shares of IBM to the trader at Goldman, and they have 500 of IBM to sell. I'm a buyer, I would pick up the phone saying I want to buy 500 shares of IBM stock. There's something where I could execute the trade myself, it was called an ECN, it was an electronic communications network. I could manually purchase

the stock that way.

There was also an anonymous system, a crossing network which matches two buyers and sellers anonymously, so you would put your order in that anonymous crossing network, but you couldn't see -- in this case the 500 shares of IBM I'd put it in the crossing network, it was anonymous though, I couldn't see who the seller was, and you'd either be matched on the order or you could execute the order or it was not matched and you weren't executed.

Q. Was there a term used to describe these anonymous networks?

A. Crossing networks dark pools.

Q. What was the second thing you said?

A. Dark pools.

Q. Was it ever the case when trading where you would get an order from one portfolio manager to buy 500 shares of IBM and would see that someone else somewhere within SAC was trying to sell 500 shares from IBM?

A. That's correct.

Q. How common was that?

A. Excuse me?

Q. How common was that?

A. It would occur multiple times throughout the course of the day.

Q. Was it permitted at SAC for one portfolio manager to be buying IBM and another portfolio manager selling IBM at the

same time?
A. That is correct.
Q. So, other than your working relationship with Mr. Martoma, were you friends with him?
A. We were friendly. I wouldn't say we were friends, but we had a cordial relationship.
Q. Did you have ever have any work disputes or other problems of note with him?
A. No.
Q. So I want to ask you about a company called Elan Pharmaceuticals. Have you heard of that?
A. Yes.
Q. What kind of company is Elan?
A. It's an Irish drug manufacturer.
Q. Does it have any offices in the United States, do you know?
A. I don't know if it has offices in the United States.
Q. Is its stock traded in the United States?
A. It's traded in the United States. Its symbol is ELN. It's called an ADR. It's an American depository receipt. So it trades locally in Ireland, and the US-based version, again, is called an ADR, an American depository receipt. It trades locally. In this case Elan trades on the New York Stock Exchange.
Q. You could buy and sell these ADRs for Elan on the New York Stock Exchange?

A. That is correct.
Q. So after Mat Martoma started at SAC, did there come a point where he purchased or directed you to purchase Elan stock in his portfolio?
A. Yes.
Q. When approximately was that in relation to when he started?
A. Shortly after he began his tenure at SAC.
Q. Did he tell you anything when he started buying Elan stock about why he liked the stock?
A. He indicated that there was a trial that was to -- there was a drug that Elan was working on with Wyeth that would be a treatment for Alzheimer's disease.
Q. Do you know the name of the drug?
A. Yes. Bapineuzumab.
Q. Did Mathew Martoma when you started buying Elan stock for him convey any view to you about the prospects for this drug trial?
A. He was positive on the drug and the upcoming trial. Upcoming, I mean a trial that was going to take a few years, not a few months.
Q. He started buying, you say, shortly after he joined SAC Capital?
A. As far as I recall, yes.
Q. Do you know when the trial ended, the bapineuzumab trial?
A. The main phase two trial results were at that time

anticipated sometime in -- now I'm talking 2006. The phase two trial was to be announced in 2008, and then the phase three trial at some point at a later date.
Q. So you mentioned just a minute ago a company called Wyeth. What is Wyeth?
A. Wyeth is an American pharmaceutical company that was actually recently acquired last year too by another U.S. based drug manufacturer, but it was -- to answer your question, it was US-based pharmaceutical company.
Q. Did that company trade on the New York Stock Exchange?
A. It did. Its symbol was WYE.
Q. Did there come a point when Mathew Martoma acquired Elan stock in his portfolio -- I'm sorry -- Wyeth stock in his portfolio?
A. Wyeth, yes.
Q. Was that before or after when he started buying Elan stock?
A. According to my recollection, it was around the same time that we started to acquire stock in Elan.
Q. Did Mathew Martoma tell you anything about his view on Wyeth stock?
A. He informed me that both Wyeth and Elan had a co-promoter they were collaborating on the development of this drug, and he had a positive view of the prospects for the stock of Wyeth, as well as Elan.
Q. How would you compare Elan and Wyeth in terms of their

size?
A. Wyeth is a much larger drug manufacturer, more products on the market, a much more diversified revenue stream. Elan is a smaller drug company. At that time a lot of the prospects for the stock price of Elan were predicated on the success or failure of this drug bapineuzumab.
Q. At the time did you believe that Wyeth's prospects would be affected as much as Elan's with respect to the results of the drug trial of bapineuzumab?
A. It would be affected, but not to the same degree as the stock price of Elan.
Q. Do you know whether or not Mr. Martoma did any sort of research with regard to bapineuzumab?
A. Yes.
Q. What research did he do?
A. Well, he would talk to analysts at banks and also banks throughout the course of the day. These banks would organize calls with various doctors that were thought leaders or specialists in various fields, as well as there would be doctors calls set up by various research groups or boutique research firms that didn't necessarily have banking capabilities.
Q. Are you familiar with a firm called GLG?
A. Yes. The acronym stands for Gerson Lehrman Group.
Q. Is that one of these research firms you mentioned?

A. I believe so, yes.
Q. Do you know what GLG did?
A. They provided access to, again, key thought leaders in various industries.
Q. Do you know if Mat Martoma used GLG services?
A. According to my recollection, yes, but we used a variety of services and service providers.
Q. Do you know whether Mr. Martoma talked to any doctors with respect to the bapineuzumab trial?
A. He would mention doctors' names, yes.
Q. Any of them stick with you?
A. If you mentioned a couple names, I might recall them.
Q. But you don't independently sitting here today remember names of particular doctors he told you back then?
A. No.
Q. How do you know he had these calls with doctors?
A. I would IM or call him, and he'd say "I'm on a call. What do you need?" I mean, he would communicate that via instant message or email saying, "I'm on a doctor's call. I can't talk. Is it important?" or "what do you need?"
Q. While you were at CR Intrinsic, did you have any understanding as to what the policy was at the firm with respect to insider trading?
A. Yes. It was not allowed.
Q. Were you required from time to time to attend compliance

trainings that dealt with insider trading?
A. That is correct. The compliance training was mandatory and it was either biannual or annual.
Q. All right. If you look on your screen, I'd like to show you what's been marked for identification as Government Exhibit 587.
MR. DEVLIN-BROWN: Your Honor, if I may approach and leave the witness hard copies of this and some other exhibits?
THE COURT: Yes.
MR. DEVLIN-BROWN: I apologize, your Honor. We just need the switch so we can show it only to the court and the witness.
THE COURT: Can you do that, Mr. Ruocco?
Q. I'm showing you what's been marked for identification as Government Exhibit 587. Do you recognize that?
A. I do.
Q. What is it generally?
A. It's a sign-in sheet for an annual compliance training meeting that SAC required us to attend.
MR. DEVLIN-BROWN: The government offers 587.
THE COURT: Any objection?
MR. BRACERAS: No objection, your Honor.
THE COURT: Government Exhibit 587 is received.
(Government's Exhibit 587 received in evidence)
MR. DEVLIN-BROWN: May I publish it, your Honor?

THE COURT: You may.
Q. So, do you see your name on this list of names here, Mr. Jandovitz?
A. I do.
Q. Maybe we could zoom in on it, Ms. Hernandez. Do you know if Mat Martoma attended this session?
MR. BRACERAS: Objection, your Honor.
Q. Withdrawn. Do you see Mat Martoma's name on this list below yours?
A. I see Mat's name.
Q. Is there a signature next to it?
A. There is a signature.
Q. We can take that off the screen, Ms. Hernandez.
So you've told us a little bit about Mr. Martoma's views on the drug trial. When did he first begin expressing the positive views that you described a little earlier
A. Shortly after his joining CR Intrinsic.
Q. Shortly after what, sir?
A. Shortly after his joining the firm.
Q. In 2007, do you recall if his views changed at all with respect to his outlook on the drug trial?
A. No, I don't recall his views changing.
Q. In January or so of 2008 at the beginning of the year, do you recall how much Elan shares were held in Mathew Martoma's portfolio?

A. At that exact time, the exact amount, no, but it was not a 50 or a hundred thousand shares. It was a considerable amount. It was maybe north of a million shares.
Q. How big was the position in Elan? By position, I just mean the amount of -- actually, I should ask you the question. Do you generally evaluate the portfolio by the number of shares or what the shares are worth?
A. What the shares are worth, the dollar value.
Q. So, if I used the term or you used the term position, can we understand that to mean just the dollar value of what shares in a particular stock are worth?
A. Largest positions being the largest dollar value invested that we have invested in the portfolio. The smallest positions for the most part predominantly are smaller dollar value positions both long and short.
Q. Do you recall what the largest position in Mathew Martoma's portfolio was through most of the first half of 2008?
A. For most of the time, it was Elan and Wyeth.
Q. If you look at them separately, let's say you just take Elan, would that still have been the largest position through most of the first half of 2008?
A. Yes.
Q. Were there limits imposed by SAC Capital as to how much of a position you could have in a particular stock in your portfolio?

A. Yes.
Q. Do you recall, generally speaking, what sort of limits those were?
A. Yes.
Q. Can you describe that?
A. I believe positions couldn't exceed 10 percent of the overall portfolio. Therefore, if you have a $500 million portfolio, position size can't be greater than $50 million.
Q. Do you recall ever hitting that limit with the Elan position?
A. Yes.
Q. When did you hit that limit with respect to the Elan position or was it more than one time?
A. I don't recall the exact date, but I recall it happening. It happened in other portfolios as well.
Q. Do you recall what year it happened where you hit the maximum Elan position in the portfolio?
A. I believe it was 2008.
Q. Do you recall what you did with respect to trading in Elan securities after you hit the maximum position limit for the portfolio?
A. We would move the position from one portfolio to another portfolio.
Q. When you say "we," who are you referring to?
A. Myself and the operations team at SAC CR Intrinsic.

Q. Who, if anyone, directed you to move the position to another portfolio?
A. Portfolio manager or Matt Grossman.
Q. With respect to what you were just describing, hitting the limit with Elan and moving the Elan position into the other portfolio, is that what you were describing?
A. Correct.
Q. Who, if anyone, directed you to do that?
A. It would usually come from Mat Martoma or Matt Grossman, at least in 2007.
Q. In 2008, did it ever happen where you hit the limit?
A. Yes, I -- I believe that did happen.
Q. And do you recall what you did when you hit the limit in 2008?
A. The position would be moved from GEHC our portfolio to another portfolio.
Q. Who directed you to move it in 2008?
A. I believe it was Mat Martoma. A couple times it may have come from a risk manager or from Phil Villhauer. I don't recall the exact names, but most of the time it was Mat. Other times it may have been someone from risk or someone in management.
Q. Now, did Mr. Martoma's portfolio consistently increase its position in Elan sort of straight up in a line?
A. We would do something called trading around the position

where --
Q. What --
A. Say the market rallied very strongly for a couple weeks and the stock price -- the price of the stock rallied in conjunction with the market. Say we were long 2 million shares, we may sell 2,000 shares just to reduce our exposure. Conversely, if we went through a period of overall weakness in the general market, and we had the ability to add to the position, in this case being Elan, then if we were, say, opened owned a million and a half shares, we may in a period of a market weakness or the course of a couple days or couple weeks buy quarter of a million or half million shares.
Q. You mentioned earlier that one thing that portfolio managers could do at SAC Capital was recommend trading ideas to Mr. Cohen. Is that right?
A. That is correct.
Q. Do you know whether Mr. Martoma recommended any Elan to Mr. Cohen?
A. Yes.
Q. What about Wyeth, do you know whether Mr. Martoma recommended Wyeth to Mr. Cohen?
A. I believe he did as well, yes.
Q. How do you know that?
A. From the weekly writeups that were sent over the weekend.
Q. Do you know whether or not Mr. Cohen bought shares of Elan

or Wyeth based on or following a recommendation from Mat Martoma?

MR. BRACERAS: Objection.

THE COURT: Would you lay a foundation?

Q. Did you have any ability to see with panorama or any other tool whether Mr. Cohen was buying or selling securities based on recommendations from Mr. Martoma?

MR. BRACERAS: Objection.

THE COURT: Overruled.

A. Occasionally Mat Martoma, the portfolio manager, as well as other portfolio managers would come over to Steve throughout the course of the day or maybe call Steve on the phone. There was a live microphone, and, yes, I had heard Mat Martoma recommend Elan to Steve. Again, this would happen 30, 40 or 50 times throughout the course of the day by various portfolio managers who worked at SAC and reported to Steve Cohen.

Q. Just to make sure I understand you correctly, the 50 times a day, that's different portfolio managers recommends --

A. Various portfolio managers that worked at SAC and reported to Steven Cohen.

Q. I don't think we understand yet though whether you know -- whether there was a way for you to determine whether Mr. Cohen was, in fact, buying or selling a stock based on a recommendation from Mathew Martoma?

A. I could hear Steven Cohen giving orders. I didn't know if

there was a 1-to-100 percent correlation between advice given by portfolio managers and Steve's buy-and-sell decisions.
Q. Did you ever receive reports with respect to whether positions in the Mathew Martoma portfolio were also positions in Mr. Cohen's portfolio?
A. There was a term where portfolio managers were tagged or attached to positions in the Cohen portfolio.
Q. What does tagging mean?
A. Tagging means if you, portfolio manager A, let's call him, recommends a stock to Steve and Steve decides to buy the stock, then part of your year-end performance in analysis of your profit and loss, you will be held responsible for that recommendation you give to Steve Cohen.
Q. Was there a way for you to determine whether stocks recommended by Mathew Martoma were tagged to Mathew Martoma if Mr. Cohen traded?
A. I didn't know the exact formulaic expression for that, but there was tagging.
Q. Do you have any basis for knowing whether Mr. Cohen traded on Elan and Wyeth following a recommendation from Mathew Martoma?

MR. BRACERAS: Objection.

THE COURT: I want you to elicit from the witness whether -- you've asked this question, but I don't think we have an answer yet -- whether from the computer, whatever the

computer devices were, whether the witness could tell whether Mr. Cohen had accepted a recommendation of any particular portfolio manager with respect to any particular stock.
Q. Did you hear the Court's question?
A. Yes, I heard your inquiry, your Honor. There was no exact way to determine that from electronic device, but I can tell you that Steve Cohen held Mat Martoma and his views on Elan and Wyeth in high regard.
Q. Mr. Jandovitz, do you recall when Elan and Wyeth announced the results of the bapineuzumab trial?
A. Full phase two results were announced from the trial after the market closed on July 29, 2008.
Q. Do you recall what position Mathew Martoma's portfolio had in the Elan or Wyeth in late June of 2008?
A. We owned both the shares of Elan and Wyeth stock.
Q. Do you recall whether Mr. Martoma was recommending to Mr. Cohen to buy more -- withdrawn. Do you recall whether Mr. Martoma was still recommending Elan and Wyeth stock to Mr. Cohen in late June 2008?
A. As far as I recall, Mat was -- Mat Martoma was still bullish on the prospects for the drug trial and the eventual outcome for the prices of both Elan and Wyeth stock.
Q. If we could show you on the screen, Mr. Jandovitz, what's been marked for identification as Government Exhibit 305. Or you could take it in a folder. They should be in numerical

order.
A. I have it in front of me.
Q. Take a look at it, sir, and let us know if you recognize it.
A. I do recognize the email.
Q. What is it?
A. It's a weekly update that was sent on June 29, 2008 to Steve's Ideas which represented --
Q. Let me just ask you, you do recognize this document?
A. I do.
Q. What sort of format is it in? What kind of document is it?
A. It's an email.
Q. Did you receive the email according to what's on there?
A. I did.
MR. DEVLIN-BROWN: The government offers 305 into evidence.
MR. BRACERAS: No objection.
THE COURT: Government Exhibit 305 is received in evidence.
(Government's Exhibit 305 received in evidence)
MR. DEVLIN-BROWN: If we could publish that, your Honor?
THE COURT: Yes.
Q. If we could zoom in, Ms. Hernandez, on -- let's just do the very top box of the email for now.

Let's start at the top. It says it's from Martoma Mat to Steve's Ideas. Do you know what Steve's Ideas means?
A. Steve Cohen had multiple inboxes to help him compartmentalize his work. Steve's Ideas represented ideas that various portfolio managers would submit to Steven Cohen.
Q. On the Bcc. line, I see your name listed. Is that right?
A. That is correct. I was blind carbon copies on this email.
Q. And the Lyndon, Katie that is after that, is that the analyst that you had previously testified that Mr. Martoma hired?
A. That is correct, Katie was the analyst that worked on our team.
Q. So, if you could look at the subject -- actually, look below the subject line, the first line in the text, it says, "6/29/08, GEHC weekly." What is GEHC?
A. GEHC was Mat Martoma's portfolio.
Q. Do you know what the GEHC weekly was?
A. Weekly writeup of ideas and current thoughts of various portfolios managers in this case. In this case Mat Martoma would send Steve on the weekend.
Q. Under that it says positions: Longs. What does long refer to there?
A. Longs is the equivalent of stocks that we own. Where you're a long stock, you own the stock.
Q. If you expressed your position as long -- withdrawn. The

next column or row below that says ticker. It says: ELN. What does the ELN refer to?
A. Elan Pharmaceuticals.
Q. Ticker means?
A. Ticker, the symbol on which it trades on the New York Stock Exchange, under the symbol ELN.
Q. It says target price. Below that it's written $40 to $50. What does the target price refer to?
A. The ultimate fair value, what the analyst or portfolio manager deemed as the fair value for the price of the stock.
Q. Fair value -- OK. Right below it, it says conviction and then there's a colon, number 9. What does the conviction row mean?
A. Your conviction on a scale of one to ten, how strongly do you believe in this idea or position.
Q. And --
A. One meaning obviously weakest. Ten, most conviction.
Q. Do you recall ever seeing any tens in the GEHC weekly?
A. To my recollection, no.
Q. Do you recall seeing all that many nines in the GEHC weekly?
A. I recall seeing more sevens, eights, nines than any tens.
Q. This shows Elan as a nine. Do you recall any other positions that you saw designated at any point as nines in Mathew Martoma's portfolio?

A. There may have been. I don't recall.
Q. The next row says timing, 2008. What does that mean?
A. The timing of the event. So oftentimes you -- there is an event which is the catalyst which determines the value -- the fair value or what we believe the stock was worth. In this case, the event was the results of the phase two trial.
Q. If you look below under updates, number one, it says, "GS adds to conviction buy list with a 45 TP." What is GS?
A. GS represents Goldman Sachs. A conviction buy list is their highest conviction ideas.
Q. $45 TP means what?
A. 45 target price. So most analysts, they assess the value of a company and they assign a price target. Not all, but most, assign a price target to a stock based upon their recommendation.
Q. So we can turn to the row below that says upcoming catalysts. What are catalysts?
A. A catalyst is a driver. You're asking me to define catalyst or -- in this case, cat -- in the case of investing, there are catalysts which enable you to arrive at your price target. Oftentimes those catalysts are earnings when companies announce their quarterly earnings, and that gives an indication of how well the company is doing vis-a-vis what the analysts are thinking. In this case, the catalyst was not earnings. The catalyst was a -- this announcement.

Q. The first catalyst listed "P2 AD data presentation at ICAD." What do you understand that to mean?
A. Phase two Alzheimer's data presentation at ICAD, which was an industry conference which was July 24 to July 31.
Q. There are some other catalysts listed after that one?
A. "Correct your safety update to Tysabri in July."
Q. You don't need to read that. I just wanted to confirm there were other catalysts?
A. There are other catalysts.
Q. Can you zoom out please, Ms. Hernandez. If you look at -- we can go to the ticker that is listed right below Elan and zoom in on that one? So what is the WYE?
A. That stands for Wyeth. That's the stock symbol, and it trades on the New York Stock Exchange under the symbol WYE.
Q. Again, there is a conviction of nine and a target price of $55 to $60?
A. Target price of $55 to $60 U.S. dollars, yes.
Q. Is the phase two data presentation noted on the Wyeth writeup as well?
A. Correct. Upcoming catalysts, it's highlighted as the second bullet point or mention.
Q. If we could zoom out again, Ms. Hernandez.

Were there any other long positions that were sent to Steven Cohen's ideas in this email that you see other than Elan and Wyeth

A. In this email, no.
Q. Do you recall if Mathew Martoma continued to purchase Elan shares in this portfolio after June 29, 2008?
A. I believe we may have added to the position. The exact quantity of shares or date I don't recall.
Q. OK. Actually, we can move backward a little in time. I'd like to show you what's been marked for identification as Government Exhibit 302.
A. I have it in front of me.
Q. Do you recognize it?
A. Yes.
Q. What is it?
A. It's an email exchange between Mat and I on June 25, 2008.
Q. The government offers 302?
THE COURT: Any objection.
MR. BRACERAS: No, your Honor.
THE COURT: Government Exhibit 302 is received.
(Government's Exhibits 302 received in evidence
MR. DEVLIN-BROWN: May we publish it, your Honor?
THE COURT: You may.
Q. So is this email chain something you need to read from the bottom up, Mr. Jandovitz?
A. Yes.
Q. Can we start at bottom then, Ms. Hernandez.
So, the bottom email from Mat Martoma to yourself it

reads, "Want to buy 750K-1M shares OTD." The subject line is ELN. What does that mean?

A. Mat Martoma would like to buy, we wanted to buy 750,000 to a million shares. OTD represents over the course of the day. Go to one million shares if you see a special weakness -- any weakness, essentially. So let's say the stock was down two percent.

Q. OK. He writes in that last sentence, "trying not to move the stock."

In your response above, you write, "Got it. I will not move the stock."

What did you understand him to be asking you to do by not move the stock?

A. Traders can be influential and moving the price of the stock. Let's say if you're more than 30 percent of the volume in a stock, then you're providing artificial support for it.

(Continued on next page)

Q. What you do you mean the volume of the stock?
A. Stock trades at a certain amount of volume on a daily basis, a certain number of shares.
Q. Go ahead.
A. In this case, this stock was probably trading around 5 or 6 million shares. Therefore, if we're going to buy a position at that point in time somewhere between 50,000 to a million and it trades 5 million shares a day, we'll be 20 percent of the volume, which is not really going to influence the price of the stock by acquiring it over the course of a day.
Q. So you wrote back, "Got it. I will not move the stock." And I think you've probably just explained what that meant.
So let's look at the email right above that one, which is also on June 25th, 2008, and it is from Mr. Martoma. And he writes, "Put 500K into GGEN."
A. Put half a million shares into GGEN, which was the other portfolio.
Q. Mr. Martoma's principal portfolio was what? Would you remind me again?
A. GEHC.
Q. So what did you understand this directive to mean, put 500K into GGEN?
A. Allocate any overage so we don't run into any capacity constraints in holding the stock in the GEHC portfolio.
Q. What do you mean, capacity restraints?

A. Position, size limits, in terms of shares or dollar value.

MR. DEVLIN-BROWN: If we could zoom out again, Ms. Hernandez, please. Let's zoom in on the top two in the email chain.

Q. So if we look at the bottom of what's zoomed in on the screen now, which is the email sent June 25th, 2008 at 8:53 a.m. from Mr. Martoma to yourself, it reads: "FYI, spoke to SC about adding ELN in case Phil V has questions about our adding."

Who is the "SC," if you understand that?

A. He's referring to Steve Cohen.

Q. And the "Phil V"?

A. Philip Villhauer, who was/is the head of trading at SAC.

MR. DEVLIN-BROWN: We could take that off the screen, Ms. Hernandez.

Q. I'd like to show you what has been marked for identification as Government Exhibit 307.

Do you recognize this? Take your time.

A. Thanks.

(Pause)

I do.

Q. What is it?

A. It's an email exchange between Mat and I on July 11, 2008. And I initiate the email correspondence by emailing Mat, saying Elan lows me, meaning at the lows of the day, 34.40 --

Q. Sorry. You recognize it.

MR. DEVLIN-BROWN: I offer it into evidence.

THE COURT: Any objection?

MR. BRACERAS: No objection.

THE COURT: Government Exhibit 307 is received.

(Government's Exhibit 307 received in evidence)

MR. DEVLIN-BROWN: If we could just publish that, your Honor?

THE COURT: Yes.

MR. DEVLIN-BROWN: OK, Ms. Hernandez. Thank you.

If we could zoom in on the top of the emails there. That is great.

Q. So your email at the bottom of the screen with the subject "ELN, lows, 34.40, down 6.5 percent I'm adding," there is no text below that, is there, Mr. Jandovitz?

A. Excuse me?

Q. There is no text below that?

A. There is no text below that.

Q. So what do you mean by what you have written on the subject line there?

A. I'm buying the stock.

Q. Do you recall whether as of the date of this email, July 11th, Mr. Martoma was still adding stock to his -- adding Elan stock to his portfolio?

A. Yes. This email exchange would indicate that we're adding,

buying stock.

MR. DEVLIN-BROWN: May I have just one moment, your Honor?

THE COURT: Yes.

MR. DEVLIN-BROWN: Do you need any water?

THE WITNESS: That would be great.

Q. So, Mr. Jandovitz, this email is dated July 11, 2008, and I believe you testified earlier that the data was going to be announced on July 29, 2008, is that correct?

A. That is correct.

Q. Did you have any personal view at this point in July 11th, or that range, as to how risky this Elan position was?

A. Generally speaking, I knew it was risky.

Q. Did you ever communicate that to Mat Martoma during July 2008?

A. I think it was understood by both parties that it was risky.

Q. Did you communicate it to him?

A. As far as I recall, if my memory serves. I don't explicitly recall communicating it.

Q. Was there also a Wyeth position in the portfolio in July 2008?

A. There was.

Q. What was your view with respect to how risky the Wyeth position was given that the drug trial announcement was at the

end of the month?
A. I viewed the Wyeth position as being less risky due to the fact that the company had a more diversified revenue stream.
Q. Do you recall whether at any point prior to the results being released on July 29, 2008, Elan or Wyeth issued a press release?
A. Yes. There was a press release issued at some point in June, either the second or third week of June.
Q. Do you recall having looked at it at the time?
A. I recall briefly glancing at it, yes.
Q. What was your takeaway from that press release at the time?
A. The initial nature of the response was that it read negatively, not positively.
Q. Did you share that view with Mr. Martoma?
A. I don't recall sending a email or a Bloomberg or any message but I'm sure I did, did share that information, or I did point it out to Mat. That was one of our responsibilities.
Q. How detailed was the press release about the results?
A. I recall the press release being a few pages. I don't recall reading every line in the press release.
Q. Do you recall whether or not you believe more data was necessary to evaluate the prospects for the --
A. Yes, I -- sorry to interrupt you.
Q. But you do recall. What was your recollection?
A. I do recall that this wasn't the official Phase II release

announcement and that it was scheduled to occur next month, meaning July 2008, not June, when it had originally came out.
Q. So prior to the announcement on July 29, 2008, did Mr. Martoma ever tell you that he was no longer positive about the drug trial results?
A. No.
Q. Did he not tell you at any point prior to the July 29th announcement that he was no longer positive about Elan's stock?
A. No.
Q. Did he tell you at any point prior to the drug trial announcement that he wanted to sell Elan stock before the drug trial results were announced on July 29th?
A. He didn't convey to me that he wanted to eliminate the position and sell the stock flat, meaning that we would own no shares.
Q. Did he discuss selling the position at all with you in any fashion prior to July 29, 2008?
A. He may have. As far as I recall, pinpointing it now, I don't recall an exact conversation.
Q. Do you even recall a general conversation about a potential sale?
MR. BRACERAS: Objection.
THE COURT: Overruled.
A. I don't recall, but we talked about 20 different stocks and

companies on a daily basis so.
Q. You mentioned before you had access to some type of computer system to see what was in the portfolio?
A. Correct. Panorama.
Q. And I think you said -- I don't remember how many hundreds you said, but you said you checked it hundreds of times a day?
A. 200, guesstimation.
Q. Would you continue to check it 200 times a day leading up to the full -- the announcement on July 29th?
A. I checked it a lot.
Q. Did you see at any point prior to the July 29th announcement significant sales of Elan securities from Mathew Martoma's portfolio?
A. No.
Q. So I want to go to the announcement now that was on July 29th.
Did you see the announcement live?
A. I recall the announcement hitting the newswires, and, yes, it was after the close of the market, so after 4 o'clock, on July 29, 2008.
Q. Where were you when you heard the announcement?
A. That day I was working in Stamford, Connecticut.
Q. So how did you get the news? How did you see the announcement?
A. I saw it released on the general newswire. In this case

one of our news service providers was Bloomberg, so I saw it on my Bloomberg monitor.
Q. What reaction, if any, did you have to the announcement?
A. The announcement didn't read well.
Q. Do stocks trade even after the market closes?
A. They do trade after the market closes.
Q. Do you recall what happened to the Elan stock price after the announcement?
A. According to my memory, the stock dropped significantly. It may have been halted for trading that night, I do not recall. But I know the stock traded down significantly.
Q. What did you believe had happened to the value of that Elan position that you were still seeing in the portfolio under Panorama?
A. I believe that we had incurred significant losses in our portfolio.
Q. How significant?
A. North of $100 million.
Q. Had you ever incurred a loss like that in a portfolio for a portfolio manager before?
A. No.
Q. Were you concerned?
A. Yes.
Q. Do you recall what you did the next day?
A. At that time I was spending a couple of days a week in New

York City but I made sure to report to work in Stamford, Connecticut.
Q. Why did you go to Stamford, Connecticut that day?
A. I was concerned about the security of my boss' job as well as my own job.
Q. Why were you concerned about the security of your jobs?
A. Normally Steve Cohen doesn't like it when you lose money.
Q. So when you got to work, did you check to see whether you had lost money?
A. Yes.
Q. And what did you see?
A. I saw no position.
Q. No position in Elan?
A. I saw no position in Elan.
Q. Before the market opened?
A. Correct.
Q. Did you see any trading that would have happened overnight?
A. No.
Q. So do I have it right that when you went home the night before, you saw a large position in Elan in the portfolio and the next morning it was gone?
A. Correct.
Q. Did you know how that had happened?
A. I did not know how that occurred.
Q. Did there come a point shortly after the announcement where

you had a conversation with Mr. Martoma?
A. I believe it was before the market opened the day after the announcement, I don't know if it was via phone or email, I believe it was via phone, but Mat communicated to me that we no longer owned the stock.
Q. Did you ever have a more detailed conversation with him after that?
A. I did.
Q. How long after that?
A. It was a few days, maybe -- it was a few days later, a couple of days, one, two, three days.
Q. Was that in person, the more detailed conversation?
A. Yes. It was in his office.
Q. Did you ask him how it had happened that you had seen a large position on July 29th, the date of the announcement, and them saw no position when you came to work the next day, on July 30th?
A. Mat informed me that Steve Cohen had directed Mat Martoma to not inform me of our decision to sell the stock.
Q. You normally trade healthcare stocks for Mr. Martoma, you testified, is that right?
A. Correct.
Q. You didn't trade the Elan stock in this case?
A. Flat, meaning bringing the stock to zero, I did not recall selling the stock one, two, three days prior to the

announcement. As far as I recall, when I went home that night, we still owned a significant number of shares in Elan.
Q. Did you ask Mr. Martoma why you hadn't been told?
A. I did. Mat Martoma told me that Steve Cohen had instructed him to keep it amongst himself and Phil Villhauer.
Q. Did he give you any reasons as to why --
A. He did not elaborate.
Q. Just to finish the question.
A. Sorry.
Q. Did he give you any reasons?
A. He did not elaborate, with the exception of me -- him telling me that they were instructions from Steve Cohen.
Q. Were you offended by that?
A. Slightly, yes.
Q. In your own estimation, had you ever done anything that gave you reason -- gave you concern that you had violated Mr. Martoma's trust?
A. As far as I recall, no.
Q. Did you ask Mr. Martoma during this conversation whether he had changed his view about the prospects of bapineuzumab before the drug trial announcement?
A. I did.
Q. What did he tell you?
A. He told me that he had reviewed his notes in the last couple of weeks and wasn't as confident on the outcome of the

trial.
Q. Did he describe what these notes were?
A. He did not go into great detail in describing that, no.
Q. Did he go into any detail beyond that they were notes?
A. I don't recall him going into detail.
Q. Did he tell you anything else about his decision to -- or why he was no longer positive in advance of the drug trial announcement?
A. According to my memory and his reviewing his notes, no, he did not go into any great detail elaborating the reasons why he was.

(Pause)

Q. So how long did you stay at SAC Capital after July 2008?

MR. BRACERAS: Objection.

THE COURT: Relevance? Do you want to approach?

MR. DEVLIN-BROWN: If we could, your Honor.

THE COURT: All right.

(Continued on next page)

(At the sidebar)

THE COURT: So the question is why do we care what happened after July 2008?

MR. DEVLIN-BROWN: I was simply going to ask him a question if in his remaining time while Mat Martoma was there there had ever been an occasion where a position had been sold in the portfolio and he wasn't able to see it.

THE COURT: You don't have any objects to that, do you?

MR. BRACERAS: A little bit, your Honor, a different reason. You were on target with my last objection, but on this point, it is due to the lack of clarity as to which portfolio we are talking about. Are we talking about Mr. Cohen's portfolio, or are we talking about GEHC?

MR. DEVLIN-BROWN: I will clarify that.

THE COURT: OK. How much longer do you have?

MR. DEVLIN-BROWN: I am just about done.

THE COURT: OK. We are going to break at a quarter of.

MR. BRACERAS: A quarter of 4?

THE COURT: Yes, just to take our mid-afternoon break.

MR. BRACERAS: So I will get going right after?

THE COURT: Yes.

MR. BRACERAS: OK.

(Continued on next page)

(In open court)

BY MR. DEVLIN-BROWN:

Q. Mr. Jandovitz, how long did you continue trading the GEHC portfolio after July of 2008?

A. Approximately two years.

Q. During your remaining two years trading the GEHC portfolio, was there ever another occasion where, to your knowledge, you couldn't see sales that were happening in the portfolio while they were happening using your Panorama?

A. No.

Q. Did you ever find out how the position was sold without you being able to see the sales in the case of Elan in July 2008?

A. At that time, no.

Q. At any point prior to you leaving SAC, did you know?

A. Specifically, no.

MR. DEVLIN-BROWN: Just one moment, your Honor.

(Pause)

No further questions.

THE COURT: All right. Cross-examination.

MR. BRACERAS: Yes. Thank you, your Honor.

CROSS-EXAMINATION

BY MR. BRACERAS:

Q. Good afternoon, Mr. Jandovitz. How are you doing?

A. Good afternoon.

Q. Mr. Jandovitz, do you recall the multiple sclerosis drug

that Elan was developing?
A. I do.
Q. And the name of that was?
A. Tysabri.
Q. Great.
MR. BRACERAS: And, Mr. McLeod, could we pull up Government Exhibit 305?
Q. Tysabri was the only drug that Elan had on the market, isn't that right?
A. I don't recall.
Q. But you recall bapineuzumab?
A. Yes.
Q. Isn't it true that Elan's largest seller was Tysabri to Symetra?
A. It sounds right, yes.
Q. Accounting for millions of dollars?
A. If you tell me so, yes.
Q. So the government reviewed part of this exhibit with you. Let's look at some of the parts that were left out.
A. Sure.
MR. BRACERAS: Mr. McLeod, if you could highlight the catalyst section. Back two. Here we go.
Mr. McLeod, this is Government Exhibit 305. Could you please highlight the upcoming catalysts section.
Q. Mr. Jandovitz, Mr. Devlin-Brown pointed you to the first

part of this, talking about the Phase II Alzheimer's data presentation. Could you read the next portion?
A. "The two year safety update on be Tysabri in July."
Q. Do you recall that as being a significant event?
A. Relatively significant, yes.
Q. In fact, Tysabri was the only drug that Elan had on the market, correct?
A. If you are telling me that, yes.
MR. DEVLIN-BROWN: Objection.
THE COURT: You can't --
THE WITNESS: I --
THE COURT: We need to get your best recollection. You are not going to be testifying through the lawyer. So if you remember, you remember. If you don't --
THE WITNESS: I don't remember. I thought it had one or two other drugs that it produced besides Tysabri.
BY MR. BRACERAS:
Q. Well, you knew that bapineuzumab was not on the market?
A. Correct.
Q. So let's go up to the ticker.
And Mr. McLeod if you could highlight the ticker and all the way over to the right.
What does the symbol in parentheses there indicate, Mr. Jandovitz?
A. MLSAIBB4 was a biotech short basket. ML, I believe,

represents Merrill Lynch, and it was a basket of stocks that we put together as a hedge in case the price of Elan went down. So it was hedging against stock price risk as well as general market risk.
Q. So you had a hedge on Elan; you weren't all in, isn't that right?
A. Right.
Q. Now, let's go down just the next line, where it says "Target Price."
A. Yes.
Q. Target price is 40 to $50, isn't that right?
A. Range. Target price range, correct.
Q. Isn't it true that sometimes a portfolio manager will decide to sell out just before the stock gets to the target price?
A. Correct.
Q. Because sometimes you balance that risk and reward, and if you're close to the target price, you're going to sell out right then, isn't that right?
A. Some, if not all, yes.
Q. Oh, and, Mr. McLeod, if we could go a little bit lower.
I think on direct Mr. Devlin-Brown suggested that there weren't any other longs on this document. Could you highlight the ticker "SN/LN."
Mr. Jandovitz, this indicates another long position,

doesn't it?
A. That's correct.
Q. And you traded -- you certainly traded a lot of the Elan and Wyeth for Mr. Martoma but you traded other securities as well, didn't you?
A. That is correct.
Q. And you worked for other traders -- other portfolio managers? I'm sorry.
A. That is correct.
Q. Who were they?
A. Eric Evans and Darryl Pardi, P-a-r-d-i.
Q. Would you say that your time was spent about evenly between those three portfolio managers?
A. I would say Eric and Mat Martoma combined were about at 80 percent of my time allotment, and I allocated probably 20 percent to Darryl.
Q. You talked about Mr. Martoma's principal portfolio as being GEHC.
A. That is correct.
Q. GEHC stands for Grossman European Healthcare, isn't that right?
A. Correct.
Q. And before 2008 there really was no separate portfolio; it was just all CR Intrinsic under Mr. Grossman, isn't that right?
A. Right. Correct.

Q. So there was no restriction on the amount of Elan or Wyeth prior to 2008?
A. Correct.
Q. And before 2008 -- and I think you said this on direct -- Mr. Martoma actually reported to Mr. Grossman?
A. Correct.
Q. Isn't it true that he was more of an analyst before Mr. Grossman left, advising Mr. Grossman with his ideas?
A. From my understanding, Mat Martoma was brought in as a senior analysis or slash portfolio manager.
Q. But Mr. Grossman actually controlled the size and direction of the account, isn't that right?
A. I believe so, yes. Mat Grossman did, yes.
Q. I think you mentioned you would also take some orders or some direction from Mr. Villhauer?
A. Yes. I reported to Phil Villhauer, yes.
Q. Mr. Villhauer was the head trader at SAC?
A. Correct, yes.
Q. SAC was a, fair to say, a hard working, competitive environment?
A. Yes.
Q. And the portfolio managers there, and their analysts and traders, were paid on how much they actually made in their portfolios, isn't that right?
A. I believe so, yes.

Q. Well, you were a trader. You received a bonus from the portfolio managers that you worked for, isn't that right?
A. Correct. Yes.
Q. And that bonus was based on how much the portfolio managers made, right?
A. As far as I know, yes. But it may have been the overall performance of the SAC master fund, I don't know. So the breakdown of my exact bonus was never told to me. Who gave what, what percentage, that was never given to me, never.
Q. Now, you understood after 2008, when Mr. Grossman left, a number of --
A. 2007.
Q. A number of the people -- you say he left --
A. He left at the end of 2007. So, yeah, you said 2008.
Q. Yeah. So at the end of 2007, when he left, a number of the people who formerly reported to him, like Mr. Martoma, then got their own portfolios?
A. Correct.
Q. And there were other people, whether they were analysts, senior analysts, other people like that who received their own portfolios?
A. Correct.
Q. And you understood that these portfolio managers were compensated based on their own P & L?
A. Correct, yes.

Q. And there would often be almost a competitive environment between different portfolio managers?
A. It was competitive.
Q. And different portfolio managers would not want to share their own ideas with other portfolio managers?
A. Sometimes. Not all the time.
Q. I think you mentioned on your direct that some portfolio managers could get compensated or get a bonus if they gave Mr. Cohen a good idea but you never got any extra bonus if you gave some other portfolio manager a good idea; isn't that right?
A. As far as I know, yes. Right.
Q. And there often would be differences of opinion among the portfolio managers.
A. Yes.
Q. And I think you mentioned that some portfolio manager might be -- want to buy the same stock that another portfolio manager is selling?
A. Correct.
MR. BRACERAS: Now, Mr. McLeod, if you could show, just pull up just for Mr. Jandovitz and the Court and counsel, Defense Exhibit 315.
Q. Mr. Jandovitz, what is this?
A. It's an email from Eric Evans, one of my portfolio managers, to me, dated July 17, 2008.

Q. You traded for Mr. Evans?
A. Correct, yes.
Q. Much like you traded for Mr. Martoma?
A. Yes.
MR. BRACERAS: Your Honor, we offer Defense Exhibit 315.
MR. DEVLIN-BROWN: No objection.
MR. BRACERAS: If you could show that to the jury now, Mr. McLeod.
THE COURT: Defense Exhibit 315 received.
(Defendant's Exhibit 315 received in evidence)
BY MR. BRACERAS:
Q. Mr. Jandovitz, could you -- let's look at the whole email first, Mr. McLeod.
Mr. Jandovitz, fair to say that this is an email about two other pharmaceutical companies, Teva Pharmaceutical and Barr, is that right?
A. Correct, yes.
Q. In fact, this is a discussion about the possible merger of Teva and Barr and Mr. Evans' interest in investing in one of those two pharmaceutical companies, isn't that right?
A. It's Teva for Barr Labs, according to this email. "Here is quick implied value based on recent comparable transactions." So he is making the stipulation that Teva could potentially acquire Barr Labs.

Q. Exactly. So he's talking about Teva possibly acquiring Barr Labs and his interest in perhaps investing in one of these two companies, isn't that right?
A. That is correct.
Q. Now, if we could -- this has nothing to do with Elan or Wyeth, obviously?
A. It does not.
Q. Now, if we could go to the top of this email, please.
Mr. Evans forwards this email to you, and he says, "For your eyes only -- do not share with Martoma, Slate/Munno et al., please." Do you see that?
A. I do, yes.
Q. Who is Slate/Munno?
A. Ben Slate and David Munno were two senior analyst/portfolio managers who I believe at that time managed the Bueno portfolio.
Q. There were other healthcare portfolio managers or analysts?
A. There were, yes.
Q. And here, where Mr. Evans says, "For your eyes only -- do not share with Martoma, Slate/Munno et al.," he is not providing you with any inside information, is he?
A. He is not.
Q. This is not material nonpublic information?
A. As far as I know, no.
Q. And you took this information and you kept it confidential,

as Mr. Evans asked you to, didn't you?
A. I believe I did, yes.
Q. You did not share this with Mr. Martoma, Mr. Slate or Mr. Munno?
A. I don't recall sharing it with anyone else, no.
Q. Because there are often very good reasons why portfolio managers would want to keep their information confidential even within SAC, isn't that right?
A. True. Yes.
Q. For example, it's possible that one portfolio manager could actually buy or sell a stock ahead of another portfolio manager and that would impact the price of the stock?
A. Yes.
Q. And do you know the term "slippage"?
A. Yes.
Q. Could you describe for the jury what that means?
A. Slippage is, let's say in very general terms, a trader is sloppy in selling a stock and say you want to sell a thousand shares of stock at $45 and the stocks sells off. Then there is slippage in the execution, meaning there is a margin of error, where the portfolio manager wants to come in and sell a thousand shares of the stock at 45 and then he gets an execution at $44 and that thousand dollar difference between selling the stock at 45 and selling the stock at 44 is slippage.

Q. Let's try to flesh that out a little bit, Mr. Jandovitz.
So, for instance, if Mr. Evans here were selling perhaps shares of stock in Teva, he would not want another portfolio manager at SAC or at another firm altogether to get in front of him and sell those shares before him because that would send the price down and he would lose money, isn't that right.
A. In some cases, yes; not in all cases. If it is a very liquid stock where you are not a significant portion of the volume, that will not create slippage. If you are a large portion of stock, the stock price's volume, that potentially will create slippage.
Q. That is a good point. So if it is not a very liquid stock, for instance, if it is a Irish pharmaceutical company and you own a slot of shares of it, there would be a lot of concerns of slippage, isn't that right?
A. Correct.
Q. So, again, there is nothing wrong at all with Mr. Evans' email that says "For your eyes only," isn't that right?
A. That is correct. That is just an analysis he did, his own proprietary analysis that he did not want to share.
Q. This issue that we are sort of skirting around in an internal debate or perhaps even disagreement at SAC --
MR. DEVLIN-BROWN: Objection --
Q. -- that actually occurred with respect to Elan and Wyeth,

isn't that right?
A. I believe it did, yes.
Q. When Mr. Devlin-Brown was asking you questions about Elan and Wyeth, you explained how Mr. Martoma was bullish or he thought -- he was optimistic about the prospects of Elan in 2006 and 2007, isn't that right?
A. That's correct.
Q. But two other portfolio managers, Mr. Munno and Mr. Slate, were actually pretty negative on the stock, weren't they?
A. I believe they were not positive, they were negative. To the degree to which they were negative, I don't know. But I think they were negative.
Q. That type of disagreement is routine at SAC, isn't it?
A. Correct.
Q. Now, have you ever heard the term "edge"?
A. Yes.

MR. BRACERAS: Mr. McLeod, if we could bring up Defense Exhibit 332 just for Mr. Jandovitz and counsel.

Q. Are you OK, Mr. Jandovitz. You are looking like -- are you OK?
A. I am fine.
Q. You look uncomfortable.

Mr. Jandovitz, I am showing you what has been marked as Defense Exhibit 332. What is this?

A. It's an email that Mat sent to me. Reading from the bottom

up, "Cohe out of name." "I think that's just net market value reduction in light of the market. Do you think he has an edge? He probably thinks he can find" --

MR. DEVLIN-BROWN: Objection.

MR. BRACERAS: Just the question was --

THE COURT: Is there any objection?

MR. DEVLIN-BROWN: Yes.

THE COURT: There is an objection.

MR. DEVLIN-BROWN: Not to offering it.

THE COURT: All right. That is my question.

All right. So Defense Exhibit 322 -- is it 322?

MR. BRACERAS: I think it is 332, your Honor.

THE COURT: 332 is received.

(Defendant's Exhibit 322 received in evidence)

BY MR. BRACERAS:

Q. OK. Let's show this to you.

So, Mr. Jandovitz, just to go back. Originally, this was an email from Mr. Martoma to you on November 12, 2008, is that right?

A. Correct.

Q. And the subject line is "UTHR." Do you recall what that is?

A. United Therapeutics.

Q. United Therapeutics, that is another stock, is that right?

A. Correct.

Q. And Mr. Martoma writes to you, "Cohe out of name."
Cohe is the symbol for Mr. Cohen's large firm account, isn't that right?
A. Correct.
Q. And the Cohe account was controlled, run by Mr. Cohen?
A. Right.
Q. Mr. Cohen obviously didn't run decisions about the Cohe account by you, did he?
A. Repeat the question.
Q. Mr. Cohen didn't run decisions about the Cohe account by you, did he?
A. Definitely didn't.
Q. And, in fact, he didn't have to run decisions about the Cohe account by Mr. Martoma either, did he?
A. It is Steve's firm.
Q. It's Steve's firm. He is the owner. He is the boss. Isn't that right?
A. Yes.
Q. He made all decisions about the Cohe account?
A. Most, not all.
Q. But he certainly didn't pass any of them by you?
A. Did not.
Q. Up above, in response to Mr. Martoma's email, it says, "Cohe out of name."
How do you interpret "Cohe out of name?" What does

that mean to you?
A. I would interpret that as "Cohe out of name" meaning that Steve no longer has a position in the stock, either long or short.
Q. So he sold out of that position?
A. Correct.
Q. And then you respond, "I think that's just NMV reduction in light of the market. You think he has an edge?"
Do you see that?
A. Yes.
Q. When you use the word "edge" there, you are not suggesting that anyone has inside information, are you?
A. No.
Q. Edge is just a routine word used throughout the industry, isn't that right.
A. In this specific case, I would interpret edge as maybe another analyst at the firm maybe relayed a data point to Steve Cohen that other analysts didn't have.
Q. But it's data or information that's completely public?
A. Public.
Q. Public information.
And when you talk about edge, isn't it fair to say that analysts and portfolio managers, part of their job was to try to get edge?
A. Yes.

Q. And by get edge, it just means get information, get better information, get an advantage?
A. Right.
Q. There is nothing nefarious or improper about trying to get edge; that was the job?
A. No. Nothing at all.
MR. BRACERAS: Mr. McLeod, if we could pull up Defense Exhibit 300.
Q. Mr. Jandovitz, without reading it, do you recognize, or just tell us, what is Defense Exhibit 300?
A. It's an email.
Q. It is an email from you to James Grebenc, dated February 29, 2008, is that right?
A. That's correct.
MR. BRACERAS: Your Honor, the defense offers 300.
THE COURT: Any objection?
MR. DEVLIN-BROWN: Objection. Relevance.
THE COURT: Give me a moment.
MR. BRACERAS: The last line, your Honor, or the next-to-last line over on the right.
THE COURT: I want you to establish who James Grebenc is and Colin Henne.
THE WITNESS: James Grebenc was a research salesman at JMP Securities, Schultz Birch & Partners. Colin Henne was/is the sales trader at Schultz Birch & Partners in San Francisco

that covers the SAC account.

THE COURT: All right. I am overruling the objection. Defense Exhibit 300 is received.

(Defendant's Exhibit 300 received in evidence)

MR. BRACERAS: Thank you, your Honor.

If we can show that to the jury. And, Mr. McLeod, if you could highlight that last line, starting, "If there is a name."

BY MR. BRACERAS:

Q. Mr. Jandovitz, you did business with Mr. Grebenc and Mr. Henne back in 2008?

A. Correct.

Q. If you could just read the highlighted language, please?

A. "If there is a name on that where you feel like you have a certain edge, please feel free to ping me. My IM is: Tjandointrinsic."

Ping me means message. What I mean by that statement is that if their analyst -- maybe if the research salesman feels like the analyst has a very good call or he has got a track record covering a certain name and he is more right than wrong, then please communicate that. James expressed that to me. That's what I'm asking for.

Q. Again here, when you talk about if you have a certain edge, ping me, call me, you are not asking for inside information, are you?

A. No, I'm not.
Q. Again, this is just a routine word that is used throughout the industry?
A. Basically use your brain if your analysis has a good call, let me know.
Q. Thank you.
MR. BRACERAS: We could pull that down, Mr. McLeod. Thanks.
Q. Mr. Jandovitz, you are the prosecutors' first witness here, but you really have no firsthand knowledge of why SAC sold Elan and Wyeth in July 2008, do you?
A. I do not.
Q. And a lot of the -- in fact, the bulk of the shares of Elan and Wyeth were in the Cohe account, isn't that right?
A. I don't recall that.
Q. Certainly -- and Mr. Cohen --
A. I do recall that Steven Cohen owned a lot of shares. I don't know the exact amount.
Q. So you recall that Mr. Cohen had a substantial position in Elan?
A. Yes.
Q. And that resided in the Cohe account?
A. Correct.
Q. Over which he had control, isn't that right?
A. Yes.

Q. Mr. Martoma, I think you explained, had discretion over the GEHC account?
A. That is correct.
Q. And you traded for Mr. Martoma almost exclusively in the GEHC account?
A. Yes.
Q. And it made sense. You would trade for the portfolio managers in their own accounts, right? So when Mr. Evans, I assume he had a four-letter account?
A. Yes. GPHA.
Q. What was his? I'm sorry.
A. GPHA.
Q. OK. And your other portfolio manager had his own account?
A. PARD.
Q. And so in each instance you traded for the portfolio manager in his personal account, more or less?
A. His account at the firm.
Q. That's right?
A. That's what I meant by his personal trading account.
Q. And Mr. Cohen -- we touched on this a little bit earlier -- he never discussed with you in July 2008 his reasons for selling Elan or Wyeth out of his account, did he?
A. He did not.
Q. Nor did Mr. Holman ever discuss his reasons for selling Wyeth, did he?

A. He did not.
Q. Mr. Jandovitz, I think you mentioned expert networks on your direct testimony. Do you recall that?
A. Did I use the exact term "expert networks?"
Q. I think you referred to --
A. Consult networks?
Q. Consulting networks.
A. Yes.
Q. That was not exclusive to Mr. Martoma, was it?
A. As far as I recall, no.
Q. There were other --
A. There were other groups within SAC or CR Intrinsic that would use consulting networks.
Q. You were never part of any -- of Mr. Martoma's calls with the dozens of experts that he consulted with, were you?
A. I was not, no.
Q. And did you know he consulted with hundreds of experts?
A. I figured it was a lot in number.
Q. It wasn't just one expert, was it?
A. No.
Q. That is part of the reason why no expert sticks out in your mind; you didn't remember on direct any name of any particular expert?
A. No.
Q. And so you weren't -- because you didn't participate in any

of the calls or meetings with Mr. Martoma and any of these experts, you have no idea of what any of the experts may have said to Mr. Martoma?
A. No.
Q. So you certainly have no personal information whether Mr. Martoma ever received inside information from anyone, do you?
A. I do not know that, no.
Q. And you said that after the position was sold, that you did have a conversation with Mr. Martoma?
A. Yes.
Q. And you recall him telling you that in the prior two or three weeks he reviewed his research again and he believed that there were some flaws in the stock; isn't that right?
A. Right. Yes.
Q. And that was his explanation for you as to why he decided to sell the stock at least out of GEHC?
A. Correct.
Q. And GEHC being his own account?
A. Correct.
Q. Just to step back a little bit.
Within a given week, it was not uncommon to buy and sell a stock just around its price point, isn't that right?
A. Correct.
Q. So with Elan and Wyeth there wasn't any steady build up of

the position, correct?
A. Steady build up irrespective of trading price?
Q. That's right.
A. Correct, yes.
Q. I mean, if it was -- there were many times -- and we could go through some of the emails here. There were many times where you and Mr. Martoma would decide to buy or sell either Wyeth or Elan just based on what its price was that particular day?
A. That is correct, yes.
Q. It was to buy low, sell high, right?
A. That's the adage.
MR. BRACERAS: Let's, Mr. McLeod, pull up Defense Exhibit 309.
Q. Mr. Jandovitz, what is Defense 309?
A. It's an email exchange between Mat and I dated July 8, 2008.
MR. BRACERAS: Your Honor, the defense offers 309.
MR. DEVLIN-BROWN: No objection.
THE COURT: 309 is received.
(Defendant's Exhibit 309 received in evidence)
BY MR. BRACERAS:
Q. So if you read the first part of the email from Mr. Martoma to you, what does the subject line read?
A. "Any luck with Wyeth?"

Q. And this is, again, July 8th of 2008?
A. Correct. Yes.
Q. And then read the response up above.
A. Sold 4400, meaning shares, at $48 even, at 90 cents on 50,000. Meaning the stock ride up. I sold a little bit there. And then based on what the stock was doing, I dropped down ten cents, selling another 50,000 shares.
Q. So it is fair to say in July 2008, you were both buying and selling in this case Wyeth, correct?
A. Wyeth, yes.
Q. Let's bring up Defense Exhibit 313.
Do you recognize 313, Mr. Jandovitz?
A. It looks like it's an instant message exchange between Mat and I.
Q. And the date of that is July 11, 2008?
A. Correct.
MR. BRACERAS: Your Honor, the defense offers 313.
THE COURT: Any objection?
MR. DEVLIN-BROWN: One moment, your Honor.
Could you zoom back out, please?
(Pause)
No objection.
THE COURT: 313 is received.
(Defendant's Exhibit 313 received in evidence)
MR. BRACERAS: Mr. McLeod, if you could just highlight

the top of that message.

Q. So at the top of the message, Mr. Jandovitz, do you see where Mr. Martoma starts this instant message that says, "on Wye?"

A. Right.

Q. And you said during your direct that instant messaging was one of the three ways that you communicated, did work with Mr. Martoma?

A. Correct.

Q. And that is one of the three ways that you guys would talk about whether to buy or sell stock?

A. Yes.

Q. And this is an example of one of those exchanges in July of 2008?

A. Yes.

Q. So Mr. Martoma writes "On Wyeth," and you respond "Yes."

And then Mr. Martoma says, "Let's try to add closer to 48." And your response is?

A. "Hear you. I was down around 48.15." Meaning Mat is indicating to drop the price at which we wish to acquire the stock.

Q. Right. Again, this is an instance in July 2008 where you are making a decision whether to buy or sell contingent on the price of the stock?

A. Correct.

Q. And just to go a little bit lower than that, you say, Mr. Martoma says, "Sure." And then he says, "Fine to get to 25,000, around there."

And your response is, "We are at 22,000 now," meaning that you had already purchased --

A. Accumulated 22,000 shares, right.

Q. OK.

MR. BRACERAS: Your Honor, this is a place where we could take a break, if you want to take the afternoon break.

THE COURT: Yes. Ladies and gentlemen, we will take our mid-afternoon break now. We will take ten minutes.

Don't discuss the case.

We will get back to you in ten minutes. Thank you very much.

THE CLERK: All rise.

(Jury not present)

THE COURT: You can step down, Mr. Jandovitz.

All right. We will resume in ten minutes.

(Recess)

(Continued on next page)

(Jury present)

THE COURT: You may proceed, Mr. Braceras.

MR. BRACERAS: Thank you, your Honor.

CROSS-EXAMINATION CONTINUED

BY MR. BRACERAS:

Q. Mr. Jandovitz, I think you testified earlier that as Mr. Martoma's trader you had visibility into the GEHC account, correct?

A. Correct.

Q. That means that you could see the trades that were being made in and out of it?

A. Yes.

Q. In fact, as his trader, you were more often than not the person making those trades?

A. 99 percent of the time.

Q. Mr. McLeod, if we could pull up Defense Exhibit 317.

Mr. Jandovitz, just tell us what is defense 317.

A. It's an IM exchange.

Q. An IM exchange between you and Mr. Martoma, correct?

A. Correct.

Q. This is dated July 22, 2008, correct?

A. Correct.

Q. As, I think you referenced on direct, the week of July 22 was the week when SAC started selling its shares of Elan and Wyeth, right?

A. Repeat the statement.
Q. The week of July 22, 2008 was the week that SAC started selling its Wyeth and Elan shares?
A. Right.
Q. So, Mr. Jandovitz, if I could just highlight --
MR. BRACERAS: Your Honor, we offer Defense 317.
THE COURT: Any objection?
MR. DEVLIN-BROWN: No objection.
THE COURT: Defend 317 is received.
MR. BRACERAS: If we could publish that.
THE COURT: Yes.
MR. BRACERAS: Thank you, your Honor.
(Defendant's Exhibit 317 received in evidence)
Q. Mr. McLeod, if we could just highlight the section where Mr. Martoma says "if Wyeth breaks 47, sell 50,000"?
A. Correct.
Q. So, Mr. Jandovitz, could you read this for the jury, please?
A. "If Wyeth breaks 47, sell 50K."
"Got it."
Q. That's you responding "got it," correct?
A. Correct.
Q. How would you interpret this for us?
A. If the stock price of Wyeth breaks below 47,000 -- $47, sell 50,000 shares.

Q. Again, that's an IM exchange between you and Mr. Martoma at 8:20 a.m. on July 22, correct?
A. Correct.
Q. At this point, I would like to pull up Defense Exhibit 370. It also appears on the Government Exhibit list as Government Exhibit 564. I would like to pull up defend exhibit 370.
THE COURT: Are you offering this?
MR. BRACERAS: Yes, your Honor.
THE COURT: Any objection?
MR. DEVLIN-BROWN: Objection.
THE COURT: I'm sorry?
MR. DEVLIN-BROWN: Objection. There has been no foundation, and I'm not sure this could be done through this witness.
THE COURT: All right. Lay a foundation.
MR. BRACERAS: Your Honor, this is on the Government's exhibit list.
THE COURT: It doesn't matter. You have to lay a foundation for every exhibit, whether it's on the other side's exhibit list or not.
Q. Mr. Jandovitz, you were a trader at SAC, correct?
A. Yes.
Q. You were familiar with the different portfolios at SAC. In fact, you discussed some of the portfolio names earlier in your testimony?

A. Yes.
Q. In fact, you described for the jury how some of the portfolio names had four letter acronyms?
A. Correct.
Q. You're familiar with in trading jargon whether you're buying or selling a security?
A. Correct.
Q. And, in fact, you described for the jury that sometimes a hedge fund would sell a security short?
A. Correct.
Q. You're familiar with the ticker names for different companies, correct?
A. Correct.
Q. And you were a trader at SAC Capital for approximately five years, correct?
A. Correct, over five years.
Q. Mr. McLeod, if we could go along to column AK.
You're familiar with some of the traders names at SAC Capital, correct
A. Yes.
Q. There is a trader at SAC named Sam W?
A. Sam Wahab.
Q. And you're familiar with Mr. -- let's look at column AC. You're familiar with the different exchanges on which trades were made, trades of securities were made?

A. Correct.

MR. BRACERAS: Your Honor, at this time we'd offer defense exhibit --

THE COURT: Well, you haven't asked him what the document is.

Q. Well do you see at the bottom of this document, Mr. Jandovitz, where it says trade run?

A. Yes.

Q. And you're familiar with what trade runs are?

A. No.

Q. You're familiar with trades, certainly?

A. With what?

Q. You're familiar with the entry of your trades?

A. Yes.

Q. You're familiar with the amounts in which you put in trades -- let's go, Mr. McLeod, if we could go to column D. Fair to say that you would often make trades in amounts of 100, 200 shares or more as reflected in column E?

A. Yes.

Q. Are you familiar with excel spreadsheets that would record trades at SAC?

A. I'm looking at one now. I wouldn't look at spreadsheets like this on a daily basis, no.

Q. You wouldn't look at them on a daily basis, but you understood that SAC kept these types of records?

THE COURT: Let me ask a question: Have you ever seen a document like this before?

THE WITNESS: Yes, but only since I left SAC.

THE COURT: No, my question is when you were at SAC, did you review a document that --

THE WITNESS: No.

Q. All right. If we could, your Honor, just ask your indulgence.

Mr. McLeod, if we could go to the trader column one more time. If you could sort the spreadsheet for Tim J.

Mr. Jandovitz, you see the entry in column AC there is Tim J?

A. Correct.

Q. If we could go across over to the entry of the portfolio number, Mr. McLeod. Do you see in column B the name of the portfolio GEHC?

A. Correct.

Q. Do you see in the position the ticker symbol WYE?

A. I do, yes.

Q. What would that ticker symbol reflect?

A. Wyeth.

Q. Under column E where it says negative one hundred, what would that reflect?

MR. DEVLIN-BROWN: Objection, your Honor. We're starting to just read from a document.

THE COURT: Yes. The problem, Mr. Braceras, is he's indicated he's never seen a document like this when he was at SAC. So it is not clear to me he is competent to testify about this particular document.

Q. Mr. Jandovitz, you've testified, I believe, that you've seen these types of spreadsheets since you've left SAC?

A. In -- in reviewing documents in the last couple weeks that have been presented to me in a span of three to five minutes, yes.

Q. So the government presented you documents like this that you reviewed?

A. Yes.

Q. And --

A. By the way, I don't know if that's sold or sold short, so -- again, this is -- with all due respect, this is something that oftentimes operations would put together that I wouldn't -- I wouldn't see. I would see a trade report, but I wouldn't see an Excel spreadsheet with 25 plus columns.

Q. Is it your testimony that you never saw a spreadsheet like this at SAC?

A. Yes.

Q. OK, your Honor, we'll move on. Mr. Jandovitz -- let's pull back up that last exhibit, Mr. McLeod: Let's highlight where Mr. Jandovitz says, "Got it."

You understand, Mr. Jandovitz that this sale of 50,000

shares here is part of the government's insider trading charge against Mr. Martoma, don't you?

MR. DEVLIN-BROWN: Objection.

THE COURT: Sustained.

Q. Mr. Jandovitz, you said that you didn't recall the sales of Elan and Wyeth the week of July 22 or before the ICAD conference. Do you recall that?

MR. DEVLIN-BROWN: Objection. Mischaracterizes.

THE COURT: Can I hear the question first?

Q. Mr. Jandovitz, I believe you testified on direct, correct me if I'm wrong, that you didn't recall sales of Elan or Wyeth prior to that Alzheimer's conference?

A. Correct.

Q. Would you be surprised to learn now that you yourself made sales of Elan and Wyeth?

A. No.

Q. And you wouldn't be surprised that you actually made sales of Elan and Wyeth that week because the government didn't refresh your recollection about those sales when it was meeting you to prepare you; isn't that right?

THE COURT: Sustained.

Q. So if you wouldn't be surprised that you actually made sales of Elan and Wyeth, it's then possible that you in fact did make sales of these stocks for Mr. Martoma?

MR. DEVLIN-BROWN: Objection.

THE COURT: Overruled.
A. Repeat the question, please.
Q. I'll rephrase it.
You said that you wouldn't be surprised that you in fact yourself made sales.
A. Sold partial positions in the stock in the three or four days prior, my recollection five plus years ago, no. Would I remember is selling the entire position before an event of this nature, yes.
Q. How about selling $30 million worth of Elan and Wyeth, would you recall that?
A. You tell me the shares and where the stock was trading 30 million versus 250 or 300 million-dollar position.
Q. But you'd agree with me 30 million is a lot of money, right?
A. Yes.
Q. What you are now testifying after -- on direct you were saying that you were shocked, shocked, that the position was brought down by Mr. Cohen and SAC and other accounts. You're now saying that it's possible that you yourself sold as much as 30 million of Elan and Wyeth before that Alzheimer's conference?
MR. DEVLIN-BROWN: Objection.
THE COURT: Sustained.
Q. Let's go to, Mr. McLeod, Defense Exhibit 328, please.

Mr. Jandovitz, this is an instant message from you to or a Bloomberg email from you to Mr. Mellick. Is that correct?
A. Correct.
Q. I'm referring to Defense Exhibit 328. Mr. Mellick was a friend at JP Morgan securities. Is that correct?
A. Jack Mellick is someone I've known since age five. We grew up together.
Q. So, a friend at JP Morgan.
A. Excuse -- he was an employee of JP Morgan at the time and a personal friend.
Q. What did he do at JP Morgan?
A. He did European pharma sales. European research sales, I should say. He sold JP Morgan's European research sales in healthcare.
Q. So he worked in the industry in healthcare as well?
A. He was a salesperson selling European sales, correct.
Q. This is dated August 1, 2008?
A. That is correct.
MR. BRACERAS: Your Honor, defense offers 328.
MR. DEVLIN-BROWN: Objection. Hearsay.
THE COURT: Give me a moment. I'll see counsel at side bar, and I want them to bring a hard copy of this with them.
(Continued on next page)

(At the side bar)

THE COURT: It's not clear to me who's communicating here. This is an instant message. I'm not, to be honest with you, very familiar with instant messaging. So is it Jandovitz whose comments are in all caps?

MR. BRACERAS: No, your Honor. That is Mr. Mellick.

THE COURT: So, Mr. Mellick is the one who is speaking in all caps?

MR. BRACERAS: Yes.

THE COURT: Is this just a portion of an IM or is this the whole thing, or ...

MR. BRACERAS: This is the whole thing.

THE COURT: So what you're telling me is Mellick is saying to Jandovitz "Martoma got out of Elan."

MR. BRACERAS: No the other way around, your Honor. So it's sort of a question, Mr. Mellick says, "Tell me Martoma got out of Elan..."

Then Mr. Jandovitz replies and says, "Without getting into detail, Wednesday and this week have been great for us."

And then Mr. Mellick says, "I love it. I love it. I love it. Great stuff, my man. Great stuff."

And then Mr. Jandovitz replies, "Stuff that legends are made of. We'll catch up over a beer and I'll tell you a tad bit more."

THE COURT: And there's a hearsay objection.

MR. DEVLIN-BROWN: Yes, I think Mr. Jandovitz's statement "I love it. I love it. I love it. Great stuff."

MR. BRACERAS: That's Mr. Mellick.

MR. DEVLIN-BROWN: Sorry. "Without getting into detail, Wednesday and this week have been great for us." That seems to be offered for the truth. It's an out-of-court statement of a witness.

MR. BRACERAS: Your Honor, a couple of things. I understand the Court's position about laying a foundation on one of the government's exhibits, but this, again, is a government exhibit, and there's some irony in them picking a hearsay objection now. But, nevertheless, it is, I would submit, a business --

THE COURT: Let me explain. The fact that something is on someone's exhibit list does not mean it comes in. And just so there is no confusion on this going forward, without a proper foundation, I will not receive any document, and I don't care whether it's on an exhibit list or not. The rules of evidence will be strictly enforced as to both sides.

So whether or not it's on an exhibit list has nothing to do with the rules of evidence as far as I'm concerned, and if the proper foundation is not laid, the document will not be received in evidence.

What I am trying to understand here is whether this is really being offered for its truth or not

MR. BRACERAS: Right. Your Honor. Understood. I understand going forward.

On this, I think, a couple things. First, I would submit it's a business record. Second, I would submit it goes to Mr. Jandovitz's state of mind, and I think it is certainly admissible for --

THE COURT: Why do we care about Jandovitz's state of mind?

MR. BRACERAS: Because he testified before certainly about the way that -- the implication is the way the trades were made, in this case that they were done confidentially, secretly was that it -- it creates an implication of smoke and that something was done untoward; that there was something improper about the way it was done; it wasn't discussed with him.

And so this document and the next document, your Honor, will show that not only at the time -- I mean, this shows his state of mind at the time, a day after he learned about it. Not only wasn't he concerned or shocked that they didn't tell him. He's telling this person in the industry and a close personal friend like this is, you know, the stuff legends are made of; this is great.

THE COURT: Well, it clearly indicates that Mr. Jandovitz thinks that the selling of Elan was a great thing for him, and I guess one could interpret it for Mr. Martoma as

well.

Now, my question is, I believe he testified that he had a conversation with Martoma on what date?

MR. DEVLIN-BROWN: He said he had one on the 30th and then a longer conversation a few days after.

THE COURT: So he found out on the 30th that the position had been sold.

MR. DEVLIN-BROWN: Yes.

THE COURT: So, as of July 30, he knows that this is a great thing. He's happy. He's happy because he thinks now I'm not going to be fired. We didn't lose a hundred million dollars. So how is that inconsistent with anything he's testified to?

MR. BRACERAS: Your Honor, they opened the door to this because the implication that they're making was that there was some surprise about the --

THE COURT: Yes.

MR. BRACERAS: About bringing down the position.

THE COURT: Yes.

MR. BRACERAS: And that there was something improper--

THE COURT: Yes.

MR. BRACERAS: -- about how the position was brought down.

THE COURT: Right. So how does this dissipate that?

MR. BRACERAS: How because hours later, the next day,

I guess it's the next day later, 7:30 in the morning, I think this tells his state of mind of excitement. If there was some suggestion in his mind that there was insider trading or something improper, he wouldn't be telling a friend in the industry: This is great. This is the stuff legends are made of. Let me tell you about it. He would want to keep it secret.

Part of the government's theory is that this was done through dark pools. This was done in some other account. The fact that this is public information the day after the sale, the day after the conference, it's being touted on Wall Street, it's not being kept secret. It completely undermines the government's theory. The government has this theory, your Honor, that somehow the sales were secret July 22 to 25, but then on August 1 the world saw it, and not only did the world see it, but the traders and portfolio managers were bragging about it.

THE COURT: Yes.

MR. BRACERAS: It's completely inconsistent with the government's theory that you'd want to keep something secret to avoid insider trading.

THE COURT: Well, I'll hear from the government. Maybe I'm missing something, but what I see is that this individual, Mr. Jandovitz, he thought he was going to be fired because they were holding all of this stock, a hundred million

dollars worth of Elan stock and it dived 42 percent, and he comes to work on July 30 and he finds out that it was sold, and so he's very happy because he knows he's not going to be fired, and he probably understands that this is a huge coup for him and for Martoma and that it's actually a very good thing. So the fact that he's reporting this to a pal on August 1, I don't see how it's inconsistent. But I will hear from the government.

MR. DEVLIN-BROWN: We agree, your Honor. Even if this were inconsistent, if that theory was a prior inconsistent statement, it's not under oath. You can't admit an email as a prior inconsistent statement.

I also think we start going down a dangerous road. We did not offer it because we didn't think it would be proper. Emails after this where Mr. Jandovitz does say things like when Martoma is arrested, he emails a friend and says, "karma is a bitch." And if we want to suggest by this that his state of mind was that this was all prim and proper, an email after his arrest where he says "karma is a bitch," that could be something that's responsive. I just think we go very far --

MR. BRACERAS: Your Honor, let me put that in context because that's a little misleading. That email is from 2012, November 2012. This is from 12 hours later, according to his testimony, 12 hours after he learned of this trade, and the way that the trade was purportedly manipulated so that no one could

find out about it, that gave rise to his suspicions that he's testifying to today. The government can't have it both ways. They can't have him testify and say, these trades were all done in these secret accounts and then within 12 hours here is --

THE COURT: I don't know why you keep saying 12 hours. The month of July has 31 days in it. This is August 1.

MR. BRACERAS: Good point. I was thinking it was the next day. OK, within two days. July 30. My apologies, your Honor.

The point is, two days after July 30, when he tells the jury that he is shocked the way -- or, you know, has suspicions about the way these trades were executed, here is an email bragging about it.

THE COURT: Well, all he says is he didn't know about it. He says he didn't know about it, and the implication was he was surprised to learn about it when he got to work.

MR. BRACERAS: Then the government elicited that after, in all of his remaining time -- and Mr. Devlin-Brown asked this question. In all of his remaining time he had never seen that done before, and the implication was, well, you know, in my two remaining years at SAC, I had never seen that happen again, as though, oh geez, this is something that, you know, was disturbing, when in fact two days later, he's bragging about it. And now five or six years later the implication is, you know, there was something nefarious about it.

MR. DEVLIN-BROWN: The only thing I would say to that is defense counsel seems to be trying to impeach the government's argument that we may make from Mr. Jandovitz, but Mr. Jandovitz did not say he was suspicious of anything. He said he didn't know and that that practice of something happening without him knowing never happened again.

One could cross-examine him whether that's accurate or not, but I just don't see the relevance of this email, and I believe it's offered for hearsay.

THE COURT: Let me say this: I think it's being offered for Mr. Jandovitz's state of mind, so I don't think it's being offered for its truth. It seems to me to me to be an easy matter for you to redirect him on it, and you can ask him what he meant when he said "this week has been great" all caps "for us," and we'll hear what he has to say.

I don't think it is going to be that effective for the purpose that defense counsel wants to use it for, but that's his decision. I will allow you to redirect him on what that means. I'm going to overrule the objection.

MR. BRACERAS: Thank you, your Honor.

(Continued on next page)

(In open court)

THE COURT: The objection is overruled.

MR. BRACERAS: Mr. McLeod, if you could publish that Defense Exhibit 313, please.

Q. Mr. Jandovitz, this is a Bloomberg from you to Mr. Mellick. Is that correct?

A. It's a response to a Bloomberg Jack Mellick sent me, yes.

Q. Mr. Mellick worked at JP Morgan?

A. That is correct.

Q. The date of this is August 1, 2008, 7:40 in the morning.

A. Correct.

Q. The language in all caps is Mr. Mellick's language, is that correct?

A. That is correct.

Q. So Mr. Mellick writes you and says "tell me Martoma --

A. That is actually incorrect. I'm sorry. I wrote "great" in caps in the reply.

Q. I'm sorry. The first line I meant that tells me "Martoma got out," that's Mr. Mellick's language?

A. Yes.

Q. Just so we're all sort of in the same place, Mr. Mellick writes you and says, "Tell me Martoma got out of Elan," correct?

A. Yes.

Q. And you respond by saying, "Without getting into detail,

Wednesday and this week have been great" all in caps "for us." That's your language?
A. Correct.
Q. And then Mr. Mellick responds and says, "I love it. I love it. I love it. Great stuff, my man. Great stuff." That's Mr. Mellick's language, correct?
A. Correct.
Q. Then you reply, "Stuff that legends are made of. We'll catch up over a beer, and I'll tell you a tad bit more," correct?
A. Correct.
Q. Mr. McLeod could we bring up defend Exhibit 368, please?
THE COURT: That last exhibit was that 313?
MR. BRACERAS: I'm sorry, your Honor. The confusion here is that it was Government Exhibit 313, but it's Defense Exhibit 328.
THE COURT: So we are going to use the Defense Exhibit designation.
MR. BRACERAS: Right, as 328.
Q. Mr. Jandovitz, it was your practice at SAC to send year end reports almost like self-evaluations?
A. No. Mat asked me to do this.
Q. So looking at Defense Exhibit 368, could you tell us what this is?
A. It's an email I sent to Mat on December 24, 2008 and

entitled "reflections on 2008 and thoughts heading into 2009."
Q. And you said that Mat Martoma asked you to do this?
A. Correct. I mean, some bosses would just say "see you next year. Sign off." So --
Q. You thought this was a good thing to do to look forward in sort of a business planning thing?
A. Yes.
MR. BRACERAS: Your Honor, defense offers 368.
MR. DEVLIN-BROWN: No objection.
THE COURT: Defense Exhibit 368 is received.
(Defendant's Exhibit 368 received in evidence)
Q. Mr. Jandovitz, if we could look at defend 368, and, Mr. McLeod, if we could highlight the first paragraph -- actually let's go to the next paragraph that starts first by the "I would."
Mr. Jandovitz, could you read the first two sentences here?
A. "I would like to start by highlighting the positives of what we did in 2008. We did an excellent job of scaling out of strength in Elan while reducing the position in the middle of the year."
Q. By scaling out of strength in Elan, that means selling when the price is strong. Isn't that right?
A. That is correct.
Q. If we could look below to lesson two, Mr. McLeod. These

are lessons that you learned from the year and that year was 2008, correct?
A. Correct.
Q. Lesson two, you write to Mat, to Mr. Martoma, "when we feel that a drawdown or selloff is forthcoming in the general market and we wanted to take down the book, we should do two things: act more quickly initially on the move, meaning take down a larger amount of capital. Be vigilant about taking down close to equal amounts of long and short capital." Correct?
A. Correct.
Q. This is saying that it's a positive thing it's sort of stating the obvious -- to draw down when a selloff is coming in the general market, correct?
A. Correct.
Q. As a general matter, Mr. Martoma often needed to check in with Mr. Cohen on certain matters, either Mr. Cohen or Mr. Villhauer; is that right?
A. With Mr. Cohen specifically. My responsibility was more to Mr. Villhauer.
Q. You talked a little bit earlier about how there were certain restricted lists. That didn't mean you could buy or sell more of Elan or Wyeth. It just means that you had to check and in Mr. Martoma's case with Mr. Cohen first, right?
A. Or a certain number of traders at the firm could trade in a stock, right.

Q. Was that like Mr. Villhauer?
A. Yes.
Q. And Mr. Villhauer was the head trader?
A. Correct.
Q. Mr. McLeod, if we could pull up defense 310?
THE COURT: What exhibit?
MR. BRACERAS: It's Defense 310, your Honor.
Q. Mr. Jandovitz, this is a July 11, 2008 IM from Mr. Martoma to you, correct?
A. Correct.
MR. BRACERAS: Your Honor, we offer Defense 310.
MR. DEVLIN-BROWN: No objection.
THE COURT: Defense Exhibit 310 is received.
(Defendant's Exhibit 310 received in evidence)
Q. Mr. Jandovitz, just to start off at the top here, and, Mr. McLeod, maybe we could just highlight the top. Mr. Martoma first writes you -- instant messaging was one of the way that you two communicated, right?
A. Correct.
Q. And Mr. Martoma writes, "If Elan is weak off piper, let's look for spots to add." And your response is "yep."
That means that if the Elan price is low, let's look to add or buy some more Elan, correct?
A. Correct.
Q. And then a little bit lower, you say "got it." And a

little bit lower you write, "looks like Steve is trying to buy 500,000 shares at 35." What does that mean?
A. Steve Cohen is looking to buy a half million shares of Elan at $35.
Q. So Mr. Cohen is looking to buy half a million shares of Elan. And, by the way, this IM is, that's you telling Mr. Martoma that Mr. Cohen is going to buy half a million shares?
A. Correct.
Q. And Mr. Martoma then asks you, you, "Do you think we should join the party or wait?" And you understood that to mean that Mr. Martoma was asking you, well, if Mr. Cohen is buying half a million shares of Elan, do you think we should follow and buy shares or should we just wait?
A. That is correct.
Q. You respond Mr. Jandovitz by saying, "I personally think we wait," correct?
A. Correct.
Q. And then Mat responds "OK."

And you could look at the seconds here, it's like eight seconds apart on July 11 at 8:30 in the morning.

Then you explain, and you say -- again, this is July 2008, "the market is horrible and the stock has had huge run."

When you say the market is horrible, you mean that --

this is 2008, and the stock market is just crashing all around you. Isn't that right?
A. I wouldn't say that in July of 2008. I'd say that there was a flash. There was a scare in the market in March 2008 with Bear Stearns going bankrupt, and then really it occurred with the Lehman bankruptcy in September, but the market may not have been acting well is what it implied and -- yes.
Q. Don't take my words --
A. But I don't want to have words put in my mouth, so...
THE COURT: Do not talk over each other. Let him finish his answer.
A. I want to explain because, no, the market wasn't crashing. The marked crashed in September, October, November. It wasn't crashing in July.
Q. Sorry.
A. Market horrible, not acting well.
Q. I didn't mean to interrupt you, and I don't want to put words in your mouth. So let's just say that you wrote the "market was horrible."
A. Correct.
Q. And you thought at the time in July 11 that the market was horrible, that's why you wrote it?
A. Correct. Not crashing.
Q. So then you said "stock has had a huge run." And that means Elan, right?

A. Referencing Elan.

Q. So Elan has had a huge run, and that means while the market was horrible, Elan had a huge run up in increase in price?

A. Increase in price, correct.

Q. You thought given that, we should wait. We shouldn't buy more Elan. Isn't that what you're saying?

A. Correct.

Q. And Mr. Martoma disagrees with you, doesn't he, because Mr. Martoma in the next line says, "I think we should buy some around 35 also though?

A. Correct.

Q. So Mr. Martoma sent you this following his boss, Steven Cohen, correct?

A. Yes.

Q. Although he's doing it at a much lower amount. If you look two lines down, he's buying 50 to a hundred thousand shares, right?

A. Correct.

Q. This is an instance where his trader is telling him, look, the market is horrible. You were such recommending against buying, but Mr. Martoma nevertheless followed his boss, Steven Cohen, and bought additional shares. Is that right?

A. Because Tysabri next week.

Q. Right. And he again, just as Mr. Cohen bought 500,000 shares, Mr. Martoma followed and bought 50 to a hundred

thousand or at least asked you to do that?
A. Correct.
MR. BRACERAS: Mr. McLeod, could we pull up defense 307?
Q. Mr. Jandovitz, what is Defense Exhibit 307?
A. It is an email that I sent to Phil Villhauer.
Q. That's an email that you sent to Phil Villhauer on June 2008, correct?
A. June 25, 2008, correct.
MR. BRACERAS: Your Honor, defense offers 307.
MR. DEVLIN-BROWN: No objection.
THE COURT: Defense Exhibit 307 is received.
(Defendant's Exhibit 307 received in evidence)
Q. If we could move it over a little bit. There we go. I think we can publish that.
THE COURT: Yes, you can publish it.
MR. BRACERAS: Thank you, your Honor.
Q. Mr. Jandovitz, you write to Mr. Villhauer a couple things: Point one I don't think is relevant to this, but number two you say, "Martoma will be adding 750,000 Elan today." That means you would be buying 750,000 shares of Elan?
A. That is correct.
Q. You say, "I will be picking spots on the order." What do you mean by that?
A. Picking spots or buying the stock throughout the course of

the day.
Q. Then you write, "Martoma already spoke to and confirmed with Steve on this." That is, Mat already spoke with Steven Cohen concerning this purchase of 750,000 shares?
A. Correct.
Q. So it's not a controversial point. The point is that there were many times when large purchases or sales were being made that Mr. Martoma had to check in with Mr. Cohen. Is that correct?
A. Correct. It was expected that portfolio managers who were managing part of Steve's money and his personal wealth would report to him based upon what they were buying or selling, especially in stocks in which he was involved.
Q. Mr. Jandovitz, are you familiar with dark pools?
A. I am.
Q. Dark pools are just exchanges where stock is bought and sold?
A. Correct, yeah.
Q. And all types of entities and funds, mutual funds, Fidelity funds, Vanguard funds use dark pools?
A. Correct, the traders at Fidelity, State Street, Vanguard, they all use the same execution devices that we do at SAC Capital.
Q. There is nothing improper at all about it?
A. Nothing whatsoever. It's a means of liquidity.

Q. Its common industry practice?
A. Correct.
Q. Mr. McLeod, could we just pull up defense 302?
Mr. Jandovitz, showing an email from -- it's an exchange between you and Mr. Evans, Mr. Evans was another portfolio manager at SAC?
A. Correct.
Q. This is dated May 2008?
A. Correct.
MR. BRACERAS: Your Honor, defense offers 302.
MR. DEVLIN-BROWN: No objection.
THE COURT: Defense Exhibit 302 will be received.
(Defendant's Exhibit 302 received in evidence)
Q. Mr. Jandovitz, in this email to Mr. Evans on May 8, you are forwarding an article from the Wall Street Journal about dark pools. Your line to him is "article on the spooky pools you're just being sarcastic there, right?
A. A little bit of sarcasm.
Q. Because the attached article actually just described the common usage in the industry of dark pools?
A. It kind of -- it described in detail the growth of dark pools in trading stocks.
Q. So --
A. My boss Eric Evans had a fascination with dark pools. He thought they were scary, so, thus, spooky.

Q. But he ultimately ended out using dark pools, didn't he?
A. He did.
Q. So, let's turn back to 2008 and some of the market conditions. We talked a little bit about the marketing conditions. You mentioned that Bear Stearns collapsed in, I think that was, March 2008?
A. Correct.
Q. You realized even in mid 2008 that portfolio managers at SAC were losing money?
A. I didn't know that.
Q. You knew it was a challenging market?
A. It was a relatively challenging market up until July/August when it became extremely difficult to manage money.
Q. Mr. McLeod, if we could pull up Government Exhibit 305 again. I apologize to come back to this, Mr. Jandovitz, but I want to do this chronologically, and this is in June.

So we look at Government 305. We talked already about how in this weekly report that the Elan was hedged by this basket of securities. Is that right?
A. Correct.
Q. The word hedged means that you're sort of protecting against losses, is that right, just to explain what that word means?
A. You're protecting against debts at risk.
Q. We were looking at the upcoming catalyst. What is a

catalyst?
A. It's an event related to a stock which will either drive the price of stock up or down.
Q. So let's just look at all the different upcoming catalyst force Elan. This is again end of June 2008. We discussed already the phase two Alzheimer's data presentation. Correct?
A. Correct.
Q. Then we also touched on the two year safety update on Tysabri?
A. Correct.
Q. Tysabri was the drug that was actually on the market that treated MS, multiple sclerosis?
A. Correct.
Q. There is a line BIIB Q208 results on July 22. What does that indicate?
A. Biogen was the company reporting second quarter results on July 22.
Q. The results of another biotech company like Biogen could affect Elan's stock price as well, correct?
A. Correct.
Q. Then the next catalyst is Wyeth Q208 results. What does that mean?
A. Wyeth was reporting second quarter results on July 23 the day after Biogen.
Q. So, again, Wyeth was going to make an announcement on

July 23, and that announcement could impact Elan's stock price?
A. Correct.
Q. The next catalyst is Elan Q208 results on July 25. What does that indicate Mr. Jandovitz?
A. Second quarter results for Elan.
Q. That means that there was going to be an analyst call where analysts would actually announce to the public what the second quarter results were for Elan, and that was going to happen on July 25 of 2008, correct?
A. Well, actually the CFO of Elan would hold a conference call or management would and then analysts would have questions or comments, but first the company would announce the results and then analysts would ask questions.
Q. Exactly. And the company CFO would talk about the company's performance in the prior quarter?
A. Correct.
Q. And certainly the company's performance in the prior quarter could impact the stock price, correct?
A. Correct.
Q. And that was announced on July 25 of 2008?
A. Correct.
Q. There are a number of other catalysts here, although I fear trying to pronounce the next one, and the next one is dated August 2008, correct?
A. Paliperidone PDUFA.

Q. That was very well said. That was August 2008. Let me see if there were any others that would happen before July 30 here. Suffice it to say, there were a number of catalysts that were listed on Mr. Martoma's weekly report that would or could impact the Elan stock price. Isn't that right?
A. Correct.
Q. Mr. McLeod, let's pull up Defense Exhibit 314, please. Mr. Jandovitz, what is Defense 314?
A. It's an email I sent to Darryl Pardi.
Q. Mr. Pardi was another portfolio manager?
A. Correct.
Q. You were a trader for Mr. Pardi?
A. Correct.
Q. This is an email from you to Mr. Pardi dated July 15 of 2008?
A. Correct.
Q. If you look lower down it's an email from you to -- actually, the first email in this chain is from you to Mr. Martoma and Mr. Pardi on July 15, 2008?
A. Correct.
MR. BRACERAS: Your Honor, we offer defense 314.
MR. DEVLIN-BROWN: One moment, your Honor. Objection.
THE COURT: Grounds?
MR. DEVLIN-BROWN: Hearsay, relevance.
THE COURT: Sustained.

MR. BRACERAS: Could we be heard, your Honor?

THE COURT: Yes.

(Continued on next page)

(At the side bar)

THE COURT: I'll hear you.

MR. BRACERAS: Your Honor, first of all, we believe that on the hearsay point, I think it's both a business record. It also goes to Mr. Martoma's state of mind. This is July 15, 2008. This is days or a week before the decision is made -- you saw Mr. Strassberg's opening. The reasons to sell part of that is the conditions of the market at that time, so it's certainly relevant to his state of mind.

THE COURT: The problem is this doesn't tell us anything about Martoma's state of mind, and Mr. Jandovitz's state of mind is only relevant in very limited areas. I admitted the last one because it went to the issue whether Mr. Jandovitz thought it was a great thing or not that they sold out of Elan. And I didn't frankly think that email was very probative of your point, but I allowed you to use it. But if your broader argument then is that Mr. Jandovitz's state of mind is generally relevant in this case, that I completely disagree with because actually his state of mind really does president matter in this case.

MR. BRACERAS: Your Honor, could I try again?

THE COURT: Sure.

MR. BRACERAS: This also would be impeachment of Mr. Jandovitz to the extent that he is saying this is one of the "Worst crises in confidence in the banking system since the

Great Depression." You heard him push back pretty aggressively with me when you were talking about the conditions of the market there.

THE COURT: Well, actually what he objected to is that you had used the word crashed, and he said no, it wasn't a crash; the market didn't crash until September when Lehman filed for bankruptcy. That was his point. You introduced an email which he said the market was horrible.

MR. BRACERAS: I'm sorry, your Honor. Mr. Strassberg is helpfully pointing out, I think, well, one additional thing, but -- first of all, it's helpful with respect to Mr. Martoma's state of mind because this is something he's receiving. But he has testified on both direct and cross that he gave advice to Mr. Martoma. We've seen IM and emails where they give advice to one another. And here is an email where he is giving advice to Mr. Martoma. This is part of his job. He sends this not just to Mr. Martoma but both portfolio managers, and he sends it to that he is essentially covering Mr. Pardi and Mr. Martoma. So this goes to Mr. Martoma's state of mind because it's received by him and sent to him. This isn't just --

THE COURT: No, it goes to Mr. Jandovitz's state of mind. He's the one saying this is the worst crises in confidence. It doesn't tell us whether Mr. Martoma agreed with it or not. I disagree with you. It does not shed light on

Mr. Martoma's state of mind at all. It tells us that Mr. Jandovitz believes that this could be one of the worst crisis in confidence in our banking system. It doesn't tell us whether Mr. Martoma agrees or disagrees with that.

MR. BRACERAS: I mean, I guess then -- and I understand, your Honor. I would say I do think this does go to impeachment. You're right, he said that the economy wasn't crashing. And this is an email where he says --

THE COURT: What was the date of the other email where he said the market was horrible.

MR. BRACERAS: It was after this.

THE COURT: This was July 15.

MR. BRACERAS: Right, so the point is, his point was the economy didn't crash until September, I think he said, or something to that effect.

THE COURT: He did say that. Because you had used the word crash, and he said no, the market didn't crash until September. And you pointed out that he said the market was horrible, and he said, yeah, I said the market was horrible. I didn't say the market crashed.

MR. BRACERAS: Right. This is an email before that other email where he is comparing it to the worst crisis in confidence in the banking system since the Great Depression, which I think is inconsistent with the market didn't crash until September.

MR. DEVLIN-BROWN: I have two problems with that, your Honor. First of all, there is no grounds to impeach the witness. If Mr. Braceras wanted to impeach the witness, he would ask the witness something like "Didn't you believe at the time X, Y or Z." Even if he had done that and the witness denied it, this is not a statement under oath, and the prior inconsistent statement doctrine does not allow any prior email to come in as a prior inconsistent statement. It has to be under oath.

THE COURT: Well, let me say that the problem here -- I disagree with what you just said. The problem is the relevance of Mr. Jandovitz's state of mind. So let's stick on that for a minute. First of all, this is not admissible as to Mr. Martoma's state of mind because the fact it was sent to him doesn't tell us anything about what his state of mind was.

On Mr. Jandovitz, the question I think is whether this is inconsistent with what he said before about the market being horrible but the market not having crashed. That, to me, I think is the issue. He made a distinction between the two. He did say the market was horrible, but he also made the point that it hadn't crashed, which was, I think, that was the major exchange between the two of you. At the end of the day, I just don't think Mr. Jandovitz's state of mind is relevant on this particular point, so I'm sustaining the objection.

MR. STRASSBERG: Your Honor, while we're here and

because I see that it is five to 5:00, as your Honor has just seen, and I think we are not going to finish with the witness today. It might be a nice point to actually excuse everyone for the weekend, if your Honor is agreeable to doing that.

THE COURT: Do you agree?

MR. BRACERAS: Yes, your Honor.

THE COURT: So we'll break then.

(Continued on next page)

(In open court)

THE COURT: The objection is sustained.

Ladies and gentlemen, we are going to break for the weekend. Don't discuss the case. Don't listen to look or read anything about the case. Keep an open mind. There is much more evidence for you to hear.

In the meantime, have a pleasant weekend. We will resume at 9:30 on Monday morning. Thank you very much.

(Jury excused)

THE COURT: You can step down, Mr. Jandovitz.

(Witness recessed)

THE COURT: Please be seated.

(Continued on next page)

(Jury not present)

THE COURT: Is there anything we need to take up before we break for the weekend?

MR. DEVLIN-BROWN: No, your Honor.

MR. STRASSBERG: Well, your Honor, we are happy to discuss -- we haven't had a chance to discuss it earlier today, sort of witness order and issues like that. Certainly we had talked about whether we could have the weekend indication from the government as to who their witnesses were going to be moving forward beforehand, and I'm not putting fault on anyone we didn't get an answer because everyone is busy getting ready for today.

THE COURT: I thought they identified their first four witnesses.

MR. STRASSBERG: They indicated that might change because of the schedule.

MR. DEVLIN-BROWN: I thought we were in agreement, frankly, which perhaps is why we should talk first, but we will happily tell them our witnesses for Monday. Obviously, this went a little longer than we expected. We can't do it sitting right here. We will regroup and as soon as we know for Monday, we will certainly communicate that to defense counsel. I think we'll know tomorrow.

THE COURT: They'll tell you tomorrow.

MR. STRASSBERG: Well, your Honor, we don't -- you

know, we always try to work these things out and not bother your Honor with them. We do not want to have a situation where we are being kept in the dark until the last minute, and you know I want to credit that everyone is trying to not have that happen, but sometimes it's helpful to kind of have clearer guidelines so that the press of business doesn't allow them giving information to us to slide to the back of the pile.

Again, I'm trying not to -- I want to stay up here and work it through, but I think it might be helpful if, for example, at the end of the day, say, 6:00 p.m. unless we're here later and when we got back we could have an understanding of who are the witnesses who are coming the next day and the exhibits that would come with them so we're not in a situation where it's 10:00 p.m. and we don't know.

THE COURT: We've had some issues with this. So there is going to be a 24 -- 24 hours before the witness will be identified the exhibits are going to be identified for the witness that are going to be used. 24 hours before that will be the rule.

Anything else? Any issues that emerge over the weekend, you'll let me know. If we need to meet early on Monday morning, please let me know.

MR. STRASSBERG: Thank you.

MR. DEVLIN-BROWN: I would just say we will discuss this with defense counsel, but we did not get, I believe, hard

copy defense exhibits today. Some of them were mislabeled so we'll work that out and figure out what's appropriate for Monday.

(Trial adjourned to Monday, January 13, 2014 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

TIMOTHY JANDOVITZ

Direct By Mr. Devlin-Brown . . .107

Cross By Mr. Braceras . . . . .157

GOVERNMENT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 587 | 128 |
| 305 | 137 |
| 302 | 142 |
| 307 | 146 |

DEFENDANT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 315 | 165 |
| 322 | 170 |
| 300 | 174 |
| 309 | 179 |
| 313 | 180 |
| 317 | 184 |
| 368 | 203 |
| 310 | 205 |
| 307 | 209 |
| 302 | 211 |