E1oQmar1                    Trial

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,            New York, N.Y.

4               v.                      12 CR 0973 (PGG)

5  MATHEW MARTOMA,

6               Defendant.

7  ------------------------------x

8
                                        January 24, 2014
9                                       10:00 a.m.

10
   Before:
11
                    HON. PAUL G. GARDEPHE,
12
                                        District Judge
13

14                         APPEARANCES

15 PREET BHARARA
         United States Attorney for the
16       Southern District of New York
   BY:  ARLO DEVLIN-BROWN
17       EUGENE INGOGLIA
              Assistant United States Attorneys
18
   GOODWIN PROCTER, LLP
19       Attorneys for Defendant
   BY:  RICHARD M. STRASSBERG
20       ROBERTO M. BRACERAS
         LARKIN M. MORTON
21       MEGHAN K. SPILLANE

22           – also present –

23 Matthew Callahan, FBI Special Agent
   Ruby B. Hernandez, Government Paralegal Specialist
24 Spencer Hattendorf, Government Paralegal
   Stephen Paterson, Defense Consultant
25 Ray McLeod, Defense Consultant

E1oQmar1                    Trial

                    (In open court; jury not present)

                    THE COURT:  I understand Mr. Halpern has an issue he

wants to raise.

                    MR. HALPERN:  Thank you.  Good morning, your Honor.

                    THE COURT:  Good morning.

                    MR. HALPERN:  I just wanted to first follow-up and

give a brief report to your Honor.  You may recall at the lunch

break, I reported there was a request from Mr. Martoma's

counsel for four documents that were identified in a privilege

log in connection with the subpoena that was issued by

Mr. Martoma to the University of Michigan in the SEC civil

case, and the university had provided to Dr. Gilman's counsel

the potentially privileged documents to review.  So those are

the four.

                    I thought we would be able to come to terms.  We

haven't.  The four documents has been reduced to three; the

request for them has been reduced to three.  I also understand

from Mr. Martoma's counsel that currently they are not asking

for those documents at this particular point.  I do have a

concern, however, that I just wanted to alert the Court to now.

It may not arise to an issue, but I wanted to raise it now so

as not to interfere with the trial proceedings.

                    It is this:  Mr. Martoma's counsel has advised me that

they currently do not intend to argue subject matter waiver in

connection with examination of Dr. Gilman in connection with

E1oQmar1              Trial

1   the documents that were produced in accordance with your

2   Honor's rulings.  And that's fine.  I just wanted it alerted

3   that there's been no application so far.

4         In the event it is an issue, I would just like the

5   opportunity to address and argue that there is no application

6   here.  I understand that Mr. Martoma is reserving that right.

7   They said they have no intention to, but they did say they're

8   reserving it, and I raise that to bring that to the Court's

9   attention.

10        MR. BRACERAS:  Your Honor, just to clarify, I don't

11  think there is an issue here, and I didn't think we even needed

12  to see the Court on this.  We would still like to see those

13  three documents.  So, to the extent that I think we are still

14  formally requesting them, but the terms by which Mr. Halpern

15  would agree to produce them were just too restrictive, too

16  unreasonable to us.  So given those terms, we said, look,

17  that's OK, we can go without those documents for today.  I just

18  don't think this is an issue.  We are not going to waive our

19  right to seek subject matter jurisdiction in these proceedings.

20        THE COURT:  You mean subject matter waiver.

21        MR. BRACERAS:  Subject matter waiver in these

22  proceedings or other proceedings down the road.  I don't think

23  this is an issue now.

24        MR. HALPERN:  I just offered it for counterproposals,

25  modifications.  I'm open to suggestions.  I just haven't heard

E1oQmar1              Trial

1    back.  So, thank you, your Honor.

2             THE COURT:  Yes.  Are we ready?

3             Dr. Gilman should retake the stand.

4         (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E1oQmar1          Trial

1      (Jury present)

2    SIDNEY GILMAN, resumed,

3          THE COURT:  Dr. Gilman, you remain under oath.

4          Mr. Strassberg, you may proceed.

5          MR. STRASSBERG:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. STRASSBERG:

8    Q.  Good morning, Dr. Gilman.

9    A.  Good morning, Mr. Strassberg.

10   Q.  Now, if you recall, at the end of the day yesterday, we

11   were discussing your first proffer session that happened on

12   February 2 of 2012.  Do you remember that?

13   A.  Yes.

14   Q.  And I'd asked you, if you remember, to try to focus on what

15   you said and what was asked of you in that session.  Do you

16   remember that?

17   A.  Yes.

18   Q.  Actually, at the very end of the day, we were talking about

19   the fact that lying to the prosecutors could consist of two

20   separate crimes, both false statements or lying and obstruction

21   of justice.  Do you remember that?

22   A.  Yes.

23   Q.  And we also discussed about how those crimes -- false

24   statements and obstruction of justice -- are crimes totally

25   independent of any insider trading crime, right?

E1oQmar1                    Gilman - cross

1    A.   Yes.

2    Q.   Now, Dr. Gilman, focusing in on that February 2, 2012

3    proffer session that you had, and putting aside any insider

4    trading issues for a moment, isn't it a fact that you lied

5    about a number of things in that meeting?

6    A.   Yes.

7    Q.   For example, you told the prosecutors that you didn't

8    discuss bapineuzumab with anyone.  Isn't that right?

9    A.   I -- no, that's not true.  I discussed bapineuzumab,

10   theoretical aspects of the treatment, the public available

11   information on bapineuzumab.

12   Q.   Dr. Gilman, my question, just so we're clear, is not what

13   you did, but what you told the prosecutors in that February 2,

14   2012 proffer.  Didn't you tell them that you did not discuss

15   any aspect of the bapineuzumab clinical trial with anyone?

16   A.   That's correct.

17   Q.   As we've seen repeatedly throughout the day yesterday, that

18   was not true, correct?

19   A.   Yes, that's true.

20   Q.   You also lied to the prosecutors in that meeting about

21   whether you had violated GLG's policy about not discussing

22   bapineuzumab.  Do you recall that?

23   A.   Yes.

24   Q.   You told the prosecutors in that February 2, 2012 proffer

25   session that you did not discuss the specific mechanisms of

E1oQmar1                    Gilman - cross

1    bapineuzumab with anyone in your consultations, correct?

2    A.   Yes.

3    Q.   And that was a lie as well, right?

4    A.   Yes.

5    Q.   You also told the prosecutors in that February 2, 2012

6    session that you did not discuss the design of the bapineuzumab

7    clinical trial with anyone, correct?

8    A.   I believe that's correct.  I don't exactly remember that at

9    this point.

10   Q.   Let me show you, if I can, with Mr. McLeod's help, Defense

11   Exhibit 3501-11 at page 4.  If you could pull up the particular

12   highlighted line, Mr. McLeod.  I want you just to read this to

13   yourself -- just if you can, just the line we were just talking

14   about.  The next line, Mr. McLeod.

15          So, again, the way this process needs to work,

16   Dr. Gilman, you need to read this to yourself.  I know you had

17   just testified that you believed that was correct, but you

18   didn't exactly remember at this point.  So, looking at Defense

19   Exhibit 3501-11, page 4, does that help refresh your memory

20   that --

21   A.   Yes.

22   Q.   And just so it's clear, you did tell the prosecutors in

23   that February 2, 2012 meeting that you did not discuss the

24   design of the bapineuzumab clinical trial with anyone?

25   A.   Yes.

E1oQmar1                    Gilman - cross

1    Q.  And that was also a lie, right?

2    A.  Yes.

3    Q.  As we've seen yesterday throughout the day, those

4    statements were easily provable lies, right, based on the

5    documentary evidence that we all reviewed?

6    A.  Yes.

7    Q.  Would it be fair to say that if you were charged with lying

8    or obstruction of justice based on those statements, you really

9    would have no defense given all the documents that we reviewed

10   yesterday, right?

11   A.  Yes.

12   Q.  In the summer of 2012, Dr. Gilman, isn't it fair to say

13   that you understood that you might be charged with a federal

14   crime unless you and your lawyers were able to reach an

15   agreement with the prosecutors, right?

16   A.  Yes.

17   Q.  In fact, on July 26 of 2012, you knew that the prosecutors

18   met with your lawyers and told your lawyers that you were in,

19   in substance, substantial danger of being charged.  You recall

20   that, right?

21   A.  I didn't know what the prosecutors were thinking, sir.

22   Q.  Well, let me show you what's been marked as Defense Exhibit

23   976-R.  I want you to read the highlighted portion to yourself

24   and tell me when you're done.  Are you done, Dr. Gilman?

25   A.  Yes, I have.

E1oQmar1                    Gilman - cross

1   Q.  My question for you isn't what's in the mind of the

2   prosecutor.  My question for you is only, don't you remember

3   that the prosecutors told your lawyers in substance on this

4   July 26, 2012 date that you were in substantial danger of being

5   charged?

6   A.  Yes.

7   Q.  And then on August 17 of 2012, you went back to the

8   prosecutors and had another proffer session, right?

9   A.  Yes.

10  Q.  In that proffer session, you told them a very different

11  story than what you had told them in the February 2, 2012

12  proffer session.  Fair to say?

13  A.  Yes.

14  Q.  Now, the day before that August 17, 2012 proffer session,

15  you and your lawyers met in your lawyers' offices with the FBI.

16  Do you remember that?

17  A.  I don't.

18  Q.  Well, do you remember that the day before you had your

19  proffer session in August, you turned over your computer to the

20  FBI agent.  Do you remember that?

21  A.  Yes.

22  Q.  Do you remember doing that in your lawyer's office?

23  A.  I remember turning over my computer at the University of

24  Michigan.  I don't remember doing it at the attorney's office.

25  Q.  But you remember turning it over the day before your

E1oQmar1                    Gilman - cross

1    proffer session to the FBI?

2    A.  Yes.

3    Q.  And when you had this meeting on August 17 of 2012, it was

4    still pursuant to that proffer agreement that you had signed

5    back in February, right?

6    A.  Would you say that again?

7    Q.  Sure, I will.  So, when you had the meeting on August 17,

8    2012 --

9    A.  Yes.

10   Q.  -- it was pursuant to that proffer agreement that you had

11   signed back in February of 2012.  Isn't that right?

12   A.  Yes.

13   Q.  And we looked at that proffer agreement yesterday.  Do you

14   remember that?

15   A.  Yes.

16   Q.  So, the proffer agreement still provided a protection for

17   you in that it meant that the prosecution could not use

18   anything you said in this session in August of 2012 against you

19   in a case they would bring directly.  Do you remember that?

20   A.  I didn't quite understand what you're -- what you said.

21   Tell me again, please.

22   Q.  Sure, I'll try.  So, do you remember that the proffer

23   agreement provided a protection for you.  Do you remember that?

24   A.  Yes.

25   Q.  And the protection was that the government and the

E1oQmar1                    Gilman - cross

1    prosecutors agreed that they would not use the statements you

2    provided to them in this interview to make a direct case

3    against you.  Do you remember that?

4    A.  Not exactly I don't, no.

5    Q.  Well, maybe we can look at the proffer agreement, if we can

6    pull that up.  I believe it's Government Exhibit 741.  That is

7    in evidence.  If we can go into the second paragraph,

8    Mr. McLeod, and blow that up.

9           We looked at this yesterday, Dr. Gilman, but really I

10   think we can focus here on the first half of this sentence.

11   You see it says, "In any prosecution brought against client by

12   this office, except as provided below, the government will not

13   offer in evidence on its case-in-chief" -- then if we can just

14   jump down to -- "any statement made by client at the meeting."

15   Do you see that?

16   A.  Yes.

17   Q.  That was the protection that you had as part of this

18   proffer agreement, right?

19   A.  Yes.

20   Q.  But, of course, as we talked about yesterday, the proffer

21   agreement gave no protection for any false statements or lies,

22   right?

23   A.  Yes.

24   Q.  I believe you've testified to us already that from the time

25   you came in in August of 2012 and began talking to the

E1oQmar1                    Gilman - cross

1    prosecutors, you've tried to tell the prosecutors the truth in

2    all of those sessions from August 4 to today?

3    A.  Yes.

4    Q.  And I think your testimony is you didn't attempt to

5    intentionally lie or intentionally mislead the prosecutors from

6    any of those sessions from August through to today, right?

7    A.  Yes.

8    Q.  Now, in the August session, as I believe the prosecutors

9    asked you on direct, you said for the first time to the

10   prosecutors that you had tipped Mathew Martoma, right?

11   A.  I had what?

12   Q.  Tipped.  Tipped.  You provided Mathew Martoma with

13   information you weren't supposed to?

14   A.  Yes, I did.

15   Q.  And do you remember that on this August 17, 2012 proffer

16   meeting with the prosecutors, they told you to start the

17   meeting that the only thing they wanted to talk about was

18   Mathew Martoma who worked at SAC Capital?

19   A.  I don't recall their saying this is all they wanted to talk

20   about.

21   Q.  Well, let me put up Defense Exhibit 3501-16.  Again, this

22   will just be for you, Dr. Gilman.  I'm going to ask you to

23   review it and see if that helps you remember.  If you can start

24   with the AUSA Devlin-Brown piece and then just read that to

25   yourself.

E1oQmar1                    Gilman - cross

1   A.  Well, it says focus --

2           THE COURT:  No, don't read it.

3           THE WITNESS:  Excuse me.

4           THE COURT:  Just read it to yourself and then let

5   Mr. Strassberg know whether it refreshes your recollection.

6   A.  It does -- it does.

7   Q.  Let me ask you a question that will be a little bit

8   modified, OK, Dr. Gilman?  Is it fair to say that to start this

9   meeting, the prosecutors told you that they wanted you to focus

10  on your interactions with Mathew Martoma?

11  A.  It says focus on, but there's no word exclusive in it.

12  Q.  Would it be fair to say that that focus was consistent with

13  what Agent Kang had told you when he followed you to your

14  office and had that session with you in September 1 of 2011,

15  that his focus was not on you or even on Mr. Martoma, but was

16  on Mr. Cohen?

17          MR. DEVLIN-BROWN:  Objection.

18          THE COURT:  Sustained.

19  Q.  Dr. Gilman, let's talk about that proffer session on

20  August 17 of 2012, OK?  Do you recall in that session that you

21  told the prosecutors that when you went to San Francisco to see

22  the unblinded efficacy results of the bapineuzumab Phase II

23  trial, you were not intending to share those results with

24  Mathew.  Do you remember saying that?

25  A.  I denied -- would you say that again?

E1oQmar1                        Gilman - cross

1    Q.  Sure.  Let me try again, OK?  Do you remember telling them

2    that back on July 15, OK, so when you first went to San

3    Francisco to see the efficacy results --

4    A.  Yes.

5    Q.  -- it was not your intention to share them with Mathew or

6    with anybody, right, when you first went out.  Do you remember

7    saying that?

8    A.  Yes.

9    Q.  And that was true, right?

10   A.  Yes.

11   Q.  Now, you also said in that August 2012 session that on

12   July 17, you did share some of those results with Mathew,

13   correct?

14   A.  Yes.

15   Q.  And you said you also sent Mathew on July 17 the ICAD

16   PowerPoint that had been sent to you earlier that day.  Do you

17   remember telling the prosecutors that?

18   A.  Yes, that was my recollection at the time.  Yes.

19   Q.  You told the prosecutors that you talked in that

20   conversation on the 17th with Mr. Martoma about the ICAD

21   PowerPoint presentation, right?

22   A.  Yes.

23   Q.  Now, at the same meeting, this August 17, 2012 meeting, the

24   prosecution asked you again about that calendar entry about

25   meeting with Mathew on July 19 of 2008.  Remember that?

E1oQmar1                    Gilman - cross

1    A.  Yes.

2    Q.  I think we had talked yesterday, they had asked you about

3    that in February.  Do you remember?

4    A.  Yes.

5    Q.  And they showed you the calendar entry at this meeting in

6    August?

7    A.  Yes.

8    Q.  And even after seeing the calendar entry, you told them

9    that you didn't have any memory of that meeting taking place,

10   right?

11   A.  Yes.

12   Q.  And that was true, correct?

13   A.  Yes.

14   Q.  And that was true back in February when you told them that

15   too then, right?

16   A.  Yes.

17   Q.  Is it fair to say, Dr. Gilman, that it is uncommon for an

18   investment professional to visit you in Ann Arbor on a

19   Saturday?

20   A.  Yes.

21   Q.  And also fair to say that Mr. Martoma had never been to the

22   University of Michigan campus where you worked, as far as you

23   know, before?

24   A.  As far as I know, he had never been there before.

25   Q.  Dr. Gilman, do you recall also that at the end of this

E1oQmar1                    Gilman - cross

1    meeting on August 17, 2012, the prosecutors gave you back your

2    computer?

3    A.  You're switching topics now.  At the end of what?

4    Q.  Sure.  That's OK, I'll repeat it.  Anything you're not

5    quite sure you understand, you just let me know.

6              So, at the end of that meeting, so now it's August 17,

7    2012.  Yes, so now we're going -- you're right, we're trying to

8    go in different time frames, but I want you now to be on

9    August 17, 2012, your proffer meeting.  At the end of that

10   meeting, do you recall that the FBI gave you back the computer

11   that you had given them the day before?

12   A.  I don't recall that, but perhaps.

13   Q.  Let's try to see if we can help your recollection.  If we

14   can put up Defense Exhibit 3501-16 at page 5.

15             Again, Dr. Gilman, if you could just read this to

16   yourself and then see if that helps your recollection that at

17   the end of this meeting, your laptop was returned to you?

18   A.  All right.  Thank you.

19   Q.  Do you remember now that it was returned to you at end of

20   the meeting?

21   A.  I don't remember it, but this document --

22             THE COURT:  No, this question is, do you remember?

23   A.  I do not remember.

24   Q.  Fair enough, Dr. Gilman.  Do you remember it was returned

25   to you at some point?

E1oQmar1                    Gilman - cross

1  A.  Yes.

2  Q.  And it was some point around that time even if you can't

3  remember it was at the meeting itself, right?

4  A.  Yes.

5  Q.  And you understood that the FBI had made a full copy of

6  that laptop, right, that's why you had given it to them, right?

7  A.  That was my understanding.

8  Q.  Now, Dr. Gilman, you next met with the prosecutors on

9  September 14 of 2012.  Do you remember that?

10 A.  What happened on September 14?  I'm sorry, say that again?

11 Q.  Sure.  You had another one of these proffer sessions,

12 another meeting with the prosecutors on September 14 of 2012.

13 A.  Yes.

14 Q.  About three weeks or a month after the August 17 meeting,

15 right?

16 A.  Yes.

17 Q.  And do you remember you spent hours with the prosecutors in

18 this meeting on September 14 of 2012?

19 A.  Yes.

20 Q.  And they showed you various documents.  Do you remember

21 that?

22 A.  Not distinctly, no.

23 Q.  No, I understand, and I'm not at this point trying to ask

24 you about specific documents, but do you remember that they

25 showed you various documents as the session went on?

E1oQmar1          Gilman - cross

1   A.  Yes.

2   Q.  Again, I'm going to want to try to focus you on what you

3   said in this session on September 14 of 2012 with the

4   prosecutors, OK?  OK?

5   A.  Yes.

6   Q.  Fair to say you were doing this agreement pursuant to that

7   proffer agreement that we looked at a few minutes ago, right?

8   A.  Yes.

9   Q.  And at this time, you did not have your non-prosecution

10  agreement yet, right?

11  A.  That's correct.

12  Q.  Now, in this meeting, you discussed with the prosecutors

13  your interactions with Mathew, correct?

14  A.  Yes.

15  Q.  And you told the prosecutors about the first time that you

16  could recall meeting with Mathew in New York at the SAC's

17  offices.  Do you remember that?

18  A.  Yes, it was CR Intrinsic's office, actually, to be precise.

19  Q.  That was that meeting in October of 2006 that you've

20  testified about, right?

21  A.  Yes.

22  Q.  And you talked to the prosecutors about how you remembered

23  that meeting in October of 2006 in CR Intrinsic's offices in

24  New York; is that right?

25  A.  Yes.

E1oQmar1                    Gilman - cross

Q.  And did you know at the time you were talking to the

prosecutors -- now this is, again, September 2012 -- did you

know that CR Intrinsic was a division, part of SAC Capital?

Did you know that by that time?

A.  Oh, I don't recall whether I knew that at the time or not.

I probably did by then.  I don't specifically recall whether I

knew it.

Q.  OK.  In your session in September, you told the prosecutors

that you believed that Mathew was gracious and friendly in your

meeting with him, right?

A.  Yes.

Q.  And you remembered the fact that he had provided lunch for

you in the meeting, correct?

A.  Yes.

Q.  And you were clear that you didn't provide any confidential

information to Mathew in this first meeting the first time you

met him, right?

A.  That's right.

Q.  Once again in this meeting, the prosecutors spent time with

you about that calendar entry on July 19 that reflected that

Mathew was going to meet you in your office in Michigan.  Do

you remember that?

A.  I don't specifically remember it being raised during that

meeting, but it could well have because I was asked multiple

times about that meeting.

E1oQmar1                    Gilman - cross

Q.  So let me direct your attention to Defense Exhibit 3501-20

at page 10.  Again, we will do the same exercise.  Mr. McLeod,

if you could highlight the relevant section here.

        And then I am going to ask you, Dr. Gilman, if after

reading that it helps your recollection that in fact you were

asked about the calendar entry and the Michigan meeting again

in September.  I know this is a little hard to read, so take

your time with it, Dr. Gilman.

A.  Yes, I've read it.

Q.  So, does that help refresh you, Dr. Gilman, that you were

asked about the calendar entry for the Michigan meeting in the

September 14, 2012 proffer session?

A.  Yes.

Q.  And you told them that you had still had no memory of that

meeting, right?

A.  Yes.

Q.  And that was a true statement at the time, right?

A.  Yes.

Q.  And you met again with the prosecutors on October 26 of

2012.  Do you remember that?

A.  Yes.

Q.  This was another one of those proffer sessions again,

right?

A.  Yes.

Q.  And, again, you didn't have a non-prosecution agreement in

E1oQmar1                    Gilman - cross

1    place yet at this time, right?

2    A.   That's right.

3    Q.   Is it fair to say that you answered all the questions that

4    the prosecutors asked you in this meeting?

5    A.   I believe I did.

6    Q.   Fair to say also that as of October 26 of 2012, you still

7    had no memory of ever meeting Mathew in your office in

8    Michigan?

9    A.   Yes.

10   Q.   Now, on November 15 of 2012, you entered into that

11   non-prosecution agreement that we've looked at in court

12   yesterday.  Do you remember that?

13   A.   Yes.

14   Q.   But even after your non-prosecution agreement, you

15   continued to have interview sessions with the government,

16   right?

17   A.   Yes.

18   Q.   But now these sessions were not covered by the proffer

19   agreement any more; they were covered by the non-prosecution

20   agreement, right?

21   A.   Yes.

22   Q.   And as you mentioned, one of the things you were obligated

23   to do under the non-prosecution agreement was come and meet

24   with the prosecutors whenever they summoned you to do so,

25   right?

E1oQmar1                    Gilman - cross

1   A.  Yes.

2   Q.  And that's one of your obligations that remains on you now

3   even as we sit here today, right?

4   A.  You're speaking too fast, and I can't understand you.

5   You're too far away from the microphone, I think.

6   Q.  I'll try again.

7   A.  Please.

8   Q.  And that is one of the obligations that you still have

9   pursuant to your non-prosecution agreement, right?

10  A.  Yes.

11  Q.  Now, do you recall that you met again with the prosecutors

12  on February 28 of 2013?

13  A.  I don't specifically remember that date, but that sounds

14  likely.

15  Q.  Let me show you a document, and see if it will help you

16  with the date.  Mr. McLeod, if you could show Defense Exhibit

17  3501-25 at page 1.

18          Do you see, Dr. Gilman -- after you've had a chance to

19  see this, does that help refresh your memory that you met again

20  with the prosecutors on February 28 of 2013 now?

21  A.  Yes.  Thank you.

22  Q.  Do you remember, again, focusing now on February 28 of

23  2013, which is a little less than a year ago, I guess, do you

24  remember that again you discussed that first meeting with

25  Mathew in October 2006?

E1oQmar1                    Gilman - cross

1    A.  Yes.

2    Q.  And by this time your first meeting in October 2006 had

3    happened almost -- well, I guess it was six and a half years

4    before, right?

5    A.  Yes.

6    Q.  After you discussed that October meeting, the prosecutors

7    talked to you again about this Michigan calendar entry about

8    the trip to meet with Mathew Martoma on July 19 in your office.

9    Do you remember that?

10   A.  Yes.

11   Q.  Once again, you said that you had no recollection of that

12   meeting with Mathew, right?

13   A.  Yes.

14   Q.  And the prosecutors asked you some detailed questions in

15   that meeting about your office.  Isn't that right?

16   A.  I think so.  I don't specifically recall.  Can you refresh

17   my memory?

18   Q.  Well, let me -- I will in a minute, but let me ask you a

19   different question, Dr. Gilman, and see if this helps.

20           Do you remember that they asked you questions about

21   how you could gain access to your office?

22   A.  Yes.

23   Q.  And they asked you questions about how you commuted to your

24   office?

25   A.  How I what?

E1oQmar1                    Gilman - cross

Q.   Commuted, how you got to your office?

A.   Yes.

Q.   That you drove to your office and the like?

A.   Yes.

Q.   And they asked you where you parked?

A.   Yes.

Q.   And they asked you about how someone would enter your

office on the weekends?

A.   Yes.

Q.   Do you remember that?  And they talked about how a visitor

could possibly get into your office, right?

A.   Yes.

Q.   Your office building, I guess it would be?

A.   Yes.

Q.   And you explained that from your office, you cannot see the

street outside.  Do you remember that?

A.   I -- that sounds familiar, yes.

Q.   And you also said that there was no buzzer outside the door

for someone to buzz you when they were outside the door, right?

A.   That's right.

Q.   And is it fair to say that you understood they were trying

to develop evidence with respect to this issue of whether you

had met with Mathew on July 19 of 2008?

A.   I thought they were trying to help me remember.  I thought

they were trying to help --

E1oQmar1                    Gilman - cross

1    Q.  So you understood, Dr. Gilman, that these questions were

2    designed to see if you could remember what you hadn't been able

3    to remember up until we were at February 28 of 2013, right?

4    A.  I had no memory of the day until that time.

5    Q.  And the prosecutors, in addition to asking you questions,

6    were also showing you documents, right?

7    A.  Yes.

8    Q.  Now, do you recall, Dr. Gilman, that by this time,

9    February 28 of 2013, you were aware that the prosecutors had

10   not been able to locate any email that would show you sending

11   the ICAD PowerPoint presentation to Mathew on July 17?

12   A.  I heard nothing about that, sir.

13   Q.  Well, did your own lawyer -- well, talking broadly,

14   Dr. Gilman, is it not fair to say that it was your

15   understanding that there had not been -- excuse me.  Let me

16   frame it again.

17            Is it not true that by February 28 of 2013,

18   Dr. Gilman, you understood that no one had been able to find

19   any email sent from you to Mathew Martoma attaching the ICAD

20   PowerPoint presentation?

21   A.  Sir, I cannot discuss what transpired between myself and my

22   attorneys.  That's privileged.

23   Q.  So, you're making a distinction here between what you may

24   have understood from conversations with your attorneys and what

25   you understood from conversations, say, with the prosecutors,

E1oQmar1                    Gilman - cross

1    is that right?  Is that the distinction you're making?  I just

2    want to make sure I understand.

3    A.  It is.

4    Q.  Let me ask it a different way, Dr. Gilman; perhaps in a way

5    that won't cause any concern about your attorney

6    communications.

7           Is it fair to say that in all of your sessions with

8    the prosecutors, they never showed you any email that was from

9    you to Mr. Martoma attaching the ICAD PowerPoint presentation.

10   Is that fair to say?

11   A.  That's correct.

12   Q.  Do you remember -- now, again, I'm at February 28 of 2013,

13   in that session, Dr. Gilman.  Do you remember that they asked

14   you in that session detailed questions about your computers.

15   Do you remember that?

16   A.  About my computers.  I don't recall such questions now.

17   Q.  OK.  Well, let's take a look at Defense Exhibit 3501-25 at

18   page 9, and we'll see if that can help you, Dr. Gilman.

19   A.  You mean the change of computers?

20   Q.  But my question to you, Dr. Gilman, is just a little

21   different.  If you've had a chance to look at this.  My

22   question only was, does this help you remember that they asked

23   you questions about your computers?

24   A.  Oh, yes, they did.  Yes.

25   Q.  And you talked to them about your computers and your laptop

E1oQmar1                    Gilman - cross

1    and the like at the University of Michigan, right?

2    A.  Yes.

3    Q.  One of the things they asked you about was whether you had

4    deleted anything from your laptop before you had given it to

5    the FBI.  Do you remember that?

6    A.  Yes.

7    Q.  And you explained to them that you had not done that,

8    right?

9    A.  That's right, yes.

10   Q.  Now, do you recall, Dr. Gilman, that you met again with the

11   prosecutors on the very next day?  That was March 1 of 2013.

12   A.  I don't specifically remember it, but that's fine.

13   Q.  Let's take a look at Defense Exhibit 3501-27.  Again, just

14   if we look at the top and see if that helps you with respect to

15   the date, Dr. Gilman.

16   A.  Yes.  Thank you.

17   Q.  Right.  Do you remember, Dr. Gilman, that in this March 1,

18   2013 session with the prosecutors, that calendar entry about

19   July 19 came up again, right?

20   A.  Yes.

21   Q.  And the prosecutors were asking you more questions to try

22   to see if they could get you to remember anything about a

23   meeting with Mathew in Michigan, right?

24   A.  I take issue with the word get me to remember.  That sounds

25   coercive.  There is no coercion involved.

E1oQmar1                    Gilman - cross

1    Q.  Well, would it be fair to say they were asking you

2    questions, a lot of questions about this topic, right?

3    A.  I was being asked questions.  Nobody was forcing me to do

4    anything.  I take issue with your choice of words, sir.

5    Q.  I didn't suggest coercion, Dr. Gilman, so I'm fine with

6    your phrasing of it.  They were asking you questions about --

7    A.  They were asking me questions, yes.

8    Q.  And I think you said a few minutes ago that you understood

9    they were trying to help you remember, right?

10   A.  Yes.

11   Q.  Do you remember in this session that, again, the session

12   started out in the morning.  Do you remember that, the session

13   on March 1, 2013?

14   A.  Tell me again.

15   Q.  It started in the morning; it was a long session you had

16   with the prosecutors?

17   A.  Yes.

18   Q.  And in the morning, you told them again you had no memory

19   of this meeting with Mathew in Michigan, correct?

20   A.  Perhaps.  Is that documented somewhere?

21           THE COURT:  The question is whether you remember it.

22           THE WITNESS:  I do not remember that, no, and I'm --

23   Q.  Let me direct your attention, Mr. McLeod, to Defense

24   Exhibit 3501-27 at page 3.  If you could highlight the relevant

25   language.  That's not the relevant language.  It's in paragraph

1    four, Mr. McLeod.  No, that's not the relevant language.

2    Mr. McLeod.  "Gilman did not."  If you can find that.  Thank

3    you.

4            So take your time, Dr. Gilman.  We've showed you a lot

5    other clips, but this is the actual clip we were looking for on

6    page 3.  Do you see that, does that help refresh your

7    recollection that --

8    A.  No.  No.  This is about canceling a meeting --

9            THE COURT:  No, the question is, does it refresh your

10   recollection?  Just a yes or no.

11   Q.  Mr. McLeod, if you could highlight only the first sentence

12   please so we are not looking at things that are not relevant to

13   this question.  Just take a look at that, Dr. Gilman.

14   A.  This helps me recollect that meeting, but not what you --

15   Q.  Right.  So just, again, in this March 1 meeting at this

16   time, the beginning of the meeting, do you remember you still

17   didn't remember anything about whether you met with Mr. Martoma

18   on July 19 of 2008?

19   A.  All right.  This doesn't give a time zone for when this

20   discussion took place though.  You were talking about the

21   morning.

22   Q.  Yes, I was.

23   A.  And I don't see a time zone here.

24   Q.  So, fair to say you can't remember when, but you do

25   remember it happened at some point in that meeting?

E1oQmar1                    Gilman - cross

1    A.  Yes.

2    Q.  And you did tell the prosecutors though that you remembered

3    that Mathew had told you that he was planning to be in Ann

4    Arbor on Saturday for a different reason, correct?

5    A.  Yes.

6    Q.  I think you testified he told you that his -- he had an

7    uncle who had died, and he was planning to come up to Ann Arbor

8    to pay respects, right?

9    A.  Yes.

10   Q.  In fact, he had told you he had been so busy, he missed the

11   funeral, correct?

12   A.  That's what he told me, correct.

13   Q.  Do you remember also, Dr. Gilman, that he told you the

14   uncle had suffered from lymphoma?

15   A.  No, he didn't tell me that.

16   Q.  So, you didn't know what the cause of the uncle's death

17   was?

18   A.  No, I did not know.

19   Q.  Do you remember during this session that there came a point

20   where you guys took a lunch break?

21   A.  I'm sorry, would you say that again?

22   Q.  Sure.  Let me be more specific, OK, Dr. Gilman.  So, do you

23   remember during the March 1, 2013 session, that there was a

24   point where you took a lunch break in the session?

25   A.  Well, I don't remember but seems natural.

E1oQmar1          Gilman - cross

1  Q.  Let me show you again Defense Exhibit 3501-27 at page 4,

2  and, again, Mr. McLeod, if you could just highlight what's

3  noted on the top of the outline page relating to that issue.

4  You see the place where it says "note" at the top of the page.

5  Really, it's just the first clause there, Dr. Gilman.

6  A.  Yes.

7  Q.  Not so much about the second part, but the first part

8  there, to see if that helps refresh your --

9  A.  Yes, there was a lunch break.  Yes.

10  Q.  Now, Dr. Gilman, do you -- stay with me, OK?  So, on

11  March 1 of 2013, do you remember anything that happened at this

12  lunch break?

13  A.  No.

14  Q.  Do you remember where you went for lunch?

15  A.  No.

16  Q.  Do you remember who you went to lunch with?

17  A.  No.

18  Q.  Did the prosecutors sit with you for lunch?  Did you all

19  eat lunch together?

20  A.  No, I don't remember, sir.

21  Q.  Do you recall which attorneys, your own attorneys you were

22  with during this March 1 session?

23  A.  I do not recall, sir.

24  Q.  Would it be fair to say, Dr. Gilman, that given all the

25  times the prosecutors had questioned you about the trip to

E1oQmar1                    Gilman - cross

1    Michigan on July 19 of 2008, you knew that they viewed that

2    trip as important?

3    A.  They knew what?

4    Q.  That you knew the prosecutors viewed that calendar entry

5    that said Mathew had made a trip to Michigan on July 19 as

6    important?  Would it be fair, would you agree with me that you

7    knew the prosecutors believed that was important?

8    A.  Would you say that entire pair of sentences again slowly?

9    Q.  I will.  So, Dr. Gilman, would it be fair to say that given

10   all the times the prosecutors had asked you about that July 19

11   calendar entry about a meeting with Mathew --

12   A.  Yes.

13   Q.  -- in Michigan, that you knew, understood that the

14   prosecutors believed that that was an important issue?

15   A.  I didn't know what the prosecutors knew or thought, dreamed

16   or had in mind.  I had no way to read their thoughts, sir.

17   Q.  OK.  So, you didn't know, fair to say then, Dr. Gilman?

18   All you did know was that they kept asking you about it?

19   A.  Yes, that's all I knew.

20   Q.  Now, is there anything else that you can remember for us

21   about this lunch break that happened on the March 1, 2013

22   meeting?

23   A.  I'm sorry, but I've had so many meetings with so many

24   people that I do not recall that specific lunch break.

25   Q.  Do you recall then, Dr. Gilman, that after the lunch break,

1    you went back to the meeting and you told the prosecutors that

2    you had a vague recollection of going out of your office

3    building and finding Mathew on the street outside your office.

4    Do you recall telling them that after the lunch break?

5    A.   That was, in fact, the first recollection I had, and I

6    don't recall exactly when that occurred, but --

7    Q.   So, fair to say you can't place it after the lunch break or

8    before; is that right?

9    A.   I can't place exactly when it happened.

10   Q.   But you do remember that that was the first recollection

11   that you had about seeing Mathew in Michigan, right?

12   A.   Yes.

13   Q.   But even then, you did not recall any other details --

14   A.   That's right.

15   Q.   -- about the meeting with Mathew in Michigan, right?

16   A.   That's right.

17   Q.   Now, do you recall, Dr. Gilman, that you had another

18   session with the prosecutors on April 4 of 2013?

19   A.   I don't specifically recall that session.

20   Q.   Can we show Defense Exhibit 3501-29, and, again, just

21   highlight the date, and see if that helps your recollection,

22   Dr. Gilman.

23   A.   Yes, all right.

24   Q.   So, fair to say, Dr. Gilman, that you met again with the

25   prosecutors on April 4 of 2013?

E1oQmar1                    Gilman - cross

1  A.  Yes.

2  Q.  And fair to say in that session that the prosecutors again

3  asked you many questions about your memory of meeting Mathew in

4  Michigan, right?

5  A.  Yes.

6  Q.  Fair to say still at this time you didn't have any

7  details -- excuse me.  Fair to say that still at this time on

8  April 4th, you didn't recall any of the details of the meeting,

9  right?

10 A.  That's probably true.  I don't specifically remember what I

11 said or recalled on April 4.

12 Q.  Do you remember that on April 4, Dr. Gilman, the

13 prosecutors asked you a number of questions about how you share

14 information with people in general?  Do you remember that?

15 A.  How I share information in general?

16 Q.  Yes, in general.

17 A.  In general, I don't understand the question.

18 Q.  Well, let me rephrase it.  I guess that was too broad.  Do

19 you recall that they asked you how you like to review documents

20 yourself?

21 A.  Please repeat.

22 Q.  Do you recall that the prosecutors in this April 4, 2013

23 session asked you how you like to review documents yourself?

24 A.  Review documents?

25 Q.  Yes.

E1oQmar1                    Gilman - cross

1    A.  I don't recall that question.

2    Q.  OK.  Let's take a look at Defense Exhibit 3501-29 at page

3    2.  Take a look at that, Dr. Gilman.  In fact, you can read

4    that whole paragraph that is there; that might help.

5    A.  Thank you.  That refreshes my memory.

6    Q.  So, do you remember they asked you how you like to review

7    documents?

8    A.  Yes.

9    Q.  And you told them how you like to review them

10   electronically or on a computer, right?

11   A.  Yes.

12   Q.  And they also asked you about how you might share documents

13   with people, right?  Do you remember that?

14   A.  Yes.

15   Q.  And you told them that sometimes you would use a jump drive

16   to give a person an electronic copy of a document, right?

17   A.  Yes.

18   Q.  And the prosecutors were asking you questions about how you

19   reviewed documents and how you shared documents, right,

20   Dr. Gilman?

21   A.  Yes.

22   Q.  Is it fair to say that from your prior answers, that you

23   don't know the reason behind why they were asking you the

24   questions; you just know they were asking you, right?

25   A.  I didn't know the reason behind why they were asking me

E1oQmar1                 Gilman - cross

1  these questions.

2  Q.  Now, let's move forward to October 22 of 2013.  You had

3  another one of these interview sessions with the government on

4  that day.  Isn't that right, Dr. Gilman?

5  A.  Yes, maybe.  I might ask you again for evidence of that.

6  Q.  Mr. McLeod, if we could show Dr. Gilman Defense Exhibit

7  3501-33?

8  A.  Thank you.

9  Q.  Fair to say, Dr. Gilman, that the issue of your meeting

10  with Mathew in Michigan came up again at this session.  Do you

11  recall that?

12  A.  I don't specifically recall it.  What specifically are you

13  interested in?

14  Q.  Really, I am just asking if you recall at this session on

15  October 22 of 2013 that the prosecutors asked you again about

16  your memory of meeting Mathew in Michigan?

17  A.  I don't -- I don't recall any specific recollection I gave

18  the prosecutors at that time, but I do recall that slowly over

19  time I had increased numbers of recollections about the 19th.

20  I can't give you the sequence, but there is no sudden recall

21  about what I disclosed.

22  Q.  Are you done?

23  A.  It occurred slowly.

24  Q.  I don't want to cut you off.  Let's go to -- I want you to

25  try to stay with me, if you can, on this October 22, 2013

E1oQmar1                    Gilman - cross

1    meeting though, OK?

2    A.   All right.

3    Q.   That was only about three months ago, right?

4    A.   Yes.

5    Q.   So, Mr. McLeod, if you could put up for Dr. Gilman -- well,

6    let me ask you first, Dr. Gilman, and then see if we need to

7    help at all with anything.

8         Isn't it a fact, Dr. Gilman, that in this October 22,

9    2013 meeting in response to the prosecutors' questions, you

10   told them again that you didn't remember reviewing the

11   PowerPoint slide with Mathew at your office, but you presumed

12   that you had reviewed them?  Do you recall saying that?

13   A.   That I presumed what?

14   Q.   You presumed that you had reviewed them with Mathew at your

15   office.  Do you remember saying that?

16   A.   I -- I don't recall saying that, no.

17   Q.   OK.  I understand.  So, Mr. McLeod, if you could put up for

18   Dr. Gilman, Defense Exhibit 3501-33 at pages 5 to 6.  If you

19   can just get the part that we are talking about here.  If you

20   can highlight that part, Mr. McLeod, so we can direct

21   Dr. Gilman to the right part.  It's the last sentence in what

22   you've highlighted.

23        Does that help you recall, Dr. Gilman, that you told

24   the prosecutors you presumed that you and Mr. Martoma had

25   reviewed the PowerPoint slide deck for ICAD at this meeting?

E1oQmar1                    Gilman – cross

1    A.  Yes.  However, this also contains information that had come

2    back to me in the interim between the two meetings in which I

3    recalled more specific details about his visit which are

4    documented here.  These memories came back slowly.

5              THE COURT:  Dr. Gilman.

6              THE WITNESS:  Yes, sir.

7              THE COURT:  No question pending.

8              Go ahead, Mr. Strassberg.

9              THE WITNESS:  Yes, sir.

10             MR. STRASSBERG:  Thank you, Judge.

11   Q.  You testified on direct with the prosecutor asking you

12   questions that the memories that you shared with this jury on

13   direct about that meeting in Michigan had come back to you only

14   as recently as about two weeks ago, right, the full memories?

15   A.  Sir, if that's a question for me, I was responding to the

16   question from Mr. Devlin-Brown, and his question permitted me

17   only a single answer quickly, and I could not give him the

18   detail that I should have been able to give him.  It was not as

19   if everything appeared all at once.  It occurred slowly, the

20   memory returned very slowly.  I hope that clarifies the

21   situation.

22   Q.  But would it be fair to say this, Dr. Gilman, that however

23   it developed slowly over time, some of what you testified to in

24   response to Mr. Devlin-Brown's questions were things that you

25   remembered only two weeks ago, right?

E1oQmar1                    Gilman - cross

1    A.   The most recent piece of the memory was a couple of weeks

2    ago.

3    Q.   OK.

4    A.   But it was an evolutionary process.

5    Q.   Now, it's fair to say, Dr. Gilman, that the things you have

6    said -- well, let me frame it this way:  You have had other

7    changes in the things you've told the prosecutors from what

8    you've testified about at trial.  Isn't that right?

9    A.   Excuse me?  I don't understand your question.

10   Q.   Well, putting aside the Michigan trip which we have been

11   talking about now for the better part of an hour --

12   A.   Yes.

13   Q.   -- isn't it right that you have changed other things about

14   what you've testified to to this jury during your sessions with

15   the prosecutors?

16   A.   I'm not sure what you're talking about, sir.

17   Q.   Well, let's look at Government Exhibit 224-A that's been

18   admitted into evidence.  You discussed this exhibit on you

19   direct examination.  Do you remember that?  The question is

20   only if you remember this document?

21   A.   Yes.

22   Q.   Mr. McLeod, you can go to the part that Mr. Martoma -- the

23   email that starts at the bottom of the page, please.

24          In this email, Dr. Gilman, Mr. Martoma asks you if you

25   know of any Phase III trials in Alzheimer's that have had

E1oQmar1                    Gilman - cross

1    multiple dose groups aside from the ongoing trial of

2    bapineuzumab.  Do you see that?

3    A.  Yes.

4    Q.  So, it's fair to say he's asking you for information about

5    trials that do not involve bapineuzumab in this question,

6    right?

7    A.  Yes.

8    Q.  If we go to the first paragraph of your response, you

9    respond to him by providing him information about a number of

10   different other drugs, right?

11   A.  Yes.

12   Q.  And you didn't have confidential information -- well, you

13   were not part of an SMC for any of these other drugs, right,

14   Dr. Gilman?

15   A.  That's right.

16   Q.  So you were providing him information here that you

17   understood was proper to provide, right?

18   A.  It was public information.

19   Q.  Now, in the second paragraph of this email, you provided

20   Mr. Martoma with information about dropout rates.  Do you

21   recall that?

22   A.  Yes, sir, I do.

23   Q.  And you recall we had a lot of testimony in your

24   questioning by the prosecutors about how the dropout numbers,

25   there'd been an error and that it was fixed.  Remember that?

E1oQmar1                    Gilman - cross

1    A.  Yes.

2    Q.  So let me show you now what's been marked for

3    identification as Defense Exhibit 839 and direct your attention

4    to the middle of the page there.  Do you recognize this as an

5    email that you sent on May 1 of 2008 to Mr. David Munno?

6    A.  Yes.

7              MR. STRASSBERG:  Your Honor, the defense offers

8    Defense Exhibit 839.

9              THE WITNESS:  Yes.

10             MR. DEVLIN-BROWN:  No objection to that portion of the

11   exhibit.  I think there is a part on the top that we would

12   object to at this point.

13             THE COURT:  All right.  Is this something we need to

14   talk about at the bench or are you only offering part of this

15   document, Mr. Strassberg?

16             MR. STRASSBERG:  You know, I would only ask whether --

17   I mean, I am happy to --

18             THE COURT:  Do you want to consult with

19   Mr. Devlin-Brown?

20             MR. STRASSBERG:  Yes, maybe we should do that for a

21   second.  I think maybe it's just subject to connection.

22             THE COURT:  All right.

23             (Pause)

24             MR. STRASSBERG:  I think what we will do, Judge, is we

25   will put that part in now.  So, Mr. McLeod, you are going to

E1oQmar1                    Gilman – cross

 1   have to not show the top part, but we will put that in now and

 2   we'll discuss it further so we don't have to take a break at

 3   the side bar.

 4          THE COURT:  All right.  I'm receiving 839, a portion

 5   redacted as the parties have agreed.

 6          (Defendant's Exhibit 839 redacted received in

 7   evidence)

 8          THE COURT:  Go ahead, Mr. Strassberg.

 9   Q.  Dr. Gilman, in our redacted version of 839, you see you

10   send an email to Mr. Munno, right?

11   A.  Yes.

12   Q.  And can you please read the text of that email to us?

13   A.  "I just discovered today that I gave you an incorrect total

14   number of cases that completed study in the Phase II trial of

15   bapineuzumab.  The reason is that the sponsor made the mistake,

16   and yesterday I reviewed the data, corrected the total and

17   informed the sponsor, who agreed that the sponsor had made an

18   error.  I quoted a total number of cases that completed all six

19   immunizations as 126 out of 234 who began the trial.  The

20   number of completers should be 164 and not 126.

21          (Continued on next page)

22

23

24

25

E1odmar2                    Gilman - cross

Q.  Now, is it fair to say, Dr. Gilman, that the error that you

are pointing out here, the correction about the number of

dropouts, was the same error and correction that was pointed

out in your email to Mr. Martoma in 224-A?

A.  Yes.

Q.  And as you referenced in this email, you had spoken with

Mr. Munno previously, right?

A.  Yes.

Q.  In fact, if we look at the GLG log, Government Exhibit 600,

we would see that there is a reference for a consultation you

had with Mr. Munno on April 17th of 2008.

A.  Yes.

Q.  Well, OK.  If we can put that up, Mr. McLeod.  If we go

over to the date that shows the name and the consultation date.

        Fair to say, that's the consultation that you are

referring back to in this email?

A.  Yes.

        May I explain that?

        THE COURT:  No.  He will ask you, if he is interested.

        THE WITNESS:  Thank you, your Honor.

Q.  Do you recall that, in addition to Mr. Munno, there was a

person named Mr. Slate, Ben Slate, on the phone during your

consultation?

A.  Would you say that again?

Q.  Yes.  Do you recall that in addition to Mr. Munno on this

E1odmar2                    Gilman - cross

1    consultation call, there was also a person named Ben Slate on

2    the call?

3    A.  I do not recall that.

4    Q.  And isn't it a fact, Dr. Gilman, that you originally

5    explained to the prosecutors about this email, Defense Exhibit

6    839, that you believe the information about dropout rates was

7    public and was disclosed by Elan so it was proper for you to

8    disclose it to Mr. Munno?

9    A.  I do not recall saying that.

10   Q.  Well, do you remember having a session with the prosecutors

11   on November 8th of 2013, just two months ago?

12   A.  Do you have a document that can remind me of that

13   statement?

14           MR. STRASSBERG:  So, Mr. McLeod, if you can show

15   Dr. Gilman Defense Exhibit 3501-36.

16   Q.  So, first, does that help you to refresh your memory of the

17   date of the meeting with the prosecutors on November 18th of

18   2013?

19   A.  That gives me the date, yes.  Thank you.  Not the essence

20   of the meeting -- of the communication.

21   Q.  So if you could direct -- directing your attention to the

22   highlighted portion.

23           THE COURT:  So what is the question?

24   Q.  Well, the question is:  Does that refresh your

25   recollection, Dr. Gilman, that you told the prosecutors on

E1odmar2                    Gilman - cross

1    November 18th of 2013 that you believed the information you

2    were sharing with Mr. Munno was publicly disclosed and proper

3    for you to share?

4              (Pause)

5    A.  I don't recall saying that and I don't know whether it is

6    true or not.

7    Q.  Well, is it fair to say, Dr. Gilman, as you have said, that

8    you had -- you never intended to lie to the prosecutors in any

9    session that you had with them just two months ago, right?

10   A.  I had not intended to lie and I don't know whether this is

11   a --

12             THE COURT:  That is a all you need to say, Dr. Gilman.

13             MR. DEVLIN-BROWN:  And I was rising to ask that the

14   document be taken off the screen now that the witness has been

15   asked.

16             THE COURT:  Yes.

17             MR. STRASSBERG:  Your Honor, may I just consult with

18   Mr. Devlin-Brown for a minute?

19             THE COURT:  Yes.

20             (Pause)

21   BY MR. STRASSBERG:

22   Q.  Now, you testified on direct that you claim you gave this

23   information to Mr. Munno because Mr. Martoma asked you to do

24   so.  Do you remember that?

25   A.  Yes.

Elodmar2                    Gilman - cross

1   Q.  Now, you know that Mr. Munno is a healthcare analyst at SAC

2   Capital, correct?

3   A.  Yes.

4   Q.  And you also know, don't you, Dr. Gilman, that Mr. Munno

5   was among Mr. Martoma's biggest critics in April of 2008?

6   A.  One of Martoma's critics, is that what you said?

7   Q.  Yes.

8   A.  Yes, he told me that.

9   Q.  In fact, you knew that he was one of his biggest

10  competitors, right?

11  A.  He told me only that he was a critic of Mr. Martoma.

12  Q.  Did he tell you -- well, is it a fact that you knew that

13  Mr. Munno and Mr. Martoma barely ever spoke?

14  A.  He never told me that.

15  Q.  And you're aware, aren't you, that Mr. Munno did not

16  believe he obtained anything improper from you in the course of

17  that email that you sent to him?

18          MR. DEVLIN-BROWN:  Objection.

19          THE COURT:  Sustained.

20  Q.  Well, Dr. Gilman, aside from your consultation with

21  Mr. Munno, did you have any relationship with Mr. Munno?

22  A.  With Mr. Munno?  No.

23  Q.  And are you aware that Mr. Munno sent your email to another

24  financial analyst at another firm called Allan Reine?

25  A.  No.

E1odmar2                    Gilman - cross

1    Q.  I'm sorry, I didn't hear your answer.  No, OK.

2           But you know Allan Reine, don't you?

3    A.  No.

4    Q.  Well, don't you know that Allan Reine worked at Trivium

5    Capital Management?

6    A.  I didn't know that.

7    Q.  Well, hadn't you just had a consultation with Mr. Reine on

8    April 17th of 2008?

9    A.  That's possible.

10          MR. STRASSBERG:  If we could look at the GLG log,

11   Mr. McLeod.

12   Q.  Does that help you remember in fact Dr. Gilman that you had

13   a consultation with Mr. Reine?

14   A.  Yes.

15   Q.  You're not claiming that Mr. Martoma told you to share

16   dropout rate information with Mr. Reine, are you?

17   A.  I have no knowledge of that.

18   Q.  In fact, isn't it the case, Dr. Gilman, that you made

19   information about dropouts and completers in the bapineuzumab

20   trial available to various clients?

21   A.  As far as I knew, I was providing it only to Mr. Munno.

22   Q.  Well, didn't you share that information with clients like

23   Mr. Shen?

24   A.  Not that I know of.

25   Q.  And didn't you share information about dropouts on some of

E1odmar2                    Gilman - cross

1  the panels that you spoke on, like the GLG innovators panel on

2  July 8th of 2008?

3  A.  Not that I recall, sir.

4  Q.  Now, Dr. Gilman, in response to telling the prosecutors

5  that you had shared improper information with Mr. Munno, did

6  they take any action against you?

7  A.  Did who take any action against me?

8  Q.  The prosecutors.

9  A.  No, sir, not as far as I know.

10  Q.  And this was something that you told them only much later

11  in the course of your cooperation sessions with them, isn't

12  that right?

13  A.  Yes.

14  Q.  And they didn't accuse you of lying for failing to talk

15  about this before, did they?

16  A.  Sir, I informed the prosecutors that I may have

17  inadvertently given away information to other investors in my

18  enthusiasm about the drug or for other reasons.  I can't count

19  the others I had because I don't have a perfect memory of all

20  the people that I had spoke with or everything precisely that I

21  told them.  But to the best of my knowledge, Mathew Martoma was

22  the only person to whom I gave away information on a regular,

23  systematic basis.

24  Q.  Dr. Gilman, you've said that clause a couple of times.  Has

25  anyone told you that you should say that clause when you have

E1odmar2                    Gilman - cross

1    an opportunity?

2              MR. DEVLIN-BROWN:  Objection.

3              THE COURT:  Sustained.

4    Q.  Let's stay focused on this email for a minute, Dr. Gilman,

5    because you changed another part of your story about this

6    email, didn't you?

7              MR. DEVLIN-BROWN:  Objection.

8              THE COURT:  Could you rephrase?

9    BY MR. STRASSBERG:

10   Q.  Well, you testified on direct, Dr. Gilman, that you

11   identified the errors in these dropout numbers when you saw

12   these slides at an SMC meeting.  Do you remember that?

13   A.  Yes.

14   Q.  But, in fact, the exhibits that we looked at show that you

15   didn't uncover the errors until after the SMC meetings were

16   completed, right?

17   A.  I believe that's correct, as I recall.

18   Q.  But you changed your story about this, too, didn't you,

19   Dr. Gilman?

20   A.  Changed my story about what?

21   Q.  Well, you told the prosecutors, in one of your sessions,

22   that you didn't discover the errors at all but that Mathew was

23   the one who discovered the errors and pointed them out to you;

24   do you remember telling the prosecutors that in one of your

25   cooperation sessions?

E1odmar2                    Gilman - cross

1    A.  I actually don't recall that.  I'm not sure who discovered

2    the error first, Mr. Martoma, myself.  I looked back through

3    the communications, and I did not find that he had.  So I

4    thought that I had discovered it, so I'm not sure.

5              MR. STRASSBERG:  Mr. McLeod, if we could put up

6    Defense Exhibit 3501-16 and first show the date of

7    August 17th of 2012.  And then, just if you can, try to show,

8    if you can, just try to show the line instead of this whole big

9    paragraph, the line that we're talking about, which is right in

10   the middle.  OK.

11             So it's on page 4, Mr. McLeod.  And if you can see the

12   line I'm talking about?

13             OK.  Do you see it -- no.  No.  No.  That's not it.

14             OK, yeah.  That's it.  Thanks.

15   Q.  So, Dr. Gilman, didn't you in fact tell the prosecutors in

16   your August 17th, 2012 proffer session that it was Mr. Martoma

17   who had found the discrepancy in the dropout numbers that's

18   reflected in Government Exhibit 224-A?

19   A.  Is this the first documentation of the finding of this

20   error?

21             THE COURT:  The question --

22             THE WITNESS:  Sir --

23             THE COURT:  The question, Dr. Gilman -- again, try to

24   stay focused here -- the question is having looked at the

25   line --

E1odmar2                    Gilman - cross

1          THE WITNESS:  Yes.

2          THE COURT:  -- that Mr. Strassberg showed you, whether

3    that refreshes your recollection that you told the prosecutors

4    at this particular interview session whether Mr. Martoma had

5    pointed out the mathematical error with respect to dropouts.

6    That's the question that's pending.

7    A.  The answer is yes, according to this document.

8    BY MR. STRASSBERG:

9    Q.  But isn't it a fact, Dr. Gilman, as we've seen in

10   Government Exhibit 224-A, that you were the one who informed

11   Mr. Martoma of the dropout error?

12   A.  Was that a question?

13   Q.  Yes, it was, Dr. Gilman.

14   A.  Could I hear the question again?

15   Q.  Well, Dr. Gilman, don't you recall that we were just

16   looking at Government Exhibit 224-A --

17   A.  Yes.

18   Q.  -- and you had spent a lot of time with the prosecutors on

19   your direct examination talking about Government Exhibit 224-A.

20   A.  Yes.

21   Q.  And in Government Exhibit 224-A, you clearly tell

22   Mr. Martoma about the error, right?

23   A.  Yes.

24   Q.  And, in fact, if we look at Government Exhibit 114, that's

25   already admitted into evidence, you also say at the time to

E1odmar2                    Gilman - cross

1   Ms. Liu that you were the one who found the errors, right?

2   A.  Yes.  I say that, yes.

3        MR. STRASSBERG:  OK.  Thank you, Mr. McLeod.  You can

4   put that down.

5   Q.  Now, Dr. Gilman, you testified on direct that you started

6   sharing confidential information in the fall or winter of

7   2006/2007; do you remember that?

8   A.  Yes.

9   Q.  But isn't it a fact that that detail of your story has

10  changed as well?

11  A.  In fact -- say that again.

12  Q.  Isn't it a fact that that detail of your story has changed

13  as well?

14  A.  That fact changed?  I'm sorry.  You dropped your voice.

15  Q.  Let me ask it a little differently.

16       Don't you remember that you told the prosecutors you

17  were confident that you did not share confidential information

18  with Mathew in 2006?  Do you remember telling them that?

19  A.  Yes.

20  Q.  OK.  And do you also -- well, by 2006, the end of 2006, you

21  had only met Mathew that one time in person, in October, right?

22  A.  Yes.

23  Q.  Now, but do you also remember telling the prosecutors, as

24  part of your sessions with them, after you started to

25  cooperate, that you did not believe you started sharing any

E1odmar2                    Gilman - cross

1   confidential information until the time when Mathew talked to

2   you when you were in Istanbul?  Do you remember telling them

3   that?

4   A.  I remember telling them that, but I've since seen documents

5   that suggest it was earlier.  It may have been as early as late

6   2006.

7   Q.  And, Dr. Gilman, you talked to us about that Istanbul trip

8   on your direct examination.  Do you remember that?

9   A.  Yes.

10  Q.  And you told us that Mathew spent an hour tracking you down

11  in your hotel in Istanbul.  That's the way you remember it,

12  right?

13  A.  That's what he told me, yes, and it's not true.

14  Q.  Isn't it true, Dr. Gilman, that it was actually Mathew's

15  assistant who spent all of that time tracking you down, not

16  Mathew himself?

17  A.  Yes.  Yes.  But that's not what he told me; he said he had.

18  Q.  Dr. Gilman, let's' look at Defense Exhibit 982.

19          You recognize that this is an email you sent to

20  Mr. Martoma's assistant?

21  A.  Yes.

22          MR. STRASSBERG:  Your Honor, the defense offers

23  Defense Exhibit 982.

24          MR. DEVLIN-BROWN:  One moment, please.

25          (Pause)

E1odmar2                    Gilman - cross

1           Your Honor, I am pausing because I believe this is in

2      evidence already.

3           THE COURT:  That's my recollection as well.

4           MR. STRASSBERG:  If it is as a government exhibit, we

5      are happy to use that one, your Honor.

6           MR. DEVLIN-BROWN:  Just one moment.

7           THE COURT:  Yes.

8           MR. STRASSBERG:  I think it is a similar one but a

9      different one.

10           MR. DEVLIN-BROWN:  I think it is 207.

11           MR. STRASSBERG:  It's a different email, your Honor,

12      but --

13           MR. DEVLIN-BROWN:  I think the time zone, there may

14      have been something wrong with it on one or the other.

15           MR. STRASSBERG:  No.  Look again, Mr. Devlin-Brown.

16           MR. DEVLIN-BROWN:  No objection to the new one.

17           THE COURT:  All right.  Then Defense Exhibit 982 is

18      received.

19           (Defendant's Exhibit 982 received in evidence)

20      BY MR. STRASSBERG:

21      Q.  Let's actually go to Government Exhibit 207 for a moment.

22      This is the one we looked at before.

23           And, again, this is an email you had with his

24      assistant, right -- with Mr. Martoma's assistant, right?

25      A.  Yes.

E1odmar2                    Gilman - cross

1   Q.  And in the email you say to her -- Stephanie Zelazny, that,

2   "I want to commend you again on your persistence in finding me

3   then."  Right?

4   A.  Yes.

5   Q.  So you knew, Dr. Gilman, that it was the assistant, not

6   Mr. Martoma, who was persistent in her efforts to try to find

7   you, right?

8   A.  I found that out at some time later, yes.

9   Q.  Well, let's go back to then Defense Exhibit 982.

10          Fair to say that this is an email from some time

11  earlier, right?

12  A.  Yes.

13  Q.  And in this email with Mathew's assistant, you again thank

14  her for finding you in the hotel, right?

15  A.  Yes.

16          MR. STRASSBERG:  OK.  Thank you, Mr. McLeod.  You can

17  put those down.

18  Q.  Now, Dr. Gilman, let's go back to the meetings with the

19  prosecutors in the summer of 2012.  OK?

20  A.  Yes.

21  Q.  It's fair to say that before you went down to speak the

22  with prosecutors in August of 2012, you had met with your

23  lawyers?

24  A.  I had met what?

25  Q.  You had met with your lawyers -- your criminal defense

E1odmar2                    Gilman - cross

1   lawyers.

2   A.  Yes.

3   Q.  And I'm not going to ask you now what was discussed, but

4   fair to say that you prepared with your lawyers about what you

5   would say in any meeting that you had with the prosecutors?

6   A.  Yes.

7   Q.  And fair to say, too, that your goal was to try not to get

8   charged with any crime?

9   A.  My goal was to tell the truth, sir.

10  Q.  Well, Dr. Gilman, are you really going to tell us that you

11  didn't have a goal to avoid being charged with a crime in the

12  summer of 2012?

13  A.  Of course I did not want to be charged with a crime.

14  Q.  Of course.

15  A.  But in so doing, I needed to tell the whole truth and only

16  the truth.  And they emphasized that to me.

17  Q.  Dr. Gilman, did you discuss whether -- with your lawyers

18  whether you should say that in response to my questions during

19  your examination, what you just said?

20          MR. DEVLIN-BROWN:  Objection.

21          THE COURT:  Sustained.

22  Q.  Did you discuss with anyone outside your lawyers that you

23  should say the clause that you just said in response to my

24  question whenever you have the opportunity?

25  A.  Please repeat that.

E1odmar2                    Gilman - cross

1    Q.  Well, did you discuss with anyone outside your lawyers that

2    you should say this clause that you keep repeating about just

3    being here to tell the truth in response to the questions I

4    asked regardless of what the question is?

5            THE COURT:  Sustained.

6    Q.  Well, let me ask it a little more pointedly.

7            Did you discuss with the prosecutors that in response

8    to questions, whenever possible, you should say you were just

9    here to tell the truth?

10   A.  I'm telling the truth at all times, sir.

11   Q.  Now, let us go back, Dr. Gilman, to your meetings in the

12   summer of 2012.

13           Do you recall that before you went down to meet with

14   the prosecutors, you authorized your attorney to go down and

15   meet with the prosecutors on your behalf?

16   A.  Yes.

17   Q.  And you authorized your attorney to say to the prosecutors

18   that while you may have given confidential information to

19   Mathew, you did so without any criminal intent?  Didn't you

20   authorize him to say that?

21   A.  I believe that's correct.

22   Q.  So now, Dr. Gilman, let us go to your nonprosecution

23   agreement itself.  OK?

24   A.  Yes.

25   Q.  Now, we've testified about how the nonprosecution agreement

1  provides that you'll never face any charges as long as the

2  prosecution or the government agrees you're telling the truth,

3  right?

4  A.  Yes.

5  Q.  But it also has a financial component to it, correct,

6  Dr. Gilman?

7  A.  Yes.

8  Q.  And you were required to turn over about $186,000, plus

9  interest, right?

10 A.  That's right.

11 Q.  But is it fair to say that in addition to agreeing to that

12 component of the agreement with respect to finances, you took

13 other steps to try to protect your finances in connection with

14 this case?

15 A.  I'm not sure what you're referring to, sir.

16 Q.  Well, Dr. Gilman, didn't you in March of 2013, about five

17 month after your nonprosecution agreement, transfer the

18 ownership of your home over to your wife?

19 A.  Yes, sir.

20 Q.  And you did that for no consideration, right, for nothing?

21 In other words, your wife didn't pay you for that transfer, did

22 she?

23 A.  That's correct.

24 Q.  Did you tell the prosecutors that you had transferred the

25 house over to your wife?

E1odmar2                    Gilman - cross

1    A.  I don't believe we did.

2    Q.  Do you know about something called a fraudulent conveyance?

3    Do you know that term?

4    A.  We -- yes, we consulted an attorney on --

5           THE COURT:  No.  The question --

6    A.  Yes, I do.

7           THE COURT:  The question is --

8    A.  I do.

9    Q.  And, again, as your Honor -- as Judge Gardephe has made

10   clear, we're not asking you questions about your subject matter

11   discussions with your attorneys, at least not at this moment.

12   So putting that aside for a minute --

13   A.  Yes.

14   Q.  -- is it fair to note -- is it fair that you know that --

15   well, let me step back.

16          You're named in a lawsuit in connection with this

17   case, aren't you?

18   A.  Yes.

19   Q.  And that's a lawsuit brought by civil plaintiffs, not the

20   government, right?

21   A.  Yes.

22   Q.  And you are aware, are you not, that this concept of

23   fraudulent conveyance can make it improper to transfer assets

24   when you're the subject of a lawsuit, right?

25   A.  Yes.

E1odmar2                    Gilman - cross

1    Q.  Now, Dr. Gilman, without trying to do too much complicated

2    math, do you recall in our discussions -- I think it might be

3    not yesterday but the day before, when we talked about the

4    income that you made from your outside consulting activity in

5    the years 2006 to 2010; do you remember that?

6    A.  Yes.

7    Q.  And would it be fair to say that that outside consulting

8    income, not counting your University of Michigan salary, for

9    those four years was around $1.9 million?  I'm OK if you want

10   to say approximately.  But would at that be fair?  Do you think

11   that's about a fair number?  If we could --

12   A.  Would you repeat that number again?

13   Q.  Sure.  If we took your outside consulting activities --

14   A.  Yes.

15   Q.  -- for the years 2006, 2007, 2008, 2009 and 2010 and we

16   added them all up --

17   A.  Yes.

18   Q.  -- would it be fair to say that that would come to about

19   $1.9 million?

20   A.  The outside consulting --

21   Q.  Right.

22   A.  -- amounts?

23       I would have to calculate that.  I don't -- I can't

24   answer that immediately.

25   Q.  And I understand, it is a little hard to do that kind of

E1odmar2                    Gilman - cross

1   math in anyone's head, I think.

2           How about this, would you agree with me that it would

3   be at least over -- well, do you remember it was roughly

4   between 3 and $400,000 a year?

5   A.  Approximately, yes.

6   Q.  So if we take those five years, it would be somewhere north

7   of the $1.5 million; is that fair to say?

8   A.  I imagine approximately that.  I don't know the precise

9   number.

10  Q.  And that was in addition to the roughly $300,000 a year

11  salary that you got from the University of Michigan?

12  A.  Yes.

13  Q.  Now, your agreement with the prosecutors means that you're

14  only required to provide the 180-some-odd-thousand-dollar

15  figure plus interest to the prosecutors or the SEC as part of

16  your involvement with this case, right?

17  A.  Yes.

18  Q.  Are you aware, Dr. Gilman, that the prosecutors could have

19  insisted on seeking a much higher figure from you in terms of

20  financial penalty?

21  A.  Yes, I am.

22  Q.  In fact, you're aware that they could have sought to obtain

23  from you all of the money that you have, right?

24  A.  Yes, I am aware of that.

25  Q.  And, in fact, if the government seeks more money than a

Elodmar2                    Gilman - cross

1  person has, the government may force a person to declare

2  bankruptcy, right?

3           MR. DEVLIN-BROWN:  Objection.

4           MR. STRASSBERG:  I'll frame it differently, your

5  Honor.

6           THE COURT:  All right.

7  BY MR. STRASSBERG:

8  Q.  Is it fair to say that if the government came after you for

9  all your money, you might have to declare bankruptcy, right?

10  A.  That's possible.

11  Q.  And, in fact, do you know, Dr. Gilman, that bankruptcy

12  can't stop the government from getting all of your money in the

13  context of a criminal case?

14  A.  That's a possibility.

15  Q.  And would it be also fair to say, Dr. Gilman, that you

16  didn't want to have to forfeit all of your assets to the

17  government?

18  A.  That is also a possibility.

19  Q.  Well, that one is not so much a possibility, is it,

20  Dr. Gilman?  Isn't that what you -- isn't it fair to say that

21  you didn't want to have to forfeit all of your assets to the

22  prosecutors?

23           THE COURT:  Can you rephrase the question?

24           MR. STRASSBERG:  Yes, Judge.

25  Q.  Dr. Gilman, isn't it true that you did not want to forfeit

E1odmar2                    Gilman - cross

1    all of your assets to the prosecutors?

2              THE COURT:  No.  That is the same question.

3              MR. STRASSBERG:  I thought your Honor was confused

4    about the first part.  Do you want me to rephrase that

5    question?

6              THE COURT:  Yes.

7    BY MR. STRASSBERG:

8    Q.  Dr. Gilman, was it important to you to be able to resolve

9    this case without giving up all of your assets?

10   A.  Yes, sir.

11             MR. STRASSBERG:  Your Honor, I'm going to move into

12   another section now.  If your Honor wants to take the

13   mid-morning break, this might be a good time.

14             THE COURT:  Yes.  This is a convenient time.

15             Ladies and gentlemen, don't discuss the case.  Keep an

16   open mind.  There is more evidence.  We are going to take our

17   mid-morning break now, about ten minutes.

18             Thank you all very much.

19             THE CLERK:  All rise.

20             (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down, Dr. Gilman.

3          THE WITNESS:  Thank you, sir.

4          (Witness not present)

5          THE COURT:  Please be seated.

6          Let me just explain why I asked Mr. Strassberg to

7     rephrase that last question.  A criminal defendant, of course,

8     does not forfeit property to the prosecutors.  So to the extent

9     the suggestion was that money forfeited by Dr. Gilman was going

10    to wind up in the pockets of Mr. Devlin-Brown and Mr. Ingoglia,

11    that was not an inference that I wished the jury to take away.

12         So I wanted you to understand, Mr. Strassberg, why I

13    asked you to rephrase the question.

14         MR. STRASSBERG:  Thank you, your Honor.  And I didn't

15    understand it and now I do.  And if that were the case, I'm

16    sure there would have been a much greater pie that would have

17    been required.

18         THE COURT:  Anything to take up?

19         MR. STRASSBERG:  No, your Honor.

20         THE COURT:  All right.  We will take ten minutes.

21         MR. DEVLIN-BROWN:  Sorry.  I'm sure this will be

22    probably corrected from the live type, but I saw your Honor

23    looking at the screen as well.  There was a moment where

24    Dr. Gilman said I'm telling the truth at all times and it came

25    up as I'm not telling the truth at all times.

E1odmar2                    Gilman - cross

1           THE COURT:  Yes, I'm glad you raised that.  There was

2    a note from the court reporter to himself that the actual

3    statement was I must tell the truth.  But it was originally

4    typed as I must not tell the truth.  So I trust that in the

5    version of the transcript that is actually prepared, it will

6    accurately reflect that the witness said that I must tell the

7    truth.

8           MR. DEVLIN-BROWN:  Thank you.

9           (Recess)

10          (Jury not present)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.

13          Can we bring in Dr. Gilman?

14          MR. STRASSBERG:  Your Honor --

15          THE COURT:  Or do you want to take something up?

16          MR. STRASSBERG:  We could raise one issue.

17          THE COURT:  Then let's hold off.  Do you want the

18   witness excluded?

19          MR. STRASSBERG:  Yes, he probably should be.

20          THE COURT:  Dr. Gilman, could you just step out for a

21   second.

22          (Witness not present)

23          THE COURT:  Go ahead, Mr. Strassberg.

24          MR. STRASSBERG:  Your Honor, it's really for redirect,

25   but since we have a moment.  I know your Honor has expressed a

E1odmar2              Gilman - cross

liberal view on questioning on redirect, and we have no, of

course, issue with leading questions to direct the witness to a

particular topic area and the like so that he could then follow

along.  But I would ask, your Honor, that given that it is the

crucial witness in the case, and a cooperating witness at that,

that once we have the prosecutor leading him to the area, that

the questions then on that area be open-ended questions since

it is redirect, as opposed to cross-examination.  So I wanted

to raise that, you know, not before the jury or take time

before the jury, but I did want to raise that.  And I think he

is different than some of the other witnesses that we've seen

so far in this case, and so it's important that we respect the

form of questioning.  That was my only point.

         MR. DEVLIN-BROWN:  Your Honor, I would just say

there's leading and then there's leading.  We have no intention

of asking questions like "Isn't it a fact you did X."  I do

think there are some questions like "Did you do X?" which are

not necessarily leading, and the answer is going to be no as

much as yes.  And I think for redirect to be efficient and for

it to be clear as to how the point responds, sometimes you do

need to ask questions like that.  So we would ask, you know,

that it not be overly restrictive.

         THE COURT:  Well, I'll listen to the questions and

I'll rule, obviously.  It does seem to me that the government

is going to have to direct the witness' attention to some

E1odmar2                    Gilman - cross

1   aspect of his prior testimony that the government wishes to

2   inquire about, and the government may, in particular, direct

3   the witness' attention to a particular portion of that

4   testimony and may attempt to refresh the witness' recollection

5   as to what he said on cross, the same way Mr. Strassberg has

6   directed his attention to what he may have said on direct.  And

7   then once we get beyond that, directing the witness' attention

8   phase, I will be alert to whether the questions that follow

9   that are inappropriately leading or not.  And to the extent

10  there are objections, I will overrule them or sustain them as I

11  deem appropriate.

12          But I am alert to the issue you raise, Mr. Strassberg,

13  and I will have it in mind.

14          MR. STRASSBERG:  Thank you, Judge.

15          THE COURT:  Are we prepared, then?  If we are, then

16  let's bring in Dr. Gilman.

17          (Continued on next page)

18

19

20

21

22

23

24

25

E1odmar2                    Gilman - cross

1        (Witness present)

2        THE CLERK:  All rise.

3        (Jury present)

4        THE COURT:  Please be seated.

5        Mr. Strassberg, you may proceed.

6        MR. STRASSBERG:  Thank you, your Honor.

7    BY MR. STRASSBERG:

8    Q.  If I may, Dr. Gilman, I'd like to talk to you about a

9    different issue now.  OK?

10   A.  Yes.

11   Q.  Am I right that you were diagnosed with lymphoma in June of

12   2008?

13   A.  Please talk closer to the microphone, sir.

14   Q.  Dr. Gilman, am I correct that you were diagnosed with

15   lymphoma in June of 2008?

16   A.  Yes.

17   Q.  And, thankfully, am I right, you had a fairly immediate and

18   successful treatment and recovery, right?

19   A.  Yes.

20   Q.  But back in June and July of 2008, you underwent

21   chemotherapy treatments as part of your treatment for this

22   disease, right?

23   A.  Yes.

24   Q.  And specifically, you underwent chemotherapy treatments on

25   June 13th, July 5th and July 25th.  Does that sound right to

E1odmar2                    Gilman - cross

1  you?

2  A.  That's correct.

3  Q.  And is it fair to say, Dr. Gilman, that the effects of

4  those treatments were to make you groggy for days?

5  A.  No.  I wouldn't call myself groggy for days.  I just felt

6  rotten.

7  Q.  So, Dr. Gilman, I want to direct your attention to Defense

8  Exhibit 3501-31, at page 2.  Well, let's actually go to the

9  date, please.

10        And so my first question to you, Dr. Gilman, is do you

11  remember meeting with the prosecutors on October 21st of 2013?

12  Again, just about three months ago.

13  A.  Yes.

14  Q.  And let me direct your attention to -- well, let me ask it

15  this way.

16        Isn't it fair to say, Dr. Gilman, that you told the

17  prosecutors in that meeting in October of 2013 that you were

18  groggy for approximately three days --

19  A.  I don't recall.

20  Q.  -- due to the drug Prednisone?

21  A.  I don't recall telling them that, sir.  Prednisone made

22  me --

23        THE COURT:  Enough.  That's the only question pending.

24        THE WITNESS:  All right.  I don't recall telling them

25  that.

E1odmar2                    Gilman - cross

1          MR. STRASSBERG:  So, Mr. McLeod, could we show

2     Dr. Gilman Defense Exhibit 3501-31 at page 2.  Well, it may be

3     that it is on page 1, I guess.

4     Q.  So, again, as we've done before, Dr. Gilman, just read this

5     to yourself, and after you've read it, especially the last

6     line, see if that refreshes your recollection about telling the

7     prosecutors that Prednisone made you feel groggy for

8     approximately three days.

9     A.  That's what it says.

10         THE COURT:  No.  That's not the question, Dr. Gilman.

11         Ladies and gentlemen, let me explain.  We've had a lot

12    of attempts to refresh recollection.  It is a common device.

13         When witnesses have -- when they indicate a failure of

14    recollection, it is entirely appropriate for lawyers to attempt

15    to refresh their recollection with various documents.  It can

16    be anything.  Anything.  You can use anything to refresh a

17    witness' recollection up to and including the telephone book;

18    it's that broad.  So it is entirely appropriate for lawyers to

19    attempt to refresh a witness' recollection with a document or

20    an exhibit.

21         However, the issue, as you've heard us say repeatedly,

22    is does it refresh recollection.  Do you remember something

23    that you didn't remember before?  If you don't, then we move

24    on.  And if you do, you say what your refreshed recollection

25    is.

E1odmar2                    Gilman - cross

1      So that's what we have been engaged in here.  And I

2  want you to understand that what matters is whether the

3  witness' recollection is refreshed.  That's what matters.  And

4  if it is they go on to report what they now remember, and if it

5  is not we move on to the next question.  OK?

6      Go ahead, Mr. Strassberg.

7      THE WITNESS:  Thank you, sir.

8  A.  It does not refresh my recollection.

9  Q.  Thank you.

10      Well, Dr. Gilman, as a medical doctor, you're aware

11  that the drug Prednisone has a known side effect of causing

12  confusion, isn't that right?

13  A.  Yes.

14  Q.  And Prednisone was one of the drugs that you were getting

15  in your chemotherapy treatments in June and July of 2008,

16  right?

17  A.  Yes.

18  Q.  And are you also aware that among the side effects, in

19  addition to confusion, that are listed for the drug Prednisone

20  are extreme changes in mood?

21  A.  Yes.

22  Q.  And dizziness?

23  A.  Yes.

24  Q.  And loss of contact with reality?

25  A.  Yes.

E1odmar2                    Gilman - cross

1    Q.  And lightheadedness?

2    A.  Yes.

3    Q.  Now, Dr. Gilman, after you obtained your nonprosecution

4    agreement in mid-November of 2012, you are aware that

5    Mr. Martoma was arrested just a few days later, on

6    November 20th of 2012, aren't you?

7    A.  Arrested?  I didn't know he was arrested, sir.

8    Q.  Well, did you not see news of this in the newspapers --

9               MR. DEVLIN-BROWN:  Objection.

10              THE COURT:  Sustained.

11   Q.  Did you see news of the charges that had been filed against

12   Mr. Martoma in the newspapers?

13   A.  I saw that he had been approached by --

14              THE COURT:  That is a yes or no question.

15   A.  Yes.

16   Q.  OK.  Do you remember that that happened just a few days

17   after you signed your nonprosecution agreement?

18   A.  Yes.

19   Q.  And are you aware that, as part of those charges, the

20   prosecution relied upon your statement about having sent the

21   ICAD PowerPoint to Mathew via email?  Are you aware of that,

22   sir?

23   A.  I'm not.

24   Q.  And so you didn't see that reported in any reports --

25              MR. DEVLIN-BROWN:  Objection.

Elodmar2                    Gilman - cross

1    Q.   -- about the charges, is that right?

2              THE COURT:   That's yes or no.

3    A.   No.

4    Q.   Now, Dr. Gilman, do you recall on direct that you testified

5    about how the patients in the bapineuzumab Phase II trial were

6    dosed with bapineuzumab?

7    A.   Would you repeat the question, please?

8    Q.   Do you recall in your direct testimony that you testified

9    about how the patients in the bapineuzumab Phase II trial were

10   dosed?

11   A.   Yes.

12   Q.   And specifically, at page 1181 of the transcript, you were

13   asked this question and you gave the following answer:

14   "Q   For people getting the drug, did they all get the same

15   amount of it?

16   "A   No.

17   "Q   Can you elaborate?

18   "A   Yes.  Some patients received a lower dose and then received

19   a somewhat higher dose and then an even higher dose."

20             Do you recall giving that testimony on direct?

21   A.   Yes.

22   Q.   And isn't it a fact, Dr. Gilman, that that testimony about

23   the basic dosing in the bapineuzumab Phase II trial is

24   incorrect?

25   A.   Well, yes and no.

E1odmar2                    Gilman - cross

1    Q.  Well, Dr. Gilman, I'm going to focus, at least to start, on

2    the "yes" part.  OK?  Which is that in fact the Phase II trial

3    was designed so that each patient was assigned to a dose cohort

4    and would receive the same amount of the drug in each of the

5    six dosing intervals; isn't that how it was designed?

6    A.  Yes.

7    Q.  And I think you did explain that with vasogenic edema

8    people were taken down to a lower dose, right?

9    A.  Yes.

10   Q.  But otherwise it was not the case that patients would get a

11   low dose and then a higher dose and then a higher dose in the

12   normal course of the bapineuzumab Phase II trial, correct?

13   A.  Yes.

14   Q.  And fair to say also, Dr. Gilman, that you made certain

15   mistakes in some basic things that the prosecutors asked you

16   right at the start of your direct testimony about the

17   University of Michigan and the City of Ann Arbor?

18   A.  And what?

19   Q.  The University of Michigan and the City of Ann Arbor.

20   A.  Yes, I did.

21   Q.  And because you know that the University of Michigan has a

22   student body of around 40,000 people, right?

23   A.  40,000 students, sir.

24   Q.  Right.  40,000 students, right?

25   A.  That's right.

E1odmar2                    Gilman - cross

1    Q.  I think you testified that you thought it was about 1500 or

2    so?

3    A.  Yes.  That was totally wrong.

4    Q.  All right.  And, similarly, you testified that you thought

5    Ann Arbor, the city itself, only had a few thousand people, and

6    in fact it has over a hundred thousand people, right?

7    A.  About 150,000 people, yes.

8    Q.  And, Dr. Gilman, hadn't you gone over those questions that

9    happened right at the beginning of your direct examination with

10   the prosecutors before you came to court?

11   A.  No, sir.

12   Q.  Now, do you recall, Dr. Gilman, that you also testified on

13   direct that you only told your wife and Mr. Martoma that you

14   had been selected to present the results at the ICAD

15   conference?  Do you remember that testimony?

16   A.  Yes.  That was my recollection.

17   Q.  Right.  But let's put up Defense Exhibit 890, which has

18   already been admitted into evidence.

19           And this is an email that you had with someone who is

20   not your wife or Mr. Martoma, right?

21           And you see in the middle page of this email,

22   Dr. Gilman, you refer to the fact that you will be giving --

23           THE COURT:  Is this in evidence?

24           MR. STRASSBERG:  I believe, your Honor.

25           THE COURT:  All right.

E1odmar2                    Gilman - cross

1           MR. STRASSBERG:  We should double-check but that is my

2     understanding.

3           MR. DEVLIN-BROWN:  Yes, it is.

4           THE COURT:  Go ahead, Mr. Strassberg.

5           MR. STRASSBERG:  Thank you.

6     Q.  And if we could direct your attention to the middle of the

7     page, isn't this email from you confirming that you're going to

8     be giving the Elan and Wyeth data at ICAD?

9     A.  Yes.  I had forgotten that.  Yes.

10    Q.  Now, Dr. Gilman, you admitted in your direct examination

11    that you lied to the University of Michigan about the number of

12    hours that you devoted to outside activities; do you remember

13    that testimony?

14    A.  I underestimated the number of hours that I devoted to

15    outside activities in my reports to the University of Michigan.

16    Q.  Right.  And I think the restriction that the university

17    imposed was that you were not allowed to do more than two days

18    per month off campus, right?

19    A.  That's right.

20    Q.  And -- well, do you recall that in your direct testimony

21    you had said you didn't take this requirement terribly

22    seriously?  Do you recall saying that?

23    A.  Yes.

24    Q.  But fair to say you did admit that you knew you were giving

25    the university false information, right; it wasn't a mistake?

E1odmar2                    Gilman - cross

1   A.  It was -- false information?  It was lowballing what I

2   actually did, yes.

3   Q.  Are you aware -- let me frame it differently.

4           Dr. Gilman, you were aware, right, that if you were

5   caught lying to the University of Michigan that there might be

6   consequences that would be bad for you, right?

7   A.  Yes.

8   Q.  In fact, you might even be fired from your position for

9   lying about your outside consulting activities, right?

10  A.  That's possible.  But in most instances I did not violate

11  the two days -- only two days per month.

12  Q.  So some months you did violate it, right?

13  A.  Most -- I don't think I did, really, violate them very

14  much, if at all.  I just -- I just lowballed the number of days

15  that I was devoting to outside activities.

16  Q.  Well, Dr. Gilman, you tell us, did you lie about your

17  outside consulting activities on the form, or didn't you?

18  A.  I listed every consulting activity I did.  I gave low

19  estimates of the number of hours I spent on campus.

20          I did not spend more than two days per month off

21  campus, to the best of my knowledge, at any time on these

22  consulting activities.

23          (Continued on next page)

24

25

E1oQmar3                     Gilman - cross

Q.   So, that's your testimony, despite all of the activity
we've seen and the consulting work that we've seen so far in
your testimony, you're now saying that you did not put
inaccurate information on your number of hours to the
University of Michigan?
A.   I'm saying that the number of hours that I listed on the
website for the university constituted the number of hours I
actually spent was a low estimate as the number of hours I was
spending on campus with university activities -- with
non-university activities.  The number of hours or days that I
spent off campus was very small, and I think probably within
university guidelines, but I'd have to go back to be sure.
Q.   Let's take a look at Defense Exhibit 994.  Do you recognize
Defense Exhibit 994, Dr. Gilman?
A.   Yes.
Q.   In fact, this is an attestation that you signed relating to
your compliance with the University of Michigan guidelines
including the guidelines about outside employment, right?
A.   Yes.
          MR. STRASSBERG:  Your Honor, we offer Defense Exhibit
994.
          MR. DEVLIN-BROWN:  No objection.
          THE COURT:  Defense Exhibit 994 is received.
          (Defendant's Exhibit 994 received in evidence)
Q.   Let me direct your attention to the paragraph above your

E1oQmar3                    Gilman - cross

1    signature where it talks about attestation.

2            If I can direct your attention to the last line and,

3    if you can read that for us?  And, Mr. McLeod, if you can

4    highlight that for us

5    A.  "I understand that failure to fully and honestly disclose

6    may result in disciplinary action up to and including

7    termination."

8    Q.  Now, Dr. Gilman, you testified yesterday about how the two

9    FBI agents on September 1 of 2011 had told you that you and

10   Mathew were just grains of sand, and that the real target of

11   their investigation was Mr. Steven Cohen.  Do you remember

12   that?

13   A.  Would you say that again, please?

14   Q.  Well, Dr. Gilman, you testified yesterday about how the FBI

15   agents who interviewed you on September 1 of 2011 told you that

16   you and Mathew were just grains of sand, and that the real

17   target of the investigation was Steven Cohen.  Do you remember

18   that?

19   A.  Yes.

20   Q.  Did you become aware at some point, Dr. Gilman, that Steven

21   Cohen was a very wealthy investor?

22   A.  I did.

23   Q.  Is it fair to say, Dr. Gilman, that prior to this trial

24   starting, you understood that you might never have to testify

25   in court despite your non-prosecution agreement if Mathew

E1oQmar3                    Gilman - cross

1   Martoma turned around and agreed to sign his own type of

2   agreement with the prosecutors?

3                MR. DEVLIN-BROWN:  Objection.

4                THE COURT:  Sustained.

5   Q.  Well, Dr. Gilman, isn't it fair to say that you considered

6   the possibility that despite having a non-prosecution agreement

7   that required you to cooperate fully with the prosecutors,

8   there could be circumstances where you might never have to

9   testify, right?

10  A.  I didn't give that very much thought, sir.  I thought I

11  would likely have to testify.

12  Q.  Now, Dr. Gilman -- so, let me be clear, is it your

13  testimony that you lied to your colleagues at the University of

14  Michigan about any subject?

15  A.  About what?

16  Q.  About any subject.

17  A.  Did I lie to my colleagues about anything?

18  Q.  Yes.

19  A.  I have no idea whether I lied about anything.  I don't

20  think I did.

21  Q.  Well -- and so your testimony is you didn't lie about your

22  consulting hours to the university?

23  A.  Oh, I admittedly did not take the website material very

24  seriously.  I may have -- in fact, I'm quite sure I did provide

25  low estimates for the amount of time that I spent consulting on

1    campus, but I think that I was within the guidelines for

2    off-campus travel on trips for consulting.

3    Q.  Fair to say, Dr. Gilman, that no one at the University of

4    Michigan ever detected that you gave a low estimate for the

5    portion of the consulting that you did give a low estimate for?

6    A.  I'm sorry, please repeat.

7    Q.  Well, would it be fair to say that no one at the University

8    of Michigan ever detected that you gave an overly low estimate

9    on a portion of your consulting activities?

10   A.  I don't think so.

11   Q.  That you are aware of, right?

12   A.  That's right.

13   Q.  You've also testified here that you lied to GLG about

14   following their policy to avoid even an appearance of a

15   conflict of interest.  Isn't that true?

16   A.  Yes.

17   Q.  And no one at GLG ever detected that you were lying to

18   them, isn't that right, Dr. Gilman, as far as you know?

19   A.  As far as I know.

20   Q.  And you lied to Elan about abiding by your confidentiality

21   agreement, right, Dr. Gilman?

22   A.  Yes.

23   Q.  And as far as you know, no one at Elan ever detected that

24   you were lying to them about that, right?

25   A.  That's correct.

E1oQmar3                    Gilman - cross

1   Q.  And you lied to Wyeth about abiding by your confidentiality

2   agreement, correct?

3   A.  That's correct.

4   Q.  And, again, as far as you know, no one at Wyeth ever

5   detected that you were lying to them, right?

6   A.  That's correct.

7   Q.  And you've testified that you lied to the FBI, correct?

8   A.  I did lie to the FBI on the initial examination, yes.

9   Q.  And you testified that you lied to the prosecutors, right,

10  in that initial session, right?

11  A.  Yes.

12  Q.  And it's your understanding, isn't it, Dr. Gilman, that you

13  will never be charged for any of those lies under your

14  non-prosecution agreement as long as the government does not

15  believe you are lying to them, right?

16  A.  That's my understanding, yes.

17          MR. STRASSBERG:  Your Honor, no further questions.

18  Thank you.

19          THE COURT:  All right.

20          Redirect.

21          MR. DEVLIN-BROWN:  Yes, your Honor.  It will probably

22  go beyond lunch.

23          THE COURT:  Yes.  My intention would be to break at

24  1:00.

25

E1oQmar3                    Gilman - cross

REDIRECT EXAMINATION

BY MR. DEVLIN-BROWN:

Q.  Good morning, Dr. Gilman.

A.  Good afternoon, Mr. Devlin-Brown.

Q.  I guess you've got the a.m./p.m. thing down this time, right?

        So, I want to go back to the beginning of cross-examination yesterday morning.  Do you recall defense counsel listing a series of about ten or so names and asking if you knew any of them?

A.  Yes.

Q.  Do you recall that your testimony was with respect to some of them, you had vague recollections.  With respect to others, you didn't remember anything at all?

A.  Are you discussing people or consulting firms?

Q.  People.

A.  People, yes.

Q.  I'd like to ask Ms. Hernandez to go over some of the names that you were asked about yesterday.

        Do you remember -- could we pull up Government Exhibit 600, please.  Do you remember being asked about someone named Economides?

A.  Yes.

Q.  And could we filter Government Exhibit -- Government Exhibit 600 is in evidence as the record of your consultations

E1oQmar3                    Gilman - redirect

1    actually, could we go down to the very bottom of it,

2    Ms. Hernandez, and see how many lines there are.  563.  Could

3    we filter this column to look just for that name Economides.

4             Do you see this consultations that shows up here

5    August 20, 2007?

6    A.  Yes.

7    Q.  Do you have any recollection of ever dealing with

8    Economides at any point in 2008 or 2009?

9    A.  No, sir.

10   Q.  Do you remember another name that you were asked about was

11   someone named Sadeghi?

12   A.  I do not.

13   Q.  Do you remember if you were asked about that name?

14   A.  I believe so.

15   Q.  Could we filter this now by Sadeghi, which I see

16   Ms. Hernandez already has.  How many consultations do you see

17   on the Government Exhibit 600 on your screen now for

18   Mr. Sadeghi?

19   A.  One.

20   Q.  Do you remember being asked yesterday on cross-examination

21   Dr. Gilman about someone named Gupta?

22   A.  Yes.

23   Q.  And Ms. Hernandez, could we filter Government Exhibit 600

24   for Gupta.

25             How many consultations do you see on the screen for

E1oQmar3                    Gilman - redirect

1   Gupta, Dr. Gilman?

2   A.  One consultation, sir.

3   Q.  Do you remember being asked about someone named Ajay?

4   A.  Yes.

5   Q.  And let's filter Government Exhibit 600 for Ajay.  How many

6   consultations are there for Ajay?

7   A.  I see one here, sir.

8   Q.  Is there an Ajay Mantha as well, Ms. Hernandez?

9        How many consultations are on the screen for Ajay

10  Mantha?

11  A.  Looks like six or so.

12  Q.  How many of those relate to Alzheimer's -- do they all

13  relate to Alzheimer's disease?

14       MR. STRASSBERG:  Objection, your Honor.  To the extent

15  he is asking for his memory, I have no objection.  But as that

16  appears to be the question, I think he was reading the

17  document.

18       THE COURT:  Are you asking him how many are on

19  Government Exhibit 600 or are you asking him for his

20  recollection?

21       MR. DEVLIN-BROWN:  How many are on Government Exhibit

22  600, your Honor.

23       THE COURT:  That's in evidence.

24  Q.  We don't need to go through every single one.  Let's do one

25  more.  Do you remember being asked about someone named Guha?

E1oQmar3                    Gilman - redirect

1   A.   Yes.

2   Q.   How many consults do you see with Guha on Government

3   Exhibit 600?

4   A.   I see one.

5   Q.   Now, do you recall that when Mr. Strassberg was asking you

6   questions about people you consulted with yesterday, there were

7   some people that you had a memory of besides Mat Martoma?

8   A.   I think there were some, yes.

9   Q.   Let me ask you about someone named Tom Brown of Millennium?

10  A.   Yes.

11  Q.   Do you remember being asked questions about him?

12  A.   Yes, I remember Tom Brown very well.

13  Q.   What do you remember about Tom Brown?

14  A.   I remember Tom Brown as being in London at a -- at a firm,

15  and I remember him being a delightful gentleman, very

16  talkative, a former chess champion player, and the

17  consultations were delightful, but he was extremely talkative.

18  Q.   If we could filter Government Exhibit 600, Ms. Hernandez,

19  by Tom Brown, please.  Let's look down the screen.  How many

20  consultations do you have with Tom Brown?

21              THE COURT:  Let me speak with my deputy for a moment.

22                            (Pause)

23  Q.   So we've shrunk Government Exhibit 600 on the screen

24  Dr. Gilman, but am I right that there is one, two, three, four,

25  five, six, seven, eight, nine, ten consults for Tom Brown?

1  A.  Yes, ten or 11.

2  Q.  Dr. Gilman, I believe you were asked on cross-examination

3  about how many consultations you had with Mat Martoma.  Do you

4  remember that?

5  A.  Yes.

6  Q.  How many consultations would you estimate you had with Mat

7  Martoma?

8          THE COURT:  Do you mean in total over the entire time

9  period?

10  Q.  In total, let's say between -- yes, over the entire time

11  period, over the entire time period you dealt with GLG.

12  A.  I think it was about 60 or thereabouts.

13  Q.  Six-zero did you say?

14  A.  Six-zero, yes.

15  Q.  Could we filter client contact Mat Martoma.  I don't think

16  we need to or are able to count all of these, but you haven't

17  counted them up yourself, have you, Dr. Gilman?

18  A.  No, sir.

19  Q.  Do you think anyone came close to Mr. Martoma in terms of

20  the number of consults you had?

21  A.  No, I don't believe so.

22  Q.  We could take that off the screen, Ms. Hernandez.

23          Other than having more consultations with Mr. Martoma

24  than other clients with GLG, was your relationship with him

25  different than with other clients?

1  A.  Yes, it was different from my relationship with other

2  clients.

3  Q.  In what way?

4  A.  In the very beginning, he was personable and seeking

5  friendship with me initially; and then as time went on, he was

6  persistently seeking non-public information.  That was true

7  from the time of perhaps our sixth or seventh meeting,

8  conversation, that is.

9  Q.  Was your personal relationship different with Mr. Martoma

10  than any of your other clients?

11  A.  Yes, it was.

12  Q.  How was it different?

13  A.  He wanted for us to get together at the public meetings at

14  the American Academy of Neurology, for example, and have coffee

15  or to meet.  I was very wary of this at first because I thought

16  we were going beyond the client/advisor relationship, but with

17  time, I began to like him.  He was personable, and he,

18  unfortunately, reminded me of my first son in his

19  inquisitiveness, his brightness; and, sadly, my first son was

20  very bright also and committed suicide.

21  Q.  In terms of science, did Mr. Martoma's knowledge of science

22  stand out in any way?

23  A.  Yes.

24  Q.  From the other people that had been mentioned?

25  A.  Yes, he seemed much brighter and more versed in science

1   than many of the other people I spoke with.

2   Q.  So, even with respect to Mr. Martoma, Dr. Gilman, do you

3   recall being asked some questions on cross-examination about

4   whether you could recall the details of every meeting with

5   Mr. Martoma?

6   A.  Yes.

7   Q.  And do you recall actually being asked on direct

8   examination whether you could recall all of the details of

9   every meeting with Martoma?

10  A.  Yes, I remember being asked.

11  Q.  And tell us, do you recall -- let me ask it this way:  Do

12  you recall each and every one of your consults with

13  Mr. Martoma?

14  A.  No, I do not.

15  Q.  Do you recall some of them?

16  A.  Yes.

17  Q.  For those that you have a recollection of, do you

18  necessarily recall -- do you recall all of the detail about the

19  consultation?

20  A.  No, I do not.

21          MR. DEVLIN-BROWN:  If we could publish Government

22  Exhibit 1211 which is in evidence, your Honor?

23          THE COURT:  All right.

24  Q.  Do you recall seeing this on your direct examination,

25  Dr. Gilman, as a table of phone calls between yourself and

E1oQmar3                    Gilman - redirect

1    Mr. Martoma?

2    A.  Yes.

3    Q.  We are going to scroll through it so you can look, but my

4    question is, do you remember the details -- well, do you even

5    remember each and every one of the calls that is listed here?

6    A.  No, I do not, sir.

7    Q.  Do you remember some of the calls with Mr. Martoma that

8    you've had?

9    A.  I remember some of the calls.

10   Q.  And for those calls, do you remember all of the details?

11   A.  No, sir.

12   Q.  We could take that off the screen, Ms. Hernandez.

13              Dr. Gilman, do you recall any practices with

14   Mr. Martoma in terms of scheduling consultations?

15   A.  Yes.

16   Q.  What do you recall there?

17   A.  After approximately December of 2006, he or I scheduled a

18   follow-up consultation after every safety monitoring committee

19   meeting.

20   Q.  Now, do you recall necessarily exactly what you discussed

21   in each of these consultations after safety monitoring

22   committee meetings?

23   A.  Yes, he wanted to know all the data that was presented

24   during those safety monitoring committee meetings.

25   Q.  My question to you, Dr. Gilman, is do you recall the

1    details of what you discussed in each of those consultations

2    after the meeting?

3    A.  Yes, I do.

4    Q.  Do you recall -- OK.  Let's -- do you recall we showed a

5    document before November 22 -- withdrawn.  Do you recall--

6    A.  All I need to do is look at what was presented, and I can

7    tell you that he wanted to know the contents of each table.  I

8    mean that's straightforward.

9    Q.  I understand that.  The question though is, do you sitting

10   here today have a specific recollection of everything you said

11   to him on each of those calls as opposed to just looking at the

12   table and making inferences?

13   A.  No, I do not have a specific recollection of everything we

14   discussed, no.

15   Q.  Could we publish again Government Exhibit 600?

16   A.  Yes.

17   Q.  Do you recall some questions on cross-examination about

18   whether certain other people had consults with you in some

19   proximity to safety monitoring committee meetings?

20   A.  I do.

21   Q.  Ms. Hernandez, is this in essentially date order by project

22   create date or -- Let's scroll down and look at November 21,

23   2006.  We will look in -- I don't know if you can -- I guess we

24   can't really see the header when we scroll out, Ms. Hernandez,

25   but the column -- is there a way we can see that?  Not so much?

E1oQmar3                    Gilman - redirect

1    I guess we have to go back to the top page, sorry.  You see the

2    column here which says "give to client date" and then the next

3    one on the right is a "consultation date," Dr. Gilman?

4    A.  Yes, I see the consultation date.  They're blank.

5    Q.  Yes, those are blank.  So, if you bear with me, ladies and

6    gentlemen, we will keep an eye on the third column from the

7    right, and we are going to lose the header as we scroll down.

8    If we can scroll down, Ms. Hernandez, to November 21, 2006.

9    How many consultations -- what's the first consultation you see

10   on Government Exhibit 600 with a date in the third column to

11   the right after November 21, 2006?

12   A.  I'm sorry, I don't see a November 21 -- oh, you mean in the

13   next to last column on the right?

14   Q.  Yes.  Do you see this -- do you see the entry for

15   November 22, 2006?

16   A.  You're looking at the right -- next to the --

17   Q.  Is there a way we can highlight that, Ms. Hernandez?

18   A.  You're looking at the 11/22/2006 in the third column from

19   the right?

20   Q.  Yes.

21   A.  You're asking me about the next one below that.

22   Q.  No, 11/22/2006, who is that consultation with?

23   A.  Mathew Martoma.

24   Q.  I see, it is sorted funny.  OK.  Do you have any other

25   consultations on 11/22/2006?

E1oQmar3                    Gilman - redirect

1   A.  Kamran Moghtaderi.

2   Q.  Do you remember what your consultation with Kamran

3   Moghtaderi is?

4   A.  I do not except it is Dimebon, the medication Dimebon.

5   Q.  Ms. Hernandez, can we see how many consults there are on

6   Government Exhibit 600 for Kamran Moghtaderi?

7           How many consults for Mr. Moghtaderi do you see on

8   your screen, Dr. Gilman?

9   A.  I see one, 11/22 and one on -- one for droxidopa for

10  orthostatic hypotension.

11  Q.  How many in total?

12  A.  Two.

13  Q.  This would probably be easiest if we sort by date, third

14  column to the right, consultation date once we select everyone

15  again.  Now, let's look down to February 8, 2007, and see -- I

16  will ask you, Dr. Gilman, who is on Government Exhibit 600

17  after February 8, 2007?

18  A.  Bihua Chen.

19  Q.  Is that a consultation that's being about Alzheimer's

20  disease?

21  A.  No, sir.  It looks like it was for droxidopa.

22  Q.  Do you remember anything about Mr. Chen?

23  A.  I do not, no.

24  Q.  What about the one below that, who is that with?

25  A.  Ed Hurwitz.

E1oQmar3                    Gilman - redirect

1   Q.  Is that anything about Alzheimer's disease according to the

2   consultation subject listed?

3   A.  No.  It's about traumatic brain injury.

4   Q.  And the one below that?

5   A.  Mathew Martoma on Flurizan.

6   Q.  What date is this consultation?

7   A.  2/9/2007.

8   Q.  What's the next consultation listed on the third column

9   from the right after February 9 -- did you say June 9?

10  A.  February 13.  Mathew Martoma about therapies for

11  Alzheimer's disease.

12  Q.  Could we scroll further down the list to 2007, please, Ms.

13  Hernandez.  Do you see any consultations on October 9 or after,

14  Dr. Gilman, on the screen?

15  A.  Yes.

16  Q.  Any consultation on October 9?

17  A.  Yes, Mathew Martoma.

18  Q.  What about October 10?

19  A.  Mathew Martoma.

20  Q.  What's the next consultation date listed?

21  A.  October 12.

22  Q.  Who is that with?

23  A.  Jim O'Rourke.

24  Q.  Is he memorable to you in any way?

25  A.  Excuse me does he what?

E1oQmar3                    Gilman - redirect

1    Q.  Do you remember him?

2    A.  No, I don't.

3    Q.  Is this consultation relating to Alzheimer's disease

4    according to Government Exhibit 600?

5    A.  No, it's about Trexima.

6    Q.  Let see go to March, keep scrolling down the list to

7    March 18, 2008, please.  Do you see any consultations on

8    March 18, 2008?

9    A.  I do.

10   Q.  With who?

11   A.  Mathew Martoma.

12   Q.  What's the next consultation that's listed after March 18,

13   2008?

14   A.  Stephen Rodgers, Neupro Schwarz Pharmaceuticals.

15   Q.  What's the date of that one?

16   A.  3/24.  March 24/2008.

17   Q.  Let's go down to July 11, 2008, please, Ms. Hernandez.

18   A.  That's Alzheimer's -- that's Tom Brown.

19   Q.  What do you see -- what's below the entry for July 11?

20   A.  July 14, Evan McColloch.

21   Q.  Is that an Alzheimer's consultation on Mr. McColloch?

22   A.  No, it's about ADHD.

23   Q.  What's the one below that?

24   A.  That's 7/14, Mathew Martoma, and it's on Parkinson's

25   disease and rasagiline.

E1oQmar3                    Gilman - redirect

1   Q.  Dr. Gilman, did you always accurately identify the topics

2   of consultations for Mat Martoma?

3   A.  No.

4   Q.  Could we put on the screen Government Exhibit 235, please,

5   which is in evidence, right?  Yes.  Actually, I'm sorry, that's

6   the wrong exhibit.  I'll come back to that topic later.

7           Dr. Gilman, let me ask you a couple things about

8   testimony from earlier today.  Do you recall being asked some

9   questions about math errors and whether it was you or

10  Mr. Martoma who detected math errors?

11  A.  Yes.

12  Q.  Was there one math error or more than one math error?

13  A.  There was more than one.

14  Q.  Could we quickly put up Government Exhibit 114 in evidence,

15  please.

16          Dr. Gilman, I would direct your attention to the first

17  sentence of the first paragraph.  "I looked again at the data

18  from the SMC meeting slide set for March 13, 2008 and added up

19  the columns."  Does what follows relate to the math error of

20  March 13, 2008?

21  A.  Yes.

22  Q.  Do you see any other math errors identified in this email?

23  A.  Yes.

24  Q.  What is the math error identified in this email?

25  A.  The errors of -- in the SMC meeting slide set for

E1oQmar3                    Gilman - redirect

October 1, 2007, there are multiple errors there.  Not only in

the additions but also in primary data listed in the columns.

Q.  Dr. Gilman, do you recall getting a question on

cross-examination about whether you ever told Enchi Liu that it

was Mathew Martoma who discovered a math error?

            MR. STRASSBERG:  Objection, your Honor.

            THE COURT:  Grounds?

            MR. STRASSBERG:  It misstates what the testimony was.

            THE COURT:  Can you rephrase the question?

            MR. DEVLIN-BROWN:  I was really just trying to elicit

that a question was asked by Mr. Strassberg.

            THE COURT:  I think Mr. Strassberg is challenging it.

Is that your point?

            MR. STRASSBERG:  You know, your Honor, my memory was

not that that was the way the question was asked, but I can't

tell you that I can remember exactly how it was asked this

morning.

            MR. DEVLIN-BROWN:  I can rephrase.

            THE COURT:  All right.

BY MR. DEVLIN-BROWN:

Q.  Dr. Gilman, do you recall any questions this morning from

Mr. Strassberg relating to whether you communicated anything to

Ms. Liu relating to math and noted Martoma had identified the

issue?

A.  I did not notify Ms. Liu that Mat Martoma had detected an

E1oQmar3                    Gilman - redirect

1    error.

2    Q.  Did you ever notify Ms. Liu of any of your conversations

3    with Mr. Martoma?

4    A.  I did not.

5    Q.  We can take that off the screen, Ms. Hernandez.

6              Now, do you recall, Dr. Gilman, being asked the other

7    day questions by Mr. Strassberg about the expertise that

8    clients would seek from you in consulting?

9    A.  The expertise that what?

10   Q.  That clients would seek from you in consulting?  Perhaps I

11   could -- would showing the transcript refresh your memory at

12   all?  As to Mr. Strassberg --

13             THE COURT:  I think the problem is he just didn't hear

14   the question.

15   Q.  Dr. Gilman, do you recall Mr. Strassberg asking you in

16   substance whether the nature of your consulting work was to

17   give your expert opinion and insight on to complex scientific

18   and medical matters to your GLG clients?

19   A.  Yes, that's right.  Yes.

20   Q.  And do you recall him asking about whether you were talking

21   to research analysts or other investment professionals that

22   were trying to advise clients on their own investments?

23   A.  Yes.

24   Q.  In any of the consults, Dr. Gilman, do you ever recall

25   giving any of your GLG clients your views on whether to buy or

E1oQmar3                    Gilman - redirect

1    sell particular stocks?

2    A.  I never did that, sir.

3    Q.  Did you ever give them your views on investing strategies

4    at all?

5    A.  Never.

6    Q.  Did you ever give them views on whether the companies that

7    were making some of the medicine you were expert in had stock

8    that was valued too high or too low given the medicine?

9    A.  I never did.

10   Q.  Did you consider yourself expert in that regard?

11   A.  Oh, no.

12   Q.  Do you recall anyone even asking you for advice on whether

13   to buy or sell particular stocks?

14   A.  No.  Nobody asked me that.

15   Q.  Do you recall being asked some questions on

16   cross-examination and being shown some documents about what you

17   communicated to GLG in your profile?

18   A.  Yes.

19            MR. DEVLIN-BROWN:  Could we publish what I believe is

20   in evidence as Defense Exhibit 727?

21            THE COURT:  Yes.

22   Q.  Could we try to zoom in on it please, Ms. Hernandez?  I

23   guess we could start with the date of the email at the top and

24   maybe through the first row.  What is the date of this email,

25   Dr. Gilman?

E1oQmar3                    Gilman - redirect

1    A.  It is Thursday, January 18, 2007.

2    Q.  Who is the client that's listed on this email?

3    A.  The client is Mat -- Mathew Martoma.

4    Q.  Do you recall being asked questions on cross-examination

5    about the column to the right that says comments?

6    A.  Yes.

7    Q.  And do you -- let me just read one aspect of that.  At the

8    bottom, "Although I know more than is publicly available, I

9    have a confidentiality agreement and will only share

10   information that is openly available, of course."

11   A.  Yes.

12   Q.  Do you remember Mr. Strassberg asking whether your profile

13   information as far as you understood was shared with GLG

14   clients?

15   A.  Yes.

16   Q.  Could we turn to the second page of this email please,

17   Ms. Hernandez.  If we could zoom in on the top.

18          Is this also information on the top of this email that

19   you provided in your profile, Dr. Gilman?

20   A.  Yes.

21   Q.  If you could just read the sentence at the top?

22   A.  "I cannot discuss trial AAB-001 as I am chair of the safety

23   monitoring committee, but I can discuss the approach of the

24   treatment of Alzheimer's disease with immunotherapy,

25   Alzheimer's medicine, Flurizan and other experimental

1    approaches to treatment."

2    Q.  Do you recall being asked questions on direct examination

3    or testifying on direct examination that there had been an

4    email with a Mr.  --

5    A.  Shin.

6    Q.  -- Shin from GLG stating that you could no longer consult

7    on AAB-001?

8    A.  Yes, I do.

9    Q.  Did you update your GLG profile after that?

10   A.  I did.

11   Q.  If we go to the top of this email, back to the top please,

12   Ms. Hernandez.  So, despite what was written at the bottom of

13   the email the title of this consultation says follow up with

14   Dr. Gilman AAB-001 for Alzheimer's disease.  Do you see that,

15   Dr. Gilman?

16   A.  Yes, sir.

17   Q.  Do you have any idea one way or the other how GLG approved

18   this given both the information at the bottom and at the top?

19   A.  I do not.

20            MR. STRASSBERG:  Objection, your Honor.

21            THE COURT:  Grounds?

22            MR. STRASSBERG:  To the form of the question.

23            THE COURT:  Overruled.

24   Q.  You may answer.

25   A.  The answer is I have no idea how this escaped and got to

E1oQmar3                    Gilman - redirect

1    me.

2    Q.  If we could publish, Ms. Hernandez, Government Exhibit 601,

3    which I believe is in evidence as the GLG 600 filtered by

4    Mathew Martoma.  If we could scroll down -- on this first page,

5    Dr. Gilman, do you see some consults listed as being for

6    AAB-001?

7    A.  Yes, I do.

8    Q.  Are these all in 2006 on this page?

9    A.  Yes.

10   Q.  If we could go to the next page Ms. Hernandez.  Do we see

11   at the bottom of this page, a consultation on January 17, 2007?

12   A.  Yes.

13   Q.  2007?

14   A.  Yes.

15   Q.  What's the topic listed there, Dr. Gilman?

16   A.  The topic is AAB-001.

17   Q.  If we could just look at the next page.  Do you see any

18   further consults being listed for AAB-001 after January 2007,

19   Dr. Gilman?

20   A.  No.

21   Q.  Page another page, Ms. Hernandez.  One more, Ms. Hernandez.

22   One more?

23   A.  I see none there.

24   Q.  One more, please?

25   A.  And none there.

E1oQmar3                    Gilman - redirect

Q.  So, Dr. Gilman, did you stop consulting with Mr. Martoma

about AAB-001 after January 2007?

A.  No, sir.

Q.  Were you violating GLG policy by doing those consultations?

A.  Yes, sir.  Yes, sir, I was.

        THE COURT:  All right.  Ladies and gentlemen, it's

1:00.  We will break for lunch.  Don't discuss the case.  Don't

read, listen to or look at anything about the case.  Keep an

open mind.  There is more evidence to hear.

        We will resume at 2:00.  Thank you very much.

        (Luncheon recess)

        (Continued on next page)

E1odmar4               Gilman – redirect

1          **A F T E R N O O N   S E S S I O N**

2                        2:15 p.m.

3          (Jury not present)

4          THE CLERK:  All rise.

5          THE COURT:  Please be seated.

6          Dr. Gilman should resume the stand.

7          THE CLERK:  All rise.

8          (Jury present)

9          THE COURT:  Please be seated.

10         Dr. Gilman, you remain under oath.

11    SIDNEY GILMAN,

12         Resumed, and testified further as follows:

13         THE COURT:  Mr. Devlin-Brown, you may proceed.

14         MR. DEVLIN-BROWN:  Thank you, your Honor.

15    REDIRECT EXAMINATION (Resumed)

16    BY MR. DEVLIN-BROWN:

17    Q.  Good afternoon, Dr. Gilman.

18    A.  Good afternoon, Mr. Devlin-Brown.

19    Q.  Have we spoken other than in court since the

20    cross-examination began?

21    A.  No, sir.

22    Q.  And have we spoken during the last lunch break?

23    A.  We did not.

24    Q.  Do you recall on cross-examination being asked by

25    Mr. Strassberg whether anyone had given you certain phrases to

E1odmar4                    Gilman - redirect

1    use to respond to particular questions?

2    A.   I remember that question.

3    Q.   Did anyone do that?

4    A.   No.

5    Q.   Do you recall, Dr. Gilman, being asked some questions on

6    cross-examination about telling ABC News about vasogenic edema,

7    or words to that effect?

8    A.   Yes.

9    Q.   And do you recall seeing an exhibit, an email about that?

10   A.   Yes.

11            MR. DEVLIN-BROWN:  Could we publish, with the Court's

12   permission, Defense Exhibit 748, please?

13            THE COURT:  That is in evidence?

14            MR. DEVLIN-BROWN:  It is.  Maybe I have made a

15   mistake.  Let me check.

16            (Pause)

17            THE COURT:  It is not on our list.

18            MR. DEVLIN-BROWN:  I think we have the number wrong,

19   your Honor.

20            (Pause)

21            MR. DEVLIN-BROWN:  Sorry, your Honor.  Just one

22   moment.

23            744, please, which is in evidence.

24            So, Ms. Hernandez, could we go to the second page of

25   that email, and just blow up the top part.  Thank you.

E1odmar4                    Gilman - redirect

1   Q.  So do you recall being asked about this sentence, which

2   I'll ask Ms. Hernandez to highlight:  "The fact that the trial

3   continues is the news; this therapy is being tolerated despite

4   some adverse events among the subjects."

5           Do you recall being asked about that sentence,

6   Dr. Gilman?

7   A.  Yes, I do.

8   Q.  Was the fact that the trial was still continuing

9   confidential?

10  A.  I don't believe so.

11  Q.  The next part of the sentence says:  "The therapy is being

12  tolerated despite some adverse events."

13          What does the term "adverse events" mean?

14  A.  It means some events that have affected patients' health.

15  Q.  Is there a difference between adverse events and serious

16  adverse events?

17  A.  Yes.

18  Q.  What's the difference?

19  A.  Serious adverse events result in hospitalization or

20  permanent changes in the health of people.

21          MR. DEVLIN-BROWN:  If we could go to the first page of

22  this, please, Ms. Hernandez, and just zoom in on the top of the

23  email, actually, including the header.  Thank you.

24  Q.  So do you recall on cross-examination being asked whether

25  you had forwarded this email to various people, including Dale

E1odmar4                    Gilman - redirect

 1    Schenk and Anita Kawatra?

 2    A.   Yes.  Yes, I do.

 3    Q.   What was Anita Kawatra's job at Elan?

 4    A.   She was in charge of external relations.

 5    Q.   What did that entail, as far as you understood it?

 6    A.   It was public information about Elan studies.

 7    Q.   Did Elan ever ask you to speak to reporters on the

 8    company's behalf?

 9    A.   Did they ask me to do what?  I'm sorry.

10    Q.   Did Elan ever ask you to speak to reporters on the

11    company's behalf?

12    A.   No.

13    Q.   Did Elan ever ask you to present at conferences on the

14    company's behalf?

15    A.   Well, besides giving the presentation to ICAD, they did ask

16    me once to speak at a public health conference that was in

17    Washington, D.C.

18    Q.   With respect to this email that's in evidence as Government

19    Exhibit -- Defense Exhibit 748 -- withdrawn.

20         Let me actually show you what's been marked for

21    identification -- withdrawn again.

22         Dr. Gilman, were there occasions when you would

23    contact Ms. Kawatra to inquire as to whether or not you could

24    say certain things in public about the ongoing trial?

25    A.   Yes.

E1odmar4                    Gilman - redirect

1   Q.  Could I show you what's marked for identification as

2   Government Exhibit 62?

3            MR. DEVLIN-BROWN:  If we could zoom in on the -- well,

4   zoom in on the top part so that Dr. Gilman can read it anyway.

5            (Pause)

6   A.  Yes.

7   Q.  Do you recognize this document?

8   A.  Yes, I do.

9            MR. DEVLIN-BROWN:  The government offers 62.

10           MR. STRASSBERG:  Your Honor, I think this is --

11  objection as to scope, your Honor.

12  A.  I recall --

13           THE COURT:  No.  Wait a second, Doctor.

14           (Pause)

15           I need a hard copy of this document.

16           All right.  I am overruling the objection.  Government

17  Exhibit 62 is received.

18           (Government's Exhibit 62 received in evidence)

19           MR. DEVLIN-BROWN:  Could we publish it, please?

20           THE COURT:  Yes.

21  BY MR. DEVLIN-BROWN:

22  Q.  Now, Dr. Gilman, on the cc line is Dale Schenk.  Was he

23  also on the cc line or on one of the lines in Defense Exhibit

24  748?

25  A.  Yes.

1   Q.  And the "to" line is to Allison Hulme?

2   A.  Yes.

3   Q.  And what is the date of this email?

4   A.  August 26, 2008.

5   Q.  And you write:  "Dear Allison, I am writing to request

6   permission to show the slides I presented at the ICAD meeting

7   to a neuroscience interest group at the annual meeting of the

8   Institute of Medicine (IOM), National Academy of Sciences."

9   Q.  Dr. Gilman, by the time of this email, had you already

10  presented the slides at ICAD?

11  A.  Yes, sir.

12  Q.  Why were you asking for permission to distribute them at

13  this other conference?

14  A.  I remember the Institute of Medicine, National Academy of

15  Sciences, there is a subgroup of neurosciences in that

16  institute, and I thought that this presentation would be of

17  interest to them.

18  Q.  Did you feel you needed to ask for permission?

19  A.  Yes, I did feel I needed to ask permission.

20  Q.  Why?

21  A.  Because this was material that had not yet been published.

22        MR. DEVLIN-BROWN:  We could take that off the screen,

23  please.

24  Q.  Could I show you Government Exhibit 59, for identification,

25  please.

E1odmar4                    Gilman - redirect

1      (Pause)

2              MR. DEVLIN-BROWN:  And if we could zoom maybe from the

3      header about two-thirds of the way down the document, that

4      would be great.

5      Q.  Do you recognize Government Exhibit 59, Dr. Gilman?

6      A.  Yes, sir.

7      Q.  What is it, just generally?

8      A.  This is an email from me to Anita Kawatra.

9              MR. DEVLIN-BROWN:  The government offers 59.

10             MR. STRASSBERG:  No objection, your Honor.

11             THE COURT:  Government Exhibit 59 is received.

12             (Government's Exhibit 59 received in evidence)

13             MR. DEVLIN-BROWN:  May we publish it, your Honor?

14             THE COURT:  Yes.

15             MR. DEVLIN-BROWN:  So perhaps we could just zoom on

16     the bottom email.

17     Q.  So, Dr. Gilman, is this from yourself to Anita Kawatra and

18     Dale Schenk and Martin Koller?

19     A.  Yes.

20     Q.  So you write:  "Tomorrow I will give the Distinguished

21     University Professor lecture, and I had originally considered

22     going into depth about both AN1792 and AAB-001.  To this end, I

23     was considering asking you all what I can say publicly."

24             Why were you sending this message relating to what you

25     can say publicly to Anita Kawatra, Dale Schenk and Martin

E1odmar4                    Gilman - redirect

1  Koller?

2  A.  I was asking their permission because the material had not

3  yet been published.

4  Q.  Did you ever ask anyone from Elan, Dr. Gilman, whether you

5  could have permission to share the ICAD presentation in advance

6  with Mr. Martoma?

7  A.  No.  I had not.

8          MR. DEVLIN-BROWN:  We could take those off the screen,

9  please.

10 Q.  Dr. Gilman, do you recall having some questions on

11 cross-examination about consultations you did with other

12 individuals in the period between when you were unblinded to

13 the results and the announcement of the results at ICAD?

14 A.  Yes.

15 Q.  I believe you testified -- do you recall when your were

16 unblinded?

17 A.  Yes.

18 Q.  When?

19 A.  Well, I was unblinded on the 15th and 16th of July 2008.

20          MR. DEVLIN-BROWN:  Ms. Hernandez, with the Court's

21 permission, could we publish Government Exhibit 600?

22          THE COURT:  Yes.

23          MR. DEVLIN-BROWN:  And is this sorted by consultation

24 date, Ms. Hernandez?

25          And could we scroll down until we find July 15, 2008.

E1odmar4                    Gilman - redirect

1    Q.  So let me ask you, Dr. Gilman, how many consultations you

2    see on Exhibit 600 between July 15 of 2008 and July 29th?

3            So far on the screen, there is a July 17, 2008, with

4    Rod Wong; a July 18, 2008 with Kumar Husam Nazer; July 21, 2008

5    with Rene Shen; and July 24, 2008 with Rod Wong; and a July 25,

6    2008 with Rod Wong; and a July 25, 2008 with Brian Grossman.

7            Dr. Gilman, as you were -- we could take that off the

8    screen for a moment.

9            Dr. Gilman, as you were preparing to deliver your

10   presentation at ICAD, did you know whether there was much

11   investor interest in the drug?

12   A.  Yes.  I suspected there was a great deal of investor

13   interest in the drug.

14   Q.  Well, did you know that one way or the other based on

15   consultations?

16   A.  Not based on consultations, but I suspected there was a

17   great deal of interest in the drug because it had been widely

18   known as an exciting potential drug for Alzheimer's Disease.

19   Q.  Did you see Mr. Martoma's name anywhere on the list for

20   consultations between July 15, 2008 and July 29, 2008?

21   A.  No.

22   Q.  Did you talk to Mat Martoma between that period about the

23   drug?

24   A.  Yes.

25   Q.  Did you report to GLG any phone calls with Mr. Martoma on

E1odmar4                    Gilman - redirect

1   July 17, 2008?

2   A.  I didn't.  No, I did not.

3   Q.  What about the meeting you testified to on July 19, 2008,

4   in your office?

5   A.  I did not report that to GLG.

6   Q.  Did you ask Mr. Martoma to report it to GLG?

7   A.  I did not.

8   Q.  Why not?

9   A.  Because it would be tantamount to confessing that I was

10  feeding -- giving him inside information.

11  Q.  Now, you did have some consultations, we just saw, with

12  Mr. Wong and Mr. Shen.  Did you see those?

13  A.  Yes.

14  Q.  Do you recall on cross-examination being asked questions

15  about various articles you had sent, or slides from AN1792 you

16  had sent to Mr. Shen and Mr. Wong?

17  A.  Yes.

18  Q.  Was -- and you remember -- do you remember, it was like

19  several different articles and slides that were shown to you on

20  cross-examination?

21  A.  Yes.

22  Q.  Were any of those confidential materials?

23  A.  No.

24  Q.  Can you describe -- well, let me show you, if we could,

25  what is Defense Exhibit 874, please.

E1odmar4                    Gilman - redirect

1          And if we could just zoom in on the text,

2    Ms. Hernandez.

3          (Pause)

4          Do you recall, Dr. Gilman, seeing this article, dated

5    on the bottom July 19, 2008, from the Lancet and I think the

6    second article from the Lancet as well?

7    A.  Yes, sir.

8    Q.  Do you remember what these articles were about, or would

9    you like to look at them a little bit?  I just wanted to ask

10   you a general question about them.

11   A.  Well, I remember them reasonably well.

12   Q.  Were those articles in your view useful for someone who did

13   not know the results of the Phase II trial but was trying to

14   look at what was reported to make a best assessment?

15   A.  I felt they were useful -- did give a useful perspective.

16   Q.  And Mr. Strassberg didn't show you any emails of you

17   sending these articles to Mr. Martoma, did he?

18          MR. STRASSBERG:  Objection, your Honor.

19   A.  No, I don't believe so.

20          THE COURT:  Overruled.

21   Q.  Did these articles affect your view at all?

22   A.  I'm sorry.  Did they what?

23   Q.  Did they affect your view at all as to the prospects for

24   bapineuzumab?

25   A.  No, they did not.

1  Q.  I think you were asked -- well, were you asked on

2  cross-examination whether you had provided this Lancet

3  article -- sorry, talked about the Lancet article with

4  Mr. Martoma?

5  A.  I was asked about whether I had discussed the Lancet

6  article with Mr. Martoma.

7  Q.  And do you recall answering that you had?

8  A.  Now we're talking about the Lancet article of the 17th of

9  April, or are we talking about -- there are several Lancet

10 articles.

11 Q.  The Lancet article in July 2008.

12 A.  In July?  I'm sorry, I am not sure whether that was the one

13 discussed with Mr. Martoma or not.

14 Q.  That was actually going to be my question.  Do you

15 recall -- do you recall any particular occasion or meeting

16 where you were discussing Lancet articles with Mr. Martoma?

17 A.  I'm sorry, I don't.

18        MR. DEVLIN-BROWN:  OK.  We can take that off the

19 screen, then, Ms. Hernandez.

20 Q.  Do you recall being asked on cross-examination some

21 questions about whether it was Mr. Martoma or whether it was

22 Mr. Martoma's secretary who tracked you down in Istanbul?

23 A.  Yes, I remember the question.

24 Q.  And do you recall being asked whether your testimony that

25 Mr. Martoma told you that he had tracked you down was

E1odmar4                    Gilman - redirect

1  consistent with the emails that showed you were in touch with

2  his secretary?

3  A.  Yes, I remember the question.

4  Q.  Did you have any understanding as to who Mr. Martoma's

5  secretary took actions on behalf of -- on whose behalf

6  Mr. Martoma's secretary took actions?

7  A.  Mr. Martoma's secretary took action on behalf of

8  Mr. Martoma.

9  Q.  And did you in fact speak to Mr. Martoma himself at some

10 point then?

11 A.  I did.

12 Q.  And what did he tell you when he spoke to you?

13 A.  He told me he tracked me down.

14 Q.  Do you recall on cross-examination being asked some

15 questions about an ICAD abstract for a study that Dr. Lon

16 Schneider did about placebos?

17 A.  Yes.

18 Q.  On direct examination -- well, on direct examination, you

19 had testified that at the ICAD conference there was a Q & A

20 session in which people asked questions about whether the

21 placebo group was a concern?

22         MR. STRASSBERG:  Objection, your Honor.

23         THE COURT:  Just give me a moment.

24         MR. STRASSBERG:  It is a scope objection.

25         MR. DEVLIN-BROWN:  I can ask it a different way to

1    makes clear of the scope.

2              THE COURT:  All right.

3    BY MR. DEVLIN-BROWN:

4    Q.  Dr. Gilman, was Lon Schneider at the ICAD conference?

5    A.  Yes, he was.

6    Q.  Did he deliver a presentation about the placebo groups

7    after you delivered yours?

8    A.  Yes.

9    Q.  Do you recall if he asked any questions about the falloff

10   in the placebo group you had seen in your study?

11   A.  I don't recall his asking any question about that falloff.

12   Q.  One other thing on the ICAD abstract.

13             Was there an ICAD abstract for bapineuzumab, as far as

14   you know?

15   A.  As far as I know, there was not.

16   Q.  Dr. Gilman, do you recall being asked some questions on

17   cross-examination about your proffer agreement and protections

18   it could afford you?

19   A.  Yes.

20             MR. DEVLIN-BROWN:  Could we publish, your Honor,

21   Government Exhibit 741, please?

22             THE COURT:  That's in evidence?

23             MR. DEVLIN-BROWN:  Yes, it is.

24             THE COURT:  Yes.

25             MR. DEVLIN-BROWN:  And if we could blow up paragraph

E1odmar4                    Gilman - redirect

1    No. 2, please.

2    Q.  Do you recall, Dr. Gilman, Mr. Strassberg asking you

3    questions about whether statements you made in the proffer

4    agreement could be used against you under this section in a

5    prosecution for false statements, obstruction of justice or

6    perjury?

7    A.  Yes.

8    Q.  Do you recall if there were other circumstances under the

9    proffer agreement in which the government could use your

10   statements against you?

11          (Pause)

12   A.  This is the proffer of February, I believe, was it not?

13   Q.  Yes.  And, actually, if we could zoom out, please, and zoom

14   in on the third paragraph.

15          Let me just read the beginning of the third paragraph.

16          "Notwithstanding Item (2) above, the government may

17   use information derived directly or indirectly from the meeting

18   for the purpose of obtaining leads to other evidence, which may

19   be used in any prosecution of Client by the government; (b), in

20   any prosecution brought against client, the government may use

21   statements by Client at meetings and all evidence obtained

22   directly or indirectly therefrom for the purpose of

23   cross-examination, should client testify; and (c) the

24   government may also use statements made by client at the

25   meeting to rebut any evidence or arguments offered by or on

E1odmar4                     Gilman - redirect

1   behalf of Client."

2           I'll stop reading there.

3           Did Mr. Strassberg ask you any questions about this

4   paragraph, as far as you recall?

5   A.  I don't recall his asking about this paragraph.

6           MR. DEVLIN-BROWN:  You can take that off the screen.

7   Q.  Dr. Gilman, when you told the government under a proffer

8   agreement that you had given confidential information to

9   Mr. Martoma, did you have an understanding of whether the

10  proffer agreement was going to provide you with -- well, what

11  was your understanding of what protections this proffer

12  agreement would provide you?

13  A.  I didn't think it was providing much protection at all,

14  sir.

15  Q.  Were you concerned, after you spoke to the government under

16  this proffer agreement about Mr. Martoma, that you could still

17  be prosecuted?

18  A.  Yes.

19  Q.  Dr. Gilman, do you recall being asked a number of questions

20  on cross-examination about a trip to Michigan -- withdrawn.

21          A number of questions about a calendar entry of

22  July 19, 2008 that Mat Martoma would come see you in your

23  office?

24  A.  Yes, sir.

25  Q.  And do you recall Mr. Strassberg asking what you had said

E1odmar4                    Gilman - redirect

 1  about that calendar entry at various proffer sessions?

 2  A.  Yes.

 3  Q.  Do you recall Mr. Strassberg asking you, with respect to

 4  the August 2012 proffer session, why -- whether you had told

 5  the government that you had met with Mr. Martoma on July 19,

 6  2008?

 7  A.  Yes.

 8  Q.  And what was your answer to Mr. Strassberg as to whether

 9  you had told the government in August 2012 that you had met

10  with Mr. Martoma?

11  A.  In August I told him that we had met.

12  Q.  In August 2012 -- my question is terrible.

13  A.  I'm sorry.  Your question is confusing.

14  Q.  Yes.  When you met with the government in August 2012 --

15  A.  Yes.

16  Q.  -- were you asked questions about whether the meeting on

17  your calendar entry had in fact occurred?

18  A.  Yes.

19  Q.  And in August 2012, do you recall testifying on

20  cross-examination that you told the government you didn't

21  recall the meeting?

22  A.  Yes.

23  Q.  Why didn't you just tell the government in August 2012 that

24  it's on your calendar, so, yes, you had a meeting?

25  A.  Because I didn't recall it.

E1odmar4                    Gilman - redirect

1   Q.  In September 2012 -- do you recall being asked questions

2   about your next proffer in September 2012 by Mr. Strassberg?

3   A.  I still didn't recall it, sir.

4   Q.  OK.  Do you recall being asked questions about a meeting

5   after you had received your nonprosecution agreement, on

6   March 1, 2013, when you were asked again about this calendar

7   entry?

8   A.  Yes.

9   Q.  And do you recall testifying that you said something at the

10  end of the meeting about recalling opening a door and letting

11  Mr. Martoma in?

12  A.  Yes.

13             MR. STRASSBERG:  Objection, your Honor.  That is not

14  the testimony.

15             THE COURT:  Just give me a moment.

16             MR. STRASSBERG:  I am happy to share it at the sidebar

17  because I remember what his testimony was.

18             MR. DEVLIN-BROWN:  I am also happy to ask an

19  open-ended question.

20             THE COURT:  Just give me a moment.

21             (Pause)

22             All right.  I will speak to counsel at the sidebar.

23             (Continued on next page)

24

25

E1odmar4                    Gilman – redirect

1        (At the sidebar)

2        THE COURT:  My notes indicate that in discussing the

3   March 1, 2013 proffer session, he said that he recollected at

4   that meeting that he had a mental image of seeing Mathew

5   Martoma out on the street but that he recalled no other details

6   at that time.

7        MR. STRASSBERG:  Your Honor's notes are very accurate.

8   He actually said, consistent with the 302, that he had a vague

9   recollection of seeing him out on the street.  There was no

10  testimony about opening a door or holding a door, or whatever

11  else Mr. Devlin-Brown just put in his question.

12       MR. DEVLIN-BROWN:  I apologize.  I will ask it using

13  those terms.

14       MR. STRASSBERG:  Yes.  I believe the quote, because I

15  believe what I said to him was you said you had a vague

16  recollection of seeing Mr. Martoma out on the street.  I

17  believe he said yes.  That is what he said at the time.

18       MR. DEVLIN-BROWN:  That is fine.

19       (Continued on next page)

20

21

22

23

24

25

1                    (In open court)

2    BY MR. DEVLIN-BROWN:

3    Q.  Dr. Gilman, let me withdraw that and ask you a different

4    question.

5              Do you recall on cross-examination testifying that on

6    March 1, 2013, you told the government, in substance, that you

7    had a vague recollection of seeing Mr. Martoma on the street

8    outside your office?

9    A.  Yes.

10   Q.  Why didn't you tell the government at that meeting that you

11   remembered meeting him in the office that day?

12   A.  It was too vague a memory for me to recount, sir.  I wasn't

13   that sure.  It was very faint.

14   Q.  Do you recall Mr. Strassberg asking you whether the

15   government had asked you the question repeatedly of whether you

16   had had this meeting in your office?

17   A.  Yes.

18   Q.  Given the repeating questions by the government, why didn't

19   you simply say, yes, I met with him in the office?

20   A.  I needed to be sure.  I did not want to make a guess

21   because I was in jeopardy if I lied.  I wanted to be sure I had

22   a solid memory in my mind.

23   Q.  Has anyone from the government, Dr. Gilman, ever encouraged

24   you in any way to provide more details than you actually

25   remember?

E1odmar4                    Gilman - redirect

1    A.  No.

2    Q.  Sitting here today, right now, what can you remember with

3    confidence occurring on July 19, 2008?

4    A.  I can recall a telephone call coming into my office from an

5    individual saying that Mr. Martoma is about to arrive.  I can

6    recall opening the front door to the North Ingalls Building to

7    allow him to come in without my going out.

8          I can recall asking him if he had lunch already, or if

9    he wanted to go out for lunch, and of him declining, and

10   offering him coffee or a soft drink and him declining.

11         I have a visual memory of letting him into my office

12   and asking him if he wanted to just chat, and of his requesting

13   to see the slides, the ICAD slides.

14         I then have a visual memory of going to the slide set

15   but not a very clear or detailed memory of that.

16   Q.  And you had testified, I believe, that details -- the final

17   details came back to you approximately two weeks ago?

18   A.  This going through the slides came back roughly two weeks

19   or three weeks ago.

20   Q.  What part came back?

21   A.  Going through the slides came back about two or three weeks

22   ago.

23   Q.  Do you have doubt as to whether that happened or not,

24   Dr. Gilman?

25   A.  I do not have doubt.  I revealed that memory to you early

E1odmar4                    Gilman – redirect

1   when it happened, or, I mean, when I was sure of it.

2   Q.  You also testified on direct that you had had a phone call

3   with Mathew Martoma on July 17, 2008, in which you had provided

4   him with the contents of the PowerPoint slides; do you recall

5   that?

6   A.  Yes.

7   Q.  At this August 2012 meeting, did you tell the government

8   about that phone call?

9   A.  Yes.

10  Q.  Have you since -- since that phone call occurred in 2008,

11  have you ever forgotten that you provided him with information

12  about the PowerPoint presentation during the phone call?

13          MR. STRASSBERG:  Objection, your Honor.

14          THE COURT:  Overruled.

15  A.  No, I had never forgotten that.

16  Q.  Do you recall getting asked some questions on

17  cross-examination about what might happen to you if you were to

18  face charges of some kind?

19  A.  Yes.

20  Q.  And do you recall testifying, in response to those

21  questions, that, in substance, the government could take all of

22  your assets?

23  A.  I remember hearing that.

24  Q.  Do you remember testifying to that on cross-examination?

25  A.  I acknowledged hearing that.

1   Q.  Well, Dr. Gilman, did you make any money after Elan's stock

2   fell following your presentation at ICAD?

3   A.  No, sir.

4   Q.  Did you make any money from Wyeth's stock falling after the

5   presentation at ICAD?

6   A.  No, sir.

7   Q.  Did you invest in these stocks at all?

8   A.  No, sir.

9   Q.  So how much money did you make yourself in connection with

10  providing information to Mathew Martoma?

11          MR. STRASSBERG:  Objection, your Honor, and I'm happy

12  to approach at the sidebar, but this line I believe is

13  improper.  Not that question but the line.

14          THE COURT:  All right.  I will hear you at the

15  sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  I think that the last question was bad.  I

3 don't find any issue with the first, the two questions that

4 preceded it.  But I will hear from you.

5    MR. STRASSBERG:  Sure.  So, your Honor, my concern

6 about this line is that it was set up to suggest that the

7 government has no ability to extract --

8    THE COURT:  That is incorrect.  That is incorrect.

9    The two questions that preceded this were essentially

10 did he make any money off of the Elan stock fall -- let me

11 finish.

12    MR. STRASSBERG:  Of course.  Of course.

13    THE COURT:  And did he make any money off the Wyeth

14 stock fall.  The answer to that was no.  I believe that's

15 undisputed.

16    The problem with the question that is pending is it's

17 too broad, in my judgment, because it's did you make any money

18 out of providing information to Mathew Martoma.  And of course

19 he did, because he was paid for the consultations.

20    I'll hear what your objections are, but that is my

21 view from what I have heard so far.

22    MR. STRASSBERG:  Frankly, your Honor, I agree with

23 everything you said.  Even if it was not, nonetheless, the law

24 of the Court, I would agree with it.

25    My actual objection was only to the question right

E1odmar4                    Gilman - redirect

1  before that and then those questions that followed.  I think

2  each of those questions that you mentioned were not

3  problematic, but the problem was that he asked before weren't

4  you asked questions about the fact that the government could

5  take money from you, and then they went into the and in fact

6  you didn't make money.  And it's that inference that I think is

7  misleading, your Honor, because the government, of course,

8  knows that they could take every penny that he has as a penalty

9  for the insider trading conspiracy charge.  They could charge

10  him with $200 million and take every penny if he was convicted,

11  of course.

12       So I just -- you know, the government, I would submit,

13  is not allowed to frame questions in a manner in order to give

14  a misleading impression to the jury about what their own powers

15  are.

16       MR. DEVLIN-BROWN:  Well, I don't propose to ask any

17  more questions.  I will tighten the question up.  I am just

18  going to now turn to his forfeiture agreement and what he

19  returned.

20       I do think the line of questions is appropriate

21  because Mr. Strassberg was asking all kinds of questions about

22  his income and his deal to suggest that he's getting something

23  that's really truly incredible here.  I don't think it is

24  incredible here.  Maybe theoretically we could take $200

25  million.  It is not an incredible deal that he is getting, and

1  I think the jury is entitled to know the facts of his profits

2  from it or lack thereof.

3       MR. STRASSBERG:  I completely disagree with that.  I

4  just disagree with linking it to the question of what the

5  government's powers were.  I'm not quite sure how to fix that,

6  but maybe we should just strike that question and answer since

7  it is not related to these questions that he is now asking,

8  your Honor.

9       THE COURT:  If you want to bring out what fines he

10 faced, what his understanding was of how much he could have

11 been fined, you can do that.

12      The linkage you're suggesting, that was not the

13 inference I drew from it.  What I drew from it was that

14 Mr. Devlin-Brown was trying to suggest that Dr. Gilman didn't

15 profit from the Elan and Wyeth stock fall.  That's what I

16 thought he was trying to do, which I think is a fair line.  And

17 I did have a problem with the pending question because it was

18 too broad and misleading, but he's going to fix that.

19      MR. DEVLIN-BROWN:  Right.

20      (Continued on next page)

21

22

23

24

25

E1odmar4                    Gilman – redirect

1          THE COURT:  And if you want to come back to the

2     financial penalties that Dr. Gilman faced, you are welcome to

3     do that.  I think you brought out that in pretty good detail

4     already.  I don't remember you asking about fines, but if you

5     want to ask him about fines, you can do that.  But I think it's

6     a pretty clear record that, well, he could have lost

7     everything.

8          MR. STRASSBERG:  Yes.

9          MR. DEVLIN-BROWN:  OK.  Thank you, your Honor.

10          (Continued on next page)

E1odmar4                    Gilman - redirect

1          (In open court)

2          THE COURT:  So, Mr. Devlin-Brown, you will rephrase

3    that last question.

4          MR. DEVLIN-BROWN:  Yes.

5    BY MR. DEVLIN-BROWN:

6    Q.  Dr. Gilman, you testified that you were required to forfeit

7    a sum of money to the SEC and pursuant to your nonprosecution

8    agreement, is that right?

9    A.  That's right.

10   Q.  And what does that money represent, as far as you

11   understand it?

12   A.  That represented the funds that I had received from Elan

13   Pharmaceuticals from consulting with them to Chair their Safety

14   Monitoring Committee, and the money that I had received from

15   the Gerson Lehrman Group for consultations with Mr. Martoma.

16   Q.  Do you recall Mr. Strassberg asking you to do some math and

17   end up with a total amount you earned from consulting of about

18   1.5 million over a period of time?

19   A.  That's what I assumed, yes.

20   Q.  And it was several hundred thousand dollars a year, as

21   Mr. Strassberg was just asking you, right?

22   A.  Yes, sir.

23   Q.  Was all of that consulting through GLG?

24   A.  No, it was not.

25   Q.  Do you recall Mr. Strassberg asking you questions about

E1odmar4                    Gilman – redirect

1    consulting for various other companies?

2    A.   Yes.

3    Q.   Did those have anything to do with Mr. Martoma?

4    A.   No, sir.  The consulting for Mr. Martoma amounted to

5    16 percent of the total Gerson Lehrman income over the three

6    years.

7    Q.   Dr. Gilman, do you recall being asked on cross-examination

8    whether you knew at some point in early 2012 you faced a risk

9    of being prosecuted for your crimes?

10   A.   I didn't know.  I thought that might have been an eventual

11   outcome.

12   Q.   When you participated in the proffer in August 2012, did

13   you still feel you faced a risk of being criminally prosecuted?

14   A.   I thought that was a possibility, yes.

15   Q.   What about when you met with the government in

16   September 2012, did you think there was a risk that you would

17   still be prosecuted or not?

18   A.   I thought there was a risk -- rather, I thought there was a

19   risk I would be prosecuted, yes, sir.

20   Q.   And I had asked you on direct examination and perhaps -- it

21   is not evidence, but if we could put it on your screen again,

22   for identification, Government Exhibit 744.

23            MR. DEVLIN-BROWN:  If we could zoom out a little to

24   see the date as well.

25   Q.   Dr. Gilman --

E1odmar4                    Gilman - redirect

1   A.  Yes, sir.

2   Q.  -- do you recall testifying on direct that there came a

3   point when you and your attorneys made a submission to seek

4   leniency?

5   A.  Yes.

6   Q.  And when was that, approximately?

7   A.  It was approximately October of 2012.

8   Q.  And is this document essentially the submission?

9   A.  Yes.

10  Q.  At the time you made this submission, did you have any

11  understanding as to whether it was likely to be granted or not?

12  A.  I understood it was very unlikely to be granted.

13          MR. DEVLIN-BROWN:  You can take that off the screen,

14  Ms. Hernandez.

15  Q.  Do you recall Mr. Strassberg asking you some questions

16  about the benefits you were receiving by having a

17  nonprosecution agreement?

18  A.  Yes, sir, I do.

19  Q.  Have you faced any negative consequences from acknowledging

20  to the government that you provided inside information to

21  Mr. Martoma?

22  A.  Yes, enormous adverse consequences.

23  Q.  Like what?

24  A.  I lost my career.  I had five more years of research ahead

25  of me and some wonderful ideas, I thought.  I lost my federal

1  grant support, which was several millions of dollars, for

2  research in Alzheimer's and multiple system atrophy.

3       I lost my collegial relationships with other people

4  that I was doing research with.  Plus, I lost continuing

5  teaching students, which I love doing, and residents, which I

6  love doing.

7       And I lost my position in the university, which was

8  precious to me.  I lost my self-esteem, my position among my

9  colleagues.  I was not allowed to enter the university campus

10 anymore.

11 Q.  Well -- sorry.

12 A.  I did 36 years of service for that university.  I started

13 the Department of Neurology almost from solo.  I started the

14 faculty and built it into a first-class department of 45

15 faculty, world-class department.

16      I had given a great deal to that university, and I am

17 suddenly ending my career in disgrace.

18 Q.  What was the name of the neurology department of the

19 University of Michigan Health System prior to your resignation?

20 A.  Well, the Neurology inpatient service was called the Gilman

21 Service after me.  That was in response to my leadership.

22 Q.  Is it still called that?

23 A.  No.  The name was taken away.

24      There was an annual lectureship named for my wife and

25 me, called the Gilman and Barber Lecture.  It is now just

1  called an annual neurology lecture.

2  Q.  I show you what's been marked for identification as

3  Government Exhibit 703.

4           No.  Sorry.  700, perhaps.

5           MR. DEVLIN-BROWN:  One moment, your Honor.

6           THE COURT:  Yes.

7           MR. DEVLIN-BROWN:  730.

8  Q.  Do you recognize this document, Dr. Gilman?

9  A.  Yes, sir.

10 Q.  And generally, what is it?

11 A.  My curriculum vitae.

12 Q.  Do you recall Mr. Strassberg asking you questions about

13 various journals that you had served on?

14 A.  Yes.

15 Q.  Various societies that you had been invited to be a member

16 of?

17 A.  Yes.

18          MR. DEVLIN-BROWN:  The government offers Exhibit 703.

19          MR. STRASSBERG:  Objection, your Honor.

20          THE COURT:  Grounds?

21          MR. STRASSBERG:  Hearsay, among them.

22          THE COURT:  All right.  I will hear you at the bench.

23          MR. DEVLIN-BROWN:  We can withdraw it.  It is not

24 necessary.

25          You can take that off the screen, Ms. Hernandez.

E1odmar4                    Gilman - redirect

BY MR. DEVLIN-BROWN:

Q.  Do you recall Mr. Strassberg asking you about the
consulting income you were earning as recently as 2010?

A.  Yes.

Q.  Do you earn any consulting income from GLG now?

A.  No.

Q.  Are you working with any pharmaceutical companies on
ongoing clinical trials?

A.  No, sir.

Q.  Are you invited to scientific conferences anymore?

A.  No.

Q.  Do you recall Mr. Strassberg asking you questions about
whether you knew the maximum sentences for these sorts of
offenses could be high?

A.  I'm sorry.  Would you state that again?

Q.  Do you recall Mr. Strassberg asking you whether the maximum
sentences for certain offenses could be high?

A.  Yes.

Q.  Did you have any understandings, by the way, as to how a
judge decides on what sentence to impose?

A.  I do not.

Q.  Do you recall being asked if you were terrified at the
prospect of prison?

A.  He asked me.  And I have no terror of prison, none.

Q.  At the time in 2012, when you were told that you were

E1odmar4                    Gilman - redirect

1    exposed to significant criminal liability, why weren't you

2    concerned about prison?

3    A.   My main concern was my wife's outcome, sir, not my own.   My

4    main concern was my wife's outcome, not my own.

5    Q.   Did you have any other concerns at the time you were told

6    that you faced significant liability?

7    A.   Yes.

8    Q.   What?

9    A.   I was worried about my wife being left without me and

10   without money.

11   Q.   Dr. Gilman, do you recall some questions about a drug I'm

12   about to mispronounce called "presidone"?

13            THE COURT:   Prednisone.

14   A.   Prednisone, yes.

15   Q.   And do you recall questions about whether or not that made

16   you confused at the time you took the drug?

17   A.   Yes, sir, I remember those questions.

18   Q.   We've talked a lot about dose effect.   Is there a dose

19   effect in that medication?

20   A.   Yes, there is.

21   Q.   And how much of it were you taking?

22   A.   100 milligrams a day for three days.

23   Q.   And is that a big dose or a small dose?

24   A.   It's a large dose for three days.

25   Q.   Was it for only three days?

E1odmar4                    Gilman - redirect

1    A.  It was for only three days.

2    Q.  Dr. Gilman, sitting here today, are you at all confused

3    about whether you provided Mr. Martoma with information about

4    the ICAD presentation in advance?

5    A.  No, sir.  I'm not confused.

6    Q.  Did you decide to end your career for something you had

7    never done?

8    A.  No, I didn't say that I would end my career that way.  It

9    was an unfortunate result of internal conflicts within my

10   unconscious brain that did it.

11              MR. DEVLIN-BROWN:  One moment, your Honor.

12              (Pause)

13              No further questions.

14              THE COURT:  Any recross?

15              MR. STRASSBERG:  No, your Honor.  Thank you.

16              THE COURT:  You can step down, Dr. Gilman.

17              THE WITNESS:  Thank you, sir.

18              (Witness excused)

19              THE COURT:  The government will call its next witness.

20              MR. INGOGLIA:  Your Honor, at this time we would like

21   to read a stipulation between the parties.

22              THE COURT:  All right.  I've told you before, ladies

23   and gentlemen, about stipulations.  Stipulations are agreements

24   that the parties enter into generally about certain facts, and

25   so these are points that both sides have agreed that you

E1odmar4

| | |
|---|---|
| 1 | could -- you should accept for purposes of your deliberations |
| 2 | in the case. |
| 3 | Go ahead, Mr. Ingoglia. |
| 4 | MR. INGOGLIA:  Thank you, Judge. |
| 5 | "It is hereby stipulated and agreed by and among the |
| 6 | United States of America, by Preet Bharara, United States |
| 7 | Attorney for the Southern District of New York, Arlo |
| 8 | Devlin-Brown and Eugene Ingoglia, Assistant United States |
| 9 | Attorneys, of counsel, and Mathew Martoma, the defendant, with |
| 10 | the consent of his attorneys, Richard Strassberg and Roberto |
| 11 | Braceras, that: |
| 12 | "1.  Government Exhibit 1170 is a true and accurate |
| 13 | record of a July 2008 credit card statement maintained by FIA |
| 14 | Card Services for an account held in the name of Rosemary A. |
| 15 | Martoma (Mathew Martoma's wife). |
| 16 | "2.  Government Exhibit 1170-A is a true and accurate |
| 17 | record of a July 2008 credit card statement maintained by FIA |
| 18 | Card Services for an account held in the name of Rosemary A. |
| 19 | Martoma (Mathew Martoma's wife).  The account number on the |
| 20 | statement has been redacted to show only the last four digits. |
| 21 | "3.  The parties agree that this stipulation and |
| 22 | Government Exhibits 1170 and 1170-A may be admitted into |
| 23 | evidence. |
| 24 | "Dated New York, New York, January 21, 2014," and |
| 25 | signed by the parties. |

E1odmar4

1          Your Honor, the government offers the stipulation and

2      Government Exhibits 1170 and 1170-A.

3          THE COURT:  Any objection?

4          MR. BRACERAS:  No objection.

5          MR. INGOGLIA:  Your Honor, may we publish Government

6      Exhibit 1170-A?

7          THE COURT:  Yes.

8          So Government Exhibit 1170 and 1170-A are received,

9      and you may publish them.

10         (Government's Exhibits 1170 and 1170-A received in

11     evidence)

12         MR. INGOGLIA:  Ms. Hernandez, if you could highlight

13     toward the bottom, about five lines up, the reference to Delta.

14         One moment, your Honor.

15         (Pause)

16         Your Honor, with your permission, we will call our

17     next witness.

18         THE COURT:  Yes.

19         MR. INGOGLIA:  The government calls Mark Manhan.

20     MARK EDWARD MANHAN,

21        called as a witness by the government,

22        having been duly sworn, testified as follows:

23         THE CLERK:  Please state your full name and spell it

24     for the record.

25         THE WITNESS:  My full name is Mark Edward Manhan.  My

1   last name is spelled M-a-n-h-a-n.  M-a-r-k.

2            THE COURT:  You may proceed.

3            MR. INGOGLIA:  Thank you, Judge.

4   DIRECT EXAMINATION

5   BY MR. INGOGLIA:

6   Q.  Good afternoon, Mr. Manhan.

7   A.  Good afternoon.

8   Q.  How are you feeling?

9   A.  I'm feeling better.

10  Q.  If at any point you need a break or something, please let

11  me know.

12  A.  OK.

13  Q.  Where do you work?

14  A.  I work with Delta Airlines in Atlanta, Georgia.

15  Q.  How long have you worked with Delta Airlines?

16  A.  Since 1995, 18 years.

17  Q.  What is your position there currently?

18  A.  I'm the general manager of revenue accounting, which also

19  includes the custodian of records role.

20  Q.  In general, what are your responsibilities in that

21  position?

22  A.  The responsibilities are to maintain the integrity of our

23  financial statements and our statistical reports.

24  Q.  Prior to your testimony today, have you reviewed certain

25  Delta records?

E1odmar4                    Manhan - direct

1    A.  Yes.

2                MR. INGOGLIA:  Your Honor, may I approach?

3                THE COURT:  You may.

4    BY THE COURT:

5    Q.  Mr. Manhan, I have handed you envelopes with what have been

6    marked for identification as Government Exhibits 1307 and 1308.

7    A.  Yes.

8    Q.  And we're also going to show 1307 first on your screen.

9    And you can look at either one of those, whichever is easier.

10               So I want to first direct your attention to What's

11   been marked for identification as Government Exhibit 1307.

12   A.  Yes.

13   Q.  Do you recognize that?

14   A.  I do recognize that.

15   Q.  Without reading it to me, can you describe what kind of

16   document it is?

17   A.  This is information from what we call our revenue pipeline

18   system, and it keeps a facsimile image of tickets.  And each

19   ticket has a coupon that allows you to travel.  You may recall,

20   in the old days we used to have paper but now it is all

21   electronic.  So on this particular --

22   Q.  Before you talk about it, two things.  First, if you could

23   speak a little closer to the mic, I think we'll hear you

24   better.

25   A.  OK.

E1odmar4                    Manhan - direct

1    Q.  Let me ask you, is that a Delta record?

2    A.  Yes, it is a Delta record.

3    Q.  And is that kind of information kept by Delta as part of

4    its business?

5    A.  Yes, it's kept in the regular part of our business.

6    Q.  Is the exhibit we're looking at something that was

7    maintained in Delta's records?

8    A.  Yes.

9              MR. INGOGLIA:  The government offers Government

10   Exhibit 1307.

11             MR. BRACERAS:  No objection.

12             THE COURT:  Government Exhibit 1307 is received.

13             (Government's Exhibit 1307 received in evidence)

14   BY MR. INGOGLIA:

15   Q.  Mr. Manhan, before I ask you about Government Exhibit 1307,

16   could I just direct your attention first to 1308?

17   A.  Yes.

18   Q.  Do you recognize what's been marked for identification as

19   Government Exhibit 1308?

20   A.  Yes, I do.

21   Q.  And without reading it to me, can you just tell me

22   generally what that is?

23   A.  Yes.  This is some more information concerning that

24   particular ticket -- the ticket number is in the upper

25   left-hand corner -- and the form of payment and status of the

E1odmar4                    Manhan - direct

1    ticket.

2    Q.  And is this information from Delta's files?

3    A.  Yes, it is.

4    Q.  Is this kind of information kept by Delta as part of its

5    business?

6    A.  Yes.

7    Q.  And was this particular information maintained in Delta's

8    records?

9    A.  Yes.

10            MR. INGOGLIA:  The government offers Government

11   Exhibit 1308.

12            MR. BRACERAS:  No objection.

13            THE COURT:  Government Exhibit 1308 is received.

14            (Government's Exhibit 1308 received in evidence)

15   BY MR. INGOGLIA:

16   Q.  All right.  Mr. Manhan, I'm going to direct your attention

17   to 1307 first.

18            MR. INGOGLIA:  And, your Honor, may we publish

19   Government Exhibit 1307?

20            THE COURT:  Yes, you may.

21            MR. INGOGLIA:  Ms. Hernandez, if you could make it as

22   big as we can?  There we go.  Why don't we stop at the top

23   third -- start at the top third.

24   Q.  Mr. Manhan, what are we looking at here?  What is this top

25   third?

E1odmar4                    Manhan - direct

1    A.   This is a facsimile-created image of a passenger ticket out

2    of our electronic ticket system.

3    Q.   At the top middle it says the words "Audit Coupon."

4    A.   Yes.

5    Q.   What is an audit coupon?

6    A.   This is what the local station or the selling agent will

7    keep, and it's proof that they sold the ticket.

8    Q.   And it says on the left-hand side it's issued by Delta

9    Airlines?

10   A.   Yes.

11   Q.   Is that right?

12   A.   Yes.

13   Q.   And in the middle, to the right of Delta Airlines, it says

14   "Date of Issue."

15   A.   17 July.

16   Q.   Yes.  17 July 08?

17   A.   08, yes.

18   Q.   That the 17th of July 2008?

19   A.   Correct, yes.

20   Q.   What does "Date of Issue" mean?

21   A.   That is when the ticket has been driven, a reservation has

22   been made and a form of payment has been presented and a ticket

23   has been issued for travel.

24   Q.   It is not necessarily the date of travel itself?

25   A.   Correct.

E1odmar4                    Manhan - direct

1    Q.  And then below that to the right, there is something that

2    says "Place of Issue."

3    A.  Yes.

4    Q.  And underneath that it says, "WWWRES."  What does that

5    mean?

6    A.  That would be the Delta reservation system.

7    Q.  Is that an online system?

8    A.  Yes.  It's the dot-com, Internet.

9    Q.  And going back to the left, underneath where it says "Delta

10   Airlines," do you see where it says "Name of Passenger?"

11   A.  Yes.

12   Q.  And after that, in parentheses, it says "Not Transferable."

13   What does that mean?

14   A.  That means the ticket needs to be used by the passenger in

15   whose name the ticket is made out to.  They can't give to

16   someone else to fly.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

E1oQmar5                    Manhan - direct

1    Q.  Is the name listed beneath the words name of passenger?

2    A.  Yes.

3    Q.  It does say Martoma, Mathew C.

4    A.  Mathew C. Martoma, yes.

5    Q.  If we could look at -- Ms. Hernandez, just pull up the

6    middle -- Mr. Manhan, do you see this one we're look at now

7    which is in the middle of the page?

8    A.  Correct.  Yes, I see it.

9    Q.  How is this different than what we were just looking at?

10   A.  This is the actual flight coupon.  You see that in there

11   it's flight coupon one of two.  This particular ticket has been

12   issued for a trip between JFK and Detroit and from Detroit back

13   to JFK.

14   Q.  Where on this document do you see the information about the

15   travel?

16   A.  On the right-hand side, you'll see the Delta flight 6213

17   for travel on 19 July 2008 from JFK, New York to Detroit.

18   Q.  The DTW, that's a reference to Detroit?

19   A.  Yes, it is Detroit's airport code.

20   Q.  You see underneath the section you just pointed out, there

21   is reference to another flight number?

22   A.  Yes, flight 5366.

23   Q.  It has the same date; is that right?

24   A.  Correct, yes, it does.

25   Q.  Where is that from and to?

E1oQmar5                    Manhan - direct

1    A.  That's from Detroit back to JFK, New York.

2    Q.  Is that the return leg of the ticket?

3    A.  It is the return leg.

4    Q.  And it's for the same date?

5    A.  Yes.

6    Q.  Directing your attention to the middle of the page, is

7    there a departure time listed there?

8    A.  Yes.  On the middle of the page, you'll see it starts on

9    the left side Delta flight 6213, 19 July 2008, departure time

10   8:40 a.m.

11   Q.  So is that the scheduled departure time on July 19, 2008 of

12   this flight?

13   A.  Yes, that's the scheduled departure time.

14   Q.  And, again, going to the left of that, we see the name of

15   passenger listing we saw on the audit coupon, and it's the

16   same, right?

17   A.  That is right.

18   Q.  Then if we look at the last third of the page, please,

19   Ms. Hernandez.  Thanks.  So, this says flight coupon two of two

20   at the top; is that right?

21   A.  That's right.

22   Q.  What are we looking at here?

23   A.  This is the flight coupon for the return leg to come back

24   from Detroit to JFK.

25   Q.  Underneath the passenger's name is the description of the

E1oQmar5                    Manhan - direct

1    return leg; is that right.

2    A.  Yes, from Detroit to JFK, New York.

3    Q.  So, to the right of the word Detroit, is that where it has

4    the return flight number?

5    A.  Yes, flight 5366 departing at 4:00 p.m.

6    Q.  Its scheduled departure time from Detroit to New York was

7    4:00 p.m.?

8    A.  Yes, sir.

9    Q.  That same day, July 19, 2008?

10   A.  Yes.

11   Q.  From anything on this page, and maybe we should -- if it's

12   easier for you to look at the hard copy, you can do that -- is

13   there anything that tells us whether this flight happened?

14   A.  On these particular pages, you don't have the information

15   that tells you the actual usage, but we do have -- I think you

16   have other pages behind --

17   Q.  Yes, if you could move to perhaps maybe the second page?

18   A.  Yes.

19   Q.  And, Ms. Hernandez, if you could take us to the second

20   page.  Why don't we blow up this as much as we can.

21   Mr. Manhan, I'll be directed by your familiarity with the

22   document.  If we go to the itinerary information.

23   A.  Yes, in the first part of that middle section you just

24   highlighted, you'll see itinerary information coupon state, and

25   it has the letter S.  That's the sold state.  It tells us the

1    coupon or individual parts of the ticket have been sold.

2              Then if you go one section below, itinerary

3    information coupon state with the U; that's the usage.

4              In the airline world, if you go underneath that block

5    that says usage, you have the letter L, and that means lifted

6    for us in the airline business.  It means we've taken the

7    coupon up, the passenger has boarded the plain, and we'll be

8    able to recognize the revenue and the statistical counts.

9    Q.  I want to walk through that more slowly.  I think you

10   explained it perfectly well, but I may not have kept up with

11   you.

12   A.  OK.

13   Q.  I'm looking at that column that says USG toward the bottom?

14   A.  Yes.

15   Q.  Is that what you meant when you said the usage column?

16   A.  Usage column, that's what I meant.

17   Q.  There are L's next to the two rows before that?

18   A.  And the L stands for lifted.

19   Q.  Lifted means what?

20   A.  It goes back in history of the airline world when you used

21   to have the paper, the agent would take the coupon from you

22   right at the gate.  Lifted means the coupon has been presented,

23   the passenger has gotten on the plane, and it's been used.

24   Q.  So, that first L, is that connected to a particular flight?

25   A.  Yes, it is connected to the flight with the origin station

E1oQmar5                    Manhan - direct

1    JFK to Detroit, and you can see about two blocks over flight

2    6213.

3    Q.  Got it.  That's the one -- is that the flight departure

4    date right to the right of that that's associated with that?

5    A.  Yes.

6    Q.  So the L means that the passenger presented the ticket --

7    the equivalent of presented the ticket and got on board?

8    A.  Correct, yes.

9    Q.  Then with respect to the row below that, is that the return

10   leg?

11   A.  It is the return leg.

12   Q.  Does the L indicate that the passenger boarded that flight

13   as well?

14   A.  Yes.

15   Q.  If we can go to the top of this page, Ms. Hernandez.  If we

16   could blow up that top.  The issue date on this line, is that

17   an indication, again, of when the ticket was purchased?

18   A.  Yes.

19   Q.  I want to ask you about this.  On the upper right-hand

20   column, there is a date, do you see that, Friday, 03

21   January 2014 up at the right?

22   A.  Yes.

23   Q.  What is the date that an indication of?

24   A.  That is the date we pulled the information and printed off

25   the document upon receiving the subpoena.

E1oQmar5                    Manhan - direct

1    Q.  Is that the date you printed this record essentially?

2    A.  Yes.

3    Q.  It doesn't have to do with the flight itself; it just has

4    to do with when you guys pulled the record?

5    A.  Correct, it's associated with the record itself; not the

6    flight.

7    Q.  I want to direct your attention to the third page of this

8    document.  Actually, what I want to do is direct your attention

9    to 1308.  Could we switch documents and go to 1308?  Tell me

10   when you have that in front of you.

11   A.  I have it in front of me.

12   Q.  So, looking at the very top center, I see the word payment

13   there.  Is that an indication of the subject matter of the

14   materials on this document?

15   A.  Yes, it is.

16   Q.  As a general matter, does this relate to the tickets we

17   were just looking at?

18   A.  Yes, it does.  The ticket number is in the left-hand

19   corner.

20   Q.  In the middle there is a section called payment

21   information.  Do you see that?

22   A.  Yes, I do.

23   Q.  All the way across to the right at the far right there is a

24   column that says D/CC, then what looks like an abbreviation for

25   account number?

E1oQmar5                    Manhan - direct

1   A.  Yes.

2   Q.  What's under that header?

3   A.  That is the credit card number that has been tokenized for

4   privacy issues, but that's the form of payment.

5   Q.  That's what I was going to ask you.  It seems like a

6   combination of numbers and letters are listed there?

7   A.  Yes.

8   Q.  So that's not the actual credit card number that was

9   billed; is that right?

10  A.  That is right.

11  Q.  Is there some sort of link between this combination of

12  numbers and letters and the actual credit card number that was

13  used?

14  A.  Yes, there is a link.

15  Q.  If we turn to the next page.  Hold on.  Before you publish

16  it, Ms. Hernandez, let me see what Mr. Braceras is gesturing.

17          MR. INGOGLIA:  Your Honor, we are redacting the

18  portion of a credit card number.

19          THE COURT:  All right.

20  Q.  Mr. Manhan, looking at this, and we are going to blow it up

21  to make it bigger, on the left is that is that code number you

22  talked about?

23  A.  Yes, the left is the tokenized credit card number.

24  Q.  The tokenized credit card number, that's the word you used.

25  That's the combination of numbers and letters that you guys use

E1oQmar5                    Manhan - direct

1    to disguise the credit card number?

2    A.   Yes.

3    Q.   To the right on the document you're looking at, I don't

4    want you to read the number, but is it a full credit card

5    number under results?

6    A.   Yes, there is underneath results the actual credit card

7    number.

8    Q.   Does it end in those four numbers there 7595?

9    A.   Yes.

10   Q.   And that's an indication of the credit card number that was

11   used to purchase this ticket.  Is that right?

12   A.   That's right.

13            MR. INGOGLIA:  Your Honor, may I take one second?

14            THE COURT:  Yes.

15            (Pause)

16   Q.   Mr. Manhan, in connection with your review of this

17   document, did you take any steps to determine whether these

18   flights -- let me start with one of them -- whether the flight

19   from JFK to Detroit arrived at or about the time it was

20   scheduled to arrive at?

21   A.   Yes, I was asked to research that, and we did determine

22   that the flight did actually operate and did arrive around the

23   time it was scheduled to arrive.

24   Q.   How about the flight back?

25   A.   Same thing.  We researched that with our partner carrier

E1oQmar5                    Manhan - direct

1    and found that the flight did operate and arrived close to the

2    time it was scheduled.

3    Q.  Mr. Manhan, I wanted to clarify something about the last,

4    the return leg.  I asked you did it arrive on or about the

5    time, but do you recall whether or not the departing flight

6    left on time?

7    A.  It did leave a little late.

8              MR. INGOGLIA:  I have no further questions for the

9    witness.

10             THE COURT:  Any cross-examination?

11             MR. BRACERAS:  Have a safe flight home.

12             THE COURT:  You may step down, Mr. Manhan.

13                           (Witness excused)

14             THE COURT:  Ladies and gentlemen, we are going to take

15   our mid-afternoon break.  So don't discuss the case.  Keep an

16   open mind.  There is more evidence.  We will be back to you

17   very shortly.

18             (Jury recessed)

19          (Continued on next page)

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  Please be seated.

3    I wanted to get a sense from the government how much

4    longer their case is going to continue, how many more witnesses

5    we can expect.

6    MR. DEVLIN-BROWN:  Your Honor, I don't expect it's

7    going to continue too much longer.  We have two further short

8    witnesses today.  I understand that defense counsel has an

9    issue with one of them so we can talk about that.  It's Ranjit

10   Singh, and it's a representative of AT&T, to address the cells

11   and our issues.

12   We then expect to call two other witnesses, the direct

13   of which will be an hour and a half to two hours, a trading

14   summary witness.  Essentially, we should be in a position to

15   rest by Tuesday.

16   THE COURT:  All right.  Is there something the defense

17   wants to raise about one or more of the witnesses we were

18   supposed to hear from this afternoon?

19   MR. STRASSBERG:  Yes, your Honor.

20   So, with respect to Mr. Singh, the nature of the

21   objection is that as we understand it from the materials we

22   have been provided, in essence, the 3500, Mr. Singh has no

23   personal knowledge of the issues he is going to be asked to

24   talk about, as we understand, and as there has already been

25   proof he is the owner of a particular phone that called to

1    Dr. Gilman's office on July 19 of 2008.  But as we understand

2    it, he has no knowledge of that phone call or any knowledge of

3    a meeting.  He was apparently a taxi driver at the time in

4    Michigan, but he has no knowledge, for example, of picking up

5    Mr. Martoma, at least as far as we could tell from the 3500

6    material, or anyone else on that particular day.  So that is

7    the essence of the objection to the testimony, your Honor.

8              MR. DEVLIN-BROWN:  Your Honor, his testimony will be

9    very limited and limited to matters of which he does have

10   personal knowledge.  We will inquire as to his phone number.

11   We will inquire as to whether or not he knows a Dr. Sidney

12   Gilman and the numbers he called for him that day.  I

13   anticipate the answer is no.  We will elicit that at the time

14   he was employed as an airport taxicab driver; that it was not

15   uncommon to take passengers to Ann Arbor and sometimes wait and

16   go back.  That is pretty much it.  But it is an important

17   point, obviously.  Because, you know, there has still been --

18   certainly Dr. Gilman's memory of the meeting has been

19   challenged, and this is corroborative evidence.

20             It's also evidence, frankly, combined with the flight

21   records that to the extent there was supposedly another reason

22   for the trip, there wasn't much time other than to do anything

23   but go back and forth from Dr. Gilman's office.

24             And, finally, your Honor, there is significance simply

25   in that Mr. Martoma did not call Dr. Gilman that day.  And the

1   only call is from a cab driver.

2           THE COURT:  I assume Mr. Singh's 3500 material is in

3   the binder?

4           MR. DEVLIN-BROWN:  Yes.  It is -- what's the number.

5           MR. STRASSBERG:  Your Honor, it's 3516, one-six.

6           MR. DEVLIN-BROWN:  We can hand it up if it's

7   convenient.

8           THE COURT:  Yes, that would be helpful.

9           MR. DEVLIN-BROWN:  There is a little note on the

10  bottom with numbers, but --

11          THE COURT:  Mr. Strassberg, is there anything else you

12  want to say before I take a break and read the 3500 material?

13          MR. STRASSBERG:  Not really, your Honor.  It is

14  simply -- we are not -- Mr. Devlin-Brown talks about why he

15  would like it as something that could help his case.  I'm not

16  going to take issue with that.  I am just going to say that the

17  witness will say "I have no idea who was in my cab, I have no

18  knowledge."  And so I just think the foundation is not there to

19  make the links they want to make with this witness giving that

20  testimony.

21          THE COURT:  What about the telephone number?  He knows

22  his telephone number.

23          MR. STRASSBERG:  I think that's already in evidence,

24  and certainly he can testify about his telephone number, and

25  I'm not suggesting he could not do that.  It's the other parts

1    that I think --

2              THE COURT:  Well, the notes I took, he is going to say

3    he's a taxi driver, he's going to be asked about his telephone

4    number, he's going to be asked if he knows Gilman.  He is going

5    to describe what he does being a taxicab driver.  What else is

6    he going to say?

7              MR. DEVLIN-BROWN:  Nothing.  I mean, not really

8    anything.  We haven't ever asked him to identify Mr. Martoma

9    from any lineup, and we won't plan on doing that.

10             THE COURT:  I don't really understand what the issue

11   is.  It doesn't seem like the evidence that is going to be

12   elicited is even in dispute, really, unless I'm missing

13   something.  He's not going to identify Mr. Martoma.  He's not

14   going to say on a particular date he brought Mr. Martoma to the

15   Ingalls building.  So as it's described, I don't see any

16   reasons for concerns.

17             MR. STRASSBERG:  We understand, your Honor.  Thank

18   you.

19             THE COURT:  We'll take a brief recess.

20             MR. DEVLIN-BROWN:  Your Honor, sorry, just before we

21   leave, timing-wise, we have two witnesses that should get us

22   close to the end of the day.  The next two witnesses, one had a

23   religious issue with Friday afternoons; the other had a young

24   child so.  I hope we won't be forced to rest at 4:45.

25             THE COURT:  If we have to break early, that will be

1   OK.

2           (Recess)

3       (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Jury present)

2   THE COURT:  Government will call its next witness.

3   MR. DEVLIN-BROWN:  The government calls Ranjit Singh.

4   RANJIT SINGH,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7   DIRECT EXAMINATION

8   BY MR. DEVLIN-BROWN:

9   Q.  Good afternoon, Mr. Singh.

10  A.  Good afternoon, sir.

11  Q.  Whereabouts do you live?  What part of the country do you

12  live in?

13  A.  Michigan.

14  Q.  What is your cell phone number?

15  A.  My cell phone number is 586-489-1223.

16  Q.  How long have you had that cell phone number, Mr. Singh?

17  A.  Almost nine years.

18  Q.  I'm going to show you, with the Court's permission, may we

19  publish something, 1120?

20  THE COURT:  That's in evidence?

21  MR. DEVLIN-BROWN:  In evidence.

22  THE COURT:  Yes.

23  MR. DEVLIN-BROWN:  Actually, just one moment your

24  Honor.  That's correct.  1120 in evidence.

25  Q.  Mr. Singh, on the screen in front of you, it says billing

E1oQmar5                    Singh - direct

1    account name Ranjit Singh, and is that an address that you've

2    lived at before?

3    A.  This is my current address right now.

4    Q.  Could you read the number that is under mobile number?

5    A.  Yes, sir.  This is my cell phone number 586-489-1223.

6    Q.  It says date account established 07/12/2007.  Is that about

7    when you remember starting cell phone service with this carrier

8    anyway?

9    A.  Yes, sir, I do believe, yes.

10   Q.  We can take that off the screen.  Thank you, Ms. Hernandez.

11           I'm sorry.  I need to go to another page on it.  If we

12   could put it back on the screen.  Go to page 16, please.  If we

13   could zoom in just on the July 19, 2008 dates.  Why don't we

14   zoom in on -- that's fine.  So could you just do the 19th?

15   There is some 18th at the top.  Trying to make it a little

16   bigger.

17           So, Mr. Singh, I want to direct your attention to --

18   it's about the fifth line from the top, and reading across, it

19   says 7/19/08/ Ann Arbor, MI 12:12, and it gives a phone number

20   734-615-1755.  Does that phone number mean anything to you,

21   Mr. Singh?  You have to answer verbally.

22   A.  Oh.  No, sir.

23   Q.  And the line right below it, reads 7/19/08, Ann Arbor, MI,

24   12:14 p.m.  754-657-3297.  What about that number, does the

25   number ending 3297 mean anything to you?

E1oQmar5                    Singh - direct

1    A.  No, sir.

2    Q.  We can take that down.

3            MR. DEVLIN-BROWN:  Could we publish one other

4    document, your Honor?

5            THE COURT:  Yes.

6            MR. DEVLIN-BROWN:  Exhibit 1201 in evidence.

7            THE COURT:  All right.

8            MR. DEVLIN-BROWN:  Do we have a version that is

9    unredacted -- doesn't matter.

10   Q.  Do you know a Sidney Gilman, Mr. Singh?  Does that name

11   mean anything to you?

12   A.  No, sir.

13   Q.  We can take that off the screen.

14           Mr. Singh, in July of 2008, what were you doing for a

15   living?

16   A.  I used to drive a cab.

17   Q.  Were you doing that in July of 2008 as well?

18   A.  Yes.

19   Q.  What was the name of the company you drove a cab for?

20   A.  It's Detroit Metro Airport Taxi.

21   Q.  Where did you work out of?

22   A.  In the airport, sir.

23   Q.  Do you ever get fares to Ann Arbor Michigan?

24   A.  Yes, sir.

25   Q.  How common is that?

E1oQmar5                    Singh – direct

1    A.  Two, three fares every day.

2    Q.  How far away is Ann Arbor, Michigan by taxi from the

3    airport?

4    A.  Approximately 35 miles.

5    Q.  How long does that take or does it vary?

6    A.  Within 25 minutes to 30, depend where the customers want to

7    go.

8    Q.  Would you ever as a taxi driver in July of 2008 drive to

9    Ann Arbor, Michigan, wait for a customer, and then drive them

10   somewhere else?

11   A.  Yes, we do that.

12   Q.  Did you when you drove a taxi, did you keep your cell phone

13   with you?

14   A.  Yes, sir.

15   Q.  Did you ever make calls on behalf of passengers?

16   A.  Yes, sir.

17   Q.  Would you ever loan your cell phone out for a passenger to

18   make a call?

19   A.  Yes, sir, like courtesy calls, yes, we offered cell phone

20   to.

21              MR. DEVLIN-BROWN:  No further questions.

22              THE COURT:  Any cross-examination?

23   CROSS-EXAMINATION

24   BY MR. STRASSBERG:

25   Q.  Good afternoon, Mr. Singh.

E1oQmar5                    Singh - cross

1   A.  Good afternoon, sir.

2   Q.  My name is Rich Strassberg.  I'm just going to ask you a

3   few questions.

4           Is it fair to say that you don't have any particular

5   memory of what you were doing on July 19 of 2008, some -- how

6   many years ago is that -- seven and a half years ago?

7   A.  Yes, I used to drive a cab.

8   Q.  Right, but in terms of besides driving a cab in general,

9   fair to say you don't remember what you were doing on that day

10  seven and a half years ago, right?  The particular details of

11  what you were doing?

12  A.  Yeah, that time I was driving a cab.

13  Q.  Let me ask it a different way, Mr. Singh.  Is it fair -- I

14  understand you said you were driving a cab at that time, but am

15  I right that you can't remember what happened on July 19 of

16  2008 other than the fact that you were driving a cab at the

17  time?

18  A.  Yeah, I saw normal routine, like we work.

19  Q.  So, am I right, Mr. Singh, that there were times when you

20  would take a passenger to multiple stops that you might pick up

21  at the airport.  Is that fair to say?

22  A.  Yes, sir.

23  Q.  And sometimes you would take a passenger to one stop and

24  you might wait for them to be finished with whatever they were

25  doing at that stop, right?

E1oQmar5                    Singh - cross

1    A.  Yes.

2    Q.  That might take a short time or it might take a long time,

3    right?

4    A.  No, we -- like if it's a long time, like two, three hours

5    tops, so we just give them a contact number that they can call.

6    If it's like ten to 15 minutes because it's a half hour ride

7    from Ann Arbor to airport.  We have to come back to airport to

8    get another fare, so...

9    Q.  So, sometimes you might have multiple stops where you'll

10   take a person to one stop and wait, if it's not too long, and

11   then take him to another stop and then wait, and continue back

12   perhaps to the airport, right?

13   A.  Yes.

14   Q.  Am I right, Mr. Singh, that if a passenger asked to use

15   your cell phone to make a call, your practice would be to dial

16   the number that they would give you but then give them the

17   phone to make the call?

18   A.  While driving, you cannot type the phone, sir, so we just

19   hand over the phone.

20   Q.  I see.  So your practice was to just give the passenger the

21   phone, and then they would make the call?

22   A.  Yes, sir.

23            MR. STRASSBERG:  Thank you, Mr. Singh.

24            Thank you, your Honor.  No further questions.

25            THE COURT:  Anything else?

1       MR. DEVLIN-BROWN:  No, your Honor.

2       THE COURT:  Mr. Singh, you can step down.

3       THE WITNESS:  Thank you, sir.

4       (Witness excused)

5       THE COURT:  Will the government call its next witness.

6       MR. INGOGLIA:  The government calls Phil Fanara.

7  PHILIP FANARA,

8       called as a witness by the Government,

9       having been duly sworn, testified as follows:

10      THE COURT:  You may proceed.

11      MR. INGOGLIA:  Thank you, Judge.

12 DIRECT EXAMINATION

13 BY MR. INGOGLIA:

14 Q.  Good afternoon, Mr. Fanara.

15 A.  Good afternoon.

16 Q.  Where do you work?

17 A.  I am a contractor for AT&T.

18 Q.  What are your responsibilities in that role?

19 A.  Previously I used to work for AT&T for about 16 years, and

20 I help with records and provide testimony for them.

21 Q.  Prior to your testimony today, did you review certain AT&T

22 records?

23 A.  Yes.

24      MR. INGOGLIA:  Your Honor, with your permission, I'd

25 like to publish Government Exhibit 1001-A which is in evidence.

E1oQmar5                    Fanara - direct

1    THE COURT:  You may.

2    Q.  Mr. Fanara, it is going to appear on your screen.  If you

3    need a hard copy, let me know, and we'll give you one of those

4    too.  Mr. Fanara, if you could take a minute and look at this

5    and see if this is one of the records you reviewed prior to

6    your testimony?

7    A.  Yes, it is.  It's one of the beginning pages of it.

8    Q.  Just focusing on page 1 for the moment, is this an AT&T

9    record?

10   A.  Yes, it is.

11   Q.  At the top, it says mobility usage.  Does that tell you

12   anything about what kind of phone this is a record for?

13   A.  Yes, it's a wireless phone record for mobility usage.

14   Q.  At the left-hand side toward the top, but not all the way

15   at the top, is there a phone number associated with this

16   record?

17   A.  Yes.

18   Q.  Could you just read that for us?

19   A.  It's for area code 203-979-7824.

20   Q.  Am I right that your entire knowledge about this phone

21   number consists of what you're seeing on the page?

22   A.  Yes.

23   Q.  You don't have any personal experience with whoever owns

24   that phone?

25   A.  No.

1  Q.  On the right-hand side of this page, do you see where it

2  says cell location?

3  A.  Yes.

4  Q.  What does that column mean generally?

5  A.  Generally, it shows the cell location where the phone was

6  networked through.

7  Q.  Can you explain for the jury, what's a cell tower?

8  A.  A cell tower is used so that when you use a wireless device

9  cell phone, it can take that phone, make that phone call go

10 through that tower and then back to another phone, very simply.

11 Q.  When we look at the cell location column on this document,

12 is that a reference to a location of a cell tower or of a

13 particular cell phone?

14 A.  The cell location column shows the cell tower ID, the

15 longitude and latitude where that cell tower is.

16 Q.  Got it.  When you say latitude and longitude, are you using

17 those terms the way you would on a map?

18 A.  Yes.

19 Q.  Is there, in fact, a way using those latitude and longitude

20 numbers that are in this record to map out the approximate

21 location at least of where that cell tower is?

22 A.  Yes.

23 Q.  Just using this page as an example, if you look at, for

24 example, it looks like line 7 is the first one that has any

25 information for a cell location; is that right?

1  A.  Yes, it's the first one that captured the cell information,

2  cellular ID and the longitude and latitude.

3  Q.  What's the relationship between the cell location for this

4  particular call and the fact that it's listed on a line

5  associated with a particular phone call?

6  A.  Could you repeat the question?

7  Q.  Yes.  I didn't ask it well.  Does the fact that there is a

8  cell location associated with a particular phone call indicate

9  anything about that particular phone call?

10  A.  The only thing it indicates is that the phone when it was

11  called out went through that cell tower to try and reach

12  another phone.

13  Q.  That that call hit off that tower?

14  A.  Yes.

15  Q.  What factors determine what particular cell tower is hit by

16  a particular cell phone call?

17  A.  Generally speaking, it's a geography.  If a phone is in a

18  particular area and there's several cell towers in the area,

19  the phone would probably go through one of those towers,

20  generally speaking.

21  Q.  In part, is it the proximity between where the cell phone

22  is and where the cell tower is?

23  A.  Generally speaking, yes.  Sometimes the topography, a

24  mountain might get in the way even though a cell tower is

25  closer but the mountain is blocking it, let's say another cell

1    tower a couple miles away will pick it up.

2    Q.  Is cell phone traffic also a factor?

3    A.  Yes, it is.  If there is too many phones in one area,

4    usually the next tower will pick something up.

5    Q.  Is it possible that during the course of one phone call,

6    the signal could hit more than one cell tower?

7    A.  Yes.

8    Q.  Would the user notice that?

9    A.  No.  It's seamlessly.

10   Q.  Is it possible that for two consecutive phone calls made

11   from approximately the same location, that one call could hit

12   one tower and the second call could hit another tower?

13   A.  Absolutely, yes.

14   Q.  I'd like to direct your attention to this exhibit but to

15   page 7.  And in particular, Ms. Hernandez, if you could

16   highlight the top six entries or so at the page at the top of

17   the page.  Is this a page that you looked at prior to your

18   testimony?

19   A.  Yes.

20   Q.  So I want to direct your attention to -- there is an entry

21   with a time of 4:31.  Then below it an entry with a time of

22   4:36 p.m.  Do you see that?

23   A.  Yes.

24   Q.  Are these lines in particular something you looked at prior

25   to your testimony?

1    A.  Yes.

2    Q.  For these two calls -- these two calls are about five

3    minutes apart, is that right, according to this record?

4    A.  Yes.

5    Q.  For these two calls, are they hitting off the same tower or

6    different cell towers?

7    A.  They're two different cell towers.

8    Q.  Have you had an opportunity using the latitude and

9    longitude that is in a cell location as reflected on the record

10   to see where on a map these two particular cell towers are?

11   A.  Yes, I did earlier today.

12   Q.  Do you remember where they were approximately?

13   A.  One was located in Greenwich, Connecticut and the other one

14   was off of the Oyster Bay tower in Long Island.

15   Q.  From that information -- well, did you look at it on a map,

16   is there a body of water between those two towers?

17   A.  Yes, the Long Island Sound and North Sound of Long Island.

18   Q.  So, there's a tower on the Connecticut side and another

19   tower on the Long Island side?

20   A.  Yes.

21   Q.  And in between is the Long Island Sound?

22   A.  Yes.

23   Q.  Do you know if it's possible to swim the Long Island Sound

24   in five minutes?

25   A.  I'm sure there's somebody out there that could do it, but I

1    don't know.

2    Q.  You don't know -- is it possible that these two calls were

3    made from the same location?

4    A.  Yes, it's possible.

5    Q.  Can a signal bounce across the sound like that to a

6    different tower?

7    A.  Yes, sure.

8    Q.  You don't know sitting here today whether if that was the

9    case, the user was on the Long Island side or the Connecticut

10   side; is that right?

11   A.  That's correct.

12   Q.  I want to direct your attention to a different Government

13   Exhibit, Government Exhibit 1002-A.

14          MR. INGOGLIA:  Your Honor, this one is in evidence.

15   May we have your permission to publish it?

16          THE COURT:  Yes.

17   Q.  Just taking a second to look at the first page of this.

18   This is a different cell phone number; is that right?

19   A.  It's mobility usage for 650-25 --

20          MR. BRACERAS:  Your Honor can we have this redacted,

21   please.

22          MR. INGOGLIA:  That's fine.

23          THE COURT:  Do you want to consult with counsel?

24          MR. INGOGLIA:  Yes.

25                              (Pause)

E1oQmar5                          Fanara - direct

1    MR. INGOGLIA:  We are not going to show you the cell

2    phone number, all right, but I am going to ask you questions

3    about the record so when it shows up on your screen next, that

4    phone number column will be blocked out.

5    A.  OK.

6    Q.  It is going to take us a second to do that.

7         So, aside from the redaction, is this a record you've

8    seen before prior to your testimony?

9    A.  It looks just like the one I was looking at, yes.

10   Q.  In particular, I want to direct your attention to line 6 of

11   the page we're looking at, which do you see it has a time of

12   2:59 p.m.?

13   A.  That's -- yes, mmm-hmm.

14   Q.  Do you remember focusing on this particular line prior to

15   your testimony?

16   A.  Yes, earlier today.

17   Q.  Do you see that to the right there is a latitude and

18   longitude of a cell location?

19   A.  Yes.

20   Q.  For that cell location, did you have an opportunity to see

21   on a map the location of the cell tower based on that latitude

22   and longitude in Government Exhibit 1102-A?

23   A.  Yes.

24   Q.  Do you recall approximately where that cell tower was?

25   A.  Yes, it was in the Detroit, Michigan area.

E1oQmar5                    Fanara - direct

1   Q.  In particular, do you remember whether it was near any

2   facility of any kind?

3   A.  It was closer to the airport.

4          MR. INGOGLIA:  One second, your Honor.

5          THE COURT:  Yes.

6          MR. INGOGLIA:  Your Honor, we have no further

7   questions for the witness.

8          THE COURT:  All right.  Thank you.

9          Cross-examination.

10         MR. BRACERAS:  Yes, just a couple questions.

11  CROSS-EXAMINATION

12  BY MR. BRACERAS:

13  Q.  Good afternoon, Mr. Fanara.

14  A.  Good afternoon.

15  Q.  Is it true that the signal strength for some cell towers

16  can be as much as 30 miles depending on terrain and strength of

17  the tower?

18  A.  I don't know about 30 miles, but it could be very strong.

19  Definitely more than five miles, ten miles, that sort of thing.

20  Q.  So, I will just ask you.  You're the expert.  I've read

21  that it could be as much as 30 miles.  What is the maximum

22  length?

23  A.  I don't know the maximum length of a cell tower, how far

24  they can go.

25  Q.  OK.  I think you also said that when you have a cell tower,

E1oQmar5                    Fanara - cross

1   you don't always connect to the closest tower; isn't that

2   right?

3   A.  That's correct.

4   Q.  Because you could have a building or even a mountain that

5   could block one cell tower so you might actually connect with a

6   cell tower that's further away?

7   A.  Yes.

8   Q.  And it could be as far as the signal strength could be

9   which could be a number of miles?

10  A.  That's correct.

11  Q.  Just as a cell tower, as you're saying, this is not like a

12  GPS signal, so you're obviously just locating the tower; you're

13  not locating the user of the phone, right?

14  A.  No, this is the cell -- if you're referencing that report--

15  Q.  Yes.

16  A.  -- that shows you the cell tower ID, longitude and latitude

17  of the cell tower.

18  Q.  Right.  And the actual user of the phone could be many

19  miles away?

20  A.  That's correct.

21  Q.  And there could actually be closer cell towers to that

22  person?

23  A.  That's correct.

24          MR. BRACERAS:  Nothing further, your Honor.

25          THE COURT:  Anything else?

1          MR. INGOGLIA:  Nothing further, your Honor.

2          THE COURT:  You can step down.

3          THE WITNESS:  Thank you.

4          (Witness excused)

5          THE COURT:  Does the government have any other

6    evidence for today?

7          MR. DEVLIN-BROWN:  No, your Honor.

8          THE COURT:  Ladies and gentlemen, we are going to

9    break a little bit early today.  I have some legal matters I

10   need to take up with the lawyers.

11         I do want you to know that we are making good

12   progress.  We are receiving evidence consistent with a schedule

13   that I laid out to you at the beginning, and we are making good

14   progress.

15         Over the weekend, don't discuss the case with anyone.

16   Don't read, listen to or look at anything about the case.  Keep

17   an open mind because there is still more evidence for you to

18   hear.  We will resume at 9:30 on Monday morning.

19         Thank you very much.  Have a pleasant weekend.

20         (Jury dismissed)

21         (Continued on next page)

22

23

24

25

E1oQmar5                    Fanara - cross

1    (Jury not present)

2    THE COURT:  So, if the government rests on Tuesday,

3    Mr. Strassberg, what can we expect in terms of a defense case?

4    MR. STRASSBERG:  Well, I do expect, your Honor, as

5    we've indicated, that there will be a defense case.  I suppose,

6    you know, in terms of timing, of course, it's always a

7    challenge.  Are we resting the end of the day Tuesday?  We

8    anticipate there would be some motion practice whenever they do

9    rest.  So, of course, if they rested Monday, of course, we

10   would be prepared to go Tuesday.

11   I think I would -- if we're resting towards the end of

12   the day Tuesday, which seems more likely to me from what the

13   government has told us they still have to do, that we would be

14   prepared to move forward with the defense case, my rough

15   estimate, Judge, is that defense case is not going to take us

16   past the end of the week.

17   So I think perhaps it's Thursday or Friday.  Of

18   course, there are some variables that could change that, your

19   Honor, as your honor knows and that are not totally clear to me

20   even at this time, but I would say that is the best estimate.

21   So that I would think the testimony barring any

22   rebuttal case, we could well be finished by next week so to

23   give your Honor a sense of what I see happening for the coming

24   days.

25   (Continued on next page)

1    THE COURT:  All right.  I appreciate that.

2         I take it, it's still the intention of the defense to

3    call these two expert witnesses?

4         MR. STRASSBERG:  It is, your Honor, and obviously we

5    know that motion is pending now with your Honor.

6         THE COURT:  All right.  I wanted to -- I had some

7    questions about the testimony, and we can use the time now for

8    that purpose.

9         Let me begin with Professor Gompers proposed

10   testimony.

11        The defense's letter of January 23rd lays out five

12   areas that it wants to elicit testimony from Professor Gompers

13   on, and I'm going to run through those with you now.

14        The first is that Professor Gompers would testify as

15   to whether there was a pattern of trading in Elan and Wyeth

16   stock around the time that SMC meetings took place from 2006 to

17   2008.

18        And my -- well, first let me ask the government, is

19   the government contending there was a pattern -- is the

20   government going to be arguing there was a pattern of trading

21   in Elan and Wyeth's security around SMC meetings?  Because I

22   had understood the government was not going to be arguing that.

23        MR. INGOGLIA:  We are not going to be arguing that,

24   Judge.

25        THE COURT:  Mr. Strassberg, Mr. Braceras, whoever

E1odmar6

1  wants --

2      MR. STRASSBERG:  Mr. Braceras will handle this, your

3  Honor.

4      THE COURT:  All right.  Mr. Braceras, given the fact

5  that the government is not going to be contending that there

6  was trading that took place around the date of the SMC

7  meetings, is it still your intention to seek to introduce this

8  evidence?

9      MR. BRACERAS:  Yes, it is, your Honor.  I think this

10  is an issue, if you recall, it goes all the way back to

11  January 6th, when we first had the hearing before your Honor,

12  and we had the debate of what the proofs would be regarding the

13  SMCs.

14      And I think that the evidence that the government has

15  offered, there is a fair implication that there was improper

16  information being shared around the SMCs and that there was,

17  because this is an insider trading case, that there was

18  improper trading around the SMCs.  The government tries to

19  soften that and argue that there was no canary in the coal mine

20  is I think the way they put it and that the information

21  received around the SMCs was important just to allow SAC to

22  continue to build its position in these stocks.

23      Well, it's important for us to put in evidence that

24  there was no unusual accumulation around the SMC meetings nor

25  was there any unusual sales around those meetings.

E1odmar6

1    THE COURT:  I take it from what you have said that

2    what you would propose to do is introduce evidence that there

3    was no temporal proximity between the SMC meetings and any

4    trading in Elan and Wyeth securities by Mr. Martoma or SAC

5    during the 2006/2008 period.

6    MR. BRACERAS:  Yes, your Honor.  If you recall from

7    our opening, there were certain slides that were used on this

8    point.  And that's why this is important evidence for us,

9    because it was discussed in opening and we need to put that

10   into evidence.

11   THE COURT:  All right.  What I am struggling with is

12   why we need an expert to tell us that there wasn't any purchase

13   or sale of Elan or Wyeth stock around the dates of the SMC

14   meetings.

15   MR. BRACERAS:  Well, I mean, I think we are free to

16   use an expert.  I mean, whether you use a summer --

17   THE COURT:  You are free to use an expert to talk

18   about things that are beyond the ken of the jury, in other

19   words, technical knowledge that they're not familiar with that

20   they would benefit from hearing from an expert on.  But to

21   demonstrate that stock was not bought or sold around a

22   particular date, that doesn't seem to me the type of evidence

23   that requires an expert opinion.

24   MR. BRACERAS:  Well, your Honor, I guess the way I put

25   it is we certainly needed experts to look at this.  If you

E1odmar6

1 recall, there was, during Mr. Jandovitz's testimony, we put up

2 for identification certain trading runs.  These are massive,

3 massive databases of trades often in relatively small numbers,

4 going in, you know, both buys and sales of stock.  It's not

5 something that you can point easily to the jury and say, look,

6 there were no purchases or sales on this date.  It's very

7 complicated data that was collected from SAC, and it's data

8 that had to be analyzed, crunched by our expert.

9          And he was the one who looked at the data and was able

10 to say there was no -- there was no pattern there.  It is not

11 that there were absolutely no buys or sales, it is that there

12 were no pattern of buys or sales around the SMC meetings.  So

13 the expert is the one who actually analyzed these, again, very

14 complicated trading runs, and he was the one who put together

15 the charts that basically summarized his findings.

16          MR. INGOGLIA:  We have no -- I think we indicate in

17 our papers, we have no objection to the defense putting in,

18 through a witness, a summary chart that sort of aggregates the

19 trades and shows that on this date there were this many buys or

20 this many sells.  And, in fact, we expect that one of our

21 agents will summarize the trading in periods in a similar

22 fashion.

23          All we've said is you don't need an expert to do that.

24 You can do the math, figure out what the net position was on

25 the day before the SMC meeting and then the days after the SMC

meeting and do a summary chart much like they've opened on

without the need for an expert to do it or offer an opinion on

it.

THE COURT:  Mr. Braceras appears to be suggesting it

is a complicated exercise to ascertain what buys or sells of

Elan and Wyeth securities took place on particulars dates.

That's what I'm hearing from him.

Actually, this seems to be like the type of thing that

there could be a stipulation on, but I gather -- have you

talked at all with the government about whether they would

stipulate?  I mean, the records are what the records are.  So

I'm not sure -- my advice is that this should come in in as

clear a form as possible for the jury.  I'm not sure calling a

Harvard Business School professor to talk been it is the

clearest way to present it.

MR. BRACERAS:  Your Honor, we agree with that.  We

have several charts that we want to show to the jury, and if

the government is willing to stipulate to those charts --

again, we believe they are perfectly accurate and consistent

with the trades that were made.

THE COURT:  All right.  So why don't you have some --

you will talk about this with the government over the weekend.

And if you can reach an agreement on it, you will let me know,

and if you can't, we'll talk about it further.

The next topic for Professor Gompers is the notion

1  that the market for Elan securities was overheated and that the

2  potential value associated with a positive outcome from the

3  bapi study was already built into the price of Elan shares in

4  June and July 2008, and that, accordingly, there was little

5  upside for Elan securities and considerable risk.

6      And my question is I think it's relevant, to state the

7  obvious, that Mr. Martoma's state of mind on that question is

8  relevant for the jury.  What I'm struggling with is why we care

9  about a post-hoc analysis five or six years later on whether

10 Elan's stock was inflated in July of 2008.

11     MR. BRACERAS:  Well, your Honor --

12     THE COURT:  So to put it -- I mean, to boil it down,

13 to the extent the defense could demonstrate reports, analyses

14 that Mr. Martoma saw, read, suggesting that Elan's stock was

15 overpriced at the relevant time, there is an argument there

16 that that type of evidence may shed light on his state of mind.

17 But that's not what this is.  This is something else.

18     MR. BRACERAS:  I guess I disagree a little bit, your

19 Honor.  I understand your Honor's point, and I think in pages 9

20 and 10 of our letter brief we try to address that point.  I

21 think that's what your Honor is pointing to.

22     We address a number of analyst reports out there, and

23 even some internal communications at SAC, where there are

24 questions about whether the market is -- use whatever words you

25 want to use -- inflated, overheated, etc.  What we seek to do

with Professor Gompers is explain to the jury that these are
all, you know, very expert people -- you know, Mr. Martoma and
the SAC traders and the analyst reports -- explain to the
jurors what does it mean for a stock to be overheated, what
does it mean for a stock to be inflated.

Now, the jurors might not be familiar with the
efficient market theory, but many people would say, well, the
value of the company is what the stock price says is the value
of the company. And it's worth Professor Gompers explaining
what the lingo means, when the Brean Murray report that was
sent to Mr. Martoma says that the Elan stock was inflated, what
does that mean, and why might it be inflated. What factors
might inflate a stock at that period in time?

And this is the type of expert analysis -- and perhaps
it is more frequent in civil securities cases, but this is a
type of expert analysis and a regression analyses that comes in
in securities fraud cases more often than not.

THE COURT: I can't say that I have read through all
the cases that you have cited, but I will tell you that so far
I'm not persuaded that this is comparable to those cases. I am
going to be spending the weekend studying those cases more
closely, but I want you to know that from what I've read so
far, I'm not convinced that this proposed testimony is the
same.

Certainly, there are cases that -- and this is

E1odmar6

common -- in which there is an issue about what the impact of a

particular disclosure might have been.  In other words, there

is an allegation that a company withheld material information

from the marketplace and once the information came out the --

well, either that the stock was inflated because the

information was withheld and investors either -- they bought

stock that was inflated based on a failure to disclose material

information, and then an expert is permitted to testify about

what the significance of that information might have been.

This strikes me as different.

MR. BRACERAS:  Yes, I agree --

THE COURT:  And part of it is what we care about here

is Mr. Martoma's state of mind.  And that's why I was

suggesting that, to the extent the defense could show that he

was reviewing reports, analyses that suggested Elan's stock was

overheated or inflated, whatever word you want to use, that

might shed light on his state of mind at that time.

What it seems to me that you are proposing the expert

is going to testify about is to make a determination, as I

said, five or six years later, that Elan's stock was inflated

as of July of 2008, and I'm not sure that an expert's

conclusion in 2014 that Elan's stock was inflated in July of

2008 helps us understand what Mr. Martoma's state of mind was

in July of 2008.

MR. BRACERAS:  I understand, your Honor.  Two points,

1    if I may?

2            First, again, there are a number of analyst reports

3    that actually were directed to Mr. Martoma that we cite and

4    they have the language we view Elan's market value as, quote,

5    inflated.  Another one is the stock market -- the stock

6    appreciation is, quote, unwarranted.  So we cite those for you,

7    your Honor.

8            And I think it's helpful to have an expert explain

9    what does it mean to be inflated, why might a stock be

10   inflated.  And so to the extent that you even want to narrow

11   that, you know, the opinion testimony to that extent, I think

12   that would be helpful.

13           On the Court's first point, I agree that this is a

14   little bit different than the typical stock drop case that your

15   Honor has probably seen, but it's still relevant to have an

16   expert that can testify how do you value a company.  So as

17   Mr. Martoma is looking at this stock and is looking at whether

18   to sell this stock, how are you valuing it?  What are all the

19   factors that you are using to value this company?  And it's

20   relevant to have an expert tell you, well, this is how a

21   portfolio manager would value a company and here are all the

22   factors that go into valuing a company.  And, of course, the

23   expert can't say exactly how Mr. Martoma was valuing the

24   company in July 2008, but no expert in any case can do that.

25           And just as we opened with the many reasons to sell,

1   part of it was the valuation of the company at that time was

2   seen as nearing its target price.

3           THE COURT:  I will hear from the government on this

4   point.

5           MR. INGOGLIA:  We are -- I mean, our view is we are

6   not surprised.  It is more consistent with your reaction.

7           Insofar as any of these arguments go to the question

8   of what the defense opened on, you recall, we broached all of

9   this before opening.  And we raised our view that certain of

10  these things weren't -- that we were going to challenge the

11  admissibility of certain of these things.  And you said to the

12  defense, you know, you can open on it, I am not going to

13  preclude you from opening on it, but you should be aware that

14  you might not get it in, that your Honor might not admit it.

15          So I don't think we should use the opening as a

16  rationale for allowing it if we are not otherwise going to

17  allow it.  I think that is not persuasive.  They sort of knew

18  ahead of time, and they decided to take that gamble that it

19  would come in.

20          To the extent Mr. Braceras is now offering a much,

21  much, much more narrow proposal, I just point out that there is

22  a pretty broad range of opinion that he is seeking to get in

23  that's much broader than just definitional.  He didn't propose

24  that Professor Gompers get on the stage -- "get on the

25  stage?" -- get on the stand and explain what inflated means.

E1odmar6

 1   Nor do I think in the context of this case it is really

 2   necessary.

 3          I think the introduction of efficient market theory

 4   and some of these other issues is making more complicated what

 5   doesn't need to be more complicated, and they can make their

 6   points by showing what Mr. Martoma actually saw at the time the

 7   analyst reports were made.

 8          THE COURT:  What I'm hearing from Mr. Braceras is in

 9   order for the jury to understand certain reports that the

10   defense may seek to introduce because they shed light on

11   Mr. Martoma's state of mind, what I'm hearing from Mr. Braceras

12   is that the jury may not understand some of the terms that are

13   used, which doesn't surprise me because I assume that the

14   analyst reports were intended for sophisticated investment

15   professionals.  And so I'm willing to contemplate the notion

16   that there may be terms that need to be explained if the jury

17   is to make any sense out of these analyst reports.

18          I will say that -- and I don't know what analysis was

19   available to Mr. Martoma in July of 2008 with respect to Elan

20   shares, but to the extent there were analyst reports that came

21   to him that suggested the opposite, then it seems to me the

22   government would be entitled to offer those, if it wished.  I

23   think that's obvious, but I thought I would mention that.

24          MR. BRACERAS:  Yes.  Thank you, your Honor.

25          THE COURT:  All right.  The next point is -- and this

1  is one I need help from you on.  I had been operating on the

2  understanding that SAC sold its Wyeth holdings entirely prior

3  to the announcement of the final results at the ICAD

4  conference.  And point three for Professor Gompers' proposed

5  testimony is that the short positions in Elan and Wyeth were

6  part of a hedging strategy vis-a-vis SAC's long position in

7  Wyeth securities.

8          My understanding was that they sold -- SAC sold its

9  position in Wyeth in its entirety, as I said, prior to the

10  disclosure of the final results of the ICAD conference.

11          MR. BRACERAS:  Yes, your Honor.  That is actually not

12  correct.

13          SAC actually had a swap agreement with -- it was 12

14  million shares of Wyeth, this swap agreement, with three

15  different banks, and it did not unwind that swap agreement

16  prior to July 29th.

17          So if the Court is familiar with swap agreements, it's

18  not easy to go out and sell those on the market or unwind those

19  on the market.  So what SAC did is they ended out short selling

20  other shares to hedge this very long position in Wyeth.  At the

21  end of the day on July 29th they were still long Wyeth, and

22  they were still long, if you put all the Elan and Wyeth

23  together, they still had a long position relative to that

24  bapineuzumab drug.

25          But the point here is that the government, throughout

E1odmar6

the litigation, has made allegations about SAC selling short
Elan shares, and the point is that the only reason why any Elan
shares had to be sold short was because of this very large
12-million share swap agreement.  The idea was to hedge against
that swap agreement.

So swap agreements by themselves are very complicated,
and it would be, we think, essential to have an expert explain
what is a swap agreement, why couldn't you sell that swap
agreement, why couldn't you unwind that swap agreement easily,
and why was SAC selling short these Elan shares, and is there
evidence that the SAC shares were actually offsetting or
hedging the long Wyeth position.

THE COURT:  What is the government's position?

MR. INGOGLIA:  There is a swap.  So Martoma is not
compensated on this swap.  The swap stays through the period
that we have been talking about.  They don't unwind it.  As I
think Mr. Braceras points out, we'll see what the evidence is
on that, but there is a reason to buy, I suppose.

And we expect our summary witness, when he testifies,
will say there is also a swap and the swap is X number of Wyeth
shares.  It is not in Elan; it is in Wyeth.  But they do
because they sell non-swap shares, which I can't remember what
the number is but several million; they sell all of those.  So
I don't know if reasoning-wise or what the rationale is we
disagree.  I don't think we disagree factually that there was a

E1odmar6

1  swap.  There was a contract for a certain number of shares and

2  that it wasn't -- that part of it wasn't unwound.

3       We don't -- I think we said in our papers we thought

4  it would be OK for an expert to testify about what a hedge was,

5  and, similarly, I think a swap might fall in that category,

6  too, something that a jury might not understand from its own

7  experience.  It's the opinions and trying to tie -- to explain

8  the rationale behind why the trading took place the way it did

9  that we objected to.

10      THE COURT:  Well, to boil it down, Mr. Braceras has

11  said there was a substantial swap agreement involving I think

12  he said 12 million shares of Wyeth.  We all know that there

13  were short positions taken in Elan and Wyeth in July of 2008.

14  And what Mr. Braceras is proposing is that the Professor should

15  be permitted to testify that taking these short positions in

16  light of the large swap agreement that was in place would be

17  consistent with a strategy of hedging the risk.  And the

18  question is whether you object to the Professor giving that

19  opinion?

20      MR. INGOGLIA:  I suppose our thought on that is if the

21  opinion is going to be that's consistent with a strategy of

22  hedging, that we wouldn't object to that.  If it's this is what

23  they were doing, or, you know, this is the only thing that they

24  could have been doing or this is what -- you know, it is hard

25  to know given the disclosures we have.

1    THE COURT:  The reason why I use that language is

2  that's the language that's on page 5 of the defense counsel's

3  January 23, 2014 letter.  That is to say, that the short -- to

4  quote:  "SAC short positions in Elan and Wyeth securities in

5  July 2008 are consistent with a strategy of hedging SAC's long

6  position in Wyeth securities."

7    So is that what you intend --

8    MR. BRACERAS:  That is exactly right, your Honor.

9    THE COURT:  So what I'm hearing from the government is

10 they do not object to Mr. Braceras eliciting that opinion as it

11 is set forth on page 5 of the January 23rd letter.

12    MR. INGOGLIA:  I think that's right.  If what we are

13 talking about the economics of it, I think we wouldn't object

14 to that.

15    You know, we've broadly -- every time it sounds like

16 there is going to be testimony about what SAC's business

17 practices were at the time, we take issue with that.  So --

18    THE COURT:  It's got to be carefully framed.

19    MR. INGOGLIA:  That is our only point, but I think I

20 agree with what your Honor said.

21    THE COURT:  It has got to be carefully framed, but it

22 seems to me if it is framed in the way it is set forth in that

23 letter we should be fine.

24    The next area that's set forth in defense counsel's

25 January 23rd letter is the point that, and I quote:  "It was

E1odmar6

1   not uncommon for SAC to sell large positions in a short period

2   of time."

3            And, again, this strikes me as factual in nature

4   rather than opinion in nature.  But I will hear from you,

5   Mr. Braceras.

6            MR. BRACERAS:  Your Honor, in some respects we don't

7   disagree.  It might be more of a summary type evidence.  I

8   mean, we would, rather than calling a different summary expert,

9   I guess we propose putting it in through him.  But I agree, it

10  is more of a summary evidence type issue.

11           THE COURT:  Isn't Mr. Villhauer going to be a witness

12  in this case?

13           MR. BRACERAS:  We don't know, your Honor.

14           MR. INGOGLIA:  I think it is likely.

15           THE COURT:  It is likely.  And wasn't he head of

16  trading for SAC?

17           MR. INGOGLIA:  He is the execution trader so he did

18  execute trades.

19           THE COURT:  My question to you would be he must be

20  intimately familiar with whether SAC commonly sells large

21  positions in short periods of time?

22           MR. BRACERAS:  He is, your Honor.

23           MR. INGOGLIA:  That is probably right.

24           MR. BRACERAS:  I guess the two issues --

25           THE COURT:  In fact, he undoubtedly has been told to

1    sell large positions in short periods of time.

2           MR. BRACERAS:  He undoubtedly has, as I understand it.

3           Just the two issues there are, one, we weren't sure

4    whether he was going to be called by the government, of course.

5    And, two, if there is a scope issue for us, there could be the

6    issue of do we recall him or do we put it in through Professor

7    Gompers.

8           MR. INGOGLIA:  I think regardless of whether those --

9    if we decided not to call him or if there was a scope issue,

10   certainly nothing would prevent them from calling him directly.

11          THE COURT:  All right.  Let's see what happens with

12   Mr. Villhauer.  But my reaction to number 4 is that this is

13   fact, it is not opinion, and it likely could be elicited

14   through a nonexpert witness, including perhaps one that the

15   government will call early next week.

16          Finally, there is the issue about dark pools and

17   algorithms, which I understand to be mechanisms that companies

18   use to disguise their sale of large quantities of stock in

19   order to avoid the price depreciation that would result if it

20   became known they were dumping large amounts of a particular

21   company's stock.  And it seems to me that -- well, I guess a

22   couple of points.

23          Is the government going to be arguing that there was

24   something nefarious about how SAC went about selling the Elan

25   and Wyeth stock?

E1odmar6

1          MR. INGOGLIA:  Not with respect to the fact that they

2     used dark pools or algorithmic trading.  I think we have raised

3     questions about why the decision was made to not have, for

4     example, Mr. Martoma's usual trader place the trades and why

5     they were conducted in -- executed in firm accounts as opposed

6     to the accounts in which the purchases were made.  But I don't

7     think that goes to the question of dark pools or algorithmic

8     trading, and I don't think we have argued that.

9          THE COURT:  Does the government intend to elicit in

10    its direct case that these mechanisms were used for purposes of

11    selling the Elan and Wyeth securities?

12         MR. INGOGLIA:  I think it came up during the testimony

13    of Mr. Jandovitz and he was questioned about it.  I think he

14    said, but this is from memory, that dark pools were -- he

15    didn't see anything nefarious about dark pools, and I think

16    there was a discussion about a particular Wall Street Journal

17    article about it on cross-examination.

18         I expect to the extent Mr. Villhauer is questioned

19    about that, he would say much the same thing, that it is

20    something that they do and that it is not -- it doesn't carry

21    with it any sort of nefarious air.

22         THE COURT:  Mr. Braceras.

23         MR. BRACERAS:  I guess -- well, a couple of things.

24    First of all, as I recall, the government raised it on their

25    direct about the dark pools and algos.  You know, if the

E1odmar6

government's willing to stipulate that they are not going to

mention dark pools or algos in their closing and that they are

not going to raise dark pools and algos with Mr. Villhauer,

maybe we would be willing to reconsider this issue. But they

want to have it both ways. They say that we acknowledge there

is nothing nefarious about dark pools and algos but they still

raise them.

And I just think that a lay jury can hear them and it

sounds like a bad thing -- dark pool. So we would like to have

an expert that is not from SAC who could come in from Cambridge

and say, hey, just because they used dark pools at SAC is not a

big deal. Mutual funds, Fidelity, Vanguard use dark pools.

THE COURT: All right. I think that's appropriate.

There has been some reference to it already, these mechanisms.

There may be more through Mr. Villhauer, and if there is, I

think it's appropriate for the defense to call an expert on

these terms, which are beyond the ken of the jury and which

they, the jury, might attribute some sort of nefarious motive

to.

So that brings me to Mr. Wisniewski -- I guess, before

I leave, Mr. Gompers, we had had some issues earlier in the

case about whether the disclosure was adequate. Are those all

resolved at this point?

MR. INGOGLIA: I think in their most recent submission

from Thursday, they supplemented their disclosures. I think we

E1odmar6

1    are OK with the disclosures.

2           We would anticipate we will get 3500 material sometime

3    prior to their testimony.  That will help us.

4           THE COURT:  I assume that will be provided on the same

5    schedule?

6           MR. BRACERAS:  Yes.  There is not much to provide, but

7    we will provide them with everything.

8           THE COURT:  All right.  So let me turn to

9    Mr. Wisniewski -- am I pronouncing that right?

10          MR. STRASSBERG:  Wisniewski, your Honor.

11          THE COURT:  Wisniewski.  Does the government have any

12   issues with Mr. Wisniewski's proposed testimony as it is

13   outlined in the defense letter of January 23rd, specifically

14   pages 17 through 19?

15          MR. DEVLIN-BROWN:  Your Honor, I think, to the degree

16   it is relevant, we do not have a problem with number B, or

17   letter B, the role of an SMC in the drug approval process.

18          C, which is the responsibility of doctors

19   participating in clinical trials, this one seems problematic

20   because that doesn't seem to be something that's relevant to

21   the issues here.  What's relevant is that the agreements

22   between Elan and the doctors and their understandings of them,

23   whether they've breached them.

24          And I think with respect to A, you know, it's the

25   meaningfulness between the disclosures that there is a press

1    release and there is data, and I think that's largely a

2    question of fact.  So I'm not sure we agree it is necessary.

3            THE COURT:  All right.  Let me say -- let me start

4    with point A.  And point A is about having Dr. Wisniewski talk

5    about whether there was a material difference between the press

6    release issued by Elan in June and the data that was disclosed

7    at the ICAD conference at the end of July.

8            And let me say that this is technical information.  It

9    involves issues about the decline in one of the placebo groups

10   and whether that is significant or not significant.  It

11   involves issues about the absence of a dose response and what

12   the significance of that is.  These are matters that Dr. Gilman

13   testified about at length.  They are areas that call for

14   scientific and medical expertise.  And to the extent that the

15   defense wants to put on an expert to testify about these

16   technical matters, it seems appropriate to me both because it's

17   beyond the ken of the average juror and because it's relevant

18   to the case.

19           On B, which is about having Dr. Wisniewski testify

20   about the role of the SMC in the drug approval process and sort

21   of the FDA background, I'm not sure how much this is going to

22   add to the case but it seems fine.  Certainly, again, it is

23   beyond the ken of the average juror.  There has been a lot of

24   testimony on the government's case about the SMC, Dr. Gilman's

25   role in the SMC, what the SMC does, what it did here.  And so

E1odmar6

1    it's been a major topic.  And to the extent the defense has a

2    different view about what the role of the SMC is in the drug

3    approval process, they can have Dr. Wisniewski testify about

4    that.

5         On C, which is about -- the way it's framed in the

6    defense January 23rd letter is it's framed generally.  And the

7    way it's presented in the defense letter, it's having him

8    testify about the responsibility of doctors participating in

9    clinical trials to maintain the confidentiality of clinical

10   trial results, and that's a quote from the defense letter.

11        I am concerned about C because the issue is not an

12   amorphous one, sort of generally what are doctors'

13   responsibilities with respect to maintaining confidentiality of

14   clinical trial results.  We have in evidence numerous

15   confidentiality agreements signed by Dr. Ross and by Dr. Gilman

16   that lay out what those responsibilities are.  And so I would

17   be concerned about a witness coming in to testify generally

18   about what doctors' obligations are when we have the specific

19   here.  We have the actual agreements which govern their

20   obligations -- Dr. Ross' obligations, Dr. Gilman's

21   obligations -- with respect to the information that they

22   learned as a result of their participation in the bapineuzumab

23   Phase II clinical trial.

24        But I'll hear you, Mr. Braceras, on this, if you --

25        MR. STRASSBERG:  I think -- you get me, your Honor, at

1    the end of the day.

2         I think maybe I'll start to say, we hear your Honor's

3    concerns and I think, you know, we may take them and perhaps

4    get back to you as to whether we'll continue to push this.

5    But, you know, overall, your Honor, the point would be that

6    it's relevant to what the industry custom is even though we

7    take your Honor's point that there are particular doctors with

8    particular agreements here.

9         But what there isn't is evidence that there's any

10   knowledge of Mr. Martoma of what those agreements are or are

11   not and what they require and did not require.  So the concept

12   of what would be the industry custom would be very relevant to

13   what someone should be expecting these doctors would be

14   required to keep confidential or not.  So that's in essence the

15   nub of it, I would say, your Honor, as to why it is relevant.

16        I do think, you know, we'll -- as I mentioned, we'll

17   consider whether -- that is certainly the great bulk of the

18   focus of the testimony is really on part A, I would say, your

19   Honor.  So given your Honor's comments, we will think about it.

20        But that's why we viewed it as something that would be

21   appropriate for an expert to talk about here, and especially so

22   because we've had a lot of, in essence, lay people talk about

23   their view of those contracts and what they required, some of

24   which seemed, at least in my view, to be inconsistent with the

25   contracts themselves.  But, again, because those contracts go

E1odmar6

only to the doctors and not to Mr. Martoma.  The idea of what
was understood in the industry could be, I think, relevant
testimony that could be helpful for the jury in considering the
issue.

THE COURT:  When you say "the industry," are you
talking about the pharmaceutical industry?

MR. STRASSBERG:  Well, you know, obviously, your
Honor, the doctor would not be talking about Mr. Martoma
directly, right?  So I think that's where your point is going
and that's correct.

But it would be talking about both, really.  It would
be talking about in the clinical trial industry, I suppose, if
you can call that an industry, but in the world of clinical
trials, what is the general custom about confidentiality with
respect to the doctors involved, whether, you know, focus
really on SMCs but also with respect to clinical investigators.
And I would submit, your Honor, that that does tie up to the
investing community, who is very actively involved in investing
in companies that conduct clinical trials.  So it connects it
to the ultimate issue of the case.

THE COURT:  Well, let me say, as I have indicated, I
would be concerned about generalized testimony about what
custom and practice is in the pharmaceutical industry where we
have a number of exhibits in evidence that lay out what the
confidentiality obligations were of these doctors, Dr. Ross and

1   Dr. Gilman.  So I understand from what you've said, you'll

2   think about it and we'll have another discussion about it.  But

3   I wanted to flag for you today that I would have concerns about

4   having Dr. Wisniewski testify generally about what

5   confidentiality obligations apply in the clinical trial context

6   where we have specific agreements that lay out what the

7   obligations of Dr. Gilman and Dr. Ross were with respect to

8   this Phase II clinical trial.

9            MR. STRASSBERG:  Understood, your Honor.

10           THE COURT:  All right.  Anything else we should talk

11   about now?

12           MR. DEVLIN-BROWN:  Your Honor, I understand the

13   Court's ruling on that.  I do just have one concern I would

14   like to raise, and then there is a matter we could take up at

15   the sidebar.

16           THE COURT:  All right.

17           MR. DEVLIN-BROWN:  With respect to A, I certainly hear

18   your Honor's analysis that there is a lot of scientific terms.

19   But I think our concern goes back to the same concern about the

20   expert testimony on whether the market was overheated.  The way

21   we see it is that Dr. Gilman and Dr. Ross, they weren't called

22   by the government as experts on whether this data was good or

23   bad.  I don't think Dr. Ross would have been qualified probably

24   to be such an expert, and Dr. Gilman was generally positive on

25   it, despite those weaknesses.  The relevance was not their

E1odmar6

objective view.  The relevance was, as fact witnesses, they are

alleged to have communicated their views to Mr. Martoma.

Mr. Martoma spoke to plenty of other doctors, and the

government wouldn't object if Mr. Martoma called as fact

witnesses other doctors who were giving him different views.

The concern is when -- you are going to find a million doctors

with any view they want on this, and if the defense calls an

expert who in retrospect is going say here's what we think of

the data, it may then invite the government to call one in

rebuttal as to what objectively the data is.  And then I think

you are getting pretty far afield from the core issue, which is

what Mr. Martoma thought about the data regardless of what it

objectively is.

So that's sort of our concern.

THE COURT:  I guess my take on it is, as I understand

the defense theory, one of their theories may be that the

information that was disclosed at the end of July was not

significantly different -- not materially different than the

information that was disclosed in the June press release.  And

Dr. Gilman testified at length about why the information that

was disclosed -- first of all, what the difference was between

what was disclosed in the June press release and what was not

disclosed in the June press release and how that -- I think he

referred to it as "top-line" results -- how the top-line

results differed from the comprehensive, detailed data that was

E1odmar6

disclosed at the end of July.  And the clear import of his

testimony, as I understood it, was that there was a great

difference between what was disclosed at the end of July and

what was disclosed in the top-line results in the June press

release.

          And it is true that he remained optimistic, and I

guess remains optimistic today, about the prospects of

bapineuzumab, but he did -- and this was brought out on the

government's examination -- he did testify that the data -- the

detailed data that were -- the data that were the subject of

the July presentation, there was a significant difference

between those two bodies of information.

          I gather from what I've read from defense counsel that

Dr. Wisniewski is going to testify that there isn't actually a

significant difference in what was disclosed in July from what

was earlier disclosed in June, from his perspective.

          Now, obviously, the argument could be made that, well,

it's not really the medical community that we're interested in,

it's the scientific -- it's not the medical and scientific

community we're interested in, it's the investor community.

But in this case there is a relationship between the two,

because the allegation is Dr. Ross, Dr. Gilman, who were part

of the medical community, were sharing information with

Mr. Martoma, a member of the investment community.  And so the

two are not entirely unrelated.

E1odmar6

1      And given that the government has elicited from

2  Dr. Gilman that there was a major difference between the

3  top-line results and what was disclosed at the end of July, to

4  the extent that Dr. Wisniewski has a different view, it seems

5  to me that the defense should be permitted to elicit that view.

6      (Pause)

7      Then do you wish to be heard at the bench?

8      MR. DEVLIN-BROWN:  Yes, your Honor, just briefly.

9      (Continued on next page)

10      (Pages 2012 through 2013 sealed by Order of the Court)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E1odmar6

1          (In open court)

2          THE COURT:  All right.  So we are adjourned until 9:30

3     Monday morning.

4          MR. STRASSBERG:  Have a nice weekend, your Honor.

5          MR. DEVLIN-BROWN:  Thank you, your Honor.

6          (Adjourned to 9:30 a.m., Monday, January 27, 2014)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   SIDNEY GILMAN

4   Cross By Mr. Strassberg . . . . . . . . . .1810

5   Redirect By Mr. Devlin-Brown . . . . . . . .1888

6   MARK EDWARD MANHAN

7   Direct By Mr. Ingoglia . . . . . . . . . . .1946

8   RANJIT SINGH

9   Direct By Mr. Devlin-Brown . . . . . . . . .1966

10  Cross By Mr. Strassberg . . . . . . . . . .1969

11  PHILIP FANARA

12  Direct By Mr. Ingoglia . . . . . . . . . . .1972

13  Cross By Mr. Braceras . . . . . . . . . . .1980

14                   GOVERNMENT EXHIBITS

15  Exhibit No.                           Received

16   62    . . . . . . . . . . . . . . . . . . .1913

17   59    . . . . . . . . . . . . . . . . . . .1915

18   1170 and 1170-A   . . . . . . . . . . . . .1945

19   1307   . . . . . . . . . . . . . . . . . . .1948

20   1308   . . . . . . . . . . . . . . . . . . .1949

21                   DEFENDANT EXHIBITS

22  Exhibit No.                           Received

23   839 redacted   . . . . . . . . . . . . . .1847

24   982   . . . . . . . . . . . . . . . . . . .1859

25   994   . . . . . . . . . . . . . . . . . . .1883