E98dmars                      Sentence

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4             v.                           12 CR 0973 (PGG)

 5   MATHEW MARTOMA,

 6             Defendant.

 7   ------------------------------x

 8                                          September 8, 2014
                                            3:21 p.m.
 9
     Before:
10
                     HON. PAUL G. GARDEPHE,
11
                                            District Judge
12                                            and a jury

13
                          APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   BY:  ARLO DEVLIN-BROWN
          EUGENE INGOGLIA
17        CHRISTINE MAGDE
               Assistant United States Attorneys
18
     GOODWIN PROCTER, LLP
19        Attorneys for Defendant
     BY:  RICHARD M. STRASSBERG
20        ROBERTO M. BRACERAS
          MEGHAN K. SPILLANE
21
               – also present –
22
     Matthew Callahan, FBI Special Agent
23

24

25
```

E98dmars                         Sentence

1            THE CLERK:  I call the case of United States of

2    America versus Mathew Martoma.

3            Is the government ready?

4            MR. DEVLIN-BROWN:  Yes.  Good afternoon, your Honor.

5    Arlo Devlin-Brown, Eugene Ingoglia and Christine Magde for the

6    government, and with us at counsel table is Special Agent

7    Matthew Callahan with the FBI.

8            THE CLERK:  Defendant ready?

9            MR. STRASSBERG:  Yes, your Honor.  Good afternoon.

10   Richard Strassberg, Roberto Braceras and Meghan Spillane, with

11   Goodwin Procter, for Mr. Martoma.

12           THE COURT:  All right.  As counsel is aware, I issued

13   decisions last week denying the defendant's motion for a

14   judgment of acquittal or, in the alternative, for a new trial.

15   I also issued a ruling as to the appropriate amount of gain in

16   this case for purposes of the Sentencing Guidelines.

17           There is one additional legal issue relating to

18   sentencing that I am going to address at this point, and that

19   concerns forfeiture.

20           The government has submitted a proposed preliminary

21   order of forfeiture.  The proposed order would require

22   Mr. Martoma to forfeit his residence in Boca Raton, Florida; an

23   account in Mr. Martoma's name at American Express Bank, in the

24   amount of $3,246,320.62; an account in Rosemary Martoma's name

25   at ING Direct in an amount up to $245,000; and an account in

E98dmars                        Sentence

1    the name of the Mathew and Rosemary Martoma Foundation in an

2    amount up to $934,897.77.  (Citing the government's forfeiture

3    application, docket number 297, at Exhibit A.)

4              In support of this proposed order, the government has

5    submitted a declaration from FBI Special Agent Coleman.  In his

6    declaration, Agent Coleman demonstrates that the $9,380,322

7    bonus that SAC Capital paid to Mr. Martoma for 2008 was based

8    entirely on recommendations he made for trading in Elan and

9    Wyeth securities in 2008.  (Citing the Coleman Declaration,

10   paragraphs 4 through 5.)  Agent Coleman traces the bonus --

11   which was paid to Mr. Martoma in two installments -- through

12   various bank accounts and through the purchase of the Boca

13   Raton residence using methodologies that have been approved by

14   the Second Circuit.  See United States v. Banco Cafetero

15   Panama, 797 F.2d 1154 (2d Cir. 1986).

16             Defense counsel has argued that forfeiture here should

17   be limited to $6,505,181.50, which counsel contends is "the

18   total amount of [Martoma's] 2008 bonus, net of tax withholdings

19   and other adjustments."  (Citing the September 5, 2014 defense

20   letter, docket number 304.)  Defense counsel has cited no

21   authority demonstrating that it would be appropriate for me to

22   deny forfeiture as to the amount of Mr. Martoma's taxes on that

23   bonus.  The law is to the contrary.

24             THE WITNESS:  "In the course of successful criminal

25   securities fraud prosecutions, a district court can order the

E98dmars                    Sentence

1    forfeiture of any property, real or personal, which constitutes

2    or is derived from proceeds traceable to [the] violation."

3    United States v. Contorinis, 692 F.3d 136 at 145 (2d Cir. 2012)

4    (quoting 18 United States Code Section 981(a)(1)(C)).  "The

5    definition of proceeds for insider trading violations is 'the

6    amount of money acquired through the illegal transactions

7    resulting in the forfeiture, less the direct costs incurred in

8    providing the goods or services.'"  Id.  (Quoting 18 United

9    States Code Section 981(a)(2)(B).  "18 United States Code

10   Section 981(a)(2)(B) supplies the definition of 'proceeds' [for

11   forfeiture] in cases involving fraud in the purchase and sale

12   of securities."  Id. at 145 Note 3.

13       Title 18 United States Code Section 981(a)(2)(B)

14   provides that, "[i]n cases involving lawful goods or lawful

15   services that are sold or provided in an illegal manner, the

16   term 'proceeds' means the amount of money acquired through the

17   illegal transactions resulting in the forfeiture, less the

18   direct costs incurred in providing the goods or services...

19   The direct costs shall not include any part of the overhead

20   expenses of the entity providing the goods or services, or any

21   part of the income taxes paid by the entity."  Id.

22       The statute, therefore, evinces an intent to include

23   income taxes in the amount of proceeds subject to forfeiture.

24       Moreover, "criminal forfeiture focuses on the

25   disgorgement by a defendant of his 'ill-gotten gains.'"  Citing

E98dmars                    Sentence

Contorinis, 692 F.3d at 146.  Although not widely addressed in

the criminal context, courts in this Circuit have repeatedly

held in civil cases that income taxes are properly included in

a defendant's disgorgement of ill-gotten gains.  (Citing SEC v.

Razmilovic, 822 F.Supp.2d 234 at 277 (E.D.N.Y. 2011), affirmed

in part, vacated in part on other grounds, 738 F.3d 14, (2d

Cir. 2013) ("Contrary to Razmilovic's contention, there is no

legal authority to support a deduction for taxes paid upon

ill-gotten gains...  Accordingly, the disgorgement amount will

not be offset by any amount paid by Razmilovic as taxes on his

ill-gotten gains."); also, SEC v. Dibella, 2008 WL 6965807, at

*3 (D. Conn. March 13, 2008), affirmed, 587 F.3d 553 (2d Cir.

2009) (Dibella "seeks an offset of the state and federal income

taxes he paid on these profits.  The taxes he paid are not

transaction costs.  As the Southern District of New York has

noted, 'the deduction from the disgorgement amount that [the

defendant] seeks for general income taxes does not fall within

the class of deductions occasionally allowed for

transaction-specific costs.'"  (Quoting SEC v. Zwick, 2007 WL

831812 at *24, (S.D.N.Y. March 16, 2007))).

        I should also note that the Federal Court of Claims

has recently held that "[an insider trading defendant] may

deduct the amounts [he] forfeited as a loss [for tax purposes]

under 26 United States Code Section 165," and receive a refund,

provided that the other requirements of deductibility under 26

E98dmars                        Sentence

 1    U.S.C. Section 1341 are met.  See Nacchio v. United States, 115

 2    Court of Claims 195 at 197 and 200 to 2003 (Fed. Cl. 2014).

 3    The Court of Claims found that "[a]llowing the deduction would

 4    not increase the odds in favor of insider trading or destroy

 5    the effectiveness of the securities laws....  Disallowing the

 6    deduction, however, would result in a 'double sting' by

 7    requiring the taxpayers to both make restitution and pay taxes

 8    on income they did not retain."  Id. at 202.  (Quoting Stephens

 9    v. Commissioner of Internal Revenue, 905 F.2d 667 at 671, (2d

10    Cir. 1990)).  Mr. Martoma may pursue this remedy if he deems it

11    appropriate.

12            For present purposes, however, given the clear

13    language of Section 981 and the precedent in this Circuit

14    requiring that income taxes be included in the calculation of

15    ill-gotten gains, Mr. Martoma will be ordered to forfeit the

16    full $9.3 million which he received as his 2008 bonus from SAC

17    Capital.  I do find that the government has demonstrated that

18    Mr. Martoma's entire bonus -- including the amount he paid in

19    income taxes -- constitutes proceeds traceable to his insider

20    trading, and that the specific properties referenced in the

21    government's proposed preliminary forfeiture order -- the Boca

22    Raton residence, the American Express Bank, ING Direct and

23    Vanguard accounts -- are traceable to Mr. Martoma's bonus.  I

24    will therefore enter the proposed preliminary order of

25    forfeiture that the government has submitted.

E98dmars                         Sentence

1              In preparation for sentencing, I have read the

2     Presence Report dated June 3, 2014.  I have read defense

3     counsel's May 27, 2014 and August 21, 2014 sentencing

4     submissions, as well as the exhibits to those submissions,

5     including the approximately 140 letters from Mr. Martoma's

6     family and friends.  I have also read defense counsel's

7     September 5, 2014 letter regarding forfeiture.

8              I have also read the government's June 27, 2014 and

9     August 11, 2014 submissions.  In addition, I read a number of

10    letters that have been submitted to the Court from members of

11    the public.

12             Many of the lawyers' arguments here have turned on

13    sentences imposed in other insider trading cases.  Accordingly,

14    in preparation for sentencing, I have read many sentencing

15    transcripts, including the sentencing transcripts from many

16    defendants who were convicted in this District of insider

17    trading, including Todd Newman, Joseph Contorinis, Anthony

18    Chiasson, Raj Rajaratnam, Winifred Jiau, Doug Whitman, Michael

19    Kimelman, the Goffer brothers (both Zvi and Emanuel), James

20    Fleishman, and Rajat Gupta.

21             Mr. Strassberg, have you read the Presence Report

22    and its recommendation and discussed them with Mr. Martoma?

23             MR. STRASSBERG:  Yes.  We have, your Honor.

24             THE COURT:  And, Mr. Martoma, have you read the

25    Presence Report and its recommendation and discussed it with

E98dmars                              Sentence

1    Mr. Strassberg?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Mr. Strassberg, the Presentence Report

4    reflects a number of objections you made to the factual

5    portions of the Presentence Report.  I believe that the

6    decisions I have issued address the issues that you raised, but

7    I'm happy to hear from you now as to any remaining objections

8    you have to the factual portions of the Presentence Report.

9              MR. STRASSBERG:  Your Honor, I don't believe there are

10   any additional objections.  I think they have all been

11   addressed either in the addendum to the Presentence Report

12   which noted the objections or/and your Honor's rulings.

13             THE COURT:  All right.  Mr. Devlin-Brown, does the

14   government have any objections to the factual statements in the

15   Presentence Report?

16             MR. DEVLIN-BROWN:  No, your Honor.

17             THE COURT:  All right.  Then I will adopt the findings

18   of fact set forth in the Presentence Report.

19             With respect to the objections that Mr. Strassberg had

20   originally raised as to the Presentence Report, I do find that

21   the Presentence Report properly relied on the testimony of the

22   cooperating witnesses, Dr. Gilman and Dr. Ross.

23             I find as to the related case section, that it was

24   appropriate for the Presentence Report to indicate the

25   individuals it indicated with respect to co-conspirator status.

E98dmars                          Sentence

1          With respect to the objection as to paragraph 17, as

2    to the issue of whether the offense was committed solely

3    between July 17th and July 29, 2008, as I will make clear in a

4    moment, I do find that the period of conspiratorial activity

5    was broader than that and that, in fact, the two years that

6    preceded July 29, 2008 were critical background for what

7    happened during the period between July 17th and July 29th.

8          There was an objection to paragraph 20 as to whether

9    there was any evidence at trial as to whether Dr. Ross provided

10   material non-public information to Mr. Martoma.  I do recall

11   from the trial that there was testimony that Mr. Martoma met

12   with Dr. Ross in the lobby of the hotel at which the ICAD

13   conference was held; that he met with him on the evening of

14   July 28th, before the disclosure of the results of the

15   bapineuzumab study were made publicly available, and I do

16   recall from the trial that Dr. Ross disclosed material

17   non-public information about the bapineuzumab study to

18   Mr. Martoma during that meeting, although he commented that

19   Mr. Martoma seemed to be familiar with this data already.

20          I believe there's also evidence in the record that SAC

21   Capital sold Wyeth stock and further shorted Elan stock after

22   that meeting.  Accordingly, I don't believe there is an

23   inaccuracy in paragraph 20.

24          Defense counsel also objected to paragraph 23 in terms

25   of its reliance on Dr. Gilman's testimony.  For reasons that

E98dmars                          Sentence

are clear from my decision denying the motion for judgment as a

matter of law, I do find that Dr. Gilman's testimony was fully

corroborated by overwhelming circumstantial evidence.

          In paragraph 25, defense counsel objected to the gain

amount, contending that SAC's gains should be limited to 131

million, and that Mr. Martoma's gain should be limited to 6.3

million.  As you know, I have rejected those arguments in

discussing the appropriate guidelines gain amount.

          Paragraph 27, defense counsel objected to a statement

that the victims of the offense are the investing public, whose

losses are difficult if not impossible to identify.  It does

seem to me that that statement, in paragraph 27 of the

Presentence Report, is consistent with what the Supreme Court

said about the same subject in Chadbourne & Parke v. Troice,

134 S.Ct. 1058 at 1067 (2014).

          So I do overrule the objections that were made in the

past to the Presentence Report to the extent that they are

maintained today, and I adopt the findings of fact set forth in

the Presentence Report.

          Although I'm not required to impose sentence in

accordance with the Sentencing Guidelines, I am required to

consider the recommended sentencing range under the guidelines.

Here the Probation Office determined that Mr. Martoma's base

offense level is 8 under Section 2B1.4(a) of the guidelines,

which applies to insider trading.

E98dmars                          Sentence

1        For the reasons I explain in my September 5, 2014

2   opinion, I find that it's appropriate for Mr. Martoma's offense

3   level to be increased by 28 levels under Section 2B1.4(b)(1)

4   and Section 2B1.1(b)(1)(O) because the gain resulting from his

5   offense was more than $200 million but less than $400 million.

6        Therefore, Mr. Martoma's total offense level is 36.

7        The Probation Office determined that Mr. Martoma has

8   no criminal record.  Accordingly, he has zero criminal history

9   points, and he falls in Criminal History Category I.

10        Offense Level 36 at Criminal History Category I yields

11   a guidelines' range of 188 to 235 months' imprisonment, which

12   correlates to approximately 15-and-a-half to 19-and-a-half

13   years.

14        Mr. Strassberg, any objections to the accuracy of the

15   guidelines' calculations in the Presentence Report other than

16   those I addressed in my September 5, 2014 opinion?

17        MR. STRASSBERG:  None other than the ones we

18   previously raised and your Honor has ruled upon.

19        THE COURT:  All right.  Mr. Devlin-Brown, any

20   objections to the accuracy of the guidelines' calculation set

21   forth in the Presentence Report?

22        MR. DEVLIN-BROWN:  No, your Honor.

23        THE COURT:  Then based on my independent evaluation of

24   the Sentencing Guidelines, I accept the calculation set forth

25   in the Presentence Report.  Accordingly, I find that the

E98dmars                          Sentence

1    Offense Level is 36, the Criminal History Category is I, and

2    the recommended sentencing range under the guidelines is 188 to

3    235 months' imprisonment.

4         I'll hear from you, Mr. Strassberg, as to an

5    appropriate sentence.

6         MR. STRASSBERG:  Thank you, your Honor, and I

7    appreciate the opportunity to talk to you about what a fair and

8    just sentence will be for Mathew Martoma.

9         We stand here understanding the seriousness of the law

10   that covers insider trading.  I do not wish to diminish the

11   seriousness of that in any way, and understand we are here to

12   sentence Mathew Martoma for that crime.

13        But Mathew as a person is much more than the charge of

14   insider trading that has brought us all to this courtroom this

15   afternoon.  We have written extensively about him and his

16   family in our sentencing submissions, and we will try not to

17   repeat what is in those written submissions.  We know your

18   Honor has studied them carefully.

19        When we submit to fashion a fair and a just sentence,

20   the Court needs to factor in Mathew's extraordinary lifetime of

21   giving back to others as well as his long history of charitable

22   acts and selfless deeds for friends, family, strangers, and

23   members of his community.  He is a person devoted to helping

24   others, but perhaps more importantly a person who has put his

25   good intentions into action time and time again.

1          From the time he was a schoolboy serving in the Royal

2     Rangers, a Scouting group, and doing charitable work, or

3     volunteering at the Wuesthoff Medical Center in his hometown,

4     to the time before the investigation in this case began when he

5     contributed $1 million to start a charitable foundation to help

6     worthwhile needy causes, right up through and after the trial

7     in this case, when he extended himself to provide comfort and

8     support for friends, grieving over the loss of a loved one to

9     cancer, even though he was suffering through his own grief in

10    connection with the trial.

11         He has through his deeds put the needs of others ahead

12    of himself, and his altruism is reflected in the more than 140

13    letters that your Honor commented upon and has read that were

14    submitted on his behalf in connection with the sentencing.

15    Letters that testify to his long history of selfless conduct

16    and to the many people that he has touched with his loving acts

17    of kindness.

18         We have seen example after example of people writing

19    about Mathew's acts of generosity during times of struggle,

20    often of times of great loss and grief for these other people,

21    episodes that, again, occurred throughout Mathew's life and

22    that, we submit, shine a lot into how he has lived apart from

23    this case.  Many wrote emotionally of how Mathew had comforted

24    them during their most vulnerable times of grief.  For example,

25    Mr. Thomas, a friend and a member of Mathew's church, wrote of

E98dmars                          Sentence

the support that Mathew provided over the course of several

years when his wife underwent chemotherapy and then tragically

as her life slipped away.  He spoke of Mathew's help in

researching and providing medical issues that Thomas' wife

faced, including coming to the hospital late at night to talk

through those questions, helping to coordinate with her

oncologist, and taking their children out to play with

Mr. Martoma's own children when Mr. Thomas needed a break.

          Mathew's priest similarly wrote that when one of the

church members was nearing the end of her life, it was Mathew

who sat at her bedside to provide comfort and support to her

and her family.  Those are Exhibit 95 and Exhibit 100, your

Honor, respectively.

          Others wrote of how Mathew was always willing to

volunteer to do the crucial but not so glamorous work that was

required to help others in times of great need.

          Aleyamma and Antony Paul, Rosemary's cousin and her

husband, wrote of Mathew's support and assistance to the family

after the death of Rosemary's uncle in February 2013.  And he

spoke of Mathew helping senior family members walk through the

snow to the funeral and looking after the children in

attendance and of their great respect for his composure in

providing this much needed assistance to others.  That's

Exhibit 79 to our sentencing submission.

          Dr. Anne Lee, one of Mathew's lifelong friends since

his college days, wrote that when her husband lost a loved one,

Mathew and Rosemary were there first to call and be physically

and consistently present for support, including bringing over

meals and checking in frequently.  That's Exhibit 60.

Others still wrote of how Mathew would be the one who

continued to call and to visit long after the initial shock of

loss had worn off but when often that agony of loneliness had

descended and those in pain so needed a friendly face.  Often

that face was Mathew's.

Tina Thomas, Mathew's cousin, wrote that Mathew not

only came to be with her family and provided immediate

emotional support when her brother unexpectedly passed away

from an epileptic seizure in 2006, but he has continued to do

so for the past eight years, including making regular calls to

her parents to make sure that they were OK.  That's Exhibit 96.

Tina's father, Thomas Philip, echoes the important

role that Mathew has played in helping the family overcome the

grief from this tragic incident, stating that Mathew has "loved

me like a son and helped me ease the pain of my suffering."

That's Exhibit 80.

Dr. Michael Epstein, another of Mathew's close friends

from college, wrote that Mathew was one of the first to reach

out and check in on him and on his mother after his father

suddenly passed away.  He also spoke of the hours that Mathew

spent in the following days and weeks reminiscing about his

E98dmars                    Sentence

father, providing what he described as a shoulder through a

telephone for him to lean on during those times.  Exhibit 23.

          And, finally, in these snippets, your Honor, Dr. Tariq

Haddad, who has called Mr. Martoma his best friend for more

than 20 years, wrote of the support Mathew provided him as he

suffered through the end of his first marriage.  He wrote that

Mathew spent hours every day helping him through his grief and

providing him support for him to get back on his feet

emotionally.  Exhibit 28.

          When considering an appropriate sentence, the

statutory sentencing factors require an individual assessment

of the defendant, and we submit Mathew's lifetime of generosity

and compassion stands out as meriting leniency.

          Now, of course, your Honor, we're not here to say that

Mr. Martoma is perfect; we're here for sentencing.  We

understand that.  We have acknowledged this in our papers, and

it is reflected in that nightmarish episode relating to Harvard

Law School, as the government has noted in its papers.  But,

your Honor, that was one horrible incident that occurred some

15, almost 16 years ago now.  And for that incident he has been

publicly shamed and humiliated in front of his family and his

friends.  And it is not reflective of how he has lived his

life, as attested to by so many of the people who have written

to your Honor among those 140-plus letters that have come to

the Court in connection with sentencing.  Those people who have

E98dmars                            Sentence

 1    taken out the time and the energy to write to the Court to make

 2    sure the Court is aware of Mathew's actions away from the

 3    allegations of insider trading, actions of compassion and

 4    kindness.

 5            And, simply put, those individuals after individual

 6    talking about Mathew's actions imbued with charity and giving

 7    means something when it comes to a day like today, a day that

 8    will be a defining moment for Mathew's life.

 9            Now, I'd like to address for a few moments the family

10    circumstances confronting the Martoma family.

11            As outlined in more detail in our submission,

12    Mr. Martoma's family circumstances are extraordinary and they

13    do merit substance leniency.  Now, it is clear from the scores

14    of individuals who wrote to the Court that Mr. Martoma is

15    unconditionally devoted to his family.  Our interactions with

16    him have shown the same -- a deep devotion to his wife,

17    Rosemary; to his children, Joshua, Ava and David; a

18    determination to be there for them, to shelter them and care

19    for them with all his might.

20            It is also fair to say that he has been blessed by

21    having found Rosemary, his wife for more than ten years to whom

22    he is so devoted, and to have had together with her the three

23    beautiful children -- Joshua, age 9; Ava, age 7, and David, age

24    5 -- but it is certainly an understatement to say that this

25    sentence will be felt deeply by all of Mathew Martoma's family.

E98dmars                      Sentence

As you know from our submissions, more than in a
typical case medical and health issues make his family
especially depended on Mr. Martoma for their support and
well-being.  And given the deeply personal and sensitive nature
of these matters, we will not repeat them here in open court
but we know your Honor has seen them and read them in our
submissions.  I submit it is no exaggeration to worry, as so
many of those who wrote to the Court are worried, about the
future health and well-being of Rosemary if Mathew is absent
for a long period of time and not available to take care of her
and the children.  And it is clear that the children are
unusually depended on Mathew and will be devastated by a
prolonged absence from him.

It is always tragic when a parent is separated from
their children, but the fragile family circumstances
confronting the Martomas make the possibility of a lengthy
separation from Mathew even more traumatic than it otherwise
would be.

And the family's history, your Honor, where the
detention of Rosemary's grandfather in connection with the
struggle for India's independence is believed to have
contributed to the tragic suicide of his son, Rosemary's uncle,
years later, makes the specter of a lengthy prison sentence for
Mathew even more haunting for the family.

The type of lengthy sentence being advocated by the

E98dmars                    Sentence

government would mean that Mathew's children -- Joshua, Ava and
David -- would not get to spend any of the remainder of their
childhoods with their father outside the walls of a prison.  We
respectfully submit that such a harsh punishment is not
necessary to effectuate a fair and just sentence.

         Now, we understand the competing forces at work in
crafting such a sentence and that the statutory sentencing
scheme requires your Honor to impose a sentence sufficient but
not greater than necessary to comply with the purposes of
sentencing.  The factors set forth in the sentencing statute,
Section 3553(a) of Title 18, include the nature and
circumstances of the offense and the history and
characteristics of the defendant, the need for the sentence to
reflect the seriousness of the offense, to promote respect for
the law and to provide just punishment, the need for the
sentence to afford adequate deterrence both specific to the
defendant and general to others, the need to avoid unwarranted
sentence disparities among defendants with similar records
found guilty of similar conduct, and, as your Honor has already
mentioned, the consideration of the Sentencing Guidelines.

         We've already touched on the individual
characteristics of Mathew and his family, and we know your
Honor is very familiar with the facts of this case from the
trial, and we agree, as I mentioned earlier, that insider
trading is certainly a serious offense.  We want to address the

E98dmars                        Sentence

1    remaining considerations under the sentencing statute briefly,

2    because we believe they all support a sentence that's

3    substantially more lenient than the sentence advocated by the

4    government here.

5           So if I can, let me start with a consideration of the

6    Sentencing Guidelines.

7           I'm not going to repeat the arguments in our papers

8    and the Court has found in its decision last week, and,

9    frankly, I think, as all the parties agree, the guidelines'

10   sentence is driven almost entirely by the size of the loss, by

11   the size of the trades involved in this transaction.  Really,

12   very little else matters under the guidelines with respect to

13   determining the guidelines' range in this case.

14          Your Honor, many courts and commentators, including

15   Judge Rakoff and Judge Sullivan in the Southern District of New

16   York, have repeatedly pointed out the fundamental unfairness of

17   basing the length of a sentence so heavily on loss amount.  And

18   that is especially the case here, we submit, where the vast

19   majority of trading and the vast majority of alleged profit and

20   avoided losses was directed by Mr. Cohen and went to

21   Mr. Cohen's company and not personally to Mathew.

22          And here, in an insider trading case, the very premise

23   of looking solely or almost solely to loss amount is

24   misleading, as Judge Rakoff and other commentators have

25   explained, because it does not focus on culpability but largely

E98dmars                        Sentence

on extrinsic forces outside of a defendant's control, like the

fortuitous size of the market's movement.

        The outcome under the guidelines, as your Honor has

calculated, confirming the Probation's calculation, is so

extreme that here in this case both Probation and the

government agree that it would be proper for the Court not to

follow those guidelines.  Probation's response is to say and to

recommend a sentence that is roughly 50 percent of those

guidelines, or 96 months -- eight years.  The government says

impose a sentence slightly higher even than that.  But there

has been no analysis offered, your Honor, as to why such a long

sentence is required under the sentencing statute other than a

citation to the amount of the trades and the loss.

        Or we submit why eight years -- eight years, a very

long, long time; almost, frankly, the entire time that

Mr. Martoma's children have been alive, a time that would bring

us to the end of 2022, such a harsh, harsh request -- no

analysis why eight years, as opposed to some much more small

period of time, is a sentence that is sufficient but not more

than necessary to vindicate the purposes of the sentencing

statute.

        In our papers, we have tried to lay out for your Honor

a comparison of the other sentences imposed in insider trading

cases in this district.  We think that comparison is helpful to

see that the vast majority of other defendants convicted of

E98dmars                        Sentence

insider trading cases have generally received sentences in the

two- to three-year range.  Of the 30 cases we cite in our

papers, which are the cases where a defendant either through a

plea where no cooperation agreement was involved or a

conviction after trial were sentenced, substantive insider

trading cases -- we did not include cases where only a

conspiracy charge was the only allegation against them

regardless of what the ultimate plea or conviction was for --

but of those 30 cases, your Honor, over 70 percent received

sentences that were in that two- to three-year range or below.

If we look a little more broadly, over 93 percent of those

sentences in those cases were below 6.5 years.

          While we understand, of course, that each case is

different and that your Honor must make an individualized

determination based on the facts of this case, other than the

size of the avoided losses, the factors cited by the government

at the time of the sentencing in those cases show that

Mr. Martoma's conduct was not more culpable than the conduct of

many others who were sentenced, again, to those sentences much

smaller than what's being advocated by the government here.

And in many respects, and in many of those cases, his conduct

was less culpable based on those metrics.

          So I appreciate your Honor's comment that you've

actually looked at the sentencing transcripts.  I know your

Honor has studied the submissions that we made.  So I won't

E98dmars                        Sentence

1   repeat reference to any of those cases.  We understand that in

2   each case there are multiple factors, some of which would

3   compare favorably with Mathew, as we have cited, and some of

4   which, and like the amount of the loss, as the government

5   points out, would compare unfavorably to him.  But, overall,

6   our point is that the great bulk of the factors seized upon by

7   the government at the time of the sentencing in those cases do

8   compare favorably to Mathew, and certainly did not suggest a

9   sentence that might be three to four times as lengthy as the

10  sentences imposed in those cases.  Because the sentencing

11  statute requires the Court to avoid unwarranted sentencing

12  disparities, these cases suggest that any sentence for

13  Mr. Martoma should be at most in that same two- to three-year

14  range.

15          When taking into account the family circumstances and

16  his lifetime of charitable acts and giving back to the

17  community and to others, we ask for a sentence, your Honor,

18  that will have as little time away from his family as can be

19  done consistent with your requirement to adhere to the purposes

20  of the sentencing statute.

21          So, finally, let me just speak a moment or two on

22  deterrence.

23          Specific deterrence with respect to Mr. Martoma has

24  been fully accomplished here.  He will never work in the

25  securities industry again.  He has lost his career, his

E98dmars                     Sentence

livelihood, his reputation.  He has been publicly shamed on the

front pages of the newspaper.  He is subject to substantial

forfeiture, as your Honor has already ruled, substantial

forfeiture of more than all of his assets, and is financially

ruined.  No further action is needed to accomplish specific

deterrence of Mathew.

General deterrence we understand is also important,

but it also has already been largely accomplished here.  And it

can be adequately addressed with a sentence in line with those

sentences imposed on similar insider trading cases without

resort to the extreme sentencing being advocated by our

adversaries.

Even before sentencing, we have a career destroyed, a

reputation in taters, a pending SEC case, a pending civil

action seeking millions and millions in damages, and forfeiture

that wipes him out financially.  And on top of all of that, of

course, we are here today for your Honor's sentence in the

criminal case.

The prospect of any jail time, let alone two to three

years in jail, is an extremely powerful deterrent to potential

wrongdoers.  It is a very substantial punishment.  It is a hard

punishment.  It is a life-altering punishment.  It is

certainly, we respectfully submit, more than enough to send a

message of general deterrence to the public to prevent insider

trading.  We submit that it is more than what is necessary to

E98dmars                          Sentence

1    satisfy the purposes of sentencing.

2            So in closing, your Honor, we appreciate the Court's

3    close attention and the great time committed to this case

4    throughout and to the sentencing process.  We simply ask your

5    Honor for one last request, to consider Mathew's kind and

6    generous history of giving to others and his and Rosemary's

7    unique and fragile family situation, and impose the most

8    lenient sentence that's possible.

9            Thank you, your Honor.

10           THE COURT:  Mr. Devlin-Brown.

11           MR. DEVLIN-BROWN:  Thank you, your Honor.

12           The Court has already heard a great deal of argument

13   both in writing and orally, so I will be brief but I do wish to

14   make a few points on behalf of the government.

15           Insider trading is a significant and very serious

16   offense precisely because it undermines the public's integrity

17   in the working of the financial system.  And viewed through

18   that lens, the public's integrity in the financial system, it

19   is hard to think of a more significant and brazen instance of

20   insider trading than the instance that is before this Court.

21           Mathew Martoma got an advance copy of a hotly

22   anticipated drug trial announcement.  He acted promptly on that

23   by causing the movement of nearly a billion dollars in

24   securities between the sales and the shorting and other

25   transactions, and he made massive profits for his firm --

E98dmars                          Sentence

$275 million of illegal proceeds and a large bonus of $9

million for himself.  The sentence in this case, the government

submits, must reflect the significance of this particular

breach.

          Now, I want to turn to defense counsel's argument on

illegal gain, and that's a factor in sentencing.  And as

defense counsel pointed out, the government, of course, agrees

that it should not be the only consideration in sentencing.

But the fact that there was a $275 million calculation of

illegal proceeds in this case, that's not a fortuity.  It's not

something that just happened to occur.  It's based directly on

the defendant's own decisions and his own conduct.

          When the defendant received this advance copy of hotly

anticipated drug trial announcement, he could have made any

number of decisions.  One, of course, the best decision would

have been to tell compliance that he was not going to trade any

longer, that he had this information.  But he could have made

smaller trades.  He could have simply many trimmed the Elan

position.  He didn't have to short the stocks.  He didn't have

to recommend sales to his boss.  No doubt he did so because

that would maximize profits.  And while the $275 million

number, maybe that number itself is unpredictable, the fact

that this was a massive movement in stock likely to yield

similarly outsized profits is no accident.

          The defense faults the government for not offering an

E98dmars                       Sentence

analysis, though, as to why a number driven anywhere -- a

guidelines -- why a sentence driven in any way by the loss is

meaningful in terms of accomplishing deterrence and other ends.

The government submits we've offered several in our briefing,

but I think that perhaps the most important one, your Honor, is

this.  The financial industry professionals who trade

securities every day are making calculations based on risk and

reward.  And for those who don't lack a firm enough moral

compass that will alone steer them clear of wrongdoing, that

same analysis of risk/reward applies to potential illegal

trades as well.  Someone not bound by sufficient ethics will

wonder how much can I probably make from these illegal trades?

What are the odds that I'll get caught?  And how significant is

the punishment if I do so?

        And I think it's important in a case like this, given

its magnitude, that the investing public and that those Wall

Street professionals understand that when one is tempted to

make outsized profits by massive trades based on inside

information, the result, if you are caught and convicted, will

be outsized punishments that exceed a smaller trading position

based on a smaller risk/reward calculation.

        I want to address briefly some of the personal

circumstance arguments made by the defendant.

        First of all, with respect to the defendant's family

circumstances -- and I'll be circumspect about this as well --

E98dmars                    Sentence

there is no doubt that the defendant has a family who is very

close to him, who has rallied around him in times of trouble,

and that makes it all the more tragic, of course, that the

defendant would commit an offense like this given the potential

damage that could do not just to other victims but to his

family.

          But when defense counsel goes beyond that and argues

that more than in a typical case the medical circumstances

warrant a lenient sentence, the government simply doesn't see

it that way as more than in a typical case.  And that's not to

make light of any of the issues, but the fact is in all of the

submissions, the hundreds of letters, there is no medical,

there is no psychiatric expertise provided by a treating or

expert physician as to underlying medical issues that could

bear on sentencing.  And in many cases, as the Court knows,

there is such a submission.

          The other positive circumstances that defense counsel

argues, again, the government is not denying their existence.

There is no doubt that the defendant has done many good things

in his life.  But it doesn't really make sense, your Honor, for

defense counsel to argue at once that the Court should consider

charitable acts the defendant did back in college but that

shining a light into how he lived his life apart from this

crime, as defense counsel says, how that light shouldn't also

shine on the defendant's time at Harvard Law School.  And it is

E98dmars                          Sentence

1    not simply to drag up something from the past and put it before

2    the Court again, but it's because there really is an uncanny

3    parallel in terms of the personal circumstances and

4    characteristics of the defendant in that the defendant rose to

5    a position that many aren't fortunate to have -- he was a law

6    student at Harvard Law School and he was doing well.  But even

7    in that position, he was tempted to cheat and to lie, to submit

8    a false, forged transcript to federal judges, and then to try

9    to cover it up in a rather clumsy and continuing fashion.

10             And then having fallen from that position of great

11   height, the defendant managed to pick his life back up and move

12   into a position within the hedge fund world, where he had

13   similarly great power and great talents.  But, again, that

14   wasn't enough for Mr. Martoma, and once again he cheated, this

15   time causing the most lucrative insider trading scheme of all

16   time.

17             And so the government submits that between the offense

18   characteristics and the personal circumstances and all of the

19   factors under 3553(a), a significant sentence in this case is

20   warranted, approaching the high end of insider trading cases in

21   this district.

22             THE COURT:  Mr. Martoma, is there anything you wish to

23   say before the Court imposes sentence?

24             MR. STRASSBERG:  Your Honor, after careful

25   consultation with counsel, Mr. Martoma will not be making a

1   statement in connection with the sentencing.

2            THE COURT:  All right.

3            In addition to the Sentencing Guidelines, in deciding

4   upon an appropriate sentence, I have considered all of the

5   factors listed in Title 18 United States Code Section 3553(a),

6   including the nature and circumstances of Mr. Martoma's

7   offenses, his personal history and characteristics, the need

8   for the sentence imposed to reflect the seriousness of those

9   offenses, as well as the need to promote respect for the law,

10  to provide just punishment, and to afford adequate deterrence.

11           I'm going to begin with the nature and circumstances

12  of the offense.

13           On February 6th of this year, after a month-long

14  trial, a jury convicted Mr. Martoma of one count of conspiracy

15  to commit securities fraud and two substantive counts of

16  securities fraud in connection with trading in the stock of two

17  pharmaceutical companies, Elan Corporation and Wyeth, while he

18  was employed as a portfolio manager at the hedge fund SAC

19  Capital.

20           The evidence at trial showed that for almost two years

21  Mr. Martoma cultivated corrupt relationships with two doctors,

22  Sidney Gilman and Joel Ross, who were involved in the Phase II

23  clinical trial with bapineuzumab, a drug that was thought might

24  be useful in the treatment of Alzheimer's disease.  The drug

25  was being developed by Elan and Wyeth.  The two doctors had

signed confidentiality agreements promising not to disclose
information they learned as a result of their work on this
study.  As a result of Mr. Martoma's efforts, both doctors
violated those agreements.

There was enormous investor interest in this study
because of the terrible nature of Alzheimer's Disease, the
large number of patients that suffer from the disease, and the
lack of any effective treatment.  Over a two-year period,
Mr. Martoma focused his attention on this study and on Elan and
Wyeth.  They represented the largest positions in the $500
million portfolio he managed for SAC Capital.

Through his corrupt relationships with Dr. Gilman and
Dr. Ross, Mr. Martoma was able to repeatedly obtain
confidential information concerning the drug trial.  Over
nearly a two-year period, Dr. Gilman, who was the Chair of the
study's Safety and Monitoring Committee, regularly informed
Mr. Martoma of what side effects the investigators were seeing
in patients.  This was useful information because during the
clinical trial of a precursor drug to bapineuzumab, the study
had to be terminated because of the side effects patients were
experiencing.  During these years, Mr. Martoma, in his own
portfolio at SAC Capital and the firm itself and the firm
accounts, built enormous positions in Elan and Wyeth stock,
totaling more than $700 million.

As discussed in my opinion denying Mr. Martoma's

post-trial motions, at the conclusion of the 18-month
bapineuzumab study, Elan chose Dr. Gilman to present the
study's results at the upcoming International Conference On
Alzheimer's Disease, or "ICAD" conference, on July 29, 2008.
Up to that point, Dr. Gilman had been blinded to efficacy data
concerning the study so he had not been in a position to share
that data with Mr. Martoma.

       To help Dr. Gilman prepare for the ICAD conference
presentation, Elan sent him a draft PowerPoint presentation
laying out the efficacy results for the bapineuzumab study.
The final results show that the drug had not demonstrated
efficacy in the treatment of Alzheimer's Disease.  In the
contemporaneous words of a stock research analyst who had been
following the clinical trial, the data "was a disaster."

       Dr. Gilman shared those disastrous results with
Mr. Martoma on a July 17, 2008 telephone call that went for
about an hour and 45 minutes, but that briefing wasn't enough
for Mr. Martoma, given what was at stake.

       And so that same day he bought a round-trip ticket to
Detroit from JFK for Saturday travel, July 19, 2008.  The
evidence showed that he met with Dr. Gilman at his University
of Michigan office, and received another briefing concerning
the efficacy results.  Dr. Gilman went through the slides of
the draft PowerPoint presentation, discussed the data in detail
with Mr. Martoma.

E98dmars                          Sentence

1          The following morning, Sunday, July 20, 2008,

2    Mr. Martoma had a 20-minute conversation with SAC Capital,

3    founder Steve Cohen.  The very next day, Monday, July 21, 2008,

4    SAC began secretly selling its positions in Elan and Wyeth.

5    $700 million worth of stock.  SAC also entered into significant

6    short transactions involving Elan and Wyeth's stock.

7          Dr. Gilman presented the efficacy results shortly

8    after 5 o'clock on July 29, 2008 at the ICAD conference.  Over

9    the next 24 hours, Elan's stock dropped 42 percent while

10   Wyeth's stock experienced a 12 percent decline.

11         As a result of the trades in Elan and Wyeth securities

12   during the week leading up to the ICAD conference, SAC Capital

13   made profits from the short sales and avoided losses totaling

14   $275 million.  As a result of his recommendations to Steven

15   Cohen for trading in Elan and Wyeth securities in 2008,

16   Mr. Martoma received a bonus of approximately $9.3 million.

17         With respect to Mr. Martoma's personal history and

18   characteristics, he's 40 years old.  He was born in Michigan

19   and moved to Florida as a young child.  He is the oldest of

20   three children.  His father is an engineer by training, while

21   his mother is a physician.  He wanted for nothing growing up.

22         Mr. Martoma enjoyed spectacular academic success.  He

23   graduated as the valedictorian of his high school class, and

24   four years later he graduated summa cum laude from Duke

25   University with a Bachelor of Arts degree in biomedicine and

E98dmars                        Sentence

1    public policy studies.

2            He was admitted to Harvard Law School.  During his

3    second year he was expelled after it was disclosed that he had

4    submitted a falsified transcript to several Federal Circuit

5    Court judges in connection with clerkship applications.

6            Mr. Martoma after his expulsion applied, and was

7    admitted to, Stanford Graduate School of Business.  He did not

8    disclose the expulsion from Harvard on his application.  In

9    2003, he graduated from Stanford with an MBA.

10           Mr. Martoma then began working as an analyst for a

11   hedge fund called Sirius Capital Management in Boston in

12   August 2003, and in July 2006 he began work as a portfolio

13   manager of an SAC Capital affiliate.  SAC terminated

14   Mr. Martoma's employment in September 2010, and he has not been

15   employed since that time.

16           Mr. Martoma is married and has three children, ages 9,

17   7 and 5.  He and his family have been living in Boca Raton,

18   Florida.  Mrs. Martoma is a pediatrician but has not practiced

19   since the birth of the couple's first child.  She has done some

20   work in real estate since then, including acting as a landlord

21   for various properties owned by her and Mr. Martoma.

22           Mr. Martoma has no prior criminal convictions.

23           With respect to the recommendations from the Probation

24   Office and counsel and the range in the guidelines, as I've

25   said, the guidelines recommend a sentence here of between 188

E98dmars                        Sentence

and 235 months' imprisonment.   The Probation Office has

recommended a sentence of 96 months' imprisonment.   The

defendant seeks a sentence below that and more in the range of

two to three years.   The government seeks a sentence that is

somewhat higher than the Probation Office's recommendation of

96 months and, in their words, a sentence that approaches the

longest sentences that have been imposed in this district in

connection with insider trading cases.

        I want to respond to a number of arguments that the

defense has made in its sentencing submissions.

        One of the central arguments in defense counsel's

submissions is that the gain amount here, the $275 million,

should essentially be ignored by the Court.   Counsel has argued

in his brief, "In a securities fraud case involving insider

trading, the [Guidelines] loss table is unhelpful because it

has no connection to the culpability of the conduct at issue or

the need for deterrence.   As another court in this District has

explained, the loss amount "is a relatively weak indicator of

the moral seriousness of the offense or the need for

deterrence."   Citing the defense brief, docket number 287, at

25, which in turn quotes United States v. Emmenegger, 329

F.Supp.2d 416, at 427 to 28 (S.D.N.Y. 2004).   The defendant has

also cited Judge Rakoff's decisions in United States v. Gupta,

904 F.Supp.2d 349, (S.D.N.Y. 2012), as well as his decision in

United States v. Adelson, 441 F.Supp.2d 506 (S.D.N.Y. 2006), as

well as a number of sentencing transcripts that I mentioned

earlier, all in support of his argument.

I reject the argument.

Nothing in any of the sources cited by the defendant

suggests that the $275 million gain here can or should be

ignored in determining sentence.  For example, in <u>Adelson</u>,

Judge Rakoff applied a Guidelines range to the full amount of

the loss that was foreseeable to that defendant -- $50 million.

Judge Rakoff granted a variance from that range because

"Adelson was sucked into the fraud not because he sought to

inflate the company's earnings, but because, as president of

the company, he feared the effects of exposing what he had

belatedly learned was the substantial fraud perpetrated by

others."  <u>Adelson</u>, 441 F.Supp.2d at 513.  In granting a

variance from the 85-year Guidelines range that applied in that

case, Judge Rakoff did not suggest that the loss amount was

irrelevant to determining Mr. Adelson's sentence.

In <u>Emmenegger</u>, Judge Lynch stated that the Guidelines

"place undue weight on the amount of loss involved in fraud."

However, he also said that loss "is certainly a relevant

sentencing factor:  All else being equal, large thefts damage

society more than small ones, create a greater temptation for

potential offenders, and thus generally require greater

deterrence and more serious punishment."  <u>Emmenegger</u>, 329

F.Supp.2d at 427.  Judge Lynch went on to say that in that

E98dmars                    Sentence

case, the amount the defendant stole was "a relatively weak

indicator of the moral seriousness of the offense or the need

for deterrence."  But that was because, in that case, the

amount the defendant stole was a "kind of accident, dependent

as much on the diligence of the victim's security procedures as

on Emmenegger's cupidity."  (Id.)  In contrast here, there was

nothing accidental about Martoma's conduct or about the gain

that was realized.  The conduct was well planned, and

Mr. Martoma knew that the amount of the avoided losses and the

profits were likely to be staggering.  Accordingly, as Judge

Lynch said in Emmenegger, "[t]he rough magnitude of [the

criminal conduct here] is relevant to sentencing close."  (Id.)

        Likewise in Gupta, in granting a variance, Judge

Rakoff emphasized that Gupta did not share in any fashion in

the monetary gain realized by Rajaratnam.  Gupta, 904 F.Supp.2d

at 351.  Judge Rakoff also found that Gupta's crimes were

"aberrant behavior."  Nothing in Gupta suggests that I should

ignore the fact that the criminal conduct here involves a

$275 million gain.

        The story is the same with respect to the sentencing

transcripts.  In Chiasson, for example, Judge Sullivan stated,

"The amount of money here is relevant."  Citing United States

v. Chiasson, 12 Cr. 121(RJS) (May 13, 2013, sentencing

transcript at 58).

        In short, I have to take into account the enormous

E98dmars                    Sentence

gain here that was the product of Mr. Martoma's criminal

conduct.  This factor makes this case very different from any

of the earlier insider trading cases that the defense has cited

to me.  I cannot and will not ignore that the gain here is

hundreds of millions of dollars more than has ever been seen in

an insider trading prosecution.

In contending that a variance from the Guidelines'

range is appropriate, defense counsel has also argued that

Mr. Martoma's criminal conduct took place over a two-week

period, that it involved only a few co-conspirators, and that

it involved trading in only two stocks.  According to counsel,

other insider trading defendants have engage in criminal

conduct for a much longer time period, with many more

co-conspirators, and in a much larger number of stocks.

I regard none of these factors as dispositive as to

culpability.  As an initial matter, I don't agree that

Mr. Martoma's criminal conduct took place exclusively over a

two-week period.  As I have stated, the late July 2008 trading

in Elan and Wyeth stock was made possible by a two-year corrupt

relationship that Mr. Martoma had developed with Dr. Gilman.

Absent that two-year corrupt relationship, the improper

disclosure of the study results to Mr. Martoma in late

July 2008 -- and the illegal trading that took place

thereafter -- never would have happened.

A greater number of co-conspirators or a greater

E98dmars                    Sentence

1    number of stocks illegally traded in also does not

2    automatically establish greater culpability.  Here, Mr. Martoma

3    decided to put all of his eggs in the Elan and Wyeth basket.

4    He relied primarily on one extremely well-placed source:

5    Dr. Gilman.  The evidence shows, I believe, that Mr. Martoma

6    was hoping for one big score that would provide him with

7    financial security.  His plan worked, but now he has to deal

8    with the fallout.

9            In any event, the fact that Mr. Martoma relied on only

10   two co-conspirators and traded in only two stocks does not

11   demonstrate that he is less culpable than other insider trading

12   defendants who had multiple sources -- not as well placed --

13   and whose gains pale in comparison to those seen here.

14           Another theme in the defense submissions, and in the

15   140 letters written on behalf of the defendant, all of which I

16   have read and studied, is that the sentence here should be one

17   that protects Mr. Martoma's spouse and innocent children from

18   harm and any negative fallout.  That, of course, I cannot do

19   and still perform my duty under the law.

20           A conviction and sentence of imprisonment is often a

21   catastrophe for a defendant's family.  It is always a tragic

22   event, and it is always unfair to the innocent children.

23           However, a defendant with a spouse and young family

24   who commits a crime of this sort does so understanding that, if

25   detected, the commission of that crime will likely have a

disastrous effect on their family.  In some cases, concern
about that effect may be enough to deter an individual from
committing such a crime.  That was not true here.
Unfortunately, as a result of the decision to commit the crimes
that brought us here today, it is inevitable that Mr. Martoma's
family will be affected.  But serious crimes of this sort
cannot be excused merely because one has a family and young
children who will be negatively affected by the awful reality
of their father going to prison.

          I want to speak to Mr. Martoma's character.

          Most of the letters, the 140 letters I have read,
address Mr. Martoma's character.  The letters make clear that
he's an extraordinary father, spouse, and son.  He has been a
good friend to many in their time of need.  It's obvious that
there's much that is very good in his character.  Like all of
us, of course, he is a mixture of good and bad.

          While I have considered, in determining an appropriate
sentence, all of Mr. Martoma's many good acts, there is a
darker side to his character.  And that surfaced in connection
with the Harvard incident, which involved not only forging a
transcript but also an astounding attempt to cover up the
offense by submitting a computer forensic report to the Harvard
Law School Disciplinary Panel while not disclosing to the Panel
that Mr. Martoma owned the company that had prepared the
report.

E98dmars                        Sentence

1            The lies continued on the application to Stanford

2       Business School.

3            And this reckless conduct -- in violation of all

4       ethical standards -- came into full bloom at SAC Capital.

5            I will not give Mr. Martoma a longer sentence because

6       of his conduct at Harvard and at Stanford, but I do believe

7       there is a connection between what happened there and what

8       happened at SAC.  The common thread is the unwillingness to

9       accept anything other than the top grade, the best school, the

10      highest bonus, and the willingness to do whatever it takes to

11      accomplish that result.  I cannot find here that Mr. Martoma's

12      conduct at SAC was aberrant conduct.  Rather, it reflects a

13      part of his character.

14           As to specific and general deterrence, defense counsel

15      has argued that no sentence of imprisonment is necessary here

16      to accomplish those objectives.  I accept the argument as to

17      specific deterrence.  Mr. Martoma has been ruined by this

18      prosecution.

19           As to general deterrence, I find that a substantial

20      sentence of imprisonment is necessary, and I return again to

21      the amount of gain here:  $275 million.

22           At some point, to some people, some risk of two or

23      three years' imprisonment may become palatable -- if only in an

24      inchoate sense -- where the potential return is $275 million

25      for your employer and more than $9 million for yourself.  As

E98dmars                         Sentence

Judge Lynch acknowledged in Emmenegger, crimes that involve

large sums "damage society more than small ones, create a

greater temptation for potential offenders, and thus generally

require greater deterrence and more serious punishment."

Emmenegger, 329 F.Supp.2d at 427.  The sums here are staggering

in size, and the sentence must be sufficient to deter others

from participating in this type of conduct, which is deeply

corrosive to our markets and breeds cynicism in investors.

        While I believe that Mr. Martoma's criminal conduct

warrants a severe sentence, I believe that the Guidelines'

range of 188 to 235 months is far more than is necessary to

accomplish all the objectives of sentencing.

        In my judgment, a range of that sort will rarely be

appropriate in this type of case absent aggravating factors

such as proof that a defendant is a recidivist who has not been

deterred by prior convictions or has managed a large enterprise

that has been engaged in such crimes for a substantial period

of time and that the defendant directed subordinates to commit

such crimes.  This, of course, is not an exhaustive list but

representative of the types of cases that in my judgment might

warrant a 15- to 20-year sentence for insider trading.

        Here, Mr. Martoma is a first offender, and there is no

reason to believe that a sentence of 15 to nearly 20 years is

necessary to deter him from future criminal conduct.  Moreover,

his subordinates at SAC had no knowledge of the crimes he was

E98dmars                         Sentence

committing.  A variance is also necessary to reflect that the

sum of Mr. Martoma is much more than the bad acts of his life

and to reflect the extraordinary acts of kindness he has shown

to family and friends over the years.

        With all of this in mind, I'll describe the sentence I

intend to impose and then I will ask the parties if there is

anything further they wish to say.

        With respect to imprisonment, I intend to impose a

sentence of nine years' imprisonment.

        With respect to supervised release, I intend to impose

a sentence of three years under the following conditions:

First, that Mr. Martoma shall not commit another federal,

state, or local crime; that he shall not illegally possess a

controlled substance; that he shall not possess a firearm or

destructive device; that he shall cooperate in the collection

of DNA as directed by the Probation Office.

        I do intend to suspend the mandatory drug testing

condition in favor of a special condition requiring treatment

and testing with respect to alcohol use.

        I intend to impose the first 13 standard conditions of

supervised release along with the special conditions:  That the

defendant shall provide the Probation Office with access to any

requested financial information; that he will participate in an

alcohol aftercare treatment program which may include testing

at the direction and discretion of the Probation Office, and

E98dmars                    Sentence

that he report to the nearest Probation Office within 72 hours
of release from custody.

        The Guidelines recommend a fine of between $20,000 and
$570,800,000.  I do not intend to impose a fine given that the
forfeiture order I intend to enter significantly exceeds
Mr. Martoma's net worth.

        I am required to impose a $300 special assessment.

        As I indicated, with respect to forfeiture, I will
sign the government's proposed preliminary order of forfeiture.

        Mr. Strassberg, is there anything further you wish to
say before I impose sentence?

        MR. STRASSBERG:  Well, your Honor, I've heard your
Honor's proposed sentence.  I think we should note for the
record our objection to the Court's sentence anticipated and
its statement of reasons because in our view it does not
adequately explain why that is not a sentence greater than is
necessary to fulfill the statutory purposes and to avoid
unwarranted sentencing disparities.  We note that for the
record.  Otherwise, nothing further, your Honor.

        THE COURT:  All right.  Mr. Martoma, I am going to ask
you again if there is anything you wish to say?

        THE DEFENDANT:  No, your Honor.

        THE COURT:  Mr. Devlin-Brown, anything else from the
government?

        MR. DEVLIN-BROWN:  No, your Honor.

E98dmars                          Sentence

1            We would dismiss the original indictment.

2            THE COURT:  All right.  That motion is granted.

3            Mr. Martoma, would you please rise.

4            It is the judgment of this Court that you be sentenced

5    to five years' imprisonment on Count One and to nine years'

6    imprisonment on each of Counts Two and Three, as well as to

7    three years of supervised release on each of Counts One, Two

8    and Three.  All sentences will run concurrently.

9            Your supervised release will be subject to the

10   mandatory, standard and special conditions I just mentioned.

11           You are also ordered to pay a special assessment in

12   the amount of $300.

13           You are further ordered to forfeit to the United

14   States, pursuant to 18 United States Code Section 981(c) and 28

15   U.S.C. Section 2461, all property, real and personal, that

16   constitutes or is derived from proceeds traceable to the

17   commission of the offenses alleged in Counts One through Three

18   of the Superseding Indictment, including but not limited to a

19   sum of money of at least $9,300,000 in United States currency,

20   representing the proceeds obtained as a result of the offenses

21   alleged in the Indictment, and all right, title and interest in

22   the following specific property:  (a) the real property and

23   appurtenances, with all improvements and attachments thereon,

24   located at 2464 West Maya Palm Drive, Boca Raton, Florida, more

25   particularly described as parcel ID 06-43-47-29-10-005-0020;

E98dmars                         Sentence

1    (b) up to $3,246,320.62 in funds on deposit in account number

2    1512369446 at American Express Bank, held in the name of Mathew

3    C. Martoma; (c) up to $245,000 in funds on deposit in account

4    number 146674626 at ING Direct, held in the name of Rosemary

5    Martoma; and (d) up to $934,897.77 in funds or other assets in

6    account number 88047594915 at Vanguard, held in the name of

7    Mathew and Rosemary Martoma Foundation.

8              You may be seated.

9              Mr. Strassberg, what do you seek in terms of a

10   surrender date?

11             MR. STRASSBERG:  Your Honor, we would suggest

12   November 10th, which is a Monday and approximately two months

13   from today's sentencing date.  We are not sure how long

14   designations are taking, but we hope that that would be a

15   period where the designation would actually happen.

16             We do have a recommendation to make to you as to the

17   designation as well.

18             THE COURT:  All right.  I'll hear you as to that.

19             MR. STRASSBERG:  We would recommend that you recommend

20   the federal prison camp at Miami based on family circumstances,

21   being the facility close to where Mr. Martoma and his family

22   live.

23             THE COURT:  All right.  Any objection to the surrender

24   date, Mr. Devlin-Brown?

25             MR. DEVLIN-BROWN:  We just note that the BOP, our

1    understanding, typically needs 45 days at this point, but

2    whatever the Court decides is fine with the government.

3          THE COURT:  All right.

4          So, Mr. Martoma, you will be ordered to surrender on

5    November 10, 2014, by 2 o'clock, to the designated institution.

6    If no institution has been designated by November 10th, you

7    will surrender to the United States Marshal of this district by

8    2 o'clock on that day.

9          You should be aware that if you do not surrender to

10   the designated institution or to the United States Marshal as

11   directed, you will have committed a separate crime, which will

12   subject you to additional penalties, including imprisonment on

13   top of those I just imposed.

14         I do recommend to the Bureau of Prisons that

15   Mr. Martoma be incarcerated at the federal prison camp at

16   Miami, Florida, so that he may maintain ties with his family

17   during his period of incarceration.

18         Mr. Martoma, I am required to advise you of your

19   appeal rights.  You can appeal your conviction if you believe

20   that it was unlawful or if there was some other defect in the

21   proceedings that makes it appropriate for your conviction to be

22   vacated.

23         You have a statutory right, in addition, to appeal

24   your sentence.  With few exceptions, any Notice of Appeal must

25   be filed within 14 days of judgment being entered in your case.

E98dmars                        Sentence

1    Judgment will likely be entered tomorrow.  Mr. Strassberg and

2    your other attorneys will discuss with you whether or not you

3    wish to file a Notice of Appeal.

4            If you are not able to pay the costs of an appeal, you

5    may apply for leave to appeal in forma pauperis.  If you

6    request, the Clerk of the Court will prepare and file a notice

7    of appeal on your behalf.

8            Is there anything further?

9            MR. STRASSBERG:  Not from the defense, your Honor.

10           MR. DEVLIN-BROWN:  No, your Honor.

11           THE COURT:  All right.  Then we are adjourned.

12           THE CLERK:  All rise.

13

14                              -   -   -

15

16

17

18

19

20

21

22

23

24

25